**ORIGINAL**

Approved: _Jason Masimore / Rahul Mukhi / Tatiana Martins_
         JASON A. MASIMORE/RAHUL MUKHI/TATIANA R. MARTINS
         Assistant United States Attorneys

Before:    THE HONORABLE MICHAEL H. DOLINGER
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    - v. -

DEAN SKELOS, and
ADAM SKELOS,

           Defendants.

- - - - - - - - - - - - - - - x

**15 MAG 1492**

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 666, 1343,
1346, 1349, 1951, and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

    PAUL M. TAKLA, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

<u>COUNT ONE</u>

(Conspiracy to Commit Extortion Under Color of Official Right)

    1.    From at least in or about 2010, up to and including in or about April 2015, in the Southern District of New York and elsewhere, DEAN SKELOS and ADAM SKELOS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1951.

    2.    It was a part and an object of the conspiracy that DEAN SKELOS and ADAM SKELOS, the defendants, and others known and unknown, willfully and knowingly, would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951, to wit, DEAN SKELOS, ADAM SKELOS, and others known and unknown, would and did arrange for DEAN SKELOS to cause entities with business before New York State to direct payments to ADAM SKELOS with

the expectation that DEAN SKELOS would use his official position on their behalf.

(Title 18, United States Code, Section 1951.)

## COUNT TWO

(Conspiracy to Commit Honest Services Fraud)

3.     From at least in or about 2010, up to and including in or about April 2015, in the Southern District of New York and elsewhere, DEAN SKELOS and ADAM SKELOS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.

4.     It was a part and an object of the conspiracy that DEAN SKELOS and ADAM SKELOS, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to DEAN SKELOS's honest services as an elected legislator, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, DEAN SKELOS, while serving as Majority Leader and Co-Majority Coalition Leader of the New York State Senate, would and did take official action in return for payments to his son, ADAM SKELOS.

(Title 18, United States Code, Section 1349.)

## COUNT THREE

(Extortion Under Color of Official Right – Real Estate Developer)

5.     From at least in or about 2010, up to and including in or about April 2015, in the Southern District of New York and elsewhere, DEAN SKELOS and ADAM SKELOS, the defendants, willfully and knowingly, would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951, to wit, DEAN SKELOS, aided and abetted by ADAM SKELOS, used his official

position to cause a real estate developer with business before New York State to make and direct payments to ADAM SKELOS.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT FOUR

(Extortion Under Color of Official Right – The Environmental Technology Company)

6.     From at least in or about 2010, up to and including in or about April 2015, in the Southern District of New York and elsewhere, DEAN SKELOS and ADAM SKELOS, the defendants, willfully and knowingly, would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951, to wit, DEAN SKELOS, aided and abetted by ADAM SKELOS, used his official position to cause an environmental technology company with business before New York State to make payments to ADAM SKELOS.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT FIVE

(Solicitation of Bribes and Gratuities – Real Estate Developer)

7.     From at least in or about 2010, up to and including in or about April 2015, in the Southern District of New York and elsewhere, DEAN SKELOS, the defendant, being an agent of a State and local government, to wit, a Member of the New York State Senate, and defendant ADAM SKELOS, as an aider and abetter of DEAN SKELOS, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to wit, DEAN SKELOS, in his capacity as a Member of the New York State Senate, and ADAM SKELOS, as an aider and abetter, solicited and accepted cash and things of value from a real estate

developer with business before New York State intending for DEAN SKELOS to be influenced and rewarded.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT SIX

(Solicitation of Bribes and Gratuities – The Environmental Technology Company)

8. From at least in or about 2010, up to and including in or about April 2015, in the Southern District of New York and elsewhere, DEAN SKELOS, the defendant, being an agent of a State and local government, to wit, a Member of the New York State Senate, and defendant ADAM SKELOS, as an aider and abetter of DEAN SKELOS, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to wit, DEAN SKELOS, in his capacity as a Member of the New York State Senate, and ADAM SKELOS, as an aider and abetter, solicited and accepted cash and things of value from an environmental technology company with business before New York State intending for DEAN SKELOS to be influenced and rewarded.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

9. I am a Special Agent with the FBI, and I have been personally involved in the investigation of this matter, which has been handled jointly by Special Agents of the FBI and Criminal Investigators in the United States Attorney's Office for the Southern District of New York ("USAO"). I have been employed by the FBI for approximately 10 years and both I and other members of the investigative team have experience in fraud and political corruption investigations and techniques associated with such investigations, including wire interceptions, financial analysis, and working with informants.

10.     This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my examination of documents and reports by others, my review of recordings of meetings and calls, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

## OVERVIEW

11.     This case involves a scheme by defendant DEAN SKELOS, the New York State Senate Majority Leader, and his son, defendant ADAM SKELOS, to monetize DEAN SKELOS's official position by extorting money from others for ADAM SKELOS, with the expectation that such payments would influence the official actions of DEAN SKELOS. As part of this scheme, DEAN SKELOS and ADAM SKELOS pressured an individual cooperating with the Government identified herein as "CW-1," who is a senior executive of a major real estate development firm ("Developer-1"), to arrange for ADAM SKELOS to be paid hundreds of thousands of dollars in order to influence official actions by DEAN SKELOS. Developer-1 arranged these payments to ADAM SKELOS in response to a series of demands made to Developer-1 by DEAN SKELOS, including during time periods when Developer-1 was lobbying DEAN SKELOS concerning legislation that was crucial to its business success and during specific meetings when DEAN SKELOS discussed his efforts to secure legislation favorable to Developer-1.

12.     Beginning in or about late 2010, Developer-1 arranged for defendant ADAM SKELOS to receive (a) a one-time $20,000 payment disguised as a commission for title work that ADAM SKELOS did not perform, and (b) continuing payments of $4,000 per month from an environmental technology company (the "Environmental Technology Company") seeking to win government-funded contracts in New York State. In 2013, when Nassau County was considering awarding the Environmental Technology Company a multi-million-dollar contract, the defendants threatened to block the contract unless payments to ADAM SKELOS were substantially increased. In response to the threat, the Environmental Technology Company agreed to increase ADAM SKELOS's payments to $10,000 per month and received the assurance that if the Environmental Technology Company "took care" of ADAM SKELOS, DEAN SKELOS would "take care" of the Environmental Technology Company.

5

The Environmental Technology Company has paid a total of at least $198,000 to ADAM SKELOS through February 2015.

13. In obtaining these and other financial benefits, DEAN SKELOS and ADAM SKELOS, the defendants, made explicit and implicit representations that DEAN SKELOS would use his official position on behalf of the entities paying his son. At times, in order to ensure that the payments to ADAM SKELOS would continue, DEAN SKELOS took official actions to benefit Developer-1 and the Environmental Technology Company, including but not limited to:

    a. DEAN SKELOS promoted and voted for various real estate legislation sought by and favorable to Developer-1, including legislation concerning rent regulation and property tax abatements, and he rebuffed legislative initiatives put forth by interests adverse to Developer-1.

    b. DEAN SKELOS used his official position to facilitate the approval by Nassau County of a $12 million contract with the Environmental Technology Company, causing the Company to more than double its monthly payment to ADAM SKELOS.

    c. DEAN SKELOS pressured Nassau County officials (i) to obtain additional funding so that work on the contract could progress, and (ii) to make payments to the Environmental Technology Company so that the Company would continue making monthly payments to ADAM SKELOS.

    d. DEAN SKELOS assisted the Environmental Technology Company in its (ultimately unsuccessful) attempt to secure the issuance of hydrofracking regulations by the New York State Department of Health sought by the Environmental Technology Company.

    e. DEAN SKELOS attempted to secure changes to New York State's 2015-2016 budget to include additional funding for stormwater infrastructure projects and changes to New York State Law that would have permitted "design-build" contracts, both of which would have benefitted the Environmental Technology Company.

14. The defendants DEAN SKELOS and ADAM SKELOS used various methods to conceal their illegal scheme, including but not limited to the following:

    a. After DEAN SKELOS made an urgent request that Developer-1 give ADAM SKELOS a title insurance commission, CW-1 and

6

ADAM SKELOS disguised a $20,000 payment to ADAM SKELOS both to falsely make it appear that the payment was in return for work by ADAM SKELOS and so that it could not be traced back to Developer-1.

      b.    ADAM SKELOS did not register as a lobbyist as required under New York State law even though he lobbied New York State and county officials, including his father, on behalf of the Environmental Technology Company.

      c.    When discussing the scheme, DEAN SKELOS and ADAM SKELOS used coded language and, in the case of ADAM SKELOS, used a self-described "burner" phone, in an attempt to limit possible electronic surveillance by law enforcement.

      d.    DEAN SKELOS and ADAM SKELOS increased their acts of concealment, including by changing their behavior and the manner in which they communicated, following the federal criminal charges brought against the Speaker of the New York Assembly on January 22, 2015 and the subsequent public focus on corruption investigations.

## RELEVANT INDIVIDUALS AND ENTITIES

### *DEAN SKELOS*

15.    Since his election in 1984, DEAN SKELOS, the defendant, has represented a portion of Nassau County as a Member of the New York State Senate (the "Senate"), which, along with the Assembly, constitutes the New York State Legislature (the "Legislature"). Additionally, DEAN SKELOS has been Majority Leader and/or Co-Majority Coalition Leader of the Senate since at least in or about January 2011. On January 7, 2015, DEAN SKELOS was elected Majority Leader of the Senate for the 2015-2016 session. I know from publicly available federal and New York State government documents, public reports, and my training and experience that, in each year relevant to this Complaint, the governments of New York State and Nassau County received funds from the federal government in excess of $10,000 per year.

16.    I know from witness interviews and my review of publicly available sources that, pursuant to the Rules of the Senate and other provisions of State law and practice, the Majority Leader holds significant power. For example, the Majority Leader appoints the chairpersons of all Senate committees, determines who is listed as the sponsors of legislation, and controls if and when legislation is brought to the floor for vote. The Majority Leader, along with

the Speaker of the Assembly and the Governor, play the principal roles in negotiating the State budget and related legislation.

17.   In a call intercepted pursuant to a Court-authorized wiretap (AS#1066), defendant DEAN SKELOS described his substantial power as Majority Leader during the 2015-2016 session to defendant ADAM SKELOS as follows:  "I'm going to be President of the Senate, I'm going to be Majority Leader, I'm going to control everything, I'm going to control who gets on what committees, what legislation goes to the floor, what legislation comes through committees, the budget, everything."[1]

### ADAM SKELOS AND HIS BUSINESS INTERESTS

18.   I know from witness interviews, emails and financial records that defendant ADAM SKELOS, now 32, is the son of DEAN SKELOS, and has been dependent on his father for financial support during periods relevant to this Complaint.  In particular, from in or about 2010 through in or about 2014, DEAN SKELOS has given ADAM SKELOS more than $100,000.  When ADAM SKELOS sought a mortgage loan to purchase a property for $675,000 in early 2013, DEAN SKELOS gifted ADAM SKELOS $50,000 and promised him an additional $125,000 for a down payment.[2]

19.   Aside from direct financial support from his father, ADAM SKELOS has generated income as a commissioned salesman for various services marketed principally to businesses that made political contributions to DEAN SKELOS and/or had substantial interests before New York State and local governmental entities.  ADAM SKELOS, with the awareness and support of DEAN SKELOS, has relied heavily on his

---

[1]   Certain evidence referred to in the Complaint was obtained through Court-authorized wiretaps on cellular phones belonging to DEAN SKELOS and ADAM SKELOS.  Each intercepted call described herein is referred to by its "session number" when intercepted and the initials of the phone's user (AS or DS).  The descriptions and quotations of intercepted calls herein are based on my preliminary review of those conversations and/or draft transcripts of the calls.

