UNITED STATES DISTRICT COURT  ORIGINAL
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
                  :

UNITED STATES OF AMERICA     :    **SUPERSEDING**
                  :    **INDICTMENT**

    - v. -

                  :    S1 15 Cr. 317 (KMW)

DEAN SKELOS and
ADAM SKELOS,          :

        Defendants.  :

- - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 2 1 2015

**Background**

*DEAN SKELOS and His Official Powers in the New York State Senate*

    1.   Since his election in 1984, DEAN SKELOS, the defendant, has represented a portion of Nassau County as a Member of the New York State Senate (the "Senate"), which, along with the Assembly, constitutes the New York State Legislature (the "Legislature"). Additionally, DEAN SKELOS was Majority Leader and/or Co-Majority Coalition Leader, as well as President Pro Tem, of the Senate from at least in or about January 2011 until on or about May 11, 2015.

    2.   As the Majority Leader and President Pro Tem of the Senate, DEAN SKELOS, the defendant, exercised significant power, including but not limited to, appointing the chairpersons of all Senate committees, determining who was listed as the sponsors of legislation, and controlling if and when legislation was brought to the floor for a vote. DEAN SKELOS also represented the Senate in negotiations with the Governor of the State of New York and the

Speaker of the New York State Assembly concerning the budget of the State of New York (the "State") and other critical legislative and other matters pending before the State, including tax abatement and rent regulation legislation important to the real estate industry and legislation impacting the solvency and profitability of businesses in the medical malpractice insurance industry.  In his official capacity DEAN SKELOS also exercised significant power with respect to Nassau County through his involvement in securing legislation important to the governance of Nassau County and the funding of its operations.

### *ADAM SKELOS and His Business Interests*

3.    ADAM SKELOS, the defendant, is the adult son of DEAN SKELOS, the defendant.  At all times relevant to this Indictment, ADAM SKELOS has relied on both direct financial support from his father and indirect support through his father's official position, including (a) more than $100,000 from DEAN SKELOS directly and (b) several hundred thousand dollars paid to ADAM SKELOS in the form of sales commissions, consulting fees, salary, and health insurance from campaign donors to DEAN SKELOS and/or companies with business before the State.

### *Developer-1 and CW-1*

4.      "Developer-1" is a large real estate development firm that, through various corporate affiliates, builds, owns, and manages residential rental properties across the New York City metropolitan area.  Developer-1's business model depends in substantial part on favorable tax abatements and rent regulations subject to periodic renewal by the Legislature.  Accordingly, Developer-1 is one of the largest contributors to candidates for State office and political action committees controlled by leaders of the Legislature, including defendant DEAN SKELOS.

5.      "CW-1" has been employed by Developer-1 as a senior executive since in or about 2001.  Among other responsibilities, CW-1 is involved in managing Developer-1's political operations, including Developer-1's political relationship with DEAN SKELOS, the defendant.  DEAN SKELOS has directed CW-1 to make hundreds of thousands of dollars in campaign contributions through various limited liability companies, or "LLCs," controlled by Developer-1.

### *The Environmental Technology Company*

6.      The "Environmental Technology Company" is based in Arizona and is owned by a holding company (the "Holding Company"), which has been publicly traded since at least in or about January 2013.  The Environmental Technology Company's principal

3

proprietary technology has been a water filter that it sells in various states including New York that purportedly removes various microbial pollutants from water, which can be used to treat polluted stormwater run-off and water contaminated by hydraulic fracturing.

### The Malpractice Insurance Administrator

7.     The "Malpractice Insurance Administrator" is a privately-held company that administers a New York-based medical malpractice reciprocal insurance company.[1]  The Chief Executive Officer of the Malpractice Insurance Administrator (the "CEO") has been a long-standing political contributor to DEAN SKELOS, the defendant, and, at all times relevant to this Indictment, has lobbied DEAN SKELOS personally and through lobbying firms on matters important to the Malpractice Insurance Administrator's business interests, including legislation that directly impacts the Malpractice Insurance Administrator's solvency and profitability such as laws that prevent New York State from liquidating medical malpractice insurers like the one administered by the Malpractice Insurance Administrator that operate with a negative balance sheet.

