UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                  :

   -v.-                                             :        S1 15 Cr. 317 (KMW)

DEAN SKELOS and ADAM SKELOS,              :

             Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


# THE GOVERNMENT'S MOTIONS *IN LIMINE*


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Jason A. Masimore
Rahul Mukhi
Tatiana R. Martins
Thomas A. McKay
Assistant United States Attorneys
     -Of Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

   -v.-                                             :        S1 15 Cr. 317 (KMW)

DEAN SKELOS and ADAM SKELOS,                :

          Defendants.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### THE GOVERNMENT'S MOTIONS *IN LIMINE*

The Government respectfully submits this memorandum of law in support of its motion

for *in limine* rulings from the Court.  As set forth in more detail below, the Government seeks the

following rulings with respect to certain evidence:[1]

     1.     Admission of acts taken by defendants Dean Skelos and Adam Skelos in

furtherance of the charged extortion and honest services fraud conspiracies beyond specific acts

enumerated in the charging documents.

     2.     Admission of statements by participants in the defendants' extortion and bribery

schemes to demonstrate the participants' then-existing states of mind.

---

[1]     In advance of this filing, the Government raised each of the issues discussed herein with counsel for each of the defendants.  For each issue, counsel stated that the defendants objected to the Government's position.  Where the defendants have indicated that they have an objection to certain evidence but not to other similar evidence, that distinction is noted in the relevant section of this memorandum.  In addition, the defendants have informed the Government that they do not object to: (1) the introduction by the Government of the fact of Sheldon Silver's arrest on January 22, 2015 on corruption charges, and evidence of news reports concerning a federal investigation into Dean Skelos; (2) the introduction by the Government of training received by Dean Skelos on the New York State Public Officer's Law, which includes, among other things, a code of ethics for state legislators, to establish that Dean acted with the requisite intent, including the specific intent to deprive New York citizens of his honest services; and, relatedly, (3) the preclusion by either party of eliciting expert or other testimony regarding whether the conduct charged in this case violated the New York Public Officer's Laws and other State laws.

3.      Admission of statements to show their effect on the listener.

4.      If defendant Dean Skelos testifies, or introduces evidence of his good character through other witnesses, leave to cross examine Dean Skelos and other witnesses on, and potentially admit evidence of Dean Skelos's long-time employment at a Long Island law firm, for which he performed no legal work, and about which he made false and misleading statements to the public and others about the nature of his work.

5.      **[Under Seal]** ████████████████████████████
████████████████████████████

6.      **[Under Seal]** ████████████████████████████
████████████████████████

## FACTUAL BACKGROUND

From in or about 1984 until the present, defendant Dean Skelos has served as a member of the New York State Senate (the "Senate"), representing a Senate District that covers parts of Nassau County.  (Superseding Indictment ¶ 1).  Since in or about January 2011, until on or about May 11, 2015, Dean Skelos was the Majority Leader and/or Co-Majority Leader of the Senate. (*Id.*).  As Majority Leader, Dean Skelos exercised enormous power over the Senate and New York State government.  (Superseding Indictment ¶ 2).  In addition to his power and influence in Albany, Dean Skelos wielded official power and influence in Nassau County, where he was the county's highest ranking State official.  (*Id.*).

As alleged, from at least in or about 2010 up to and including in or about April 2015, Dean Skelos criminally abused the power of his office to obtain payments for his son, defendant Adam Skelos.  (Superseding Indictment ¶ 8).  The payments solicited and accepted by the defendants included jobs for Adam Skelos for which he was not qualified and often performed

little work, other than to attempt to increase his payments through the official actions of his father, Dean Skelos. (*Id.*). In order to bring about and continue these payments, Dean Skelos repeatedly pressured the entities from which he and Adam Skelos solicited money, including during meetings, conversations, and time periods in which the same entities were lobbying Dean Skelos to take legislative actions in the entities' favor, and Dean Skelos then took numerous official actions in favor of the entities that agreed to pay his son. (*Id.* ¶¶ 11, 18).

On July 21, 2015, a Grand Jury returned an eight-count Superseding Indictment. Count One of the Superseding Indictment charges the defendants with conspiring to obtain property under color of official right from entities with business before New York State, in violation of Title 18, United States Code, Section 1951; Count Two of the Superseding Indictment charges the defendants with conspiring to commit honest services wire fraud by soliciting and accepting bribes and/or kickbacks from entities with business before New York State, in violation of Title 18, United States Code, Section 1349; Counts Three, Four, and Five each charge the defendants with obtaining property under color of official right, in violation of Title 18, United States Code, Section 1951 and 2, related to a particular major real estate development firm ("Developer-1") (Count Three), an environmental technology company (the "Environmental Technology Company" or the "Company") (Count Four), and a medical malpractice insurance administrator (the "Malpractice Insurance Administrator") (Count Five), respectively; Counts Six, Seven, and Eight each charge the defendants with solicitation and acceptance of bribes and gratuities, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2, also related to Developer-1 (Count Six), the Environmental Technology Company (Count Seven), and the Malpractice Insurance Administrator (Count Eight), respectively.

**ARGUMENT**

I.     **EVIDENCE OF THE ACTS DESCRIBED BELOW SHOULD BE ADMITTED AS DIRECT EVIDENCE**

In discussions with the Government, the defendants have taken the position that the Government may only introduce evidence that either relates to the three particular schemes charged in the substantive counts of the Superseding Indictment, or that was specifically cited in the charging documents in this case, notwithstanding the fact that the Superseding Indictment charges conspiracies that, by their own terms, cover conduct that extends beyond the substantive offenses and the acts enumerated in the charging documents.[2]   The defendants' effort to limit the Government's proof is unsupported by law and should be rejected.

A.     **Background**

The Superseding Indictment charges the defendants with participating in conspiracies to misuse Dean Skelos's official position to obtain benefits for his son Adam Skelos, conspiracies that plainly extend beyond the specific actions taken by the defendants that are detailed as examples in the charging documents in this case.  In particular, the Superseding Indictment charges a conspiracy to commit extortion under color of official right (Count One) and a conspiracy to engage in honest services wire fraud (Count Two).  As set forth in the Superseding Indictment, these counts relate to the defendants' "corrupt scheme to monetize DEAN SKELOS's official position to obtain for ADAM SKELOS hundreds of thousands of dollars in bribes, gratuities, and extortion payments from campaign donors to DEAN SKELOS and/or

---

[2]     Defendants have informed the Government that they do not object to the admissibility of evidence that was referenced in the criminal complaint or the Superseding Indictment.  For example, the defendants concede that the evidence cited in paragraphs 19(a), 19(b) and 19(d) of the complaint are admissible as direct evidence of the charged conspiracies.

