UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

       - V. -

Dean Skelos and Adam Skelos,

           Defendants.

S1 15 Cr. 317 (KMW)

**MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S
MOTIONS _IN LIMINE_**

G. Robert Gage, Jr.
Joseph B. Evans
Gage Spencer & Fleming LLP
410 Park Avenue, Suite 900
New York, New York 10022
(212) 768-4900

*Attorneys for Dean Skelos*

Christopher P. Conniff
Jon A. Daniels
Alicia Giglio Suarez
Ropes and Gray LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 596-9000

*Attorneys for Adam Skelos*

<u>**ARGUMENT**</u>

**I.**     **Evidence Concerning Unrelated And Highly Prejudicial Acts Should Not Be Admitted (the "Other Act Evidence")**

The government's motion to introduce two instances of "bad act" evidence should be rejected for what it is—a last minute effort to tarnish Dean Skelos and Adam Skelos at trial and bolster the government's case through prejudicial speculation.   As set forth below, the Other Act Evidence has no connection to the conspiracies charged in the Superseding Indictment and, without the unfounded and inappropriate characterizations suggested by the government, the underlying activities are not even illegal.  First, the "Greek Diner" evidence is nothing more than an animated telephone conversation between Adam Skelos and a failed prospective client that has nothing to do with any alleged scheme involving Dean Skelos.  The second instance, offering discussions related to the *possibility* that Adam Skelos's wife might obtain a position on a local zoning board, will cause even greater confusion and prejudice since the government has not proffered any evidence—nor is there any—that the possible appointment would be secured corruptly and, as the government concedes, Mrs. Skelos never received the appointment.

In sum, the government seeks through this irrelevant evidence to demonize Adam Skelos and prejudice Dean Skelos in order to improperly strengthen its case.   Simply put, "[i]t is far too late, far too prejudicial to defendants, and far too confusing to the jury" to allow the introduction of such evidence.  *United States v. DiCarlo*, 131 F. Supp. 2d 537, 539 (S.D.N.Y. 2001).   For the reasons set forth below, the government should be precluded from offering the Other Act Evidence.

**A.     Background**

The government has charged Dean Skelos with corruptly exploiting his position as a New York State Senator in order to obtain payments for Adam Skelos.  (Superseding Indictment ¶ 8).

The government makes clear in its Brief that the unifying feature of the conspiracy charged in the Superseding Indictment—and the part that allegedly enabled the Skeloses to profit from the arrangement—is that the alleged victims of this extortion scheme were all purportedly beholden to Dean Skelos in some important way.  Indeed, it is precisely this dependent nature that led the government to classify the alleged targets of the conspiracy into two distinct categories, both of which suggest a need to obtain assistance from Dean Skelos: namely, companies with business before the State, or campaign donors to Dean Skelos.  (*See*, *e.g.*, Gov't Br., at 4-5) (stating that charges "relate to the defendants' corrupt scheme to monetize DEAN SKELOS's official position to obtain for ADAM SKELOS . . . payments from ***campaign donors to DEAN SKELOS and/or companies with business before the State*** . . . Thus, the conspiracies charged in Counts One and Two cover broad actions related to the defendants' agreement to extort and solicit bribes and kickbacks from '***campaign donors to DEAN SKELOS and/or companies with business before the State*.'" (emphasis added)).

On July 10, 2015, defendants submitted their initial joint request for discovery, (Letter from C. Conniff and G. Gage to R. Mukhi et al., dated July 10, 2015 (hereinafter "July 10, 2015 Letter")), and on August 7, 2015, defendants submitted a request for a bill of particulars, (Bill of Particulars, Gage Aff. Ex. O [Dkt. No. 25]).  Defendants' July 10 letter requested detail around the charges contained in the Indictment and specifically requested that the government "identify any work or services that the government intends to argue at trial was referred to Adam Skelos in the hope that Dean Skelos would assist them with official acts other than those acts identified in the Complaint and/or Indictment," and also to "identify any acts ('official' or otherwise) by Dean Skelos that the government intends to argue at trial were done in return for any work or services

provided to Adam Skelos other than those acts identified in the Complaint and/or Indictment." (July 10, 2015 Letter, at 2-3).

The government responded by informing the defense that it had already provided defendants with sufficient discovery material relating to the charges. (*See generally* Letter from J. Masimore et al. to C. Conniff and G. Gage, dated July 16, 2015 (hereinafter "July 16, 2015 Letter")). In particular, the government emphasized that "[t]o guide you in your review of this discovery, you are in possession of the 43-page criminal Complaint filed against the defendants, which sets forth in great detail factual allegations by the Government. In addition, the 22-page Indictment in this case, rather than merely setting forth the statutory allegations, also details factual allegations by the Government." *Id.* at 1. In its subsequent response to the defendants' bill of particulars, the government maintained that "[i]n light of the detailed Indictments and Complaint, as well as our prior discovery disclosures, there is no colorable argument that the defendants were unaware of the acts of which they have been accused. . . . We have also had several informal discussions with you concerning the Government's allegations and the supporting evidence." (Response to Bill of Particulars, Gage Aff. Ex. P, 3 [Dkt. No. 25]). The Other Act Evidence was never identified by the government.

