UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/14/16

United States of America,

v.

Dean Skelos and Adam Skelos,

        Defendants.

OPINION ~~AND ORDER~~

S1 15 Cr. 317 (KMW)

Defendants have moved for a judgment of acquittal on all counts under Rule 29(c) and for a new trial under Rule 33. For reasons set forth below, the Court denies the motions.

## BACKGROUND

The charges in the Superseding Indictment arose from a long-running, approximately five year scheme by the Defendants to brazenly solicit payments to Defendant Adam Skelos, from companies with business before the New York State Senate, in exchange for official action by Defendant Dean Skelos, who was, from January 2011 to May 11, 2015, a New York State Senator and Senate Majority Leader or Senate Co-Majority Leader.

Count One of the Indictment charged the Defendants with conspiring to commit extortion by obtaining property under color of official right from entities with business before New York State, in violation of Title 18, United States Code, Section 1951; Count Two charged the Defendants with conspiring to commit honest services wire fraud, by soliciting bribes from entities with business before New York State, in violation of Title 18, United States Code, Section 1349; Counts Three, Four, and Five each charged the Defendants with substantive extortion under color of official right, in violation of Title 18, United States Code, Sections 1951 and 2, related to three particular companies: Glenwood Management ("Glenwood") (Count

Three), AbTech Industries ("AbTech") (Count Four), and Physicians Reciprocal Insurers (PRI") (Count Five), respectively; Counts Six, Seven, and Eight each charged the Defendants with solicitation and acceptance of bribes and gratuities, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2, also related to Glenwood (Count Six), AbTech (Count Seven), and PRI (Count Eight), respectively.

The Defendants' trial lasted from November 16, 2015 to December 11, 2015, when the jury returned guilty verdicts against both Defendants on all counts. The Government's proof at trial included: (i) testimony from 20 witnesses, including cooperating witnesses from Glenwood, AbTech, and PRI, who testified that they arranged for payments to Adam Skelos in exchange for official actions from Dean Skelos, including his support for legislation in the New York State Senate; (ii) emails showing the Defendants' solicitation of payments to be made to Adam Skelos from Glenwood, AbTech, and PRI, during time periods when the companies had legislation and other official business before Dean Skelos; and (iii) wiretap recordings from December 2014 through April 2015 that support the Governments charges.

Through these schemes, the Defendants sought more than $760,000 in extortion payments, bribes and gratuities; they succeeded in obtaining more than $300,000 as a result of these schemes.

## THE RULE 29 MOTIONS

At the close of the Government's case, defense counsel made oral Rule 29 motions, which the Court considered and denied. Having read counsels' post-trial Rule 29 submissions, the Court again denies the Rule 29 motions, for the reasons set forth below.

At trial, the Government presented overwhelming evidence from which a rational juror could conclude beyond a reasonable doubt that Defendants acted in concert to solicit and receive

payments from each of Glenwood, AbTech, and PRI, with the understanding that, in exchange for those payments, Dean Skelos would take official action for the benefit for those companies, including taking specific legislative action.

I. **The Glenwood Scheme (Counts One, Two, Three and Six)**

The Government presented copious evidence at trial that, when it became clear that Dean Skelos would become Senate Majority Leader in January 2011, he began soliciting payments from Glenwood Management ("Glenwood"), a large real estate development firm, in exchange for his support for legislation worth millions of dollars to Glenwood.[1] The following is a sample from that evidence.

During private meetings with Glenwood representatives on, inter alia, December 20, 2010; March 18, 2011; and May 5, 2011; in which Glenwood lobbied for particular legislation favorable to it, Dean Skelos persistently pressured Glenwood representatives to provide payments or income to Adam Skelos. Often within days of Dean Skelos's demands, Adam Skelos followed up by calling Glenwood's general counsel, Charles Dorego ("Dorego") and pressured him to meet Dean Skelos's demands.

In response to the pressure from Dean Skelos and Adam Skelos, Dorego reluctantly arranged for third parties to make payments to Adam Skelos, so that the payments could not be traced to Glenwood. Dorego arranged for Adam Skelos to receive a $20,000 payment from American Land Services for title work Adam Skelos did not perform, and later arranged for Adam Skelos to be hired as a "government relations" consultant for $4,000 per month, by

---

[1] Glenwood's profitability was heavily dependent on substantial New York State tax abatements to real estate developers of residential real estate buildings in New York City, commonly referred to as "421-a." Glenwood was also dependent on New York State rent regulation laws favorable to Glenwood. Both the 421-a program and rent regulation laws expired every four years. To promote versions of these laws favorable to it, Glenwood actively lobbied the State legislature, and donated over $10 million to New York State politicians over the past ten years.