[2]   Ultimately, it was not necessary for DEAN SKELOS to pay the additional $125,000 directly because ADAM SKELOS was able to collect the down payment through other sources, including through a title insurance commission of more than $100,000 he obtained through a Long Island-based real estate developer following a lunch meeting between the developer and ADAM SKELOS and DEAN SKELOS, as well the separate $20,000 payment arranged by Developer-1 described in detail below.

father and his father's official position to generate sales income, including by making implicit and explicit references to DEAN SKELOS's position and powers. For example, I know the following from emails and intercepted communications:

      a.    On January 28, 2011, ADAM SKELOS emailed a supervisor at the title insurance company then employing ADAM SKELOS stating that the president of a major commercial real estate developer based in New York, New York ("Developer-2") and ADAM SKELOS were "having lunch on [February] 10th and he wants to start giving me his work." DEAN SKELOS's Senate calendar reflects a lunch meeting with ADAM SKELOS and the president of Developer-2 at Developer-2's office on February 10, 2011. One month later, a managing director of Developer-2 emailed ADAM SKELOS asking him to produce a title report for a $250 million mortgage of the Chrysler Building complex in Manhattan, owned by Developer-2.

      b.    In or about August 2011, DEAN SKELOS and ADAM SKELOS attempted to secure title insurance work for the refinancing of hundreds of millions of dollars of bonds related to a large hospital system in Long Island, which required approval through the Nassau County Industrial Development Agency ("IDA"), a public benefit corporation regulated by the State Legislature. On or about August 9, 2011, ADAM SKELOS emailed one of his colleagues the following: "with my dad right now calling [] head of Nassau IDA. We're going to try to get half the deal." I know from documents that ADAM SKELOS subsequently became employed by a title company that performed the title insurance work for the transaction and received commissions for the deal.

      c.    DEAN SKELOS agreed to have official meetings with customers who purchased products through ADAM SKELOS. For example, on or about October 26, 2011, the owner of a grocery store emailed ADAM SKELOS about purchasing energy services through ADAM SKELOS. DEAN SKELOS's Senate calendar reflects that, less than a month later, on November 16, 2011, DEAN SKELOS went to the grocery store chain and met with its owner. That same day, the grocery store owner emailed DEAN SKELOS to thank DEAN SKELOS for the meeting and copied ADAM SKELOS. The next day, the grocery store owner emailed ADAM SKELOS a signed contract for purchasing gas and electricity through ADAM SKELOS.

      d.    ADAM SKELOS sought and obtained from his father's Senate Office records of top donors to DEAN SKELOS, so that ADAM SKELOS could attempt to sell products to these donors. For example, on December 19, 2011, DEAN SKELOS's Director of District Operations

emailed ADAM SKELOS a document containing a list of individuals who had contributed to DEAN SKELOS's campaign. ADAM SKELOS then forwarded the document to individuals at companies whose services ADAM SKELOS marketed on a commission basis.

     e.    DEAN SKELOS worked at a Long Island law firm (the "Law Firm") that steered title insurance work to ADAM SKELOS at the request of DEAN SKELOS, including at least one real estate transaction for more than $32.6 million.[3]

<em>DEVELOPER-1 &amp; "CW-1"</em>

    20.   I have learned from emails, financial records, publicly available information, and witness interviews, including interviews with CW-1, that:

     a.    Developer-1 is a large real estate development firm that, through various corporate affiliates, builds, owns, and manages residential rental properties across the New York City metropolitan area. Developer-1's business model depends in substantial part on favorable tax abatements and rent regulations that must be periodically renewed by the New York State Legislature. Accordingly, Developer-1 is one of the largest contributors to candidates for State office and political action committees controlled by leaders of the Legislature, including DEAN SKELOS.

     b.    CW-1 has been employed by Developer-1 as a senior executive since in or about 2001. Among other responsibilities, CW-1 is involved in managing Developer-1's political operations, including Developer-1's political relationship with DEAN SKELOS. In this role, as reflected in emails, DEAN SKELOS has directed CW-1 to make hundreds of thousands of dollars in campaign contributions through various limited liability companies, or "LLCs," controlled by Developer-1. CW-1 has been cooperating with the Government's investigation since in or about April 2015.

---

[3]    DEAN SKELOS has worked for the Law Firm since in or about 1994, and has been paid more than $2.6 million over that time. Based on evidence gathered during the ongoing investigation, it appears that DEAN SKELOS did not perform any actual legal work for the Law Firm, but instead was paid largely for referring clients to the firm (including companies with business before the State) and meeting with Law Firm clients, including about legislative matters.

21.   The Environmental Technology Company is based in Arizona and owned by a holding company (the "Holding Company"), which has been publicly traded since at least in or about January 2013.   The Environmental Technology Company's principal proprietary technology has been a water filter that it sells in various states including New York that purports to remove various microbial pollutants from water, which can be affixed to storm drains and pipes and can be used to treat polluted stormwater run-off, as well as water contaminated by hydrofracking.

22.   A second individual who has been cooperating with the Government's investigation since in or about February 2015, referred to herein as "CW-2," worked as a senior executive at the Environmental Technology Company and one of its affiliates between in or about 2010 and in or about April 2015.[4]   The CEO of the Environmental Technology Company and the Holding Company ("CEO") instructed CW-2 that CW-2's duties and responsibilities included the management of the Environmental Technology Company's relationship with ADAM SKELOS, the defendant.

**THE SCHEME**

*DEAN SKELOS's Plan and Efforts to Provide ADAM SKELOS Income Through His Official Position*

23.   The scheme involving Developer-1 and the Environmental Technology Company grew out of longstanding efforts by DEAN SKELOS and ADAM SKELOS, the defendants, to obtain income for ADAM SKELOS from businesses that made political contributions to DEAN SKELOS and/or had substantial legislative interests before the State.  Based on interviews with CW-1 and other witnesses, as well as my review of emails and phone records, among other things, I have learned that over the course of two years, from late 2010 through 2012, defendant DEAN SKELOS persistently pressured CW-1 and others associated with

---

[4]    CW-1 and CW-2 have entered into non-prosecution agreements with the Government, which, among other things, require their continued cooperation, including by providing truthful information and testimony.   Information attributed to CW-1 and CW-2 reflected in the Complaint has proven reliable and has been corroborated by other information gathered during the investigation, including documents, emails, consensual recordings, and intercepted communications pursuant to Court-authorized wiretaps.

Developer-1 to direct commissions to ADAM SKELOS and that, as a result, Developer-1 arranged for ADAM SKELOS to receive almost $200,000 from the Environmental Technology Company in which the Developer-1 founding family was a significant shareholder, as well as another $20,000 disguised as a payment from a title insurance company. CW-1 has stated that CW-1 felt pressured to comply with DEAN SKELOS's requests in large part due to DEAN SKELOS's position as Senate Majority Leader and the fact that Developer-1 had critical legislative interests continually pending before the New York State Senate. Among other things, CW-1 knew from his conversations with DEAN SKELOS that DEAN SKELOS, using explicit language, stated that he would punish members of the real estate industry who DEAN SKELOS felt had not adequately supported him.

## DEAN SKELOS and ADAM SKELOS Solicit Developer-1 for Payments to ADAM SKELOS

24. In November 2010, the New York State Republicans were elected to a majority in the State Senate, and DEAN SKELOS was elected Majority Leader for the session beginning in January 2011. Beginning in or around late 2010, Developer-1 was actively lobbying and obtaining support from DEAN SKELOS for real estate legislation critical to Developer-1's business, including rent regulation laws, which was set to be reviewed by the Legislature in June 2011. I know from interviews of individuals, including CW-1 and a lobbyist for Developer-1 (the "Developer-1 Lobbyist"), and from reviewing emails, DEAN SKELOS's Senate calendar, and other documents, that DEAN SKELOS, throughout this period, repeatedly met with and asked CW-1 and other representatives of Developer-1 to direct commissions to ADAM SKELOS, the defendant, including during meetings when Developer-1 was lobbying DEAN SKELOS with respect to real estate legislation. For example:

a. On or about December 20, 2010, DEAN SKELOS met with the founder of Developer-1 (the "Developer-1 Founder"), CW-1, and the Developer-1 Lobbyist to thank Developer-1 for supporting the Senate Republicans during the November 2010 election. During the meeting, DEAN SKELOS discussed the fact that he would be working with Developer-1 to negotiate the legislation renewals during the upcoming session. Both during this meeting and while walking out of the meeting, DEAN SKELOS directly asked the Developer-1 Founder and CW-1 to send Developer-1's title insurance commissions to ADAM SKELOS.

b. Following DEAN SKELOS's request, on or about February 17, 2011, CW-1 and the Developer-1 Lobbyist met with ADAM SKELOS at CW-1's apartment building in New York, New York, to discuss

12

Developer-1 sending ADAM SKELOS title insurance commissions and other business, as DEAN SKELOS had requested.

c. On or about March 18, 2011, CW-1 and the Developer-1 Founder attended a real estate industry group meeting with DEAN SKELOS in New York, New York. During the meeting, members of the real estate industry group and DEAN SKELOS discussed the upcoming review of rent regulation and real estate tax benefits important to Developer-1 and the industry. After that meeting, DEAN SKELOS thanked CW-1 for meeting with ADAM SKELOS and renewed his request that Developer-1 direct business to ADAM SKELOS.

d. On or about May 5, 2011, DEAN SKELOS met with CW-1 and the Developer-1 Lobbyist at CW-1's apartment building. During this meeting, the Developer-1 Lobbyist explained to DEAN SKELOS Developer-1's views about the real estate laws that were up for renewal in the Legislature. At this meeting set up for the purpose of discussing legislation affecting Developer-1, DEAN SKELOS again thanked CW-1 for meeting with ADAM SKELOS and reiterated his request that Developer-1 give ADAM SKELOS business because ADAM SKELOS was purportedly suffering financially.[5]

e. In or around this time, CW-1 decided to arrange for ADAM SKELOS to be hired by the Environmental Technology Company, in which Developer-1's founding family and CW-1 had financial investments and, as a result, substantial influence. CW-1 believed that having the Environmental Technology Company hire ADAM SKELOS would be a way to comply with DEAN SKELOS's repeated requests that Developer-1 give commissions to ADAM SKELOS without having the payments come directly from Developer-1. CW-1 spoke to ADAM SKELOS about the plan to have the Environmental Technology Company hire him and ADAM SKELOS stated that he would speak to DEAN SKELOS to make sure that DEAN SKELOS approved. ADAM SKELOS later told CW-1 that DEAN SKELOS approved of CW-1's proposal to have the Environmental Technology Company hire ADAM SKELOS.