---

[1]     A reciprocal insurance company is owned and controlled by its members and is administered through an "attorney-in-fact," a company that receives a fee in exchange for managing the overall administration, promotion, and underwriting for the reciprocal company.

## The Conspiracy to Commit Extortion and Honest Services Fraud

8.     From at least in or about 2010 up to and including in or about April 2015, DEAN SKELOS and ADAM SKELOS, the defendants, engaged in a corrupt scheme to monetize DEAN SKELOS's official position to obtain for ADAM SKELOS hundreds of thousands of dollars in bribes, gratuities, and extortion payments from campaign donors to DEAN SKELOS and/or companies with business before the State.   DEAN SKELOS and ADAM SKELOS referred implicitly and explicitly to DEAN SKELOS's power to reward and punish through official action in inducing campaign donors to DEAN SKELOS and/or companies with business before the State to provide commissioned sales work or employment to ADAM SKELOS.   Through these efforts, DEAN SKELOS attempted to secure and did secure hundreds of thousands of dollars for ADAM SKELOS, including but not limited to the following:

a.     Commissions for the sale of title insurance and other products to real estate developers and other companies with legislative business before DEAN SKELOS.

b.     Over $100,000 in payments and health insurance benefits from the Malpractice Administrator that actively lobbied DEAN SKELOS on legislative matters, as described in more detail below.

c.     A $20,000 payment arranged by Developer-1, as well as Developer-1's assistance in obtaining for ADAM SKELOS payments of $10,000 per month from the Environmental Technology Company, as described in more detail below.

**The Schemes to Obtain Funds From Developer-1 and the Malpractice**

**Insurance Administrator**

9.     Beginning at least in or about 2010, DEAN SKELOS, the defendant, used the power and influence of his official position to obtain and attempt to obtain income for ADAM SKELOS, the defendant, from real estate developers with substantial legislative interests before the State, including Developer-1. DEAN SKELOS and ADAM SKELOS obtained these benefits from Developer-1, directly and through the Environmental Technology Company, by fostering the expectation that DEAN SKELOS would take official action favorable to and would refrain from taking official action to the detriment of Developer-1 and the Environmental Technology Company in return for such payments. Thereafter, DEAN SKELOS did in fact take official action favorable to Developer-1 and the Environmental Technology Company to reward them for the payments to ADAM SKELOS and to attempt to ensure that such payments would continue.

10.     Beginning in or about 2012, while DEAN SKELOS and ADAM SKELOS, the defendants, were engaged in the corrupt scheme

6

to obtain benefits from Developer-1, they also used DEAN SKELOS's power and influence to obtain and maintain a no-show job for ADAM SKELOS at the Malpractice Insurance Administrator, at a time when it was actively engaged in lobbying the Senate on legislation critical to its business.  Despite the fact that ADAM SKELOS did not regularly report for work at the Malpractice Insurance Administrator, the CEO continued to make payments to ADAM SKELOS based on his belief and fear that DEAN SKELOS would take official action against the Malpractice Insurance Administrator's business interests if the payments to ADAM SKELOS did not continue.

### DEAN SKELOS's Illegal Demands to Developer-1 to Make Payments to ADAM SKELOS

11.  In or about late 2010 and early 2011, during a period in which Developer-1 actively was lobbying defendant DEAN SKELOS for real estate legislation critical to Developer-1's business, DEAN SKELOS repeatedly solicited representatives of Developer-1 to direct money to ADAM SKELOS, the defendant, including during meetings in which Developer-1 was lobbying DEAN SKELOS on real estate legislation.  For example:

a.    On or about December 20, 2010, DEAN SKELOS met with the founder of Developer-1 (the "Developer-1 Founder"), CW-1, and a lobbyist for Developer-1 (the "Developer-1 Lobbyist"). During the meeting, DEAN SKELOS discussed the fact that he would be working with Developer-1 to negotiate certain legislation

renewals sought by Developer-1 during the upcoming session.  Both during this meeting and while leaving the meeting, DEAN SKELOS directly asked the Developer-1 Founder and CW-1 to send Developer-1's title insurance business to ADAM SKELOS in order for him to receive cash commissions.