4

companies with business before the State" from in or about 2010 up to an including April 2015. (Superseding Indictment ¶ 8).  Thus, the conspiracies charged in Counts One and Two cover broad actions related to the defendants' agreement to extort and solicit bribes and kickbacks from "campaign donors to DEAN SKELOS and/or companies with business before the State."  (*See id.* ¶ 8 (listing efforts taken by Dean Skelos "including but not limited to" enumerated acts)). Indeed, the "to wit" clauses of Counts One and Two allege wide-ranging conspiracies wherein the defendants "would and did arrange and attempt to arrange for DEAN SKELOS to cause entities with business before New York State to direct payments to ADAM SKELOS with the expectation that DEAN SKELOS would take official actions favorable to their interests and would not take official actions adverse to their interests" (Count One), and in which Dean Skelos, while serving as the Senate Majority Leader, "would take official action in return for payments to his son," (Count Two).

That the conspiracies encompass acts that extend beyond the several examples listed in the charging documents has been clear to the defendants at least since the Government started producing discovery in this case within days of the defendants' May 4, 2015 arrest on a criminal complaint.  As the discovery has made clear to the defendants, there is compelling evidence – evidence that the defendants now are seeking to preclude – reflecting numerous efforts by the defendants to use the official power of Dean Skelos to obtain monetary benefits for Adam Skelos that extend beyond those successfully obtained from Developer-1, the Environmental Technology Company, and the Malpractice Insurance Administrator.  For example, in Rule 16 discovery, the Government produced wiretap linesheets to the defendants on June 2, 2015 that categorized numerous calls as "pertinent" that did not relate specifically to Developer-1, the Environmental Technology Company, and the Malpractice Insurance Administrator schemes, or

to any of the other acts specifically cited in the charging documents.  Rather, the calls marked "pertinent," calls which the defendants now seek to preclude, related in many instances to other acts that were relevant to the defendants' use of Dean Skelos's office to obtain benefits for Adam Skelos from numerous entities with business before New York State.  Some of these calls were also highlighted to the defense in the wiretap affidavits and periodic reports produced in discovery as early as May 7, 2015.[3]

In several discussions over the last two weeks, the Government has raised with defense counsel the evidence of the conspiracies that the Government intends to introduce at trial, including the particular matters set forth below.  Although the defendants initially asserted that they would oppose the introduction of any evidence that was not tied to one of the substantively-charged schemes (*i.e.*, any evidence that did not relate to Developer-1, the Environmental Technology Company, and the Malpractice Insurance Administrator), on October 23, 2015, the defendants limited their objection to evidence that was not specifically detailed in the criminal complaint or the Superseding Indictment.  As set forth below, there is no legal distinction between those acts specifically referenced in the charging documents as examples of overt acts in furtherance of the conspiracy and those that also constitute direct evidence of the alleged crimes but were not specifically described in the charging documents.  Accordingly, the Government seeks a ruling permitting it to offer evidence of the conspiracies charged in Counts One and Two that extend beyond the examples enumerated in the charging documents, including, but not limited to, evidence that the defendants took the following acts (collectively, the "Other Conspiracy Evidence"):

---

[3]     Notably, while the defendants did seek particulars on various other issues, which the Court recently denied, the defendants have never sought additional detail as to each particular act taken by the defendants in furtherance of the charged conspiracies.

- On or about December 22, 2014, during the period of the charged conspiracies, Adam Skelos called an individual affiliated with a group that represents Greek diners and whom Adam Skelos had been soliciting for commissioned sales business.  During the sales call, Adam Skelos invoked the power of Dean Skelos's office by citing his frequent appearance in the "papers," and stated that, if the individual wanted to "utilize" Adam Skelos's "reach," the individual needed to call Adam Skelos to set up a meeting to discuss purchasing business from Adam Skelos.  When the individual asked Adam Skelos what he meant, Adam Skelos stated "I'm not gonna go there. I'm not going to say this on the phone. You could've heard those opportunities in person."  (Collectively, the "Greek Diner Call Evidence.")[4]

- In late 2014 and early 2015, during the period of the charged conspiracies, Dean Skelos and Adam Skelos undertook efforts to obtain a position for Adam Skelos's wife on the zoning appeals board of a town in Nassau County (the "Zoning Board").  In particular, on several recorded calls, Dean Skelos and Adam Skelos discussed Dean Skelos's efforts to get Adam Skelos's wife onto the Zoning Board, and the salary and health benefits that Adam Skelos's wife would get from the position.  On January 12, 2015, Adam Skelos called a Senate employee, who temporarily resided with Dean Skelos in Albany, and stated "I don't want to text him [Dean Skelos] anything.  Can you just remind him two things that – just say I just wanted to remind him about [Adam Skelos's wife's name] and Nassau County?"  On other intercepted calls, Adam Skelos discussed with third parties – including the individual identified as CW-2 in the Complaint – his ability to corruptly obtain zoning decisions favorable to real estate deals he brokered given his wife's appointment.  (Collectively, the "Zoning Board Evidence.")[5]

## B.     Applicable Law

Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401. Federal Rule of Evidence 402, in turn, provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these

---

[4]     This intercepted call was provided to the defendants as part of Rule 16 discovery in early June 2015, and was marked as pertinent on the wiretap line sheets.  It was also highlighted repeatedly in the Title III applications.
[5]     In Rule 16 discovery the Government produced wiretapped calls related to this scheme and identified the calls as pertinent.

rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority."  Fed. R. Evid. 402.

Relevant evidence is admissible pursuant to Rules 401 and 402 regardless of whether all such evidence is detailed in the charging instrument.  Thus, "[i]t is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy."  *United States* v. *Thai*, 29 F.3d 785, 812 (2d Cir. 1994).  *See also United States* v. *Amrep Corp.*, 545 F.2d 797, 800 (2d Cir. 1976) ("Relevant evidence should be admitted and not excluded.  It makes no difference whether such evidence is particularized in the indictment. . . ."); *United States* v. *Jefferson*, 562 F. Supp. 2d 719, 724 (E.D. Va. 2008) (in bribery case, permitting Government to introduce additional facts and legal theories not specifically enumerated in indictment on grounds that "the Indictment need not enumerate every possible legal and factual theory of defendant's guilt so long as the Indictment, as here, recites the elements of the statutory offense"), *aff'd*, 674 F.3d 332 (4th Cir. 2012).  Indeed, where, as here, an indictment contains a conspiracy charge, "uncharged acts may be admissible as direct evidence of the conspiracy itself."  *United States* v. *Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (quotation omitted).  "An act that is alleged to have been done in furtherance of the alleged conspiracy is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged."  *United States* v. *Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (quotation omitted).

Consistent with these principles, a broad range of relevant evidence can be introduced to prove a conspiracy charge, including, for example, evidence of incomplete attempts by co-conspirators to effect the object of the conspiracy.  *See, e.g.*, *United States* v. *Wallach*, 935 F.2d 445, 470 (2d Cir. 1991) ("Because it is the conspiratorial plan itself that is the focus of the charge, the illegality of the agreement is not dependent on the actual achievement of its goal.").