On October 10, 2015, the government provided the defense with more than 150 draft transcripts that it indicated it was considering introducing at trial. It was in the context of reviewing these drafts that the defendants became aware that the government intended to introduce at trial the Other Act Evidence. Defendants challenged the admissibility of this evidence and the government then filed its motion.

### B.    Discussion

The government's motion to introduce the Other Act Evidence should be denied because neither act is connected in any way to the conspiracies charged in the Indictment, nor does either fall within the spectrum of evidence covered by Federal Rule of Evidence 404(b).  As set forth below, the Other Act Evidence is also unduly prejudicial.

It is well-established that evidence must be relevant in order to be admissible at trial. *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004) (citing FED. R. EVID. 402).  In general, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable," *United States. v. Griffith*, 385 F.3d 124, 126 (2d Cir. 2004) (citing FED. R. EVID. 401), meaning that the evidence "must tend to prove the government's case."  *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  "As the proponent of the evidence, the government has the burden of establishing admissibility."  *United States v. Stein*, 521 F. Supp. 2d 266, 268 (S.D.N.Y. 2007).

The defense recognizes that uncharged acts may be introduced at trial if the government establishes a connection to the charged conspiracy.  *See*, *e.g.*, *United States v. Cummings*, 60 F. Supp. 3d 434, 437 (S.D.N.Y. 2014).  In order to be considered "within the scope of the conspiracy," *id.*, the government is required to show that the evidence "arose out of the same transaction or series of transactions as the charged offense, . . . is inextricably intertwined with the evidence regarding the charged offense, or . . . is necessary to complete the story of the crime on trial."  *United States v. Carboni*, 204 F.3d 39, 44 (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)).

The government must substantiate a claim that evidence is linked to the charged conspiracy.  Broad, unfounded assertions containing "sparse details" are insufficient to satisfy

this requirement; instead, the government must "provide sufficient evidence to meet the standard laid out in *Carboni* for admission . . . as direct evidence of the conspiracy." *Cummings*, 60 F. Supp. 3d at 438 (S.D.N.Y. 2014) (refusing to consider proffered acts as direct evidence of underlying conspiracy due to limited information provided by government regarding evidence at issue).  Similarly, the "allegation of broad conspiracies does not . . . render 'inextricably intertwined' with those conspiracies every transaction conducted by Defendants during the relevant time period." *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 706-07 (S.D.N.Y. 2011) (evaluating evidence under Rule 404(b) rather than as direct evidence of underlying conspiracy).

In order to constitute direct evidence of the charged conspiracy, it is also not necessarily enough to show that the evidence relates generally to the charged transactions or to demonstrate that the proffered evidence is in some way "relevant to show the background of the charged conspiracy." *United States v. Nektalov*, 325 F. Supp. 2d 367, 370 (S.D.N.Y. 2004).  Instead, such evidence will only be considered "inextricably intertwined" if it is also "necessary to understand the charged transaction." *Stein*, 521 F.Supp.2d at 271.  Even where the "proffered testimony relates to similar transactions with the same [cooperating witness]" and "there is a strong argument that the evidence arises from the same series of transactions as, and is necessary to complete the story of, the charged conduct," courts may still find that the transactions are not "inexorably intertwined." *See*, *e.g.*, *Nektalov*, 325 F. Supp. 2d at 370 (declining to consider acts as direct evidence in part because they appeared to involve transactions distinct from crimes charged); *see also United States v. Kahale*, 789 F. Supp. 2d 359, 384-85 (E.D.N.Y. 2009).

Courts have also refused to find conduct "inextricably intertwined" where the "charged crimes are straightforward and may be fully understood without reference to" such other

evidence.  *United States v. Newton*, No. S101 Cr. 635 (CSH), 2002 WL 230964, at *2-3 (S.D.N.Y. Feb. 14, 2002) (prior false visa referrals issued by defendant had insufficient connection to charged false referrals and therefore were considered under Rule 404(b) rather than as direct acts).  Even where facts regarding the proffered evidence are "quite similar to the acts alleged in the indictment," they may nonetheless be considered extrinsic to the conspiracy where they relate to a "separate, discrete offense that may be conceptually segregated from the charged offenses without impairing the jury's ability to understand the facts underlying the schemes alleged in the indictment."  *United States v. Mahaffy*, 477 F. Supp. 2d 560, 566 (E.D.N.Y. 2007), *aff'd in part*, *vacated in part on other grounds*, 285 F. App'x 797 (2d Cir. 2008).

Evidence of "other acts" may also be admitted pursuant to Federal Rule of Evidence 404(b).  This rule "provides that evidence of a defendant's prior crimes, wrongs, or other acts cannot be used to prove that a defendant was a bad fellow and most likely remains one," but it "may be admissible for other legitimate purposes, such as demonstrating motive, opportunity, identity, intent, and knowledge."  *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). Although the Second Circuit has adopted an "inclusionary" approach to "other act" evidence under Rule 404(b), it has also made clear that "it is by no means [its] view that such evidence is either presumed relevant or automatically admissible."  *United States v. Halper*, 590 F.2d 422, 432 (2d Cir. 1978) (noting efforts by Second Circuit to limit inclusion of 404(b) evidence);[1] *see also United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).  Consistent with this approach, the Second Circuit has steadfastly refused to allow the introduction of impermissible character

---

[1]  The *Halper* court also noted that "we have attempted to make clear our belief that the introduction of such evidence should normally await the conclusion of the defendant's case, i.e., under normal circumstances it should not be admitted on the government's direct case."  590 F.2d at 432.

evidence under the guise of a non-propensity rationale.  Indeed, the Second Circuit specifically "emphasized that [its] inclusionary rule is not a carte blanche to admit prejudicial extrinsic act evidence when . . . it is offered to prove propensity."  *United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012).  Put simply, a court must not allow the government to introduce "propensity evidence in sheep's clothing."  *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009).