AbTech, a waste water treatment company in which Glenwood's founding family had an interest; Adam Skelos had no experience in AbTech's type of business. During this time period, Dean Skelos took numerous official actions favoring Glenwood, including sponsoring legislation renewing the 421-a program, and making changes to rent regulation laws favored by Glenwood.

Beginning in early 2012, Dean Skelos resumed pressuring Glenwood representatives to find income for Adam Skelos. On February 8, 2012, at an industry meeting, Dean Skelos asked Dorego whether Glenwood could help Adam Skelos, "maybe some title business." Right after that meeting Dean Skelos called Adam Skelos, and Adam Skelos then emailed Dorego to solicit energy business from Dorego. On April 6, 2012, Dean Skelos met with Dorego and other real estate executives to discuss tax legislation favorable to real estate developers who benefited from the 421-a program. Dorego testified that right before the meeting, Dean Skelos again asked if there was anything Glenwood could do "to . . . get something going for Adam Skelos." During this time period, Dean Skelos again voted in favor of extending the 421-a program.

Also during this time period, Dean Skelos actively opposed campaign finance reform, reform that Glenwood opposed because it would have curtailed Glenwood's ability to influence politicians.

Although the Glenwood representatives were uncomfortable with obtaining payments for Adam Skelos at the same time they were lobbying Dean Skelos for specific legislation, they capitulated because they feared Dean Skelos would otherwise not support the legislation Glenwood favored. The fear was based in part on Dorego's having experienced Dean Skelos's anger, and how his anger could affect whether he would follow through on campaign promises. Dorego heard Dean Skelos say that "if [another real estate developer] didn't "step to the plate and pony up, that, you know, at some point he was going to F them."

Taken as a whole, the Government presented copious evidence from which a rational juror could conclude that, with respect to the Glenwood scheme, Dean Skelos engaged in a conspiracy to obtain property under color of official right (Count One); engaged in a conspiracy to commit honest services fraud (Count Two); attempted to and did commit extortion by obtaining property under color of official right (Count Three); and corruptly solicited and/or accepted bribes and gratuities in connection with a federal program (Count Six).

The Government also presented copious evidence from which a rational juror could conclude that, with respect to the Glenwood scheme, Adam Skelos engaged in a conspiracy to obtain property under color of official right (Count One); engaged in a conspiracy to commit honest services fraud (Count Two); aided and abetted or willfully caused Dean Skelos's attempt to commit and commission of extortion by obtaining property under color of official right (Count Three); aided and abetted or willfully caused Dean Skelos's solicitation and/or acceptance of bribes and gratuities in connection with a federal program (Count Six).

## II. The AbTech Scheme (Counts One, Two, Four and Seven)

At the time AbTech hired Adam Skelos, AbTech was actively attempting to convince Nassau County to issue a Request for Proposal ("RFP") for a project crucial to AbTech's success. Adam Skelos's contract with AbTech provided for his compensation to increase to $5,000 per month if Nassau County awarded the contract to AbTech. Dean Skelos used his official influence to expedite Nassau County's issuance of the RFP sought by AbTech.

What follows is just one example of ways in which the Defendants insisted that, as a quid pro quo for Dean Skelos taking official action to obtain a Nassau County contract for AbTech, the Defendants insisted on more and more payments to Adam Skelos.

During AbTech's bid for the Nassau County work, Adam Skelos learned that AbTech's engineers were paid more than he was paid. At trial, Dorego testified that Adam Skelos, after hearing that the engineers were earning more than he, telephoned Dorego and said Adam was "furious that he'd been doing all this and his father was helping him, and they were – he was angry that when they finally saw the breakdown of [the AbTech] project, that the engineers were going to make more money than [Adam Skelos]." Adam Skelos also said that his father was "going to stop whatever they were doing" unless Adam Skelos received a 4% commission on the expected $10 million contract. Adam Skelos told Dorego to communicate that message to AbTech's CEO, Glenn Rink ("Rink"). Adam Skelos's cellphone records show that he was in contact with Dean Skelos immediately after this call to Dorego.

In response to the call from Adam Skelos, Dorego sent an email to Rink delivering the Defendants' threat. Dorego wrote Rink that if Adam Skelos did not receive a 4% commission on the contract, the Defendants did not think it was worth "pushing through" the "legislation and RFP" necessary for Nassau County to award the contract to AbTech. Dorego testified that the information in this email to Rink came directly from his earlier call with Adam Skelos. Dorego then spoke to Rink by phone and communicated the same message delivered to him by Adam Skelos that he had memorialized in his earlier email to Rink. Dorego testified: " . . . this is a threat to either do or not do legislation for money, and it was a wrongful threat to be made; . . . ."