25. In response to defendant DEAN SKELOS's sustained requests described above, Developer-1 sought opportunities to provide money to defendant ADAM SKELOS in order influence the official actions of DEAN SKELOS. Based on my debriefings with CW-1, I know that neither

---

[5] Notwithstanding DEAN SKELOS's statements to CW-1, financial records reflect that in 2010 ADAM SKELOS earned more than $133,000 from two employers, and in 2011 ADAM SKELOS earned more than $193,000 from three employers.

CW-1 nor the Developer-1 Founder wanted the payments to ADAM SKELOS to come from Developer-1 directly. Accordingly, as described below, CW-1, acting on behalf of Developer-1, and in coordination with DEAN SKELOS, successfully arranged for payments to ADAM SKELOS from at least two sources: (1) approximately $200,000 (plus the potential for millions of dollars in performance-based commissions) as a government relations consultant for the Environmental Technology Company, and (2) $20,000 disguised by Developer-1 as a purported commission payment from a title insurance company ("Title Company-1"). As further described below, the purpose of these payments was to reward DEAN SKELOS and to obtain official actions from him for the benefit of both Developer-1 and the Environmental Technology Company, in which Developer-1's founding family had an ownership interest.

CW-1 Puts ADAM SKELOS in Contact with the Environmental Technology Company

26. I know from witness interviews and testimony, from emails, and from my participation in this investigation, that CW-1 agreed to arrange for payments to defendant ADAM SKELOS from the Environmental Technology Company in response to the requests by defendant DEAN SKELOS set forth above as well as later requests that DEAN SKELOS repeated to CW-1. Specifically, I have learned the following:

a. In or about July 2012, ADAM SKELOS had lunch with CW-1 and requested that CW-1 continue to seek compensation for ADAM SKELOS through the Environmental Technology Company.

b. Following that lunch meeting, in or about July 2012, CW-1 told the CEO that the Environmental Technology Company should hire ADAM SKELOS to obtain business in New York State. CW-1 believed that ADAM SKELOS would be able to use the influence of DEAN SKELOS to obtain business from New York municipalities for the Environmental Technology Company. In promoting ADAM SKELOS's services to the CEO, CW-1 emailed the CEO that there "is great potential for [ADAM SKELOS] to exploit his father's contacts statewide," and later CW-1 added "[j]ust to remind you, [ADAM SKELOS's] contacts are very, very high level. His dad is Dean Skelos, NYS Senate majority leader."

c. Following these entreaties, the CEO asked CW-2, who was then serving as the Environmental Technology Company's Executive Vice President for Business Development, to meet with ADAM SKELOS, and the two met in August 2012 at a hotel in New York, New York. During the meeting, CW-2 and ADAM SKELOS discussed ADAM SKELOS's ability

14

to promote the Environmental Technology Company in New York State. ADAM SKELOS later told CW-2 (during a conversation CW-2 recorded at the direction of the FBI in February 2015 at a meeting in New York, New York) that it was CW-1 who had gotten ADAM SKELOS "involved" with the Environmental Technology Company, even though, as ADAM SKELOS described it, he "literally knew nothing about water or, you know, any of that stuff."[6] ADAM SKELOS also told CW-2 that CW-1 had gone through his father, DEAN SKELOS, before introducing ADAM SKELOS to the Environmental Technology Company.

27. Following defendant ADAM SKELOS's meeting with CW-2, CW-1 began negotiating the terms of a consulting agreement for ADAM SKELOS with the Environmental Technology Company. CW-1 did so because of the pressure from DEAN SKELOS, the defendant, to obtain a significant amount money for ADAM SKELOS. DEAN SKELOS remained informed and engaged throughout ADAM SKELOS's negotiation with the Environmental Technology Company over the terms of the consulting agreement it ultimately entered into with ADAM SKELOS in November 2012 (the "Consulting Agreement"). ADAM SKELOS and DEAN SKELOS made clear during this period that ADAM SKELOS would be able to access his father if hired by the company. For example, I know the following from, among other things, emails and interviews of CW-1 and CW-2:

a. In or about August and September 2012, ADAM SKELOS sent several drafts of the Consulting Agreement to DEAN SKELOS. Once it was signed, ADAM SKELOS also sent DEAN SKELOS the terms of the finalized Consulting Agreement.

b. DEAN SKELOS emailed articles about the Environmental Technology Company's business to ADAM SKELOS, which ADAM SKELOS in turn passed on (with the email chains making clear it had come from DEAN SKELOS) to the CEO, CW-2, and others. For example, on September 2, 2012, DEAN SKELOS forwarded ADAM SKELOS a news story about a sewage leak near Albany, which ADAM SKELOS forwarded (including the header information indicating that his father had sent him the email) to CW-1, the CEO, and CW-2 stating, "Read below . . . looking forward to getting started." CW-1 replied to all, "Let's get him to work!"

---

[6]    CW-2 was approached on February 5, 2015 and agreed to cooperate with the investigation shortly thereafter. Since on or about February 9, 2015, CW-2 has been acting at the direction of Government agents and recording telephone calls and in-person meetings at the request of the Government.

c.  Early on in his discussions with the Environmental Technology Company, ADAM SKELOS informed CW-2 that he had the ability to shape New York State legislation.  The Environmental Technology Company was focused on bidding for "design-build" stormwater projects,[7] and in or about late August 2012, ADAM SKELOS offered to CW-2 to obtain his father's assistance in procuring the extension of temporary State legislation authorizing design-build contracts. ADAM SKELOS asked DEAN SKELOS about the legislation, and DEAN SKELOS informed ADAM SKELOS by email that he would instruct his Chief of Staff (the "Chief of Staff") to look into the issue.  Likewise on another occasion, CW-1 and ADAM SKELOS exchanged emails about the potential for DEAN SKELOS to assist in helping the Environmental Technology Company in New Jersey through DEAN SKELOS's strong relationship "with some of the higher ups in the [New Jersey Governor] administration."

d.  While contract negotiations with ADAM SKELOS were ongoing, DEAN SKELOS spoke directly to CW-2 to advise the Environmental Technology Company on its strategy for obtaining New York government-funded contracts.  Specifically, in early November 2012, shortly after Superstorm Sandy devastated the Long Island region, CW-2 emailed ADAM SKELOS about the Environmental Technology Company potentially contracting with Nassau and Suffolk Counties relating to flood mitigation projects.  ADAM SKELOS forwarded the email chain to DEAN SKELOS, asking "What should I do?"  Minutes later, ADAM SKELOS arranged a three-way call between DEAN SKELOS, CW-2, and ADAM SKELOS (reflected in telephone records that I have reviewed), during which DEAN SKELOS demonstrated a familiarity with the business plans of the Environmental Technology Company.  DEAN SKELOS advised CW-2 that the Environmental Technology Company's focus should be on obtaining contracts with counties, which were expected to distribute flood recovery and mitigation funding.  This demonstrated to CW-2 that ADAM SKELOS would use his access to DEAN SKELOS on behalf of the Environmental Technology Company if hired.

28.  While contract negotiations continued, CW-1, acting with the intent to influence defendant DEAN SKELOS and based on CW-1's fear that DEAN SKELOS would take officials actions against Developer-1's interests unless DEAN SKELOS was satisfied that CW-1

---

[7]  In sum and substance, a design-build project is one in which the design and construction services are bid out to and contracted with a single entity, which has sole responsibility for designing and building the project.

secured sufficient compensation for defendant ADAM SKELOS, pushed aggressively for greater compensation to ADAM SKELOS. For example, on September 6, 2012, CW-1 emailed the CEO to reject the Company's offer, writing, in part, "If this agreement isn't changed to reflect a straight 2 year sales contract paying Adam a hefty percentage commission payable in stock and cash then I will be forced to tell him this arrangement is not for him. I will not put [Developer-1]'s relationship with him in jeopardy over this."[8]

DEAN SKELOS and ADAM SKELOS Solicit a Separate $20,000 Payment from Developer-1 to ADAM SKELOS, Disguised as a Title Insurance Commission, While the Consulting Agreement Is Still Being Negotiated

29. At the same time that CW-1 was negotiating the Consulting Agreement on behalf of defendant ADAM SKELOS, CW-1 and defendant DEAN SKELOS arranged for Developer-1 to pay ADAM SKELOS $20,000. The payment from Developer-1 was disguised as a "referral" commission from Title Company-1, which was dependent on Developer-1 for business, even though ADAM SKELOS did not refer or provide any title insurance work to Developer-1 or Title Company-1 in return for the $20,000. In particular, I know the following from documents, telephone records, and witness interviews:

a. As reflected on his Senate calendar, DEAN SKELOS spoke at a real estate industry meeting in New York, New York on September 19, 2012, which was attended by the Developer-1 Founder, CW-1, and others. According to CW-1, at this meeting, DEAN SKELOS repeated his request to CW-1 that Developer-1 direct commissions to ADAM SKELOS. DEAN SKELOS stated that he was concerned that ADAM SKELOS needed to make more money. In a particularly urgent manner, DEAN SKELOS requested that Developer-1 direct title insurance commissions to ADAM SKELOS because the "other thing" would take too long, which CW-1 understood to mean that DEAN SKELOS wanted a more immediate business

---

[8]     At the same time that CW-1 was negotiating on behalf of ADAM SKELOS for greater compensation, DEAN SKELOS was soliciting substantial campaign contributions from Developer-1 to DEAN SKELOS and officials and political entities selected by DEAN SKELOS. For example, on the same day CW-1 sent the email above, CW-1 and the Developer-1 Lobbyist exchanged emails about a call from DEAN SKELOS to send overnight checks to the Erie County Republican Committee, over which the Developer-1 Lobbyist believed that DEAN SKELOS had significant control. Public records show that Developer-1 sent five checks, totaling $100,000, dated September 7, 2012, using five different LLCs contributing $20,000 each.

opportunity for ADAM SKELOS because DEAN SKELOS believed that the negotiations with the Environmental Technology Company were taking too long. After this meeting, CW-1 was also contacted by the Developer-1 Lobbyist, who reiterated DEAN SKELOS's request.