b.   On or about February 17, 2011, CW-1 and the Developer-1 Lobbyist met with ADAM SKELOS at CW-1's apartment building in New York, New York, to discuss Developer-1 sending ADAM SKELOS title insurance commissions and other business, as DEAN SKELOS had requested.

c.   On or about March 18, 2011, CW-1 and the Developer-1 Founder attended a real estate industry group meeting with DEAN SKELOS in New York, New York.  During the meeting, members of the real estate industry group and DEAN SKELOS discussed the upcoming legislative review of rent regulation and real estate tax benefits important to Developer-1 and the industry.  After the meeting ended, DEAN SKELOS thanked CW-1 for meeting with ADAM SKELOS and renewed his request that Developer-1 direct commissions to ADAM SKELOS.

d.   On or about May 5, 2011, DEAN SKELOS met with CW-1 and the Developer-1 Lobbyist at CW-1's apartment building. During this meeting, the Developer-1 Lobbyist explained to DEAN SKELOS Developer-1's views about the real estate laws that were

up for renewal in the Legislature.  At the meeting, DEAN SKELOS
again thanked CW-1 for meeting with ADAM SKELOS and reiterated his
request that Developer-1 give ADAM SKELOS business because ADAM
SKELOS was purportedly suffering financially.

12.  During the time period relevant to this
Indictment, DEAN SKELOS, the defendant, stated to CW-1 and others
that he would take detrimental action against real estate
developers who did not support him by, among other things, making
contributions to his campaign fund.

### Developer-1's Payments to ADAM SKELOS in Response to the Demands of DEAN SKELOS

13.  As a result of defendant DEAN SKELOS's repeated
requests and his threat regarding real estate developers who did
not support him, CW-1, acting on behalf of Developer-1, arranged
for defendant ADAM SKELOS to receive payments totaling almost
$220,000 from two sources: a one-time $20,000 payment from
Developer-1 and a recurring monthly payment – initially $4,000
and then increasing to $10,000 – from the Environmental Technology
Company, in which Developer-1's founding family and CW-1 had
financial investments and, as a result, substantial influence.

14.  In or around November 2012, after a period of
negotiation led by CW-1 with defendant DEAN SKELOS's awareness,
the Environmental Technology Company retained defendant ADAM
SKELOS as a government relations consultant at a rate of $4,000

9

per month (plus the potential for millions of dollars in performance-based commissions). Shortly thereafter, following a threat from DEAN SKELOS and ADAM SKELOS to block a potential contract between the Environmental Technology Company and Nassau County if ADAM SKELOS did not receive a substantial raise, the Environmental Technology Company increased its payments to ADAM SKELOS to $10,000 per month. In total, from in or about November 2012 to in or about April 2015, ADAM SKELOS was paid approximately $200,000 by the Environmental Technology Company.

15. The Environmental Technology Company made these payments with the expectation, based on statements by DEAN SKELOS and ADAM SKELOS, the defendants, as well as CW-1 on behalf of the defendants, that DEAN SKELOS would use his official position to benefit the Environmental Technology Company in return for these payments, and would use his official position to harm the Environmental Technology Company's interests if payments at the desired amount were not made to ADAM SKELOS.

16. In addition to causing the Environmental Technology Company to hire and pay ADAM SKELOS, the defendant, CW-1 also arranged for ADAM SKELOS to receive a payment of $20,000 in February 2013 as a result of further pressure by DEAN SKELOS, the defendant, on Developer-1 to provide immediate financial assistance to ADAM SKELOS pending negotiations over the terms of

10

ADAM SKELOS's contract with the Environmental Technology Company.
In particular, CW-1 contacted an executive ("Title Executive-1")
at a title insurance company that was dependent on Developer-1
for business ("Title Company-1") and instructed Title Executive-1
to provide a $20,000 payment to ADAM SKELOS in a manner that was
not traceable to Developer-1.  ADAM SKELOS did not refer any
business or perform any work for Title Company-1 or Developer-1
in connection with this $20,000 payment.