8

Such evidence can also include acts taken by only one co-conspirator to prove the existence of the conspiracy. *See, e.g.*, *United States* v. *Geibel*, 369 F.3d 682, 695 (2d Cir. 2004) ("It is axiomatic that all acts and statements committed by one co-conspirator in furtherance of the conspiracy are admissible against all members of the conspiracy.") (quotation omitted).

In addition, evidence of the defendants' conduct may be admitted as direct evidence if it if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably linked with the charged conduct, or if it is necessary to complete the story of the crimes on trial. *See United States* v. *Robinson*, 702 F.3d 22, 37 (2d Cir. 2012); *United States* v. *Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). "Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States* v. *Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988).

Evidence of other acts taken by the defendant can also be admissible pursuant to Rule 404(b) of the Federal Rules of Evidence. The Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States* v. *LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). The proper purposes under Rule 404(b) include "motive, . . . intent, plan, preparation [and] knowledge." Fed. R. Evid. 404(b); *see also United States* v. *Teague*, 93 F.3d 81, 84 (2d Cir. 1996) (proof of state of mind, such as intent and knowledge, is a proper purpose); *United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (evidence admissible to infer knowledge or intent where defendant claims his conduct had an innocent explanation); *United States* v. *Paccione*, 949 F.2d 1183, 1198 (2d Cir. 1991) (evidence of prior bribery attempts admissible to show awareness that acts were not innocent). The Second Circuit has "held

repeatedly that it is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *United States* v. *Rosa*, 11 F.3d 315, 334 (2d Cir. 1993) (collecting cases).  As long as the "other act" evidence is relevant for such a proper purpose and its probative value is not substantially outweighed by any unfair prejudicial effect, it is admissible.  *See United States* v. *McCallum*, 584 F.3d 471, 474–75 (2d Cir. 2009); *United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993).

**C.     Discussion**

The Superseding Indictment alleges that, from at least 2010 up through and including April 2015, Dean Skelos and Adam Skelos engaged in a corrupt scheme to monetize Dean Skelos's official provision in order to obtain for Adam Skelos hundreds of thousands of dollars in bribes, gratuities, and extortion payments from various entities with business interests before New York State.  As set forth in detail in the Superseding Indictment, the defendants' actions in furtherance of this scheme included, but were not limited to, actions directed at Developer-1, the Environmental Technology Company and the Malpractice Insurance Administrator.  (*See* Superseding Indictment ¶ 8 (listing efforts taken by Dean Skelos "including but not limited to" enumerated acts); Complaint ¶¶ 19, 19(a)-(d)).  Because the Other Conspiracy Evidence relates to acts within the scope of the conspiracy and taken in furtherance of it, it is admissible as direct proof of the extortion and honest services fraud conspiracies charged in Counts One and Two of the Superseding Indictment.  *See United States* v. *Thai*, 29 F.3d at 812 ("[i]t is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy").  *See also United States* v. *Montour*, 944 F.2d 1019, 1026-

10

27 (2d Cir. 1991) ("[if] an act is relevant to the alleged conspiracy when viewed in light of all the evidence, it should not be stricken"); *United States* v. *LaSpina*, 299 F.3d 165, 176 (2d Cir. 2002) ("an overt act may be made by only a single one of the conspirators and need not be itself a crime"); *United States* v. *Slocum,* 695 F.2d 650, 654 (2d Cir. 1982).

The Other Conspiracy Evidence is also admissible independently because it arises from the same series of transactions, is inextricably intertwined with the charged conduct, and is necessary to "complete the story of the crime on trial."  *United States* v. *Robinson*, 702 F.3d at 37 (quotation omitted).  *See also United States* v. *Carboni*, 204 F.3d at 44.  The proffered acts all arose from the defendants' efforts to obtain payments for Adam Skelos through the use of Dean Skelos's official position during the timeframe alleged in the Superseding Indictment.  As such, the Other Conspiracy Evidence is part and parcel of the defendants' sustained attempts to monetize Dean Skelos's position for Adam Skelos's benefit, which are inextricably intertwined with the charged conduct and are necessary to "complete the story of the crime on trial."

The Other Conspiracy Evidence is also admissible under Rule 404(b) as relevant to the defendants' motive, intent, plan, preparation and knowledge.  Evidence regarding the defendants' various attempts to secure financial benefits for Adam Skelos is highly probative of the defendants' motive—to financially support Adam Skelos.  These instances also demonstrate the defendants' common plan for achieving that goal—using Dean Skelos's official position.  *See, e.g.*, *United States* v. *Memoli*, 2014 WL 5313707, at *2 (D. Conn. Oct. 16, 2014) (evidence of uncharged extortionate demands admissible to show defendant's *modus operandi*); *United States* v. *Curley*, 639 F.3d at 59 (pattern of acts by defendant probative of intent).  *See also United States* v. *Brennan*, 798 F.2d 581, 589 (2d Cir. 1986) (evidence of prior bribes admissible to help explain to jury how illegal relationship between defendants developed).

Moreover, to the extent defendants contest the intent element of any of the alleged offenses, which the Government expects they will do based on discussions with defense counsel and motion papers already filed in this case, evidence of these other corrupt acts will be admissible to show the defendants' corrupt intent and knowledge that their acts were unlawful. *See Carboni*, 204 F.3d at 44 (bad acts admissible to rebut good faith defense); *United States* v. *Inserra*, 34 F.3d at 89 (evidence of false statements conviction admissible to prove state of mind); *United States* v. *Paccione*, 949 F.2d at 1198 (evidence of attempt to bribe public official relevant to show awareness that actions were not innocent); *United States* v. *Chaimson*, 760 F.2d 798, 806 (7th Cir. 1985) (evidence of prior bribe admissible to prove intent).

For these reasons and those set forth below, the Other Conspiracy Evidence (including other conduct of a similar nature) should be admitted at trial.

1.   The Greek Diner Call Evidence Should Be Admitted

On or about December 22, 2014, during the timeframe of the charged conspiracies, Adam Skelos called an individual affiliated with a group that represents Greek diners to whom Adam Skelos was seeking to sell energy services, which Dean Skelos and Adam Skelos had also tried to sell to Developer-1 principally in 2011 and 2012, also during the course of the charged extortion and honest services fraud schemes.  During the December 2014 call to the individual associated with Greek diners, Adam Skelos made clear that buying energy services from Adam Skelos included a *quid pro quo* for Dean Skelos's official power.  Specifically, during the call, Adam Skelos explicitly referred to his father's frequent appearance in the "papers," and stated that, if the individual wanted to "utilize" Adam Skelos's "reach," the individual needed to call Adam Skelos to set up a meeting to buy energy services.  When the individual asked Adam Skelos what he meant, Adam Skelos stated "I'm not gonna go there.  I'm not going to say this on

the phone.  You could've heard those opportunities in person."  A transcript of that call is attached hereto as Exhibit A.[6]  This call is direct evidence of Adam Skelos's use of his father's official power and position to threaten individuals in an attempt to make them pay him, which is precisely the conduct with which he is charged in Counts One and Two of the Superseding Indictment.  *See, e.g.*, *Quinones*, 511 F.3d at 309 (threats admissible where they contain admission to charged crime and are inextricably linked to evidence offered to prove charged offense).