Several "hurdles" must be met before a court will introduce Rule 404(b) evidence.  *Kahale*, 789 F. Supp. 2d at 385.   In considering the evidence, a court must consider whether "(1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; [and] (3) its probative value is substantially outweighed by its prejudicial effect."  *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004) (per curiam).

The inquiry into the admissibility of such evidence does not end even if the requirements of the "inextricably intertwined" test or Rule 404(b) are met.  Both of these analyses also "require the Court to balance probative value and prejudice under Rules 402 and 403."  *Nektalov*, 325 F. Supp. 2d at 372; *see also United States v. Afjehei*, 869 F.2d 670, 674 (2d Cir. 1989) (citing FED. R. EVID. 403).   In other words, evidence offered for a legitimate purpose may still be inadmissible if the unfair prejudice generated by the evidence outweighs its relevance to the case.  *See*, *e.g.*, *United States v. Lauersen*, No. S298CR1134 (WHP), 2000 WL 1677931, at *2 (S.D.N.Y. Nov. 8, 2000).   Evidence is considered prejudicial when it "tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).

### i.   Evidence Concerning Adam Skelos's Call with a Diner Owner is Inadmissible

The government argues in its Motion that the "Greek Diner" evidence is admissible because "[d]uring the December 2014 call to the individual associated with the Greek diners,

7

Adam Skelos made clear that buying energy services from Adam Skelos included a *quid pro quo* for Dean's official power." (Gov't Br., at 12).  The government then concludes that "[t]his call is direct evidence of Adam Skelos's use of his father's official power and position to threaten individuals in an attempt to make them pay him, which is precisely the conduct with which he is charged in Counts One and Two of the Superseding Indictment." *Id.* at 13.  The government's argument completely mischaracterizes the nature of this communication and is sought to be admitted only to make Adam Skelos look bad in front of the jury.

First, the government has not proffered any evidence that this diner owner was a "campaign donor[] to DEAN SKELOS" or engaged in "business before the State"—the expressed object of the government's conspiracy charge.  (Superseding Indictment ¶ 8).  In fact, there is nothing to suggest that this individual had any interaction with Senator Skelos or any business with the State.  Rather, he is someone that Adam Skelos unsuccessfully sought to obtain as a utility customer.  Not only is this exchange unnecessary to complete the story of the conspiracy, it is not even part of that story.

Second, it appears from this individual's 3500 material that the purported business approach by Adam Skelos occurred "two or three years" earlier and the recorded call took place only after the individual mistakenly dialed Adam Skelos's telephone number a few days before Christmas 2014.  The admittedly angry exchange happened after Adam Skelos returned this call.  The government seeks to turn Adam Skelos's irritated reaction to this mistaken "pocket dial" into evidence of the underlying conspiracy.  It may be evidence of Adam Skelos's bad temper—the exact point that the government is trying to make—but it has nothing to do with the charged conspiracies.

Third, the government's description of this incident is inaccurate and misleading.  A careful review of the entire call reflects that it is nothing more than an angry business exchange. There is nothing in this call that suggests that the purchase of energy services "included a *quid pro quo* for Dean Skelos's official power." (Gov't Br., at 12).  In fact, Dean Skelos is referenced only once, and merely as part of a suggestion by Adam Skelos that the individual only contacts him after the individual sees his father's name in the newspaper.  The government distorts this exchange from its natural and clear meaning in order to make its claim that this call represents "direct evidence of Adam Skelos's use of his father's official power and position to threaten individuals."  *Id.* at 13.  The government also omits key parts of the conversation to support its point: as an example, Adam Skelos suggested that the diner owner call him if he wanted to "utilize" Skelos's "reach *and business opportunity*"—clearly emphasizing his network of business contacts.  (Gov't Br., Ex. A 3:3-4) (emphasis added).  In the government's telling, the portion of the quote referring to Adam Skelos's "business opportunity" has been removed and the reference to "utiliz[ing]" his "reach" was quoted in isolation to suggest a connection to Dean Skelos's senatorial influence.  (Gov't Br., at 12-13).  In short, the Greek Diner evidence is nothing more than "propensity evidence in sheep's clothing," *McCallum*, 584 F.3d at 477.[2]

The government's desire to introduce this irrelevant exchange is not surprising since it paints Adam Skelos in a bad light and is likely to cause the jury to dislike him.  Skelos's aggressive tone and harsh language during the call; his derogatory statements towards the diner owner's nationality; and his generally dismissive treatment of the diner owner will all lead the jury to believe that he has a "bad character."  However, this is precisely the kind of evidence that

---

[2] The government's assertion that this conversation somehow serves as an example of "the defendants' method of communicating threats" and as "evidence . . . that these types of threats were part of the defendants' *modus operandi*" is equally implausible.  (Gov't Br., at 13).  Adam Skelos does not pressure the diner owner or suggest that his father will take action detrimental to the diner owner's interest; instead, he just walked away.