At trial, Rink testified that he understood from Dorego's email and phone call that Dean Skelos and Adam Skelos would stop work on the Nassau County project unless Adam Skelos was paid more, and Rink feared that Dean Skelos would use his power to stop the contract. Rink believed AbTech had no choice other than to meet Defendants' demand. Rink testified: "[b]ecause everything was at risk . . . and I felt that the project could be - - this could be a death

threat or a death knell in this opportunity. . . . And the thought of having this, for whatever reason, taken away would be a disaster. And so for those reasons I was going to - - I was going to accommodate." Bjornulf White ("White"), another AbTech executive, who supervised Adam Skelos and was involved in the submission of AbTech's bid to Nassau County, testified that the email and threat from the Defendants "was pretty shocking."

Rink testified that he and White ultimately agreed to increase Adam Skelos's compensation to $10,000 per month in response to the Defendants' threat. White communicated the decision to Adam Skelos in a phone call on April 23, 2013. Immediately following this phone call from White, Adam Skelos called Dean Skelos.

After AbTech was awarded the contract, AbTech began paying Adam Skelos $10,000 per month, even though Adam Skelos's contract entitled him to only $4,000 per month.

Thereafter, Dean Skelos provided assistance to AbTech by repeatedly contacting Nassau County officials, over whom Dean Skelos had enormous official power, in order to facilitate the approval of the AbTech contract.

However, as with the Glenwood scheme, the Government's evidence against the Defendants was much more far-reaching, and involved additional official action by Dean Skelos related to legislation in the New York State Senate. Among other things, the evidence at trial showed that, over the course of the next two years, Dean Skelos took numerous official actions to ensure that AbTech's payments to Adam Skelos would continue and even potentially increase. During this same time period, Dean Skelos advocated for New York State legislation to allocate budget funds to storm water projects and to authorize "design-build" projects, both of which would have benefited AbTech and potentially increased the company's payments to Adam

Skelos. And, during this same time period, Adam Skelos and Dean Skelos were in frequent communication regarding how Dean Skelos could benefit AbTech.

The Government presented an enormous amount of evidence that, with respect to the AbTech scheme, a rational juror could conclude that Dean Skelos conspired to obtain property under color of official right (Count One): conspired to commit honest services wire fraud (Count Two); attempted to and did commit extortion by obtaining property under color of official right (Count Four); and corruptly solicited and accepted bribes and gratuities in connection with a federally funded program (Count Seven);

The Government also presented an enormous amount of evidence that, with respect to the AbTech scheme, a rational juror could conclude that Adam Skelos conspired to obtain property under color of official right (Count One); conspired to commit honest services wire fraud (Count Two); aided and abetted or willfully caused Dean Skelos's attempt to commit and commission of extortion to obtain property under color of official right (Count Four); and aided and abetted or willfully caused Dean Skelos's solicitation and acceptance of bribes and gratuities in connection with a federally funded program (Count Seven).

### III. The PRI Scheme (Counts One, Two, Five and Eight)

From 2011 to 2015, Physicians' Reciprocal Insurers ("PRI"), one of New York's largest medical malpractice insurers, actively lobbied Dean Skelos on legislation essential to PRI's business. That legislation included what are referred to as "extenders" - - legislation that prevented the Department of Financial Services from liquidating PRI due to PRI's negative

capital balance. Anthony Bonomo ("Bonomo"), PRI's CEO, testified at trial to the importance of "extenders" to PRI as follows:

> "If [the extenders were] to go away and rates were to be set low, then the threat is we could be put into liquidation for no fault of anything that we have done" and over time, PRI would be put out of business.

He also testified about how much lobbying for extenders was done by PRI:

> "The day [the extender] is passed we start lobbying for its extension again. We would not want to wait until the absolute year it expires because of the threat that it may not pass. So we would lobby to extend it the next year to just keep trying to extend the legislations, because it's critical to us."

The extenders needed to be renewed in 2011. Bonomo testified that, beginning in late 2010, Deal Skelos began making repeated requests for Bonomo to direct PRI's court-reporting business to U.S. Legal Support, a company that employed Adam Skelos's then-fiancée, and later also employed Adam Skelos, on a commission basis. Throughout 2011 and 2012, Dean Skelos continued to pressure Bonomo to direct PRI's court-reporting commissions to Adam Skelos, and Bonomo attempted to do so. And, during this time, Dean Skelos repeatedly told Bonomo that the amount of commissions Bonomo was providing was insufficient for Adam Skelos. Dean Skelos's pressure on Bonomo regarding payments for the benefit of Adam Skelos typically were made during conversations in which Dean Skelos and Bonomo also discussed pending legislation important to Bonomo and PRI, including the extenders, which Dean Skelos voted to pass in 2011, 2012, and 2015.

Partly as a result of Deal Skelos's repeated pressure on Bonomo to increase the amount of payments from PRI to Adam Skelos, and to find Adam Skelos a job with health benefits, Bonomo offered Adam Skelos a full-time job at PRI.