b.    In response to DEAN SKELOS's requests, on September 25, 2012, CW-1 emailed ADAM SKELOS asking, "[W]ho do you sell title insurance for?" Later that day, ADAM SKELOS emailed CW-1, stating, "If you have a title for me . . . I could really use the work if you have anything for me, it's been a real slow year in the title world." ADAM SKELOS then forwarded DEAN SKELOS his email to CW-1, stating, "FYI . . . This is what I sent to [CW-1] and I still haven't heard anything back from him." Telephone records indicate that DEAN SKELOS was in contact with the cellphone of the Developer-1 Lobbyist, and three minutes after speaking with the Developer-1 Lobbyist, DEAN SKELOS replied to ADAM SKELOS's email, "Following up, be patient." According to telephone records, later that same day the Developer-1 Lobbyist spoke to CW-1, who then called Title Company-1. The Developer-1 Lobbyist then called DEAN SKELOS, and shortly after their call, DEAN SKELOS spoke to ADAM SKELOS. Around this period, CW-1 recalls receiving multiple phone calls related to DEAN SKELOS's request for Developer-1 to give title commissions to ADAM SKELOS.

c.    I know from interviews of two executives of Title Company-1 ("Title Executive-1" and "Title Executive-2") that around this same time CW-1 called Title Executive-1 and stated, in substance, that CW-1 needed to find money for ADAM SKELOS. CW-1 also told Title Executive-1 that the payment to ADAM SKELOS could not be traceable to Developer-1, which Title Executive-1 understood was due to the fact that ADAM SKELOS's father was the Senate Majority Leader.

d.    Title Executive-1 understood that the payment to ADAM SKELOS needed to appear to be connected to an actual transaction, not involving Developer-1, in order to make the payment appear to be legitimate. Accordingly, Title Executive-1 and Title Executive-2 identified a real estate transaction for which Title Company-1 was already receiving a commission, and decided that they could arrange for ADAM SKELOS to receive $20,000, which was approximately 10% of Title Company-1's anticipated commission. Title Executive-1 and Title Executive-2 understood from CW-1 that ADAM SKELOS would not refer any business nor perform any work for Title Company-1 or Developer-1 in exchange for the $20,000. CW-1 told executives from Title Company-1 that CW-1 would reimburse Title Company-1 for agreeing to divert the $20,000 to ADAM SKELOS.

18

e. On October 9, 2012, CW-1 emailed ADAM SKELOS, stating, "I can do a 20,000 referral on the title. That okay?" ADAM SKELOS replied, "Absolutely, that's great. Going through [Title Executive-1]?" CW-1 responded, "Yes."

f. On October 20, 2012, another individual associated with Developer-1 emailed CW-1, Title Executive-1, and Title Executive-2 to inquire about the $20,000 payment to ADAM SKELOS. CW-1 replied, "Not for emails." According to CW-1, this statement expressed CW-1's concern about documenting Developer-1's involvement in arranging the $20,000 payment to ADAM SKELOS at DEAN SKELOS's request.

g. The real estate transaction that CW-1 and Title Company-1 used to disguise the $20,000 payment to ADAM SKELOS was completed in or about February 2013. On February 18, 2013, Title Executive-1 met in person with ADAM SKELOS and handed him a $20,000 check from Title Company-1. ADAM SKELOS did not refer any business or perform any work for Title Company-1 or Developer-1 in connection with this $20,000 payment, which was arranged by CW-1 as a result of the repeated requests by DEAN SKELOS.

<u>ADAM SKELOS Obtains More Money by Threatening to Have DEAN SKELOS and ADAM SKELOS Block the Environmental Technology Company's Bid for a Nassau County Project</u>

30. I know from emails that in late November 2012, ADAM SKELOS, the defendant, and the Environmental Technology Company executed the Consulting Agreement. I know from reviewing the Agreement that, in part, it provides that the Environmental Technology Company would begin paying ADAM SKELOS a base monthly fee of $4,000 upon its execution, which would increase to $5,000 per month after the Environmental Technology Company received a payment on its first contract obtained by ADAM SKELOS and $10,000 per month after payment on its sixth contract obtained by ADAM SKELOS. The Consulting Agreement also provided for an incentive payment to ADAM SKELOS of one percent of gross revenue received on the contracts, as well as stock option awards and a one-time $10,000 bonus if the first contract exceeded $1 million. On November 27, 2012, ADAM SKELOS forwarded the final Consulting Agreement to DEAN SKELOS, the defendant, who replied, "Mazel Tov."

31. Later, notwithstanding the payment levels set by the Consulting Agreement, CW-1, acting on behalf of defendants DEAN SKELOS and ADAM SKELOS, successfully pressured the Environmental Technology Company to increase its payment to ADAM SKELOS by 150% by threatening

to have DEAN SKELOS and ADAM SKELOS block the Environmental Technology Company's ability to obtain a valuable contract with Nassau County. Specifically, I have learned from emails, witnesses and other sources the following:

a. In April 2013, after the Environmental Technology Company had submitted a bid for a multi-million-dollar stormwater project to Nassau County, but before Nassau County officials awarded the bid to the Environmental Technology Company, ADAM SKELOS called CW-1 and told CW-1, in sum and substance, that DEAN SKELOS believed that ADAM SKELOS's compensation from the Environmental Technology Company should be increased and that, if it was not, DEAN SKELOS and ADAM SKELOS would make efforts to ensure that Nassau County did not approve the Environmental Technology Company's bid.

b. Following these conversations with ADAM SKELOS, CW-1 sent an email with the subject "Adam" to the CEO with the following message:

> I'm told he's about 45 days away from producing the legislation and the RFP to do up to [a] ten million project with you. He's hesitant (and his dad called) to do it with the engineer's [sic] making more money than him. If he doesn't get like a 4% commission I think they don't think it's worth pushing through.

CW-1 also orally reiterated to the CEO the substance of ADAM SKELOS's statements about the efforts that ADAM SKELOS and DEAN SKELOS would take to subvert the Environmental Technology Company's bid with Nassau County unless ADAM SKELOS's compensation was increased to a level approved by ADAM SKELOS and DEAN SKELOS.

c. The CEO forwarded CW-1's email to CW-2, who replied, in part, "I can't believe he's going to try to hold us hostage to renegotiate the contract. The engineers are getting paid for labor hours to do real work (I think around ~5500 man hours). Unreal." I know from speaking to CW-2 that CW-2 understood the communication from CW-1 to be a threat that DEAN SKELOS and ADAM SKELOS would block the contract with Nassau County unless the Environmental Technology Company increased ADAM SKELOS's compensation.

d. Following the email from CW-1, the CEO told CW-2 that the CEO believed, based on his communications with CW-1, that if the Environmental Technology Company "took care of" ADAM SKELOS, then DEAN SKELOS would "take care of" the Environmental Technology Company.

Thereafter, the CEO and the Environmental Technology Company agreed to increase the Company's payments to ADAM SKELOS to $10,000 per month once the Nassau County contract was approved by the Nassau County Legislature, even though under the terms of ADAM SKELOS's Consulting Agreement he was not entitled to an increase of his monthly payment to this amount until he obtained six contracts for the Company, an event that still has not occurred as of the date of this Complaint.

### Actions Taken by DEAN SKELOS in Return for Payments to ADAM SKELOS And To Ensure The Payments Continued

32. In return for payments to defendant ADAM SKELOS described above, defendant DEAN SKELOS used his official position to benefit Developer-1 and the Environmental Technology Company, and to ensure that payments to ADAM SKELOS would not be discontinued. Among other things, DEAN SKELOS used his official position to: (i) introduce and vote on real estate legislation sought by Developer-1 and critical to its success; (ii) assist the Environmental Technology Company in obtaining a $12 million contract with Nassau County; (iii) pressure Nassau County officials to find sources of funding for the contract and to make payments to the Company for work performed under the contract; (iv) assist the Environmental Technology Company in attempting to obtain favorable Department of Health regulations concerning hydrofracking wastewater in the event hydrofracking was permitted in New York; (v) pursue budget legislation to increase State funding available for stormwater mitigation projects of the type pursued by the Environmental Technology Company; and (vi) advocate for legislation sought by the Environmental Technology Company permitting municipalities to enter into and fund "design-build" contracts for stormwater and other projects.

### Actions by DEAN SKELOS to Benefit Developer-1

33. Based on my review of public information and statements from witnesses, including lobbyists for Developer-1, I know that during the same time frame when Developer-1 arranged for payments to ADAM SKELOS, the defendant, Developer-1 had significant interests before the New York State Legislature. I also know that during this period DEAN SKELOS, the defendant, took official positions that were favorable to Developer-1, including with respect to legislation on which Developer-1 was lobbying the Legislature. For example:

a. The Developer-1 Lobbyist and CW-1 personally lobbied DEAN SKELOS in connection with Senate Bill S5856-2011, the "Rent Act of 2011," which was introduced by DEAN SKELOS and which, in part, addressed rent regulation in New York City and sought to extend until

21

June 23, 2015 the "421-a Program," under which substantial real estate tax abatements are provided for certain new residential real estate developments. This tax abatement extension and rent regulation legislation was crucial to the financial success of Developer-1. Records reflect that CW-1 and Developer-1 met with DEAN SKELOS on June 3, 2011 to lobby on this bill, less than one month after CW-1 had emailed that ADAM SKELOS was meeting DEAN SKELOS to "talk about the opportunity and get the blessing" with respect to a position with the Environmental Technology Company. On or about June 24, 2011, DEAN SKELOS voted in favor of the bill. The Governor signed the bill into law the same day.

b.    Developer-1 lobbied the Senate in connection with Senate Bill S6472-2011, which, in part, sought to expand the circumstances in which landlords like Developer-1 could increase rents on rent-controlled apartments. On or about June 5, 2012, DEAN SKELOS voted in favor of the bill.

c.    Developer-1 lobbied the Senate in connection with Senate Bill S2320-2013, which, in part, sought to exempt from taxation alterations and improvements to existing multiple dwellings and to provide incentives for the construction of new developments through extension of the 421-a Program. On or about January 23, 2013, DEAN SKELOS voted in favor of the bill. The Governor signed the bill into law on or about January 30, 2013.

d.    Developer-1 lobbied the Senate in connection with Senate Bill S5247-2013, which, in part, sought to continue and make retroactive changes to the 421-a Program. On or about June 21, 2013, DEAN SKELOS voted in favor of the Bill.

34.    CW-1 has stated that CW-1 arranged for payments to ADAM SKELOS, the defendant, at the request of DEAN SKELOS, the defendant, because CW-1 was aware that DEAN SKELOS had substantial control over real estate legislation critical to Developer-1 and because CW-1 was concerned that DEAN SKELOS could take action adverse to Developer-1 if Developer-1 failed to secure compensation for ADAM SKELOS.

Actions by DEAN SKELOS to Assist the Environmental Technology Company in Obtaining a $12 Million Contract with Nassau County

35.    I know from interviews of multiple Nassau County officials and other sources that defendant DEAN SKELOS has power and substantial influence over County governance. For example, Nassau County is dependent in large part on the New York State Legislature with respect to the funding of County operations and services. DEAN SKELOS is the

highest-ranking New York State elected official in Nassau County, and the County is dependent on DEAN SKELOS to advocate for and obtain sufficient State funding for the County's operations and services. Nassau County officials have stated that they address requests from DEAN SKELOS with urgency in light of DEAN SKELOS's substantial official influence over County affairs.