### DEAN SKELOS's Illegal Demands to the Malpractice Insurance Administrator to Make Payments to ADAM SKELOS

17.  In or about 2012, the Malpractice Insurance
Administrator was actively lobbying DEAN SKELOS, the defendant,
on malpractice insurance legislation critical to its business.
For example, on or about January 18, 2012, the CEO and lobbyists
for the Malpractice Insurance Company met with DEAN SKELOS in DEAN
SKELOS's Senate office in Albany to discuss legislation that was
being sought by the Malpractice Insurance Company.

18.  During the same time period that the Malpractice
Insurance Company was lobbying defendant DEAN SKELOS, DEAN SKELOS
repeatedly solicited the CEO to direct money to ADAM SKELOS, the
defendant.  For example:

a.  In 2012, DEAN SKELOS approached the CEO about
meeting with ADAM SKELOS regarding a court-reporting service that
employed ADAM SKELOS's then-girlfriend (and later wife).  On

11

several occasions thereafter, DEAN SKELOS asked the CEO to direct
more business to the court-reporting service for the benefit of
ADAM SKELOS.

b.      On or about August 2, 2012, DEAN SKELOS, ADAM
SKELOS, and the CEO all attended a political fundraising event.
At the event, ADAM SKELOS asked the CEO for a full-time job at the
Malpractice Insurance Administrator, explaining that he needed a
source of income as well as health insurance benefits.  The CEO
agreed to hire ADAM SKELOS in part because the CEO understood from
DEAN SKELOS's repeated requests relating to the court-reporting
service that DEAN SKELOS wanted the CEO to assist ADAM SKELOS
financially.  Later that day, the CEO advised DEAN SKELOS that the
CEO had agreed to help ADAM SKELOS with a job, and DEAN SKELOS
thanked the CEO.

19.  On or about January 2, 2013, ADAM SKELOS, the
defendant, began getting paid as an employee of the Malpractice
Insurance Administrator in its Sales and Marketing Department,
even though he did not have a license to sell insurance.  Under
the terms of ADAM SKELOS's written offer of employment with the
Malpractice Insurance Administrator, ADAM SKELOS was required to
work full-time in exchange for an annual salary of $78,000, plus
health insurance benefits for him and his family.  From the outset

12

of his employment, however, ADAM SKELOS regularly failed to report for work.

20. On or about January 10, 2013, approximately one week after defendant ADAM SKELOS began as an employee of the Malpractice Insurance Administrator, ADAM SKELOS's supervisor ("Supervisor-1") called ADAM SKELOS to set up a meeting to discuss ADAM SKELOS's work schedule given that ADAM SKELOS had not reported for work for more than one hour during the previous four days. Shortly after that phone call, ADAM SKELOS called back Supervisor-1 and threatened to "smash in" Supervisor-1's head, and told Supervisor-1 that Supervisor-1 would "never amount to anything," and that "guys like" Supervisor-1 "couldn't shine [ADAM SKELOS's] shoes." On this phone call, and on other occasions, ADAM SKELOS also told Supervisor-1, in sum and substance, that ADAM SKELOS did not have to come to work regularly because his father, defendant DEAN SKELOS, was Majority Leader of the Senate.

21. On January 10, 2013, after the conversation between defendant ADAM SKELOS and Supervisor-1 described above, the CEO received a call from DEAN SKELOS, the defendant, who demanded to know why ADAM SKELOS was being "harassed" by Supervisor-1. After speaking with Supervisor-1 about the incident, the CEO called DEAN SKELOS back and told DEAN SKELOS

13

that ADAM SKELOS had not been reporting for work, contrary to the
terms of his employment, that ADAM SKELOS had been verbally
abusive to Supervisor-1, that ADAM SKELOS had been telling
employees of the Malpractice Insurance Administrator that ADAM
SKELOS was entitled to special treatment because his father was
the Senate Majority Leader, and that his father and the CEO had
an arrangement limiting ADAM SKELOS's expected work hours.   In
response, DEAN SKELOS informed the CEO, in sum and substance, that
the CEO needed to resolve any issues that Supervisor-1 might have
with ADAM SKELOS so that ADAM SKELOS could remain employed at the
Malpractice Insurance Administrator.