The evidence further shows that the defendants' method of communicating threats was not just limited to the explicit and implicit threats the defendants made to Developer-1, the Environmental Technology Company, and the Malpractice Insurance Administrator.  That is, the evidence shows that these types of threats were part of the defendant's *modus operandi*, and is also evidence of their intent, when soliciting payments from those with business interests before New York State.  Thus, the phone call with the individual associated with Greek diners demonstrates the defendants' common plan and/or intent and is therefore also admissible for these reasons.

　　2.　The Zoning Board Evidence Should Be Admitted

The Government seeks to admit evidence in support of the conspiracies charged in Count One and Count Two related to joint efforts by Dean Skelos and Adam Skelos to ensure that Adam Skelos's wife received an appointment to a zoning appeals board of a town in Nassau County.  The purpose of the appointment was to make sure that Adam Skelos received additional income and health benefits, and that Adam Skelos would be able to corruptly use his wife's

---

[6]　Adam Skelos's tone in the conversation with the individual makes clear that Adam Skelos was attempting to extort him by using Dean Skelos's official power.  The Government can make an audio clip of the call available upon request by the Court.

position with respect to his real estate deals.  The defendants' attempt to appoint Adam Skelos's

wife to the board of appeals ultimately was thwarted by publicity surrounding the instant case,

among other things.

      The Zoning Board Evidence is probative of Dean Skelos's willingness to use his official

position to ensure continuing benefits to Adam Skelos as charged in the Superseding Indictment.

On the intercepted calls, Dean Skelos and Adam Skelos discuss how to achieve their goal of

securing the appointment for Adam Skelos's wife.  Moreover, the defendants discuss Adam

Skelos's wife's compensation for serving on the zoning board and the fact that Adam Skelos's

family would receive health benefits if she were appointed.  These discussions are especially

probative in light of Adam Skelos's employment with the Malpractice Insurance Administrator,

which, as Adam Skelos informed the CEO of that company, he needed not only because of the

salary but also because of the health insurance benefits.  As alleged, the Malpractice Insurance

Administrator made payments and provided health benefits to Adam Skelos because of the

CEO's belief, based on his conversations with Dean Skelos, that Dean Skelos would take official

action against the Malpractice Insurance Administrator if those benefits were discontinued.

During the time of the Zoning Board Evidence, Adam Skelos was no longer receiving health

benefits from the Malpractice Insurance Administrator and thus, as the Government will argue at

trial, the defendants were attempting to use Dean Skelos's position to obtain such benefits from

another entity over which Dean Skelos exercised official power.  This is direct evidence of the

charged conspiracies.

      Finally, even though the evidence is clearly admissible as direct evidence, it is also

admissible to rebut the defendants' apparent defense that Adam Skelos lied about his father's

level of involvement in his business and financial dealings.  *See* Defendant's Mem. of Law in

Support of Mot. to Suppress Wiretap Evid. at 3, n.3 (accusing Government of "want[ing] to continue recording [Adam Skelos's] lies so that it could make a case against Senator Skelos based on them"); Defendant's Reply Mem. of Law in Support of Wiretap Suppression Mot. at 6 ("Adam Skelos had a proclivity to exaggerate and/or misrepresent his importance and ties to Albany politics and [the Government] hoped to build a case against Senator Skelos by relying on his son's careless remarks.").  Evidence that Dean Skelos was in fact involved in an effort to use his own power and influence to obtain financial benefits for Adam Skelos – *i.e.,* that these were not simply empty statements by Adam Skelos – is probative of Dean Skelos's involvement in the scheme and necessary to rebut the expected defense that Adam Skelos supposedly invoked Dean Skelos's power without Dean Skelos's knowledge.

      3.   <u>The Other Conspiracy Evidence Is Not Unfairly Prejudicial Under Rule 403</u>

      There is no basis to exclude the Other Conspiracy Evidence under Federal Rule of Evidence 403.  First, the evidence is no more sensational than any of the other evidence concerning the defendants' participation in the honest services and extortion conspiracies charged in the Superseding Indictment.  *See United States* v. *Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (no unfair prejudice where "evidence did not involve conduct more serious than the charged crime"); *United States* v. *Siegel*, 717 F.2d 9, 16-17 (2d Cir. 1983) (evidence of a $30,000 bribe payment and its "clandestine circumstances" admitted over Rule 403 objection that dramatic nature of evidence was unfairly prejudicial compared with "the other evidence presented at trial of small bribes and gratuities"); *see generally United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) (explaining that "[e]vidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence").  To the contrary, and as noted above, there is a very

substantial overlap between the conduct giving rise to the Other Conspiracy Evidence and the other evidence cited in the charging documents, including evidence concerning Developer-1, the Environmental Technology Company, and the Malpractice Insurance Administrator.

In particular, the Other Conspiracy Evidence concerns the same means and methods employed by Dean Skelos and Adam Skelos to obtain payments for Adam Skelos through the use of Dean Skelos's official position. For example, the Greek Diner Call Evidence is no more prejudicial (and in fact is less sensational) than the expected testimony of Supervisor-1 at the Medical Insurance Administrator, which will include testimony about a threat made by Adam Skelos to "bash in" Supervisor-1's head after Adam Skelos told Supervisor-1 that he did not have to show up for work because his father was the Majority Leader. Similarly, the Zoning Board Evidence is no more prejudicial than the evidence of the corrupt actions taken by the defendants in connection with the substantive charges in this case.

Second, the proffered evidence is unlikely to significantly expand or increase the length of the trial or risk confusing the jury. As noted above, the Other Conspiracy Evidence overlaps in time and substance with the charged conduct, and is limited in scope. For example, the Greek Diner Call Evidence consists of one intercepted call and one potential witness; the Zoning Board Evidence consists of fewer than five intercepted calls and a few additional emails. In short, the Other Conspiracy Evidence will be limited in scope in light of all the other evidence in the trial.

## II.   EVIDENCE SHOWING THE STATES OF MIND OF PARTICIPANTS IN THE DEFENDANTS' SCHEME SHOULD BE ADMITTED

In discussions with the Government, the defendants have taken the position that the Government may not introduce the evidence set forth below that relates to the state of the mind of the other participants in the alleged crimes. However, such evidence not only is necessary to establish an element of the substantive extortion charges – an offense

requiring proof of the mental state of its victims – it also is probative of the defendants'

own corrupt intent with respect to the schemes.  Accordingly, the defendants' effort to

limit the Government's proof of the state of mind of the participants and victims of the

defendants' corrupt schemes is contrary to law and should be rejected.