Rule 403 is intended to preclude.  *See, e.g.*, *Park West Radiology v. CareCore Nat'l. LLC*, 675 F. Supp. 2d 314, 323 (S.D.N.Y. 2009) (finding potential relevance of evidence substantially outweighed by risk of unfair prejudice in part because evidence at issue "could elicit a strong negative reaction from the jury for reasons not at all relevant to this litigation.").  For all of these reasons, evidence regarding this incident should not be admitted at trial.

### ii.   Evidence Concerning the Zoning Board is Inadmissible

The government's evidence relating to the possibility of Adam Skelos's wife being appointed to a local zoning appeals board is even more attenuated and speculative.  The government suggests in its Brief that it "seeks to admit evidence in support of the conspiracies charged in Count One and Count Two related to joint efforts by Dean Skelos and Adam Skelos to ensure that Adam Skelos's wife received an appointment to a zoning appeals board of a town in Nassau County."  (Gov't Br., at 13).  According to the government, the purpose of the appointment was to "make sure that Adam Skelos received additional income and health benefits, and that Adam Skelos would be able to corruptly use his wife's position with respect to his real estate deals." (Gov't Br., at 13-14).

First, the government has proffered no evidence—nor is there any—to suggest any illegality in connection with the possible appointment of Mrs. Skelos to this position and the defense is not aware of any witness the government intends to call to provide such evidence.  In fact, the government proffers nothing in the way of any "scheme" to obtain the position illegally or a single act taken in furtherance of this purported plan.  Without some evidence of illegality, there would be nothing wrong with Mrs. Skelos's appointment to the board, assuming it occurred, even if she took the position solely to earn "additional income and health benefits" for her family *Id.* at 13.  Absent some actual evidence of illegality, the government's introduction of

this evidence is meant only to create the unsupported suggestion that this was some illegal scheme by Dean Skelos and Adam Skelos.  Such unsupported speculation should not be permitted at trial.

The government then doubles down on this evidence by seeking to put before the jury telephone communications between Adam Skelos and unrelated third parties in order to suggest that Adam Skelos can obtain zoning board approvals because of his wife's position (which, of course, she did not even have).  In the first instance, the conversation is centered on an unrelated property deal; the second conversation is a wide-ranging discussion with a co-worker in which Adam Skelos boasts of the potential benefits of having his wife on the zoning board.  Evidence regarding such "other, discrete and distinct . . . deals" is entirely unrelated to the charges at issue and does nothing to help complete the story of the crime on trial.  *Kahale*, 789 F. Supp. 2d at 384-85.  Even if the government's theory were true, which defendants contest, there is nothing connecting these conversations to Dean Skelos or the monetizing of his official position to assist Adam Skelos.  In short, these allegations, even if true, would be evidence of a completely different scheme and one clearly not charged in the Indictment.  *See Nektalov*, 325 F. Supp. 2d at 370.

As such, the government should be prohibited from introducing at trial any evidence relating to Mrs. Skelos's possible appointment to the zoning appeals board.

**II.    Rule 803(3) Does Not Cover Backward Looking Statements**

The government seeks to admit the following statements by its witnesses as state of mind evidence:

> • "During the time period when Dean Skelos was making requests of Developer-1 to find income for Adam Skelos, CW-1 and the Developer-1 Lobbyist had several conversations with each other during which they made

statements, in sum and substance, that they each felt uncomfortable and pressured by Dean Skelos's requests given Dean Skelos's legislative power over Developer-1's business interests. This evidence will be elicited directly from CW-1 and Developer-1 Lobbyist, both of whom are expected to testify at trial. (Collectively, the "Developer-1 State of Mind Evidence.")

- Statements made by the CEO of the Malpractice Insurance Administrator regarding Adam Skelos's employment at his company. In particular, on or about January 10, 2013, and on other occasions thereafter, the CEO of the Malpractice Insurance Administrator told another executive at the company (the "Executive") about a phone call that the CEO had with Dean Skelos, and explained to the Executive that he (the CEO) did not believe he could terminate Adam Skelos's employment without angering Dean Skelos based on Dean Skelos's statements and demeanor on the call. This evidence will be elicited directly from the CEO and the Executive, both of whom are expected to testify at trial. (Collectively, the "Malpractice Insurance Administrator State of Mind Evidence.")"

(Gov't Br., at 17).

In fact, this evidence is being introduced to improperly corroborate two of the government's witnesses on key aspects of their testimony and should not be admitted into evidence at trial.

### A.    Applicable Legal Standard

A statement is hearsay when it is made out of court and offered to prove the truth of the matter asserted. FED. R. EVID. 801(c), 802.    Subject to certain exceptions, hearsay is inadmissible. *Id.*  One such exception is Rule 803(3) which is commonly referred to as the "state of mind" exception:

"**Then-existing Mental, Emotional, or Physical Condition**.  A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) but not including a statement of memory or belief to prove the fact

remembered or believed unless it relates to the validity or terms of the declarant's will."