On January 2, 2013, PRI began paying Adam Skelos $78,000 a year, plus health benefits, as a full-time employee in PRI's Sales and Marketing Department, even though Adam Skelos did

not have a license to sell insurance. Although under the terms of his contract Adam Skelos was required to work full-time, in his first four months, Adam Skelos failed to come to work more than half of the work days, and when he came to work. There were only five days when he worked three or more hours.

Notwithstanding Adam Skelos's absence from work, his failure to secure even one medical malpractice insurance policy on behalf of PRI, and his aggressive rudeness to his supervisor,[2] Bonomo continued to pay Adam Skelos, because Bonomo believed that Dean Skelos would retaliate with official action against PRI if PRI were to terminate Adam Skelos; the retaliation Bonomo feared was that Dean Skelos would fail to support the "extenders," as well as other legislation sought by PRI. Dean Skelos voted to support the "extenders" in 2012 and 2013.

Dean Skelos did not disclose to his staff or Senate colleagues that Adam Skelos was being paid by PRI while Dean Skelos promoted the above-referenced legislation.

The Government presented ample evidence that, with respect to the PRI scheme, a rational juror could conclude that Dean Skelos conspired to obtain property under color of official right (Count One); conspired to commit honest services fraud (Count Two); attempted to and did commit extortion by obtaining property under color of official right (Count Five); and corruptly solicited and accepted bribes and gratuities (Count Eight).

The Government also presented ample evidence that, with respect to the PRI scheme, a rational juror could conclude that Adam Skelos conspired to obtain property under color of

---

[2] On January 10, 2013, in response to Adam Skelos's supervisor calling him to discuss the need to come to work more regularly, Adam Skelos called his supervisor, threatening to "smash your fucking head in," stating that [y]ou'll never amount to anything," and stating that his supervisor "couldn't shine [Adam Skelos's] shoes," and that he did not have to come to work regularly because his father was the Majority Leader of the Senate. Adam Skelos also told other employees that his father and PRI's CEO had an arrangement that substantially limited the hours Adam Skelos was expected to work. When PRI's CEO reported all of this to Dean Skelos, Dean Skelos simply told him to "work it out."

official right (Count One); conspired to commit honest services fraud (Count Two); aided and abetted or willfully caused Dean Skelos's attempt to commit and commission of extortion to obtain property under color of official right (Count Five); and aided and abetted or willfully caused Dean Skelos's solicitation and acceptance of bribes and gratuities in connection with a federally funded program (Count Eight).

Two prongs of Defendants' defense warrant mention. First, with respect to legislation favoring Glenwood and PRI, the defense argues that his actions were innocent because they promoted his long-held, core positions, and because they were consistent with "the best interest of his constituency and the citizens of New York State." The defense fails, because, as the United States Supreme Court has held, a public official is "guilty of accepting a bribe even if he would and should have taken in the public interest, the same action for which the bribe was paid." City of Columbia v. Omni Outdoor Advertising, Inc., *499 U.S. 365, 378 (1991)*. The Second Circuit has applied the same reasoning, and has rejected the contention that acts are innocent if the public official previously supported the positions at issue. United States v. Rosen, *716 F.3d 691, 704 (2d Cir. 2013)*.

Furthermore, the specific content of the 421-a program and rent regulation laws was subject to being modified in ways favorable to some constituents, and unfavorable to others. Dean Skelos chose to support specific content of these laws that were favorable to Glenwood.

Second, the Defendants claim (1) that there was no proof that each Defendant intended there to be a link between payments to Adam Skelos and official actions by Dean Skelos, and (2) that even if there is such a link, the payments were intended merely to buy [foster] goodwill with

11

Dean Skelos, not to take any specific official action, and that payments to foster goodwill are lawful.

Evidence in the form of Defendants' own emails and telephone conversations show that they intended to link payments by Glenwood and PRI to Adam Skelos to specific legislation favorable to Glenwood and to PRI, and show that Defendants intended to link increases in Adam Skelos's pay to Dean Skelos's official actions promoting AbTech's interest in obtaining the Nassau County contract, and promoting legislation favorable to AbTech.

In conclusion, the Defendants' conduct described above followed a brazen pattern of pressuring, bullying and threatening companies with substantial business before the New York State Senate, all to force the companies to enrich his son.

For the reasons set forth herein, the Court denies Defendants' Rule 29 motion, and also denies Defendants' Rule 33 motion for a new trial; competent, satisfactory and sufficient evidence support the jury's verdicts.

So ordered.

Dated: New York, New York
April 14, 2016

_____
THE HONORABLE KIMBA M. WOOD
UNITED STATES DISTRICT JUDGE