36. I know from my review of documents and interviews of CW-2 and other witnesses that ADAM SKELOS and DEAN SKELOS, the defendants, arranged for DEAN SKELOS to take various actions in his official capacity to assist the Environmental Technology Company in obtaining a $12 million contract with Nassau County, for example:

a. In or about early November 2012, DEAN SKELOS advised the Environmental Technology Company to submit contract proposals to the two counties on Long Island. The day after this call, DEAN SKELOS's Director of District Operations emailed ADAM SKELOS and told him to call the Commissioner of the Nassau County Department of Public Works ("DPW"). ADAM SKELOS replied, "Any word on Suffolk?" The Director responded, "One step at a time. Haha. Your dad prob needs to make a call." ADAM SKELOS replied, "Gottya . . . Thanks."

b. Following DEAN SKELOS's suggestion, the Environmental Technology Company submitted an "Unsolicited Conceptual Proposal" to Nassau County for a contract to design, build, and operate end-of-pipe and antimicrobial water filtration solutions with respect to stormwater in Nassau County. About five days later, ADAM SKELOS informed CW-1 and CW-2 that Nassau County was going to issue a Request for Proposal related to the stormwater project (the "RFP").

c. In or about late 2012 and early 2013, the CEO became impatient with how long it was taking for Nassau County to issue the promised RFP, and asked CW-2 to contact ADAM SKELOS to request that DEAN SKELOS expedite Nassau County's issuance of the RFP. Accordingly, CW-2 asked ADAM SKELOS whether DEAN SKELOS could speak to the Nassau County Executive about having the County act more quickly. Nassau County then issued the RFP in or about February 2013.

d. On or about April 3, 2013, ADAM SKELOS personally delivered the Environmental Technology Company proposal in response to the Nassau County RFP. After CW-2 asked whether ADAM SKELOS could try to find out which other companies had asked for the RFP "so we can guess at competition," ADAM SKELOS responded "I will but no competition," which CW-2 understood to mean that ADAM SKELOS already knew that the Environmental Technology Company would win the contract.

e.    On various occasions during the spring of 2013, while awaiting Nassau County's approval of the Environmental Technology Company's bid, ADAM SKELOS and DEAN SKELOS planned to make and did make calls to various Nassau County officials to push the County to enter into a contract with the Environmental Technology Company.  For example, when ADAM SKELOS did not hear back from the Nassau County Commissioner of the DPW, ADAM SKELOS emailed CW-2 that he would have DEAN SKELOS call the Nassau County Executive unless he heard soon.

f.    On or about May 28, 2013, two days before the DPW selected the Environmental Technology Company's bid, emails and phone records show that ADAM SKELOS was in contact with the Nassau County Attorney (the "Nassau County Attorney") to obtain documentation for the Environmental Technology Company to show its investors that Nassau County had already chosen it for the project, and minutes earlier DEAN SKELOS himself was also in phone contact with the Nassau County Attorney for approximately four minutes.

g.    On May 30, 2013, two days after DEAN SKELOS and ADAM SKELOS's contacts with the Nassau County Attorney, the Commissioner of the DPW issued an approval to award the Nassau County contract to the Environmental Technology Company, but the contract could not be executed by the Nassau County Executive until it received several layers of additional approvals.

h.    On July 1, 2013, the Rules Committee of the Nassau County Legislature passed a resolution approving the Nassau County contract with the Environmental Technology Company, an action which CW-1 previously had emailed the CEO that DEAN SKELOS and ADAM SKELOS would not "push through" unless the Environmental Technology Company increased payments to ADAM SKELOS.  After the Nassau County Legislature Rules Committee approved the contract, the Environmental Technology Company increased ADAM SKELOS's monthly payments to $10,000.  On July 2, 2013, the Environmental Technology Company issued a press release announcing that it had been awarded the contract.

i.    Before the Nassau County Executive could execute the Nassau County contract, approval was required from the Nassau Interim Finance Authority, or "NIFA", which is a public benefit corporation of New York State (one of whose members is appointed by DEAN SKELOS) with the power to monitor and oversee Nassau County's finances. Delays in obtaining approval for the contract were a source of concern for the CEO, who wished to make a positive announcement to investors about the likelihood of executing a contract with Nassau County.

Based on my interviews with Nassau County officials, I know that, during this time period, DEAN SKELOS and ADAM SKELOS made inquiries with Nassau County officials as to the status of NIFA's approval of the contract. In response to such inquiries, Nassau County officials obtained an advisory opinion from NIFA concerning whether the contract would be approved.

j. On or about August 12, 2013, CW-2 asked ADAM SKELOS to obtain a letter from Nassau County giving notice of the status of the contract for use in connection with the following day's scheduled investor call (the "Status Letter"). ADAM SKELOS forwarded CW-2's request to DEAN SKELOS's wife, who replied, "What do u want me to do with this!" ADAM SKELOS replied "Show you know who."

k. ADAM SKELOS then forwarded CW-2's email to DEAN SKELOS's Director of District Operations. Approximately four hours later, the general counsel of NIFA emailed the Chief Deputy Executive of Nassau County, stating, "As requested, I have taken my Board's temperature regarding this contract." The general counsel went on to state that, although there were no "major concerns" with the contract, "[p]lease note that this accommodation was made because of your representation that time was of the essence. In the future, we will continue our analysis of contracts in the normal course pursuant to our prescribed procedures." The NIFA general counsel's email was then forwarded to CW-1 and the CEO.

37. In October 2013, NIFA approved the Nassau County contract and the Nassau County Executive signed it on October 8, 2013.

38. From my review of public information, I know that the Environmental Technology Company publicly touted its contract with Nassau County and the expected revenues under the contract with its investors. For example, in the Environmental Technology Company's 2013 annual report filed with the U.S. Securities & Exchange Commission, the Company highlighted the Nassau County contract prominently in the "Revenue" section and stated, among other things, that "the Nassau County project is viewed internally by [the Company] as a highly significant initial project under contract in the municipal stormwater programs/infrastructure market sector." The CEO has also repeatedly highlighted the Nassau County contract and its progress in earnings calls with the Company's investors, including as recently as an investor call on April 1, 2015.

Actions Taken by DEAN SKELOS to Help Obtain Additional Funding for
the Contract and Payments from Nassau County for the Environmental
Technology Company

39.  Following the execution of the Nassau County contract, the
Environmental Technology Company began encountering difficulties in
obtaining payments to perform work under the Nassau County contract.
The difficulties included: (i) Nassau County declined to proceed
beyond the preliminary tasks anticipated by the contract because there
was no State approval for counties or municipalities to enter into
design-build contracts for public works projects;[9] (ii) the County
was slow to release funds for payment related to the preliminary tasks
that could be completed even prior to State approval of design-build
projects; and (iii) there were insufficient County funds to make
payments under the Contract, and the County therefore needed
additional County, State and/or federal funds to fully implement the
Contract.  As described below, ADAM SKELOS and DEAN SKELOS, the
defendants, used the official position of DEAN SKELOS in an effort
to address these issues in a sufficient manner so that payments to
ADAM SKELOS would continue.

40.  I know from interviews with Nassau County officials and
my review of Nassau County records that, on numerous occasions
following the execution of the Contract, defendant DEAN SKELOS
contacted senior Nassau County executives about the limited progress
under the Contract.  In response to DEAN SKELOS's questions about how
the Nassau County Executive intended to find more funding for the
Contract, the Nassau County Executive directed other Nassau County
officials to look into DEAN SKELOS's requests.  Nassau County
officials also explained to DEAN SKELOS that, for the Contract to
proceed beyond the initially earmarked amount of approximately
$331,000 to fund the project, the State needed to pass legislation
approving municipal design-build contracts.

41.  I also know from interviews with Nassau County officials
and my review of Nassau County records that, on multiple occasions,
DEAN SKELOS, the defendant, contacted the County and expressed
impatience regarding the speed with which the County was issuing
payments to the Environmental Technology Company.  During these

---

[9]    Paragraph 2(a) of the contract provides that "The County is
seeking approval to award this contract as a design build contract.
When such approval is received the County will proceed with the
Construction."

conversations, DEAN SKELOS stated that the delays were hurting ADAM SKELOS financially and could result in the loss of ADAM SKELOS's job with the Environmental Technology Company. Nassau County officials were concerned that DEAN SKELOS might take action as Majority Leader adverse to the interests of Nassau County if they did not satisfy his demands with respect to the Environmental Technology Company. Accordingly, Nassau County officials attempted to identify additional funding and to issue payments to the Environmental Technology Company more quickly.

42. Intercepted telephone communications, together with statements made by CW-2 and Nassau County officials, confirm that ADAM SKELOS and DEAN SKELOS, the defendants, arranged for DEAN SKELOS to use his influence to press Nassau County officials with respect to funding and payments on the Nassau County contract. For example:

a. On December 17, 2014, ADAM SKELOS spoke to CW-2 on the phone (AS#955) about the slow pace of work and payment under the Nassau County contract, telling CW-2 in substance and part, "[M]y father sat with [the Nassau County Executive] two weeks ago. [Nassau County Executive] promised that it'd be done and that they'd find the funding for it." DEAN SKELOS's Senate calendar reflects a meeting between DEAN SKELOS and the Nassau County Executive approximately two weeks earlier on December 2, 2014.

b. On December 31, 2014, ADAM SKELOS spoke to CW-2 (AS#1246) and expressed frustration that Nassau County had not acted promptly enough to pay the Environmental Technology Company and assured CW-2 that his father, DEAN SKELOS, could and would punish Nassau County through his official position if the funds were not released:

> ADAM SKELOS: Nassau County, man. Burning bridges left and right. I tell you this, the State is not going to do a fucking thing for the County. Any favor that [Nassau County Executive] calls and asks for, it's not happening.
>
> CW-2: What's not happening?
>
> ADAM SKELOS: Like [Nassau County Executive] will call and ask for favors to help with NIFA or to help with the labor unions and negotiating contracts or this and that, and it's just not going to happen after they haven't helped us with what we needed. . . .

On a call that same day (DS#191), DEAN SKELOS urged ADAM SKELOS to "stay focused on the, you know, [the Environmental Technology Company]."

       c.    On or about January 2, 2015, *Newsday* reported that Nassau County had entered into a public-private partnership ("P3") agreement with another company to run sewage facilities, for which Nassau County would pay approximately $57.4 million per year for 20 years. ADAM SKELOS was displeased that Nassau County had taken this step at a time when Nassau County still owed money to the Environmental Technology Company.[10] ADAM SKELOS told CW-2 (AS#1396) that he had become irate upon seeing the article and had immediately contacted DEAN SKELOS.

       d.    On or about January 3, 2015, DEAN SKELOS called the cellphone of the Nassau County Executive (DS#270) to make arrangements the following day for DEAN SKELOS to ride with the Nassau County Executive to the wake of a NYPD Police Officer slain in the line of duty. During the call, DEAN SKELOS – using coded language to refer to the Environmental Technology Company as "the situation" and to refer to ADAM SKELOS as "somebody" – pressured the Nassau County Executive to make payments to the Environmental Technology Company and expressed frustration at past delays:

    DEAN SKELOS:  That thing in Newsday today.  Where does that leave the other situation?