    22.   Based on the January 10, 2013 conversation with
defendant DEAN SKELOS, among other things, the CEO believed that
if the Malpractice Insurance Administrator terminated ADAM
SKELOS's employment, then the CEO could lose access to DEAN SKELOS
and DEAN SKELOS could take adverse action on legislation important
to the Malpractice Insurance Administrator's business interests.
Accordingly, the CEO maintained ADAM SKELOS as an employee of the
Malpractice Insurance Administrator despite ADAM SKELOS's
continued absence from work.

    23.   Following the January 10, 2013 phone call with
defendant DEAN SKELOS, a lobbyist for the Malpractice Insurance
Administrator ("Lobbyist-1") met in person with DEAN SKELOS for

the purpose of discussing with DEAN SKELOS the fact that defendant
ADAM SKELOS continued to not show up for work.   In response, DEAN
SKELOS informed Lobbyist-1 that ADAM SKELOS needed money,
including because ADAM SKELOS had recently purchased a house.

24.   Records of defendant ADAM SKELOS's attendance at
work maintained by Supervisor-1 reflect that, from January 2, 2013
through April 26, 2013, ADAM SKELOS worked for three or more hours
only on five days during that approximately four-month period,
failing to report for work at all on the vast majority of days.
During this period, the CEO continued to employ ADAM SKELOS at
full pay and without disciplining him because of, among other
things, the CEO's belief from the January 10, 2013 conversation
with defendant DEAN SKELOS that DEAN SKELOS would retaliate with
official action against the Malpractice Insurance Administrator
if ADAM SKELOS were terminated.

25.   In or about the fall of 2013, ADAM SKELOS, the
defendant, approached the CEO about converting his employment to
a consulting agreement.   The Malpractice Insurance Administrator
offered, and ADAM SKELOS signed, a consulting agreement that would
pay him at a rate of $36,000 per year, in exchange for his agreement
to make at least 100 sales calls per week.   The CEO discussed this
new arrangement with defendant DEAN SKELOS.   During the period
of ADAM SKELOS's consulting agreement, ADAM SKELOS did not

15

complete even a small fraction of the required sales calls each week.  The Malpractice Insurance Administrator never sold one medical malpractice policy to a single doctor as a result of any call placed by or work performed by ADAM SKELOS.

26.   The Malpractice Insurance Administrator continued to employ ADAM SKELOS despite his non-performance at work -- even giving ADAM SKELOS an extension of his consulting contract -- until on or about March 31, 2015, when the extension to ADAM SKELOS's consulting contract expired.

**Official Actions Taken by DEAN SKELOS in Return for the Payments to ADAM SKELOS and to Ensure Payments Would Continue**

27.   From in or about 2010 through in or about 2015, in exchange for the illegal payments to defendant ADAM SKELOS and to ensure they would continue, defendant DEAN SKELOS used his official position to take numerous actions as the opportunities arose under the color of his official authority and in his official capacity as an elected legislator and as Co-Majority Coalition Leader, Majority Leader and President Pro Tem of the Senate, including but not limited to the following:

a.   DEAN SKELOS, in his official capacity, met with representatives of Developer-1 and discussed legislative matters of importance to Developer-1.

b.   DEAN SKELOS supported legislative proposals favorable to Developer-1, including but not limited to proposals

16

made by lobbyists for Developer-1 with respect to the Rent Act of 2011.

   c. DEAN SKELOS promoted and voted for various real estate legislation sought by and favorable to Developer-1, including legislation concerning rent regulation and property tax abatements, and he rebuffed legislative initiatives put forth by interests adverse to Developer-1.

   d. DEAN SKELOS facilitated the approval by Nassau County of a $12 million contract with the Environmental Technology Company (the "Nassau County Contract").

   e. DEAN SKELOS pressured Nassau County officials (i) to obtain additional funding so that work on the Nassau County Contract could progress, and (ii) to make payments to the Environmental Technology Company so that the Company would continue making monthly payments to ADAM SKELOS.

   f. DEAN SKELOS assisted the Environmental Technology Company in its ultimately unsuccessful attempt to secure the issuance of hydraulic fracturing regulations by the New York State Department of Health sought by the Environmental Technology Company, including by directing members of his Senate staff to arrange a meeting between the Environmental Technology Company and the Department of Health.