## A.       Background

        The Government intends to introduce statements made by participants in the charged

schemes to show the participants' then-existing states of mind, namely, that certain actions and

conduct taken by victims of the extortion schemes charged in the Superseding Indictment were

motivated by Dean Skelos's control or influence related to his official position.  Such evidence

will include, but is not limited to, the following:

- During the time period when Dean Skelos was making requests of Developer-1 to find income for Adam Skelos, CW-1 and the Developer-1 Lobbyist had several conversations with each other during which they made statements, in sum and substance, that they each felt uncomfortable and pressured by Dean Skelos's requests given Dean Skelos's legislative power over Developer-1's business interests.  This evidence will be elicited directly from CW-1 and Developer-1 Lobbyist, both of whom are expected to testify at trial.  (Collectively, the "Developer-1 State of Mind Evidence.")[7]

- Statements made by the CEO of the Malpractice Insurance Administrator regarding Adam Skelos's employment at his company.  In particular, on or about January 10, 2013, and on other occasions thereafter, the CEO of the Malpractice Insurance Administrator told another executive at the company (the "Executive") about a phone call that the CEO had with Dean Skelos, and explained to the Executive that he (the CEO) did not believe he could terminate Adam Skelos's employment without angering Dean Skelos based on Dean Skelos's statements and demeanor on the call.  This evidence will be elicited directly from the CEO and the Executive, both of whom are expected to testify at trial. (Collectively, the "Malpractice Insurance Administrator State of Mind Evidence.")

## B.       Applicable Law

        Rule 803(3) of the Federal Rules of Evidence provides an exception to the hearsay rule

for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) .

---

[7]       CW-1's statements also are admissible as statements of a co-conspirator made in furtherance of the conspiracy.  *See* Fed. R. Evid. 801(d)(2)(E).

. . , but not including a statement of memory or belief to prove the fact remembered or believed

unless it relates to the validity or terms of the declarant's will." Fed. R. Evid. 803(3).  The

reasons for this so-called "state of mind" exception "focus on the contemporaneity of the

statement and the unlikelihood of deliberate or conscious misrepresentation." *United States* v.

*Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991).  "[U]nder Rule 803(3)," moreover, "hearsay

statements reflecting a declarant's intentions or future plans are admissible to prove subsequent

acts." *United States* v. *DeJesus*, 806 F.2d 31, 35 (2d Cir. 1986).  The Second Circuit has made

clear that statements that meet the requirements of Rule 803(3) may be admitted without regard

to their apparent credibility or trustworthiness.  *See United States* v. *Cardascia*, 951 F.2d at 487;

*see also United States* v. *DiMaria*, 727 F.2d 265, 271-72 (2d Cir. 1984).  Declarations that fall

within the parameters of Rule 803(3) "are *categorically* admissible, even if they are self-serving

and made under circumstances which undermine their trustworthiness." *United States* v. *Lawal*,

736 F.2d 5, 8 (2d Cir. 1984) (emphasis in original).

     In prosecutions for extortion under color of official right, courts routinely admit out-of-

court statements reflecting the extorted party's state of mind under Rule 803(3)'s hearsay

exception for state of mind evidence.  "In order for a jury to find a defendant guilty of extortion

under color of official right, the government must prove beyond a reasonable doubt," among

other things, "that the victims were motivated to make payments as a result of the defendant's

control or influence." *United States* v. *McDonough*, 56 F.3d 381, 388 (2d Cir. 1995); *see also*

*United States* v. *Margiotta*, 688 F.2d 108, 132-33 (2d Cir. 1982) (explaining that "a public

official may be guilty of obtaining money under color of official right if the [extorted party's]

payments are motivated as a result of [the public official's] exercise of the powers of his public

office and he is aware of this fact"), *cert. denied*, 461 U.S. 913 (1983).  The relevance of the

payor's state of mind to proving a charge of extortion under color of official right consistently

has been recognized by other Circuits.  *See, e.g.*, *United States* v. *McDonnell*, 792 F.3d 478, 511-

12 (4th Cir. 2015) ("we have no difficulty recognizing that proof of a bribe payor's subjective

belief in the recipient's power or influence over a matter will support a conviction for extortion

under color of official right"); *United States* v. *Fountain*, 792 F.3d 310, 316-17 (3d Cir. 2015).

These legal principles have supported admission of out-of-court statements by

participants in an extortion scheme concerning their relevant states of mind.  In *United States* v.

*Biaggi*, 705 F. Supp. 830, 841 (S.D.N.Y. 1988), for example, which involved, among other

things, the prosecution of former Congressman Mario Biaggi for extortion under color of official

right, the District Court admitted certain out-of-court statements of a participant in the extortion

scheme, in which the participant had promised to pay an associate of Biaggi's $50,000.  As the

court in *Biaggi* explained, the statements at issue reflected the participant's "intent to pay the

$50,000," and thus were admissible as reflecting the participant's then-existing state of mind

under Rule 803(3).  *Biaggi*, 705 F. Supp. at 841.

Similarly, in *United States* v. *Kelly*, 722 F.2d 873, 878 (1st Cir. 1983), a Massachusetts

state senator was convicted of extortion under color of official right for seeking money and other

items of value in exchange for awarding or continuing certain government contracts to other

participants in the extortion scheme.  The district court permitted the Government to introduce

several out-of-court statements of the participants in the scheme, which showed their states of

mind when dealing with the senator.  For example, one victim (Masiello) testified that another

victim asked him if he "thought that . . . Senator Kelly could, in fact, do the type of things that he

alluded to, such as having our contracts canceled in Massachusetts or if he could help us."  *Id*. at

877.  Masiello further testified that he told another victim that Senator Kelly "posed a veiled

threat that if we didn't retain Billy as a member of Masiello & Associates and didn't—and didn't continue to employ him, that there could be some problem—trouble with our contracts being canceled." *Id.* The district court explained that these statements were "admissible to show what these people thought about why they were doing things or why they were going to do things," and the First Circuit found that the district court "did not err in admitting the testimony under the state of mind exception to the hearsay rule." *Id.* at 878. According to the court, extortion under color of official right "requires as an essential element of proof the state of mind of the victim," and therefore the testimony at issue "bore directly on what 'under color of official right' encompasses: the ever-present opportunity of a public official to misuse his power under the guise of official duty." *Id. See also United States* v. *Tuchow*, 768 F.2d 855, 865-66 (7th Cir. 1985); *United States* v. *Adcock*, 558 F.2d 397, 401, 404 (8th Cir. 1977); *Margiotta*, 688 F.2d at 116-18, 136.