FED. R. EVID. 803(3).

"A determination of whether a statement falls within the state of mind exception requires a predicate finding as to whether the statement relates to a then existing state of mind or to a past memory or belief offered to prove the fact remembered or believed." *United States v. Cardascia*, 951 F.2d 474, at 488 (2d Cir. 1991).

As the Supreme Court recognized, the state of mind exception does not apply when the "testimony [] questioned faced backward and not forward." .*Shephard v. United States*, 290 U.S. 96, 106 (1933) (refusing to admit out of court statements from an alleged victim finding that "[w]hat is even more important [is that the statement] spoke to a past act, and even more than that, to an act by someone not the speaker."); *accord Cardascia*, 951 F.2d at 487. Statements about "'memory or belief [offered] to prove the fact remembered or believed' [are] squarely omitted from the ambit of this exception." *United States v. Lesniewski*, No. 11-cr-1091, 2013 WL 3776235, at *5 (S.D.N.Y. July 12, 2013) *aff'd sub nom. United States v. Rutigliano*, No. 14-1339, 2015 WL 3823849 (2d Cir. June 22, 2015)(internal citations omitted).

"Recognizing that the exception under Rule 803(3) is a specialized application of the present sense impression and excited utterance exceptions preceding it in Rule 803, the reasons for the state of mind exception focus on contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation." *Cardascia*, 951 F.2d at 487.

In order to be admissible, statements that are not covered by the "state of mind" exception must still be relevant under Rule 401, and cannot be substantially more prejudicial than probative under Rule 403.

**B.    The Introduction of These Statements Is Meant To Corroborate Important Testimony By These Witnesses Through The Introduction of Hearsay And Therefore Are Not Covered By Rule 803(3)**

The government only briefly addresses the "state of mind" legal standard but instead devotes the majority of its argument to a relevance inquiry.  In so doing, it misses the central reason why these statements should not be admitted.  The statements focus on past statements by the defendant, which are being corroborated through the subject exchanges between the witnesses.  This testimony faces backward to prove the "fact remembered or believed," i.e., that Senator Skelos actually said the things the cooperating witnesses claim.  *Cardascia*, 951 F.2d at 487 (citing FED. R. EVID. 803(3)).  These statements do not, as they must, reflect a present state of mind or a future plan and are not covered by Rule 803(3).  This testimony is of the sort that *Shephard* and the cases that follow exclude from Rule 803(3) and they should not be admitted into evidence.  *Id.*

**i.    Developer-1 Statements**

In essence, the government seeks to introduce (through CW-1 and Developer-1 Lobbyist) conversations during which they purportedly discussed past conversations they each had with Senator Skelos.  (Gov't Br., at 17).  The true benefit to the government's case of the testimony is to seek to "corroborate" cooperating witnesses' testimony by having the jury learn that the statements had been repeated to other witnesses in the past.  These out of court conversations between CW-1 and Developer-1 Lobbyist about the past conversations with Senator Skelos are statements of "'memory or belief [offered] to prove the fact remembered or believed' [that Senator Skelos actually had those conversations] which is squarely omitted from the ambit of this exception."  *See Lesniewski*, No. 11-cr-1091, 2013 WL 3776235, at *5; *see also Shephard*, 290 U.S. at 98.

A statement from CW-1 to Developer-1 Lobbyist rehashing how he had felt during a past conversation with Senator Skelos is categorically outside the scope of Rule 803(3).  *See United States v. Netschi*, 511 F. App'x 58, 62 (2d Cir. 2013).  In *Netschi* a defense witness was asked on direct "what did [defendant] say to you and what was his reaction?" and the witness was asked to testify to "his perceptions of how [defendant] appeared' when [defendant] received" certain reports.  *Id.*  The court excluded this evidence holding that the statements "do not fit within Rule 803(3)'s 'state of mind' exception."  *Id.*  Moreover, here, there is even another layer of separation between Senator Skelos and the statements.  They refer to conversations between government witnesses regarding past conversations they each had with Senator Skelos and their past feelings during those conversations.  As in *Netschi*, these statements should be excluded from evidence.  *See id.* (citing *Cardascia*, 951 F.2d at 488 ("to admit statements of one's state of mind with regard to conduct that occurred . . . earlier as in this case would significantly erode the intended breadth of this hearsay exception.")).

### ii.    Malpractice Insurance Administrator Statements

Similarly, the government seeks to introduce (through statements of the CEO and the Executive of the Medical Malpractice Insurance Adminstrator) that "on or about January 10, 2013, and on other occasions thereafter," the CEO told the Executive about a conversation he had with Senator Skelos.  (Gov't Br., at 17).  This too is not being offered for the CEO's state of mind; it is simply meant to corroborate that Senator Skelos had actually called and threatened the CEO in regard to Adam Skelos' employment by showing that the CEO told others about the conversation.  At best, these statements will attempt to establish how the CEO felt when he spoke to Senator Skelos – a past feeling – but they do not, as they must, reflect his present or future state of mind.  *See Shephard*, 290 U.S. at 98; *Cardascia*, 951 F.2d at 457.