    COUNTY EXECUTIVE:  The privatization of the sewer?

    DEAN SKELOS:  Yeah.  Yeah.

    COUNTY EXECUTIVE:  Independent.  Independent.

    DEAN SKELOS:  Yeah, but where does it leave that other situation that's been out there for a couple years?

    COUNTY EXECUTIVE:  It just leaves the funding, which doesn't come from them.  It doesn't come from that.  The funding's supposed to come from either FEMA or . . .

---

[10]    A P3, or public-private partnership, goes beyond awarding a single contract to a private entity for designing and building the project and typically involves the private entity making an investment in the project in return for an ownership interest, managing ongoing project operations, and earning revenue from such operations.

DEAN SKELOS:  I understand that.  I don't understand this.
Where does this leave that other RFP?

COUNTY EXECUTIVE:  I'll see you tomorrow, I'll see you
tomorrow.  I'll look back into it, but I think everything's
fine.

DEAN SKELOS:  Alright, I just, you know, somebody feels
like they're just getting jerked around the last two years.
So we'll talk tomorrow.

    e.    DEAN SKELOS then called ADAM SKELOS (DS#272),
reporting the substance of his call with the Nassau County Executive
and confirming that the sewer privatization issue would not stand
in the way of payments to the Environmental Technology Company.
During the call, ADAM SKELOS remained skeptical, and DEAN SKELOS
assured him that he would "iron everything down" with the Nassau County
Executive the next day.  ADAM SKELOS told DEAN SKELOS that "before
you see him, I need to talk to you . . . In person," to which DEAN
SKELOS replied "And explain it all to me? . . . Okay."

    f.    The following morning, January 4, 2015, while walking
together outside the wake, DEAN SKELOS asked the Nassau County
Executive and the Chief Deputy Nassau County Executive about the
status of payments to the Environmental Technology Company.  After
consulting by telephone with another Nassau County official, the Chief
Deputy Nassau County Executive informed DEAN SKELOS that the payments
would be made and took steps to expedite the payments due to DEAN
SKELOS's official position.

    g.    At around the same time, ADAM SKELOS called DEAN SKELOS
(DS#290) while DEAN SKELOS was still at the wake.  In the middle of
a conversation about dinner, DEAN SKELOS interjected to ADAM SKELOS
in coded language, "All claims that are in will be taken care of."
ADAM SKELOS responded, "What's that?"  DEAN SKELOS repeated, "All
claims that are in will be taken care of."  ADAM SKELOS replied, "Oh,
okay.  Gotcha."  DEAN SKELOS responded, "Alright?"  ADAM SKELOS
replied, "Alright, great."  DEAN SKELOS then said, "I'll discuss the
rest with you later."

    h.    The next day, on January 5, 2015, ADAM SKELOS called
CW-2 (AS#1396) and told him, in substance and in part, that he had
discussed the *Newsday* article with DEAN SKELOS, and that ADAM SKELOS
had attended "a wake" with his father, at which he learned from the
Nassau County Executive that the funds allocated to the project
described in the *Newsday* article were "not going to affect anything

29

that is, you know, we are doing with stormwater" and that money sought by the Environmental Technology Company would soon be paid.[11]

43.     I know from documents provided by Nassau County that, on December 11, 2014, the Environmental Technology Company had sent an invoice to the county for $11,445.34.  On January 5, 2015, the day after defendant DEAN SKELOS personally asked the County Executive and the Deputy Executive about the payments to the Environmental Technology Company, Nassau County Officials completed a voucher for this payment and then made the payment on or about January 12, 2015.

DEAN SKELOS Uses Official Position to Assist the Company in its Attempts to Obtain Hydrofracking-Related Business

44.     I know from CW-2, emails, and intercepted calls that the Environmental Technology Company was prepared to pay ADAM SKELOS, the defendant, on a commission basis for any contracts in New York State related to the Company's treatment of contaminated wastewater byproducts of hydraulic fracturing ("hydrofracking").  To that end, defendants ADAM SKELOS and DEAN SKELOS also worked with lobbyists and Senate Staff to try to persuade the Department of Health to implement regulations concerning hydrofracking wastewater that would favor the use of the Environmental Technology Company's products in the event hydrofracking was approved by the Governor, which DEAN SKELOS believed to be imminent.  In particular:

        a.     DEAN SKELOS and ADAM SKELOS met with CW-2 in late 2013 at DEAN SKELOS's District Office.  During that meeting, DEAN SKELOS instructed one of his District staff members to leave the room, after which DEAN SKELOS inquired about the Environmental Technology Company's plans to financially exploit the State's potential approval of hydrofracking.

        b.     In or about late 2013, ADAM SKELOS called DEAN SKELOS's Chief of Staff and asked him to set up a meeting between representatives of the New York State Department of Health, which was considering regulations concerning hydrofracking, and representatives of the Environmental Technology Company.  On November 25, 2013, ADAM SKELOS emailed DEAN SKELOS's Chief of Staff about the Environmental Technology Company's capabilities with

---

[11]     Based on interceptions and other evidence it does not appear that ADAM SKELOS attended the wake and was instead relaying what his father had told him about the conversation with the Nassau County Executive.

respect to hydrofracking. ADAM SKELOS then forwarded his own email to DEAN SKELOS, stating, "Sent this link to [the Chief of Staff], explains everything." DEAN SKELOS followed up with his Chief of Staff and inquired whether he had set up the Department of Health meeting requested by ADAM SKELOS.

c.　On December 12, 2014, ADAM SKELOS participated in a call (AS#830) with another lobbyist ("Lobbyist-2"). During the call, after ADAM SKELOS obtained Lobbyist-2's assurance that it was a "private call," ADAM SKELOS asked DEAN SKELOS, who was present with ADAM SKELOS at the time, questions concerning whether hydrofracking was about to be approved in New York State, and said that Lobbyist-2 had to act quickly to ensure that the Department of Health enacted regulations that would financially benefit the Environmental Technology Company. ADAM SKELOS then spoke (AS#833) to another lobbyist working with Lobbyist-2 ("Lobbyist-3") about the potential regulations, and Lobbyist-3 told ADAM SKELOS that he would check with DEAN SKELOS's Chief of Staff to find out what the Department of Health was planning to do.

45. I know from public reports that, on December 17, 2014, the Governor publicly announced that hydrofracking would not in fact be permitted in the State. ADAM SKELOS and DEAN SKELOS, the defendants, spoke on the phone immediately following the announcement (AS#942). During the call, DEAN SKELOS assured ADAM SKELOS, using coded language, that although the Governor's announcement meant that ADAM SKELOS would not be able to receive commissions from the Environmental Technology Company related to hydrofracking, DEAN SKELOS would work with ADAM SKELOS so that he would continue to profit from stormwater projects:

ADAM SKELOS: Ahhh! This day sucks!

DEAN SKELOS: It does. Well, we're going to totally focus on that other thing now. Ok?

ADAM SKELOS: Yeah. Oh my god.

. . .

DEAN SKELOS: Ok, [Lobbyist-3] is going to call you. We're going to refocus on that other stuff, ok?

ADAM SKELOS: Alright, alright. That's good.

DEAN SKELOS Uses Official Position to Promote the Company's
Legislative Goals

46. The New York State Legislature commenced a new session in
early January 2015. The principal item on the agenda was the New York
State Budget, which the Governor of New York proposes each January
and which is required to be enacted following negotiation with the
Assembly and Senate by March 31 of the same year.

47. During the 2015 budget process, defendant ADAM SKELOS
emphasized to defendant DEAN SKELOS that his livelihood depended in
substantial part on legislative support for positions promoted by
the Environmental Technology Company. For example, on January 15,
2015, ADAM SKELOS spoke to DEAN SKELOS (DS#399) and told him that
CW-2 was "my best chance for being successful" and that if the
Environmental Technology Company did not succeed then he would "lose
the ability to pay for things."

48. I know from public reports, among other things, that in
connection with the budget negotiations, DEAN SKELOS, the defendant,
engaged in official acts in support of legislation directing a portion
of a $5.4 billion sum that the State had recovered in litigation with
financial services companies (the "Settlement Funds")[12] in a way that
would benefit water projects and contracts that were being pursued
by the Environmental Technology Company. For example:

a. On or about December 11, 2014, DEAN SKELOS was reported
in *Newsday* to have stated that he, along with the then-Speaker of
the Assembly and the Governor, were in ongoing talks for a special
session of the State Legislature to, among other things, divvy up
a financial windfall for infrastructure. The next day, a
spokesperson for the Senate Republicans, led by DEAN SKELOS, stated
that the Senate Majority wanted the Settlement Funds allocated towards
key environmental initiatives that ensure "clean water," among other
things.

b. On or about January 7, 2015, *CITY & STATE*, a news
publication, interviewed DEAN SKELOS in his capacity as Majority
Leader and reported that DEAN SKELOS stated that the Settlement Funds

---

[12] The Settlement Funds represent New York State's share of fines
and penalties paid by major financial institutions that resulted in
part from enforcement actions brought by the U.S. Attorney's Office
for the Southern District of New York, together with other law
enforcement and regulatory partners.

"should be used for one shots, not put it into something that becomes recurring. Infrastructure, sewers, bridges. . . . Some of the biggest costs that developers have are the infrastructure, the sewers, storm water, that type of thing. So to encourage development, I think that's where the money should be directed."

c. On January 8, 2015, DEAN SKELOS spoke to another State Senator from Long Island (DS#359) who wanted to know if DEAN SKELOS would be interested in announcing a "commitment from, you know, the Senate delegation to Long Island to improve water quality." After confirming that the other Senator was not simply referring to drinking water, DEAN SKELOS responded "I've been talking about that, and the answer is yes. I've been talking about the infrastructure should be sewers, stormwater." DEAN SKELOS further assured the other Senator that the funding would be used for "what we want to do" rather than projects favored by the Nassau and Suffolk County Executives. I know from interviews of Nassau County officials that during the time DEAN SKELOS was advocating for the use of the Settlement Funds on stormwater infrastructure projects, Nassau County officials did not place a high priority on such projects.

d. DEAN SKELOS also inserted language favorable to the Environmental Technology Company's business interests into the Senate Republicans' response to the Governor's State of the State address that was delivered by another Senator in DEAN SKELOS's caucus ("Senator-1"). On January 16, 2015, DEAN SKELOS's press secretary sent an email to DEAN SKELOS, subject line, "Changes to [Senator-1's] [State of the State] response you requested in bold for your review," that added in bold the following language to the Senate Republicans' response to the Governor's State of the State address: "When it comes to billions in one-time settlement money for New York, Senate Republicans think we should invest it in modernizing the state's infrastructure – roads and bridges, sewer and water systems. . . ."

e. On or about January 21, 2015, the Governor presented the annual State of the State address and unveiled the Executive Budget Proposal. The Budget Proposal did not include any Settlement Funds earmarked for Long Island or for water-related infrastructure projects as sought by DEAN SKELOS and defendant ADAM SKELOS. On the same day, ADAM SKELOS spoke to DEAN SKELOS (DS#478) and stated that he wanted "to talk about work stuff" when he arrived in Albany and that this is "why I am coming up," which DEAN SKELOS agreed to do. Referring to the Settlement Funds, ADAM SKELOS complained "You know, the Governor, he's really, like, pushing to spend all that money on his own" to which DEAN SKELOS replied "Yup, don't worry. That's part of our, what [Senator-1] talks about."

f. On January 21, 2015, during his speech in response to the Governor's State of the State address, Senator-1 advocated for using the Settlement Funds for water systems, reading the lines DEAN SKELOS had inserted into the speech.