g.   DEAN SKELOS attempted to secure changes to New York State's 2015-2016 budget to include additional funding for stormwater infrastructure projects and changes to New York State Law that would have authorized so-called "design-build" contracts, which would have benefitted the Environmental Technology Company and ADAM SKELOS.

h.   DEAN SKELOS met with lobbyists for the Malpractice Insurance Administrator and supported legislation critical to the Malpractice Insurance Administrator's business, including the renewals in 2012 and 2015 of legislation that gives special protection to medical practice insurers from being liquidated by New York State even when operating a negative balance sheet as was the case for the medical malpractice insurance company administered by the Malpractice Insurance Administrator.

28.   In furtherance of these schemes, DEAN SKELOS and ADAM SKELOS, the defendants, and others caused interstate wires to be used, including but not limited to interstate e-mails, telephone calls, and wire transfers of funds.

### The Defendants' Concealment of Their Criminal Conduct

29.   As part of their corrupt schemes and to avoid detection by the public, State regulators, law enforcement, and others, DEAN SKELOS and ADAM SKELOS, the defendants, took numerous

18

steps to conceal their illegal conduct, including but not limited
to the following:

a.    CW-1 and ADAM SKELOS disguised a $20,000
payment to ADAM SKELOS as a commission for title insurance work
from Title Company-1 in order to falsely make it appear that the
payment was in return for work by ADAM SKELOS and so that the
payment could not be traced back to Developer-1.

b.    ADAM SKELOS signed falsified time sheets to
falsely make it appear that he was working full-time at the
Malpractice Insurance Administrator.

c.    ADAM SKELOS did not register as a lobbyist as
required under New York State law even though he lobbied New York
State and county officials, including DEAN SKELOS, on behalf of
the Environmental Technology Company.

d.    When discussing the schemes, DEAN SKELOS and
ADAM SKELOS used coded language and, in the case of ADAM SKELOS,
used a self-described "burner" phone, in an attempt to limit
possible electronic surveillance by law enforcement.

30.    DEAN SKELOS and ADAM SKELOS, the defendants,
increased their acts of concealment, including by changing their
behavior and the manner in which they communicated, following the
federal criminal charges brought against the Speaker of the New

York Assembly on January 22, 2015, and the subsequent public focus
on corruption investigations.

### Statutory Allegations

### COUNT ONE

**(Conspiracy to Commit Extortion Under Color of Official Right)**

The Grand Jury charges:

31.   The allegations contained in paragraphs 1 through
30 of this Indictment are repeated and realleged as if fully set
forth herein.

32.   From at least in or about 2010 through in or about
April 2015, in the Southern District of New York and elsewhere,
DEAN SKELOS and ADAM SKELOS, the defendants, and others known and
unknown, willfully and knowingly did conspire, confederate, and
agree together and with each other to commit extortion, as that
term is defined in Title 18, United States Code, Section
1951(b)(2), that is, by obtaining payments from others, with their
consent, having been induced under color of official right, and
that extortion would and did thereby obstruct, delay, and affect
commerce and the movement of articles and commodities in commerce,
as that term is defined in Title 18, United States Code, Section
1951(b)(3), in violation of Title 18, United States Code, Section
1951, to wit, DEAN SKELOS, ADAM SKELOS, and others known and
unknown, would and did arrange and attempt to arrange for DEAN

SKELOS to cause entities with business before New York State to direct payments to ADAM SKELOS with the expectation that DEAN SKELOS would take official actions favorable to their interests and would not take official actions adverse to their interests.

(Title 18, United States Code, Section 1951.)

## COUNT TWO

### (Conspiracy to Commit Honest Services Fraud)

The Grand Jury further charges:

33.  The allegations contained in paragraphs 1 through 30 of this Indictment are repeated and realleged as if fully set forth herein.

34.  From at least in or about 2010, up to and including in or about April 2015, in the Southern District of New York and elsewhere, DEAN SKELOS and ADAM SKELOS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.