Most recently, the District Court in *United States* v. *Sheldon Silver*, S1 15 Cr. 093 (VEC), admitted pursuant to Rule 803(3) certain communications from one of the participants in the charged extortion scheme to a third party in which the participant expressed his view that Silver would demand something of value in exchange for helping the third party locate a charity event at a particular location. *United States* v. *Sheldon Silver*, S1 15 Cr. 093 (VEC), Transcript of October 16, 2015 Pre-Trial Conference ("Silver Tr.") at 83 (attached as Exhibit B). According to the Court, the evidence of the participant's state of mind was admissible not only to show the declarant's state of mind, but also "as circumstantial evidence that a relationship is a *quid pro quo* relationship." *Id.* Judge Caproni reasoned that, "if one of the persons in the relationship believes that when he asks for a quid, he's going to be asked in return for a quo… it's direct evidence about at least one party's understanding of the relationship." *Id.* The court also noted

that such evidence was probative of the defendant's own guilty state of mind because "[i]t is unusual in terms of common sense and human nature that one person in a relationship believes they are in a *quid pro quo* relationship and the other party does not." *Id.*[8]

## C.    Discussion

The out-of-court statements listed above, and others to the same effect, are admissible under Rule 803(3) because they bear directly on the state of mind of participants in the extortion scheme at relevant points during the extortion and bribery offenses, and explain the participants' motive and intent in continuing to pay Adam Skelos. As such, they constitute direct evidence of the existence of the charged conspiracies to obtain *quid pro quo* agreements.

With respect to the Developer-1 State of Mind Evidence, statements by CW-1 and the Developer-1 Lobbyist regarding their discomfort with Dean Skelos's repeated requests for payments to Adam Skelos, in light of the Senate Majority Leader's power over Developer-1's business, go to the heart of CW-1's motivation in ultimately deciding to direct payments to Adam Skelos from the Environmental Technology Company and an unrelated title insurance company. *See United States* v. *McDonough*, 56 F.3d at 388 (participant in scheme "motivated to make payments as a result of the defendant's control or influence"). Specifically, the conversations show that when CW-1 caused Developer-1 to arrange the payments to Adam Skelos, CW-1 did so because he understood that, if CW-1 did not do so, Dean Skelos would take official action against Developer-1. This is precisely the alleged *quid pro quo* charged in the Superseding Indictment with respect to Developer-1. The evidence is also strong circumstantial

---

[8]    In ruling for the admissibility of the statements under Rule 803(3), the *Silver* Court rejected the defendant's argument that *United States* v. *McDonough*, 56 F.3d at 388, required the Government to show that, with respect to each piece of state-of-mind evidence proffered at trial, the participant's state of mind was in fact communicated to the defendant in order for it to be relevant. *Silver* Tr. at 85-88.

21

evidence of the defendants' own understanding that Developer-1 arranged for payments to Adam Skelos based on Dean Skelos's power to perform official actions for and against Developer-1. *See* Silver Tr. at 83 (ruling that a victim's state of mind is circumstantial evidence of the defendant's state of mind as to a *quid pro quo* relationship).

Similarly, the Malpractice Insurance Administrator State of Mind Evidence demonstrates the CEO's belief that, as a result of his discussion with Dean Skelos, he had to pay Adam Skelos despite his non-performance at work in order to avoid adverse official action by Dean Skelos against the company if the CEO ceased the payments to his son.  The CEO's admission to the Executive that, as a result of a call from Dean Skelos, the CEO believed he could not terminate Adam Skelos's employment is direct evidence of the CEO's state of mind at the time with respect to the charged extortion scheme.  *See United States* v. *Kelly*, 722 F.2d at 877.  The evidence is also circumstantial evidence of the defendants' own understanding that the payments to Adam Skelos were made as part of that same *quid pro quo. See Silver* Tr. at 83; *United States* v. *McDonough*, 56 F.3d at 388.  Accordingly, these statements are admissible under Rule 803(3).

## III.   CERTAIN STATEMENTS SHOULD BE ADMITTED TO SHOW THEIR EFFECT ON THE LISTENER

The Government seeks to admit certain statements to the CEO of the Malpractice Insurance Administrator (a victim-participant in the defendants' extortion and bribery schemes) for a non-hearsay purpose – *i.e.*, to show the effect of the statements on the listener.  In discussions with the Government, the defendants have taken the position that such evidence is inadmissible hearsay, notwithstanding the fact that the proffered evidence – regardless of whether or not true – is probative of the CEO's understanding that he was engaged in a *quid pro*

*quo* relationship with the defendants.  The defendants' arguments should be rejected, and the Government should be permitted to elicit the requested statements at trial.[9]

## A.    Background

The Government seeks to introduce certain statements made to the CEO of the Malpractice Insurance Administrator in order to show the effect those statements had on the CEO's state of mind (collectively, "Statements to the CEO"), including, but not limited to:

- In or about December 2013, a lobbyist for the Malpractice Insurance Administrator (the "Med Mal Lobbyist-2") told the CEO that he should not hire Adam Skelos because the company had significant interests before the Senate Majority Leader, and hiring Adam Skelos could pose problems for the company.  At the time the CEO heard these statements, he had already told Adam Skelos that he would employ him, and felt that he could not, given Dean Skelos's position, renege on that offer.  The CEO and the Med Mal Lobbyist-2 are expected to testify at trial.

- On or about January 10, 2013, the CEO spoke with Adam Skelos's supervisor (identified as Supervisor-1 in the criminal complaint) as a result of a call from Dean Skelos to the CEO regarding Adam Skelos's employment.  During the conversation, Supervisor-1 relayed to the CEO that Adam Skelos had not shown up for work, despite having been hired for a full-time position, and stated that Adam Skelos had told Supervisor that he did not have to work the requisite number of hours because his father was the Senate Majority Leader.  The CEO then relayed the substance of this conversation to Dean Skelos on the same day, but was told by Dean Skelos to continue employing Adam Skelos.  Supervisor-1 is also expected to testify at trial.[10]

---

[9]    The defendants have informed the Government that they do not object to the admission of statements made to show their effect on the listener with respect to statements made to Dean Skelos, including: (1) the Malpractice Insurance Administrator CEO's statements to Dean Skelos concerning the fact that Adam Skelos had not been showing up for work and had stated that he did not have to show up to work because his father was the Senate Majority Leader; (2) statements to Dean Skelos by a lobbyist working for the Malpractice Insurance Administrator ("Med Mal Lobbyist-1") that Adam Skelos continued not to show up for work and warning Dean Skelos that such behavior was problematic for the parties; and (3) an email from an individual ("Individual-1") telling Dean Skelos that Individual-1 had emailed a Nassau County official seeking confirmation that a county contract would be awarded to the Environmental Technology Company and telling Dean Skelos that Individual-1 was "careful of what I put in the email as you never know where it could wind up," to which Dean Skelos responded "All happy."