The cases cited by the government do not support its argument.  In *United States v. Silver*, the government sought the admission of an email from an alleged victim which states: "[i]t will probably cost us.  [Silver] is very good at getting people to owe him.  But if he says he will deliver, he does . . . I added a line to the letter to Shelley Silver – if he delivers, I am sure it will cost me."  *United States v. Sheldon Silver*, No. 15-cv-00093, ECF No. 55 (S.D.N.Y. Sep. 11, 2015)(government's motion in limine brief).  The witness' statements at issue in *Silver* reflect what the victim believed at the time, and what he believes "will" happen.  *Id.*  Here, the statements refer to a conversation CW-1 and the CEO had with Senator Skelos in the past, and as such, is testimony that "face[s] backward and not forward" and is not covered by Rule 803(3).  *Shephard*, 290 U.S. at 98.

Similarly, in *United States v. Biaggi*, the statement that the witness "testified that he promised [co-conspirator] $50,000 and that he told [another co-conspirator] about the promise" which was allowed into evidence only to show the witnesses' "intent to pay the $50,000."  705 F. Supp. 830, 841 (S.D.N.Y. 1988).  In sharp contrast, here, these are not forward looking statements about the CEO's or CW-1's "intent to pay."  Rather, they are just recalling and repeating to others previous communications they claim to have had with Senator Skelos.

### iii.   In Any Event The Minimal Probative Value Of These Statements, If Any, Is Outweighed By Significant Prejudice

Last, even if the Court determines that the statements could be admissible as state of mind evidence, they still should be excluded because the risk of prejudice substantially outweighs any minimal probative value.  FED R. EVID. 403.  The prejudicial effect of these statements is high because the jury would attribute truthfulness to cooperating witnesses' recollection of the conversations with Senator Skelos by showing that they told others the same

thing.  Thus, any minimal probative value, if any, is far outweighed by the prejudicial effect

these statements will have on the jury and they should be excluded on Rule 403 grounds.[3]

## III.    The Government's Attempt To Admit Additional Statements As Nonhearsay Is Unavailing

The government seeks to admit the following:

- "In or about December 2013, a lobbyist for the Malpractice Insurance Administrator (the "Med Mal Lobbyist-2") told the CEO that he should not hire Adam Skelos because the company had significant interests before the Senate Majority Leader, and hiring Adam Skelos could pose problems for the company. At the time the CEO heard these statements, he had already told Adam Skelos that he would employ him, and felt that he could not, given Dean Skelos's position, renege on that offer. The CEO and the Med Mal Lobbyist-2 are expected to testify at trial.

- On or about January 10, 2013, the CEO spoke with Adam Skelos's supervisor (identified as Supervisor-1 in the criminal complaint) as a result of a call from Dean Skelos to the CEO regarding Adam Skelos's employment. During the conversation, Supervisor-1 relayed to the CEO that Adam Skelos had not shown up for work, despite having been hired for a full-time position, and stated that Adam Skelos had told Supervisor that he did not have to work the requisite number of hours because his father was the Senate Majority Leader. The CEO then relayed the substance of this conversation to Dean Skelos on the same day, but was told by Dean Skelos to continue employing Adam Skelos. Supervisor-1 is also expected to testify at trial.

- In or about February 2013, after learning that Adam Skelos was treating his full-time job at the Malpractice Insurance

---

[3] Additionally, under Rule 104(b), "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."  With respect to both sets of statements, it bears relevance that the CEO and CW-1 are appearing under non-prosecution agreements.  In order for conversations between the two cooperating witnesses and others about the conversations they had with Senator Skelos to be relevant, the government must first establish that the conversations between them and Senator Skelos occurred.  The Court is permitted to consider any evidence in this fact-finding but, the government has yet to provide any evidence to corroborate these conversations with Senator Skelos beyond the self-serving statements of the cooperators.  As such, these conversations should be barred under Rule 104(b).

> Administrator as a "no show" job, the Med Mal Lobbyist-2 again discussed with the CEO the fact that Adam Skelos's job with the company was problematic given the company's lobbying relationship with Dean Skelos. At the time of this discussion, the CEO feared, based on the January 10, 2013 call with Dean Skelos, that he could not take adverse employment action against Adam Skelos."

(Gov't Br., at 23-24).

The government contends that it is offering these statements for their effect on the CEO. Specifically, that the lobbyists' statements gave him a "warning" or "notice" that employing Adam Skelos was a bad idea. (Gov't Br., at 24-26 (*citing George v. Celotex*, 914 F.2d 26, 39 (2d Cir. 1990)). To be offered under a "notice" theory it must be offered "merely to show that the defendant was on notice of a danger." *George*, 914 F.2d at 30. This testimony is not merely offered for notice purposes. The clear purpose of this testimony is so the jury will use it for the truth of the matter asserted and not for its effect on the CEO. Inevitably, the jury will attribute a truth value to the lobbyists' statements, to wit, that employing Adam Skelos was wrong.[4]

Jurors will inescapably infer that when people with expertise in relationships with politicians say that this relationship is a bad idea they will necessarily use it for the truth – that Adam Skelos' employment was inappropriate. Thus, "the significance of [the] offered statement[s]" is not under the theory offered by the government, but instead, is for the hearsay purpose of proving that what the lobbyists told the CEO was the truth. *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (citing FED. R. EVID. 801(c)).