49. During the same time period when DEAN SKELOS, the defendant, was proposing use of the Settlement Funds for stormwater projects, ADAM SKELOS, the defendant, with the awareness of DEAN SKELOS, was seeking to use the expectation of future funding to obtain new contracts for the Environmental Technology Company. For example, on the morning of December 10, 2014, ADAM SKELOS called DEAN SKELOS (AS#781) and told him that he was going to "have a conference call" that day with an association of village officials in Nassau County about "how to apply for certain things, all that stuff, funding and all that." [13] When the conference call occurred later that day (AS#789), one of the local officials asked "How can you be so comfortable that this is what Albany is going to dictate? That money will be allocated to stormwater management?" ADAM SKELOS replied that the Senators from Long Island were already meeting on the issue and "[w]hat we're doing is setting aside some money in the surplus that can be requested through any municipality and their needs." On the same day, CW-2 had expressed concern during an intercepted phone call (AS#778) that the Legislature might "suddenly start putting together a bill on how that 5 billion [the Settlement Funds] is spent, if we're not part of the mix at that point it could be too late." ADAM SKELOS responded: "I kind of got that covered."

50. In addition to attempting to secure funding, DEAN SKELOS and ADAM SKELOS, the defendants, tried to obtain design-build legislation that would enable Nassau County to fully implement its design-build contract with the Environmental Technology Company and that would incentivize local municipalities to enter into contracts with the Environmental Technology Company:

a. In or about the fall of 2014, ADAM SKELOS arranged for CW-2 to hire lobbyists close to DEAN SKELOS to lobby other State

---

[13] During the same call, DEAN SKELOS and ADAM SKELOS discussed a recent storm that had caused flooding throughout Long Island in a manner that reflected the awareness of DEAN SKELOS that his son stood to profit from stormwater concerns. ADAM SKELOS commented "we got some major water problems here with all the flooding going on . . . I love it! Keep it coming Mother Nature! Keep it coming!" ADAM SKELOS and DEAN SKELOS laughed and then DEAN SKELOS replied, "It will."

officials for design-build legislation so as to mask the involvement of DEAN SKELOS in obtaining benefits for his son. To this end, CW-2 hired Lobbyist-2 and Lobbyist-3. I know from witness interviews that Lobbyist-2 personally obtained DEAN SKELOS's permission to work with ADAM SKELOS before CW-2 hired Lobbyist-2 and Lobbyist-3. According to CW-2, Lobbyist-2 told CW-2 and ADAM SKELOS that DEAN SKELOS could not be the Senator to publicly sponsor the design-build legislation for "obvious reasons," which CW-2 understood to mean DEAN SKELOS should not be tied publicly to legislation that would benefit the Environmental Technology Company in light of the Company's relationship to ADAM SKELOS.[14]

b. On January 15, 2015, DEAN SKELOS called ADAM SKELOS (DS#399), and ADAM SKELOS explained how he would promote design-build legislation favored by the Environmental Technology Company while he was in Albany for the Governor's State of the State address. At the end of the call, in response to DEAN SKELOS's inquiry concerning which Senators ADAM SKELOS was meeting with in Albany, ADAM SKELOS told DEAN SKELOS that he "was hesitant" to talk about the specifics of his planned meetings over "this cellphone," but that he would provide the information when they met in person.

DEAN SKELOS and ADAM SKELOS Become More Cautious After Charges Are Filed Against the New York State Assembly Speaker and Press Speculation About the U.S. Attorney's Investigation of DEAN SKELOS

51. I know from public reports and my involvement in the investigation that, on January 22, 2015, the FBI and U.S. Attorney's Office charged the then-Speaker of the New York State Assembly (the "Speaker") with federal public corruption offenses. On or about January 29 and 30, 2015, a local NBC news affiliate and the New York Post reported that the U.S. Attorney's Office was investigating defendant DEAN SKELOS's outside income from his position as "Of Counsel" with the Law Firm as it related to certain real estate deals. Finally, on or about February 2, 2015, the Governor announced in a

---

[14] I know from emails that ADAM SKELOS, with the assistance of DEAN SKELOS, had previously attempted to retain a different lobbying firm ("Lobbying Firm-4") to lobby on behalf of the Environmental Technology Company, but the firm declined citing conflict of interest concerns. A managing director of Lobbying Firm-4 emailed an employee of Lobbying Firm-4 indicating they were "in agreement that there is absolutely no way that [ADAM SKELOS]'s going to join [Lobbying Firm-4] and that we are not going to be a front for clients that he could otherwise not take for various reasons. Uuggghhhhh!"

public address that he would demand that the Legislature enact various ethics reforms – including with respect to the disclosure of outside income earned by lawyers like DEAN SKELOS who were paid salaries from private law firms. Based on the intercepted communications, interviews with CW-2, and other evidence, I understand that this caused the defendants to be more cautious in their communications and change their behavior in connection with the scheme. For example:

      a.    On January 30, 2015, defendant ADAM SKELOS called Lobbyist-2 (AS#2216) and reported that CW-2 believed that they should not be pushing State legislation to benefit the Environmental Technology Company "because of everything that came out." Lobbyist-2 said he agreed, telling ADAM SKELOS that, "we've got to rethink this whole thing out. I think too much is going down. . . . And we've got to be careful you know with the Senate side. You know, we've got real problems here, . . . . there's too much going on, too many reporters involved, too many fucking Feds so we gotta be careful."

      b.    On February 9, 2015, ADAM SKELOS called Lobbyist-2 (AS#2433), and Lobbyist-2 told ADAM SKELOS that Lobbyist-2 and Lobbyist-3 could no longer represent CW-2. During the call, Lobbyist-2 told ADAM SKELOS that they had to "protect" themselves, "have deniability," and "lay low," because "there's a lot of scrutiny going on."

      c.    DEAN SKELOS and ADAM SKELOS also began using modes of communication that ADAM SKELOS believed could not be electronically intercepted. For example, on a phone call on February 10, 2015 (DS#926), ADAM SKELOS told DEAN SKELOS that ADAM SKELOS was going to "FaceTime" DEAN SKELOS. ADAM SKELOS told DEAN SKELOS that he would explain during their FaceTime call why he wanted to use FaceTime. In an earlier call on February 4, 2015 (AS#2324), ADAM SKELOS told CW-2 that ADAM SKELOS had used FaceTime to communicate with a certain individual "because of what's going on with my dad because that doesn't show up on the phone bill, just the data plan."

      d.    On February 26, 2015, ADAM SKELOS began using a new cellphone that ADAM SKELOS variously described as his "safe phone" and "burner phone." ADAM SKELOS instructed CW-2 to send a coded text to his regular cellphone when it was necessary to speak freely by phone, and that ADAM SKELOS would then call CW-2 on the burner phone.

      e.    On or about February 27, 2015, during a recorded call on the "burner phone," ADAM SKELOS warned CW-2 not to email ADAM SKELOS bullet points on the design-build legislation that the Environmental Technology Company wanted enacted, but rather to deliver the document

to him in person at their next meeting because, "it's just, it's safer."

        f.    On or about March 25, 2015, during an intercepted call with a Senate staff member (AS#4115) during which ADAM SKELOS was seeking to reach DEAN SKELOS to get an update on budget negotiations, ADAM SKELOS complained that it was "fucking frustrating" that he could not speak openly to DEAN SKELOS on the phone and that he could not "just send smoke signals or a little pigeon with [a] fucking note [tied] to its foot."

        g.    On March 28, 2015, ADAM SKELOS placed an intercepted call to DEAN SKELOS (AS#4182), who relayed he was in Albany seeking to finalize the State budget. ADAM SKELOS complained that his father could not give him "real advice" concerning issues with the Environmental Technology Company because "you can't talk normally because it's like fucking Preet Bharara is listening to every fucking phone call. It's just fucking frustrating." DEAN SKELOS replied, "It is."

DEAN SKELOS and ADAM SKELOS Continue to Pursue Legislation Favorable to the Environmental Technology Company While Protecting DEAN SKELOS

    52.    Notwithstanding their concerns set forth above concerning the arrest of the Assembly Speaker, the focus on ethics reform, and reports that defendant DEAN SKELOS was under federal investigation, the defendants did not completely abandon efforts to obtain benefits for the Environmental Technology Company through State legislation. Instead, as described below, defendants ADAM SKELOS and DEAN SKELOS pursued a strategy through which DEAN SKELOS would support legislation benefiting the Environmental Technology Company, provided that such legislation was first promoted by other political figures, which would provide DEAN SKELOS with deniability. ADAM SKELOS then touted, and at times exaggerated, the continuing official action by DEAN SKELOS in order to continue receiving $10,000 monthly payments premised on his father's ability to assist the Company.