35.  It was a part and an object of the conspiracy that DEAN SKELOS and ADAM SKELOS, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to DEAN SKELOS's honest services as an elected legislator, would and did transmit and cause to be

21

transmitted by means of wire communication in interstate and

foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing such scheme and artifice, in violation

of Title 18, United States Code, Section 1343, to wit, DEAN SKELOS,

while serving as Majority Leader, Co-Majority Coalition Leader,

and President Pro Tem of the New York State Senate would take

official action in return for payments to his son, ADAM SKELOS,

and in connection therewith and in furtherance thereof, DEAN

SKELOS and ADAM SKELOS transmitted and caused to be transmitted

interstate electronic wire transfers of funds, e-mails, and

telephone calls.

(Title 18, United States Code, Section 1349.)

### COUNT THREE

**(Extortion Under Color of Official Right: Developer-1)**

The Grand Jury further charges:

36.   The allegations contained in paragraphs 1 through

30 of this Indictment are repeated and realleged as if fully set

forth herein.

37.   From at least in or about 2010 through in or about

April 2015, in the Southern District of New York and elsewhere,

DEAN SKELOS, the defendant, while serving as an elected legislator

and as Majority Leader, Co-Majority Coalition Leader and President

Pro Tem of the New York State Senate, together with ADAM SKELOS,

22

the defendant, willfully and knowingly, attempted to and did commit extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), that is, by obtaining and attempting to obtain payments from Developer-1, with its consent, such consent having been induced under color of official right, and that extortion would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, DEAN SKELOS, aided and abetted by ADAM SKELOS, attempted to and did cause Developer-1, which had business before New York State, to make and direct payments to ADAM SKELOS in exchange for officials actions by DEAN SKELOS.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT FOUR

### (Extortion Under Color of Official Right: The Environmental Technology Company)

The Grand Jury further charges:

38.   The allegations contained in paragraphs 1 through 30 of this Indictment are repeated and realleged as if fully set forth herein.

39.   From at least in or about 2010 through in or about April 2015, in the Southern District of New York and elsewhere, DEAN SKELOS, the defendant, while serving as an elected legislator and as Majority Leader, Co-Majority Coalition Leader, and

President Pro Tem of the New York State Senate, together with ADAM SKELOS, the defendant, willfully and knowingly, attempted to and did commit extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), that is, by obtaining and attempting to obtain payments from the Environmental Technology Company, with its consent, such consent having been induced under color of official right, and that extortion would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, DEAN SKELOS, aided and abetted by ADAM SKELOS, attempted to and did cause the Environmental Technology Company, which had business before New York State, to make payments to ADAM SKELOS in exchange for official actions by DEAN SKELOS.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT FIVE

### (Extortion Under Color of Official Right: The Malpractice Insurance Administrator)

The Grand Jury further charges:

40.   The allegations contained in paragraphs 1 through 30 of this Indictment are repeated and realleged as if fully set forth herein.

41.   From at least in or about 2012 through in or about March 2015, in the Southern District of New York and elsewhere,

24

DEAN SKELOS, the defendant, while serving as an elected legislator and as Majority Leader, Co-Majority Coalition Leader, and President Pro Tem of the New York State Senate, together with ADAM SKELOS, the defendant, willfully and knowingly, attempted to and did commit extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), that is, by obtaining and attempting to obtain payments from the Malpractice Insurance Administrator, with its consent, such consent having been induced under color of official right, and that extortion would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, DEAN SKELOS, aided and abetted by ADAM SKELOS, attempted to and did cause the Malpractice Insurance Administrator, which had business before New York State, to make payments to ADAM SKELOS in exchange for official actions by DEAN SKELOS.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT SIX

### (Solicitation of Bribes and Gratuities – Developer-1)

The Grand Jury further charges:

42.   The allegations contained in paragraphs 1 through 30 of this Indictment are repeated and realleged as if fully set forth herein.

43.   From at least in or about 2010, up to and including in or about April 2015, in the Southern District of New York and elsewhere, DEAN SKELOS, the defendant, being an agent of a State and local government, to wit, a Member of the New York State Senate, and defendant ADAM SKELOS, as an aider and abetter of DEAN SKELOS, knowingly and corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency involving a thing of value of $5,000 and more, such government and agency having received, in a one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to wit, DEAN SKELOS, in his capacity as a Member of the New York State Senate, and ADAM SKELOS, as an aider and abetter, solicited and accepted cash and things of value from Developer-1, which had business before New York State, intending for DEAN SKELOS to be influenced and rewarded.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

26

## COUNT SEVEN

(Solicitation of Bribes and Gratuities –
The Environmental Technology Company)

The Grand Jury further charges:

44.   The allegations contained in paragraphs 1 through
30 of this Indictment are repeated and realleged as if fully set
forth herein.

45.   From at least in or about 2010, up to and including
in or about April 2015, in the Southern District of New York and
elsewhere, DEAN SKELOS, the defendant, being an agent of a State
and local government, to wit, a Member of the New York State Senate,
and defendant ADAM SKELOS, as an aider and abetter of DEAN SKELOS,
knowingly and corruptly solicited and demanded for the benefit of
a person, and accepted and agreed to accept, a thing of value from
a person, intending to be influenced and rewarded in connection
with a business, transaction, and series of transactions of such
government and agency involving a thing of value of $5,000 and
more, such government and agency having received, in a one year
period, benefits in excess of $10,000 under a Federal program
involving a grant, contract, subsidy, loan, guarantee, insurance,
and other form of federal assistance, to wit, DEAN SKELOS, in his
capacity as a Member of the New York State Senate, and ADAM SKELOS,
as an aider and abetter, solicited and accepted cash and things
of value from the Environmental Technology Company, which had

business before New York State, intending for DEAN SKELOS to be influenced and rewarded.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

### COUNT EIGHT

(Solicitation of Bribes and Gratuities –
The Malpractice Insurance Administrator)

The Grand Jury further charges:

46. The allegations contained in paragraphs 1 through 30 of this Indictment are repeated and realleged as if fully set forth herein.

47. From at least in or about 2012, up to and including in or about March 2015, in the Southern District of New York and elsewhere, DEAN SKELOS, the defendant, being an agent of a State and local government, to wit, a Member of the New York State Senate, and defendant ADAM SKELOS, as an aider and abetter of DEAN SKELOS, knowingly and corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency involving a thing of value of $5,000 and more, such government and agency having received, in a one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to wit, DEAN SKELOS, in his

capacity as a Member of the New York State Senate, and ADAM SKELOS, as an aider and abetter, solicited and accepted cash and things of value from the Malpractice Insurance Administrator, which had business before New York State, intending for DEAN SKELOS to be influenced and rewarded.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

### FORFEITURE ALLEGATIONS: COUNTS ONE THROUGH EIGHT

48. As a result of committing one or more of the offenses alleged in Counts One through Eight of the Indictment, DEAN SKELOS and ADAM SKELOS, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the offenses alleged in Counts One through Eight, including but not limited to any and all right, title, and interest in:

a. Any and all funds, up to and including at least $192,000, in account number 2994573919 at JPMorgan Chase in the name of ADAM SKELOS and his spouse;

b. Any and all funds, up to and including at least $107,581.06, in account number 970779211 at JPMorgan Chase in the name of ADAM SKELOS and his spouse;

c. the real property known and described as all that lot or parcel of land, together with its buildings,

appurtenances, improvements, fixtures, attachments and easements, located at 29 Leon Court, Rockville Centre, New York, NY 11570.

### Substitute Asset Provision

49.   If any of the above-described forfeitable property, as a result of any act or omission of DEAN SKELOS and ADAM SKELOS, the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), to

seek forfeiture of any other property of the defendants up to the

value of the above forfeitable property.

(Title 18, United States Code, Section 981,
Title 21, United States Code, Section 853, and
Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

DEAN SKELOS and
ADAM SKELOS,

Defendants.

SUPERSEDING INDICTMENT

S1 15 Cr. 317 (KMW)

(18 U.S.C. §§ 666, 1343, 1346,
1349, 1951, & 2.)

_____          PREET BHARARA
Foreperson.                  United States Attorney.

A True Bill.

7/21/15
AF - Filed Superseding Indictment
Jury not
US MJ