[10]    As stated above, the defendants have informed the Government that they do not object to testimony about the statements by the CEO to Dean Skelos recounting the CEO's conversation with Supervisor-1.  Herein, the Government is seeking a ruling that the direct conversation

- In or about February 2013, after learning that Adam Skelos was treating his full-time job at the Malpractice Insurance Administrator as a "no show" job, the Med Mal Lobbyist-2 again discussed with the CEO the fact that Adam Skelos's job with the company was problematic given the company's lobbying relationship with Dean Skelos.  At the time of this discussion, the CEO feared, based on the January 10, 2013 call with Dean Skelos, that he could not take adverse employment action against Adam Skelos.

**B.     Applicable Law**

Out of court statements are admissible without resort to a hearsay exception where they are offered for a purpose other than to "prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Thus, "if the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."  *United States* v. *Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (quoting Fed. R. Evid. 801(c) advisory committee's note).  A statement is not hearsay if it is "offered to show its effect on the listener."  *Id.*  For instance, a statement introduced to show that the listener "was on notice of a danger" is not hearsay.  *George* v. *Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990).

In addition, statements can be independently admissible to provide context to a defendant's admissions during those same conversations.  *See, e.g.*, *United States* v. *Dupre*, 462 F.3d 131, 136–137 (2d Cir. 2006) (email messages sent by third parties to defendants were admissible to provide context for email messages sent by defendants in response); *United States* v. *Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995) (holding that recorded statements of a confidential informant offered to render intelligible defendant's recorded statements were not hearsay).

**C.     Discussion**

The Statements to the CEO are admissible as non-hearsay in order to show the extortion victim's state of mind with respect to the continued payments to Adam Skelos despite Adam

---

between the CEO and Supervisor-1, which contains the same statements that the defendants concede are admissible when re-told by the CEO to Dean Skelos, is also admissible.

Skelos's non-performance at work.  In a case charging extortion under color of official right, the government must prove beyond a reasonable doubt, among other things, "that the victims were motivated to make payments as a result of the defendant's control or influence."  *United States* v. *McDonough*, 56 F.3d at 388.  Accordingly, proving the victim's state of mind at the time of the extortion is not only relevant but necessary.  With respect to the CEO, his state of mind is evidenced both by statements he made to Dean Skelos (statements that, as noted above, are admissible under Rule 803(3)), and by statements made *to* the CEO by others that informed his own understanding and intent with respect to his participation in the extortion scheme.  In this context, statements by the Med Mal Lobbyist-2 to the CEO relaying the Med Mal Lobbyist-2's concerns both in hiring and continuing to employ Adam Skelos are relevant as direct evidence of the CEO's intent in continuing to pay Adam Skelos, despite Adam Skelos's failure to show up for work and his use of his father's official position as justification for such non-performance.  In particular, the warnings given to the CEO concerning Adam Skelos's employment are direct evidence that the CEO continued to employ Adam Skelos due to Dean Skelos's power and influence over matters critical to the CEO's business.  *See, e.g.*, *United States* v. *Dupree*, 706 F.3d at 136 ("[A] statement offered to show its effect on the listener is not hearsay.") (citing *George* v. *Celotex Corp.*, 914 F.2d at 30  ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.")).

This evidence is also probative to rebut any suggestion that the CEO's motives were not related to the *quid pro quo* with Dean Skelos.  The Government expects, based on defendants' filings in this case and discussions with defense counsel, that the defendants will argue that the CEO's motive for hiring and continuing to pay Adam Skelos was not due to any fear of adverse

action by Dean Skelos, but rather because of friendship.  Accordingly, evidence that the CEO

was told by the Med Mal Lobbyist-2 that the company's continued employment of Adam Skelos

was legally problematic constitutes direct evidence that the CEO continued to employ Adam

Skelos because of the *quip pro quo* relationship with Dean Skelos.  *Celotex Corp.*, 914 F.2d at

30; *see also United States* v. *Ferguson*, 676 F.3d 260, 286 (2d Cir. 2011) (statement about risk of

regulatory scrutiny not hearsay because offered to show fact that statement was made to the

defendant); *United States* v. *Ansaldi*, 372 F.3d 118, 130 (2d Cir. 2004) (statements about effects

of controlled substance not hearsay because offered to show defendant's state of mind).

Similarly, the statements by Supervisor-1 to the CEO that Adam Skelos was not showing up for

work are further proof of the CEO's state of mind when he nevertheless continued to employ

Adam Skelos.  These particular statements are also admissible because they explain why the

CEO then called Dean Skelos, who told the CEO to continue employing Adam Skelos regardless

of his reported work performance.  *See, e.g.*, *Rolland* v. *Greiner*, No. 02 Civ.8403 (GBD), 2006

WL 779501, at *3 (S.D.N.Y. Mar. 27, 2006) ("If a statement is offered for a purpose other than

proving the truth of the matter asserted, such as to explain actions taken as a result of the

statement or to show how an investigation developed, its admission violates neither the hearsay

rule nor the Confrontation Clause.").

## VI.   THE GOVERNMENT SHOULD BE ALLOWED TO CROSS EXAMINE DEAN SKELOS, AND/OR ANY CHARACTER WITNESSES, WITH RELEVANT INSTANCES OF HIS CONDUCT

Should Dean Skelos seek to admit character evidence, through reputation or opinion

testimony, concerning his good moral character, the Government seeks permission, pursuant to

Rule 405(a) of the Federal Rules of Evidence, to cross-examine those witnesses with the

following specific instances of conduct.  In addition, should Dean Skelos testify, the Government

seeks a ruling from the Court permitting it to cross-examine him regarding such conduct and, to the extent Dean Skelos denies the conduct on direct examination, to introduce evidence to contradict that testimony.

## A.    Background

Since in or about 1994, Dean Skelos has been employed as "Of Counsel" with a Long Island law firm (the "Law Firm"), which was affiliated with a lobbying firm ("Lobbying Firm"). During that time, Dean Skelos has been paid more than $2.6 million by the Law Firm.  Dean Skelos did not perform legal work for the Law Firm, but rather was compensated for referring clients to the Law Firm and/or meeting with such clients (including clients with business before the State).  (*See* Complaint, at n.3).  The Lobbying Firm, which was founded and managed by a former New York State legislator who was also a partner at the Law Firm ("Founder-1"), lobbied state legislators on behalf of its clients and operated essentially as a practice group within the Law Firm.  Among other things, the Lobbying Firm shared office space with the Law Firm, the Lobbying Firm's revenues were shared with the Law Firm, the Law Firm partners worked with the Lobbying Firm to jointly develop business and serve overlapping clients.  The Law Firm also determined compensation for the Lobbying Firm employees.

Dean Skelos has made public statements and statements to his employees and colleagues about the nature of his employment at the Law Firm that are inconsistent with these facts.  For example, after the arrest of Sheldon Silver, reports emerged that the United States Attorney's Office was investigating the outside employment of state legislators.  Responding to questions about the Law Firm and its relationship with the Lobbying Firm and Founder-1, Dean Skelos stated, through a spokesperson, that "[t]here is a wall.  [Dean Skelos] doesn't have anything to do with that. There is a total wall.  They don't discuss it."  In fact, there was no such wall – either

between Dean Skelos and Founder-1 or between Law Firm and Lobbying Firm matters.  To take just one example, on or about October 28, 2009, a law firm partner emailed Dean Skelos and Founder-1 about "a client who owns interests [sic] several independent pharmacies in NYC" and who "has expressed an interest in meeting with Dean" about issues which may include "legislative issues relating to pharmacies."  Another partner "suggested to the client that it may be beneficial to meet with [Founder-1] also," and accordingly the email sought to coordinate a meeting.  Law Firm billing records confirm that Dean Skelos attended a meeting with that client several weeks later.  There are similar e-mails and other communications reflecting actual or potential meetings between clients of the Lobbying Firm and/or the Law Firm with business before the State and Dean Skelos.

### B.    Applicable Law

Where evidence of character is admitted by way of testimony as to reputation or opinion, Rule 405(a) of the Federal Rules of Evidence permits cross-examination "into relevant specific instances of conduct."  Fed. R. Evid. 405(a).  "Once a defendant offers character testimony, the prosecution is afforded substantial latitude to rebut such evidence."  *United States* v. *Russo*, 110 F.3d 948, 952 (2d Cir. 1997).  In doing so, the prosecution may not pose "guilt-assuming" hypothetical questions.  *See id.*  As with any type of cross-examination, "[t]he scope and extent of cross-examination lies within the discretion of the trial judge."  *United States* v. *Blanco*, 861 F.2d 773, 781 (2d Cir. 1988).  The trial court may, in its discretion, preclude questions for which the questioner cannot show a good-faith basis.  *United States* v. *Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008).  In cross-examining a character witness, the Government need not offer extrinsic evidence so long as it can point to a good-faith basis for its questions.  *See United States* v. *Payton*, 159 F.3d 49, 58-59 (2d Cir. 1998).

Specific acts of a witness's conduct may be inquired into on cross-examination "if they are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1). "When a defendant offers an exculpatory explanation for the government's evidence, he 'opens the door' to impeachment of his credibility, even by previously inadmissible evidence." *United States* v. *Desposito*, 704 F.3d 221, 233-34 (2d Cir. 2013). Although the introduction of extrinsic evidence is not allowed to follow up on the inquiry under Rule 608(b), that rule does not govern impeachment of a witness with respect to specific falsehoods. *United States* v. *Beverly*, 5 F.3d 633, 639-40 (2d Cir. 1993). Thus, "[w]here a defendant testifies on direct about a specific fact, the prosecution is entitled to prove on cross-examination that he lied as to that fact," and may do so using "evidence that it was barred from using on its direct case." *Id.*; *see also United States* v. *Ramirez*, 609 F.3d 495, 499 (2d Cir. 2010) (stating that the doctrine set forth in *Beverly* "provides that when a witness puts certain facts at issue in his testimony, the government may seek to rebut those facts, including by resorting to extrinsic evidence if necessary").

## C.  Discussion

In the event that the defendants call witnesses to testify to the good character or reputation of defendant Dean Skelos, the Government should be permitted to cross-examine those character witnesses with questions regarding the nature of Dean Skelos's employment with the Law Firm. The same is true if the defendant should seek to introduce character testimony through any Government witness on cross-examination. This is particularly true should the defendant seek to establish character evidence relating to the defendant's alleged integrity, ethics or alleged separation of personal/family outside income from his official position as a State Senator and Majority Leader. To offer such testimony a character witness "must qualify to give

an opinion by showing such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded." *Michelson* v. *United States*, 335 U.S. 469, 478 (1948); *accord United States* v. *Perry*, 643 F.2d 38, 52 (2d Cir. 1981). When reputation testimony is offered, "the prosecution has a right to test the qualifications of the witness to bespeak the community opinion." *Michelson* v. *United States*, 335 U.S. at 478. Knowledge about the nature of how Dean Skelos obtains his primary source of income is clearly relevant to a witness's ability to opine on Dean Skelos's good character or on his reputation in the community. *See, e.g.*, *United States* v. *Reich*, 479 F.3d 179, 190–91 (2d Cir. 2007) (inquiry about defendant's actions in violation of law firm partnership agreement was proper cross-examination of reputation and opinion witness). And the fact that Dean Skelos has made public statements regarding his employment that are inconsistent with the true nature of that employment is certainly something which, if known to the witness, would tend to bear on the witness's own opinion of Dean Skelos's good character and the witness's basis for speaking to Dean Skelos's reputation in the community.

In the event Dean Skelos testifies, inquiry into the nature of his employment at the Law Firm and the truthfulness of his public statements and statements to others on the topic should be permitted because such inquiry goes directly to Dean Skelos's character for truthfulness. Evidence of prior false statements is quintessential impeachment material. *See, e.g.*, *United States* v. *Jones*, 900 F.2d 512, 521 (2d Cir. 1990). That evidence is particularly probative where, as here, the statements obscure conduct which is similar to the charged conduct: Dean Skelos's use of his official position to obtain financial benefits by assisting entities with business before the State. *Cf. Inserra*, 34 F.3d at 89 (evidence of prior bad act sufficiently similar to allow jury

to draw inference about defendant's knowledge).  Nor would such inquiry be unfairly

prejudicial; having put his character for truthfulness at issue, the defendant has opened the door

to questions regarding prior instances of dishonesty.  *See, e.g.*, *United States* v. *Payton*, 159 F.3d

49, 58–59 (2d Cir. 1998) (defendant's statement that he "had nothing to hide" entitled

Government to introduce relevant evidence that defendant "was, in fact, hiding something").

Finally, to the extent the defendant testifies inconsistently with the foregoing, the Government

should be permitted to impeach him by contradiction with extrinsic evidence.  *Beverly*, 5 F.3d at

640.

**VII.** ████████████████████████████████████████████
██████████████████████████████ **[UNDER SEAL]**

█   ██████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████   ███████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████

───────────────────
█   ███████████████████████████████████████████
███████████████████████████████





**VIII.**

**[UNDER SEAL]**



███████████████████████████████████

███████████████████████████████████████

███████████

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court grant

the Government's *in limine* motions.

Dated:     October 23, 2015
           New York, New York

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

                    By:     _____/s/_____
                              Jason A. Masimore/Rahul Mukhi/
                              Tatiana R. Martins/Thomas A. McKay
                              Assistant United States Attorneys