The prejudicial effect of the lobbyists' statements about the propriety of Adam Skelos' employment substantially outweighs any probative value it has *with respect to its effect on the*

---

[4] With regard to footnotes 9 and 10 we note that the defense did not agree that the statements therein were admissible under the "effect on the listener" theory. (Gov't Br., at 23 n. 9, 10).

*listener.*  The government's evidence must meet the Rule 403 balancing test under the theory it admits the evidence, and, it has failed to do so. [5]

## IV.    The Law Firm Evidence Is Not Appropriate Character Evidence

The government seeks to introduce testimony regarding Dean Skelos' work at the Law Firm.  It claims generally that it is relevant character evidence for Senator Skelos that a "spokesperson" said that the Law Firm had a wall between Senator Skelos and the lobbying arm of the firm, which, the government claims is not true.  The reference to a statement made by a "spokesperson" with respect to the lobbying arm is not a "relevant specific instance" of Senator Skelos' conduct and is far outside the scope of Rules 405(b) and 608.  In addition, this evidence is irrelevant, significantly more prejudicial than it is probative and is also rather misleading.

### A.    Applicable Legal Standard

Rule 405(a) permits inquiry about specific instances on cross-examination of witnesses who testify about reputation for character or who give an opinion of character. However, there are "restraints on how far the government may go on cross-examination in posing guilt-assuming hypotheticals to a character witness."  *United States v. Russo*, 110 F.3d 948, 952 (2d Cir. 1997). Rule 608(b) allows for cross-examination regarding specific acts of conduct "if they are probative of the character for truthfulness or untruthfulness of . . . the witness."  *See United States v. Desposito*, 704 F.3d 221, 233 (2d Cir. 2013).  However, "even if the specific instance is probative of the witness's veracity, the court still must balance that probative value against the risk of unfair prejudice to the defendant, pursuant to Rule 403."  *Id.*

---

[5] With respect to the conversation between the CEO and the Supervisor there is a high risk that the jury will use these statements for the truth (that Adam Skelos was underperforming) and not for the government's stated purpose of the effect that information had on the CEO.

### B.     The Law Firm Evidence Does Not Go To Senator Skelos' Character And Serves Only To Complicate The Case

We note at the outset that Senator Skelos did nothing wrong with respect to the Law Firm.  Even assuming Senator Skelos' "spokesperson" was wrong about this division, it does not mean that he intentionally misled anyone regarding this fact.  As such, it is not "probative of the character for truthfulness or untruthfulness of" Senator Skelos and it should be excluded from evidence.  *See Desposito*, 704 F.3d at 233.

Moreover, if cross-examination is permitted on the "spokesperson's" statement the defense would have to offer evidence which, among other things, would establish that Senator Skelos' conduct with respect to the law firm was completely lawful under New York's Public Officer's Law § 74(3)(a).   In effect, the Court would be required to conduct a mini-trial regarding Senator Skelos' conduct at his law firm which is not part of the charged conduct.  This evidence would only serve to distract the jury's attention from the ultimate issues in this case.  Even if the Court could achieve fairness in the handling of this Law Firm conduct offered to prove character, the time spent in this regard would not be justified in terms of its probative worth.

The government seeks to characterize this evidence as relevant to rebut "character evidence relating to the defendant's alleged integrity, ethics or alleged separation of personal/family outside income from his official position as a State Senator and Majority Leader."   (Gov't Br., at 29).   This evidence has nothing to do with the "separation of personal/family outside income from his official position."  It does not imply any encompassing generalization about the truthful character of Senator Skelos.

In sum, any minimal probative value in allowing cross-examination on the "spokesperon's" statements is far outweighed by the prejudice.[6]

## V.   Cross-Examination Into the Relevant Knowledge And Credibility Of A Government Witness Should Be Permitted

Section V of the government's motion *in limine* seeks to prevent the defense from examining a government witness about allegations regarding a judicial inquiry that was made during the witness's tenure as local judge.   Defendants should have the ability to examine on these allegations since they relate not only to the witness's possible testimony about lobbying and campaign finance practices but also to his credibility as a witness.

### A.   Applicable Law

It is well-established that the trial court retains discretion over the scope and extent of cross-examination. *See*, *e.g.*, *United States v. Reindeau*, 947 F.2d 32, 35 (2d Cir. 1991) (quoting *United States v. Pedroza*, 750 F.2d 187, 195 (2d Cir. 1984)).   The "purpose of cross-examination is to impeach credibility and exposes a witness's biases or possible motives for testifying." *United States v. Millan-Colon*, 836 F. Supp. 1007, 1012 (S.D.N.Y. 1993).

The Second Circuit has emphasized that a district court "must . . . give 'wide latitude' to a defendant in a criminal case to cross-examine a government witnesses."   *United States v. Cedeno*, 644 F.3d 79, 82 (2d Cir. 2011) (quoting *United States v. Weiss*, 930 F.2d 185, 197 (2d Cir. 1991)).   As a result, the "trial judge's discretion 'cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony.'"   *Reindeau*, 947 F.2d at 35 (quoting *Gordon v. United States*, 344 U.S. 414, 423 (1953)).   Moreover, if a matter has been raised by the government during the direct examination, "generally cross examination must be permitted."   *Pedroza*, 750 F.2d at 196 (quoting *United*

---

[6] We further submit that any ruling on the scope of cross-examination of this defense witness is best reserved until the completion of the government's direct case.

*States v. Segal*, 534 F.2d 578, 582 (3d Cir. 1976)).  In evaluating whether a particular subject was raised during the examination in chief, "in a close case the rule [limiting cross-examination to the scope of the direct examination] must not be so strictly applied as to deprive the defense of an opportunity to present to the jury a vital element of the defense . . . ."  *United States v. Lewis*, 447 F.2d 134, 139 (2d Cir. 1971).  Even if a subject matter was not covered by the direct examination and does not relate to a witness's credibility, a court may nonetheless "allow inquiry into additional matters as if on direct examination."  Fed. R. Evid. 611(b).  There is no specific requirement that impeachment evidence consist only of proven claims.  *See*, *e.g.*, *Millan-Colon*, 836 F. Supp. at 1026 (finding that "despite the Government's contention that these allegations are false, the Court finds that [they] are an appropriate matter for disclosure and cross-examination.").

Rule 608(b) of the Federal Rules of Evidence allows inquiry on cross-examination into specific instances of the conduct of a witness in order to attack or support the witness's credibility, so long as the evidence is "probative of truthfulness or untruthfulness."  Fed. R. Evid. 608(b).  Indeed, even if the questions are not related to the events of the case, they may still be relevant so long as they "relate to [the witness's] character for truthfulness."  *Hynes v. Coughlin*, 79 F.3d 285, 294 (2d Cir. 1996).  The questioner must only have a "good-faith basis for the questions."  *See*, *e.g.*, *United States v. Payton*, 159 F.3d 49, 59 (2d Cir. 1998).  The trial judge ultimately retains discretion under Rules 608(b) and 403 to determine whether such relevant information should be allowed at trial.  *See*, *e.g.*, *Hynes*, 79 F.3d at 294.

## B.     Discussion

Based on a review of the witness's 3500 material, it appears that the government's direct examination of the witness may touch on his knowledge of lobbying and campaign finance practices.  If so, the defense should have the opportunity to challenge the witness's purported knowledge of these subjects by identifying certain of his own failures with respect to compliance with these laws, as exemplified by the allegations contained in the judicial investigation.   *See, e.g., United States v. Caracappa*, 614 F.3d 30 at 42-43 (2d Cir. 2010) (allowing questioning on cross-examination that was "reasonably related to the questions put to [witness] on direct."); *see also Davis v. Alaska*, 415 U.S. 308, 316 (1974) (noting that cross-examination serves as "the principal means by which the believability of a witness and the truth of his testimony are tested.").[7]

Even if not within the scope of the witness's direct testimony, however, the defense should still have the opportunity, if they choose to take it, to examine the witness on these allegations since they raise credibility issues that directly "relate to [a witness's] character for truthfulness." *Hynes*, 79 F.3d at 294.  Indeed, the judicial rules at issue were put in place in part to address "the State's compelling interest in preventing . . . corruption, or the appearance of . . . corruption, in its judiciary." *In re Raab*, 100 N.Y.2d 305, 316 (2003).  Evidence of such corruption clearly implicates the type of credibility concerns that cross-examination was designed to address. *See Millan-Colon*, 836 F. Supp. at 1012 (emphasizing that, among other reasons, "purpose of cross-examination is to impeach credibility").  Given the fact that the

---

[7] Alternatively, the Court "may reserve judgment until trial, so that the motion is placed 'in an appropriate factual context.'" *Loussier v. Universal Music Group, Inc.*, No. 02 Civ. 2447(KMW), 2005 WL 5644421, at *2 (S.D.N.Y. July 14, 2005) (quoting *Nat'l Union Fire Ins. Co. v. L.E. Meyers Co. Group*, 937 F.Supp. 276, 287 (S.D.N.Y.1996)).

Commission on Judicial Conduct saw fit to open an investigation into the issue, there is clearly a

"good-faith basis" for questions regarding the misconduct.  *Payton*, 159 F.3d at 59.

**VI.    Evidence Of Adam Skelos's Personal Circumstances Are Admissible Since They Are Relevant To The Charges [UNDER SEAL]**



## CONCLUSION

For the reasons contained herein, the government's *in limine* motion should be denied in its entirety.

Dated:       November 2, 2015
              New York, New York

                            Respectfully submitted,

By:    /s/    G. Robert Gage, Jr.
       G. Robert Gage, Jr.
       Joseph B. Evans
       Gage Spencer & Fleming LLP
       410 Park Avenue, Suite 900
       New York, New York 10022
       (212) 768-4900

       *Attorneys for Dean Skelos*

By:    /s/    Christopher P. Conniff
       Christopher P. Conniff
       Jon A. Daniels
       Alicia Giglio Suarez
       Ropes and Gray LLP
       1211 Avenue of the Americas
       New York, New York 10036
       (212) 596-9000

       *Attorneys for Adam Skelos*