    53.    With respect to design-build legislation, ADAM SKELOS, the defendant, arranged for CW-2 to meet with two New York State Senators ("Senator-2" and "Senator-3"), who are members of the group of nine Long Island Senators led by DEAN SKELOS, the defendant, to discuss their potential sponsorship of the design-build legislation as a further way to mask DEAN SKELOS's involvement in the legislation. ADAM SKELOS repeatedly told CW-2, in substance, and during recorded conversations and phone calls, that after CW-2 had the "official"

meetings, ADAM SKELOS would have unofficial meetings with the Senators to promote the legislation. For example:

      a.    CW-2 met with Senator-2 on February 23, 2015, through a meeting arranged by ADAM SKELOS. Before the meeting, ADAM SKELOS told CW-2 that he would meet with Senator-2 that night at a fundraiser with "checks in hand" and that he would "tell [Senator-2] where we are" with respect to the position of DEAN SKELOS on design-build legislation. CW-2 confirmed, "So you're going to tell him at least where your dad is on it?" to which ADAM SKELOS replied "Yeah, yeah. I'll fill him in and I'll also kind of direct him on what he needs, what we want him to do."

      b.    On February 23, 2015, ADAM SKELOS also personally arranged for an "official" meeting between CW-2 and Senator-3, telling Senator-3's legislative director ("Legislative Director-1") that he was "going to stay out of" the meeting "because of obvious reasons" (AS#2803) but noting that "we can talk" at a fundraising event. In a subsequent call with CW-2 (AS#2811), ADAM SKELOS relayed that he would be seeing Senator-3 and Legislative Director-1 at a fundraiser, which he would be attending with DEAN SKELOS, and that, "I'm going to be able to talk to them that night about everything as far as a timeline, you know, pushing it along, when we need things done, what we need them to do, who they should go for to co-sponsor, you know? So I'm going to direct them in that, in that, um, that meeting and it will all happen this Wednesday." ADAM SKELOS added: "[I]t's better that I distance myself from being in like official meetings, you know, that have to do with the State because, one, I'm not a registered lobbyist and, two, it's a conflict."

      c.    I know from CW-2 and intercepted communications that the specific plan to use Senator-2 and Senator-3 to introduce legislation promoting design-build failed because DEAN SKELOS believed that it was too risky in light of the ongoing investigation. In particular, intercepted calls and witness interviews reflect that DEAN SKELOS caused the Office of Senator-3 to cancel the meeting. When ADAM SKELOS learned of this cancellation on February 25, 2015, he contacted his father (AS#2877) (asking DEAN SKELOS to call him back immediately using DEAN SKELOS's wife's phone, which DEAN SKELOS did) (AS#2878) and, telling his father that he would be "very, very vague" on the phone, urged DEAN SKELOS to permit the meeting. DEAN SKELOS promised to discuss the issue later with ADAM SKELOS but he warned: "Right now we are in dangerous times Adam."

54.    I know from interviews, including with CW-2 and Nassau County officials and New York State officials, and documents from

those officials, as well as intercepted calls, that, after DEAN SKELOS, the defendant, canceled CW-2's meeting with Senator-3 to discuss Senator-3 sponsoring design-build legislation, DEAN SKELOS and defendant ADAM SKELOS discussed a plan through which the Nassau County Executive would lobby the Governor for design-build legislation and DEAN SKELOS could then support the proposal with less risk. In particular:

a.    On February 26, 2015, on a recorded call using his "burner phone," ADAM SKELOS assured CW-2 that the State would enact the design-build/P3 legislation that would benefit the Environmental Technology Company: "They're going to pass it. And they're going to make sure that it's, you know, the stormwater stuff, P3 approval." ADAM SKELOS told CW-2 that his father had told him in a private conversation that "he's going to be sure that gets done. So, we should be good to go." ADAM SKELOS then explained to CW-2 the strategy that DEAN SKELOS had relayed to him for pushing through the legislation:

> ADAM SKELOS:  Well, that's one thing I was told. That he's definitely, my dad said he's definitely going to do it. They're going to do it. And they're just going about it, I guess, in the way of, you know, having the [Nassau County Executive] pushing for it through the Governor, where it's the Governor asking us if this is okay, which we'll ultimately say absolutely.

b.    On March 6, 2015, CW-2 spoke to ADAM SKELOS over ADAM SKELOS's "burner phone," and, in a recorded call, ADAM SKELOS relayed to CW-2 that the Governor would propose general design-build legislation which would need modifications to include larger stormwater projects and "what we need to do is not disagree with Governor" and instead "[k]ind of make [the Governor] think it's his idea and you're supporting his agenda." ADAM SKELOS also told CW-2 to send him the bullet points on the proposed design-build legislation by regular mail (having previously told him to avoid e-mail to be "safe") because "I'm just going to hand it to my dad and he's going to [be] the one ultimately that makes the decision."

c.    On or about March 6, 2015, the Nassau County Executive and Chief Deputy Nassau County Executive, among others, met with DEAN SKELOS at DEAN SKELOS's District Office. During the meeting, the Nassau County officials presented a legislative proposal that included a proposed amendment to New York State law allowing design-build contracts for "stormwater" projects, among other things.

39

d.      On or about March 7, 2015, CW-2 sent the design-build bullet points to ADAM SKELOS via a Federal Express package. On March 10, 2015, CW-2 spoke to ADAM SKELOS on his "burner" phone, and ADAM SKELOS informed CW-2, in substance and in part, that he was going to give the bullet points "over to my dad on Thursday."

e.      On or about March 12, 2015, the New York State Senate, led by DEAN SKELOS, enacted its "one-house" budget resolution in response to the Governor's proposed budget. Among other things, the Senate's budget proposed allocating the Settlement Funds in a manner that could provide greater funding for water projects and stated opposition to the Governor's design-build proposal, which applied only to State agencies, not counties, and therefore would not have benefited the Environmental Technology Company.

f.      On or about March 23, 2015, the Nassau County Executive and Chief Deputy Nassau County Executive, among others, met with DEAN SKELOS at DEAN SKELOS's Albany Office. During the meeting, the Nassau County officials again presented a legislative proposal that included a proposed amendment to New York State law allowing design-build contracts for "stormwater" projects, among other things. During this March 23, 2015 meeting, DEAN SKELOS stated that he supported design build and that the Senate would approve Nassau County's design-build legislative proposal if the proposal was also agreed to by the Governor.

55.    I know from wiretap interceptions, witness interviews and documents that as the March 31 deadline for an on-time budget approached, defendant ADAM SKELOS obtained information from defendant DEAN SKELOS on the budget negotiations and provided updates to CW-2 and the CEO. Through these updates, ADAM SKELOS explained that the Governor's focus on ethics reform legislation was interfering with the ability to achieve the Company's legislative goals by March 31, 2015. For example:

a.      On or about March 19, 2015, the date on which ADAM SKELOS had previously told CW-2 he would get the "scoop" from DEAN SKELOS, ADAM SKELOS and DEAN SKELOS spoke by phone (AS#3876) and agreed to meet in person. The next day, March 20, 2015, ADAM SKELOS called the CEO (AS#3893) and told him that the issue of ethics reform "is kind of getting in the way and taking the spotlight off everything right now." Nevertheless, ADAM SKELOS assured the CEO that "[w]e'll get to the Promised Land eventually."

b.      On March 23, 2015, ADAM SKELOS spoke to the CEO (AS#3976) and told him that the budget agreement was expected to

40

include a "water purification" fund that could be used to fund the Nassau County contract as well as other municipal contracts pursued by the Company but that the "harder ask" during the budget negotiations was legislation permitting counties to pursue design-build contracts.

c.     On March 25, 2015, ADAM SKELOS called a staff member of the Senate and expressed frustration at not being able to have a substantive conversation with DEAN SKELOS (AS#4115). When ADAM SKELOS learned from the staff member that the budget was proceeding quickly, he told the staffer, "you know what, I have an emergency. I gotta call you, can I call from another place right now and talk to you . . . cause I need to relay a message." I know from telephone records that ADAM SKELOS then spoke to the staff member on ADAM SKELOS's wife's cellphone.

d.     On March 25, 2015, following the call described above, ADAM SKELOS placed a recorded call to CW-2 and told CW-2 that although negotiations continued, design-build legislation "most likely would not get done" by the March 31, 2015 deadline for the State budget, but would be acted upon sometime before the end of the Senate's session on or about June 23, 2015.

e.     On March 26, 2015, ADAM SKELOS told the CEO during an intercepted call (AS#4147) that the Senate proposal to use Settlement Funds for water infrastructure projects on Long Island was still a part of the negotiations over the budget, and that the design-build legislation sought by the Environmental Technology Company was not "off the table for this legislative session, which would end . . . [on] June 23rd," but that it would not be included in the 2015-2016 budget.

56.     On March 31, 2015, *Newsday* reported that the final budget included a $400 million allocation for economic development projects on Long Island. That night, ADAM SKELOS, the defendant, called DEAN SKELOS, the defendant (AS#4334). During the call, ADAM SKELOS told DEAN SKELOS that he had just read the *Newsday* article, and DEAN SKELOS stated that Long Island was receiving $550 million from the Settlement Funds for infrastructure projects. DEAN SKELOS informed ADAM SKELOS that the Governor had wanted to give Long Island $150 million, but that DEAN SKELOS "got him up to $550." DEAN SKELOS confirmed that municipalities would be able to apply for the funds. ADAM SKELOS then asked if "[a]ny of the other stuff [is] moving forward yet or no?" to which DEAN SKELOS replied, "I haven't heard yet. But I will."

57.     In the early morning hours of April 1, 2015, the New York State Senate passed the 2015-2016 budget. Included in the budget was

a $400 million "transformative investment fund" that would cover the "capital costs of regionally significant economic development initiatives" that, among other things, "enhance the environment and quality of life" for State residents. In addition, the budget also included $150 million designated for "transformative economic development projects" that demonstrate, among other things, "an enhancement of the environment and quality of life for residents of Nassau or Suffolk County."

## DEAN SKELOS and ADAM SKELOS Prepare for Future Opportunities to Collect Payments from the Environmental Technology Company

58. At the direction of the Government, CW-2 informed defendant ADAM SKELOS on March 25, 2015 that the CEO was considering suspending ADAM SKELOS's $10,000/month payment pending the successful passage of the design-build legislation sought by the Environmental Technology Company, which would not occur in connection with the budget negotiations as the CEO had hoped. Immediately following this call, ADAM SKELOS called DEAN SKELOS, the defendant (AS#4146), telling his father that he "lost something that I had . . . the water . . . the water thing." In response, DEAN SKELOS told ADAM SKELOS that "we'll try to get it back at some point." DEAN SKELOS advised ADAM SKELOS not to "burn bridges," but rather to just tell the Environmental Technology Company that "hopefully we can get it all going again." DEAN SKELOS also urged ADAM SKELOS to press the Company to pay ADAM SKELOS his fee ($20,000) for his work over the prior two months, which had consisted of ADAM SKELOS working with DEAN SKELOS to attempt to pass legislation favorable to the Environmental Technology Company.

59. On March 26, 2015, ADAM SKELOS, the defendant, spoke to the CEO (AS#4149-4150) and confirmed that his payment from the Environmental Technology Company would be suspended until State design-build legislation was passed that would allow the Company to further monetize the Nassau County contract. ADAM SKELOS then informed the CEO that he was going to draft a "formal letter" for "my records" stating that he and the Environmental Technology Company had purportedly ended their professional relationship. ADAM SKELOS explained that "one thing we have to work on is the State and once that's approved it'll be easier for us anyway." In response to the CEO's inquiry about whether the letter related to an "ethics problem," ADAM SKELOS stated that the letter was a form of protection for him "just in case I ever get questioned by anyone of our continuing

relationship." ADAM SKELOS noted that the letter was just a formality because "really nothing is going to change."

WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of DEAN SKELOS and ADAM SKELOS, the defendants, and that they be imprisoned or bailed, as the case may be.

_____
PAUL M. TAKLA
Special Agent
Federal Bureau of Investigation

Sworn to before me this
1st day of May, 2015

_____
THE HONORABLE MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK