UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

                              :

    - v -

                              :            S1 15 Cr. 317 (KMW)

DEAN SKELOS and ADAM SKELOS,

                              :

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANTS' MOTION FOR BAIL PENDING APPEAL

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Tatiana Martins
Thomas McKay
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS.........................................................................................................3

    I.    THE PRI SCHEME (COUNTS ONE, TWO, FIVE AND EIGHT) ....................................5

    II.   THE GLENWOOD SCHEME (COUNTS ONE, TWO, THREE AND SIX)............................8

    III.  THE ABTECH SCHEME (COUNTS ONE, TWO, FOUR AND SEVEN) ............................13

ARGUMENT ......................................................................................................................18

    I.    THE DEFENDANTS' MOTIONS FOR BAIL PENDING APPEAL SHOULD BE DENIED...........18

        A.    Applicable Law.............................................................................................18

        B.    The Supreme Court's Decision in McDonnell ....................................................20

        C.    The Defendants Present No Substantial Question Likely to Result in Reversal or New Trial .................21

    CONCLUSION .............................................................................................................42

**TABLE OF AUTHORITIES**

*McDonnell v. United States,*
    No. 15-474 (2016)...............................................................................*passim*

*Ocasio* v. *United States,*
    136 S. Ct. 1423, 1434 (2016).............................................................24

*Puckett* v. *United States,*
    556 U.S. 129, 134 (2009) ...................................................................22

*United States* v. *Abuhamra,*
    389 F.3d 309, 319 (2d Cir. 2004) ......................................................18

*United States* v. *Applins,*
    637 F.3d 59, 72 (2d Cir. 2011) ..........................................................19

*United States* v. *Bestway Disposal Corp.,*
    724 F. Supp. 62, 70 (W.D.N.Y. 1988) ................................................43

*United States* v. *Birdsall,*
    233 U.S. 223, 230-31 (1914)..............................................................28

*United States* v. *Carson,*
    464 F.2d 424, 432 (2d Cir. 1972) .................................................22, 28

*United States* v. *Coplan,*
    703 F.3d 46, 87 (2d Cir. 2012) ..........................................................19

*United States* v. *Ganim,*
    510 F.3d 134, 141 (2d Cir. 2007) .............................................25, 27, 28

*United States* v. *Ghailani,*
    733 F.3d 29, 52 (2d Cir. 2013) ..........................................................22

*United States* v. *Giancola,*
    754 F.2d 898, 901 (11th Cir. 1985) ...................................................19

*United States* v. *Marcus,*
    560 U.S. 258, 262 (2010) ...................................................................20

*United States* v. *McDonnell,*
    792 F.3d 478, 514-15 (4th Cir. 2015) ................................................26

*United States* v. *Miller,*
    753 F.2d 19, 22 (3d Cir. 1985) .....................................................18, 19

iii

*United States* v. *Mulder*,
    273 F.3d 91, 105 (2d Cir. 2001) .........................................................................19

*United States* v. *Myers*,
    692 F.2d 823, 840-41 (2d Cir. 1982) .................................................................28

*United States* v. *Quattrone*,
    441 F.3d 153, 177 (2d Cir. 2007) .......................................................................23

*United States* v. *Randell*,
    761 F.2d 122, 125 (2d Cir. 1985) .......................................................................18

*United States* v. *Rosen*,
    716 F.3d 691, 699 (2d Cir. 2013) ...................................................................25, 28

*United States* v. *Sabhnani*,
    599 F.3d 215, 237 (2d Cir. 2010) .......................................................................23

*United States* v. *Skelly*,
    442 F.3d 94, 99 (2d Cir. 2006) .....................................................................19, 22

## PRELIMINARY STATEMENT

After their swift and decisive convictions of eight corruption offenses, defendants Dean and Adam Skelos now seek bail pending appeal on the sole ground that the Supreme Court's decision in *McDonnell* v. *United States*, No. 15-474 (2016), creates a "substantial question" on appeal. It does not, and the defendants' application for bail pending appeal should be denied. After a nearly four week trial, a jury needed just one day of deliberations to unanimously convict former New York State Majority Leader Dean Skelos and his son Adam Skelos of engaging in a series of *quid pro quo* corruption schemes. *See* Tr. 2823, 2856. The evidence presented at trial, which this Court described as "overwhelming," "copious," and "enormous," *see United States* v. *Skelos*, 15 Cr. 317 (KMW), Dkt. 175 ("Rule 29 Op."), at 2, 5, 8, proved that the defendants carried out three long-running schemes to solicit payments to Adam Skelos from three companies with business before the New York State Senate – PRI, Glenwood and Abtech – in exchange for specific official actions on important legislative matters from Dean Skelos.

The defendants' brief seeking bail pending appeal relies on incomplete quotation from the Court's charge to the jury in support of a claim that the Court's charge was insufficient in light of *McDonnell*. But, read as a whole, this Court's charge accurately stated the law, both before and after *McDonnell*.

The defendants' application also scrupulously avoids any discussion of the defendants' conduct or the evidence presented at trial. But facts matter. And here they are dispositive: Fairly reviewed, the record leaves no doubt that the jury's guilty verdicts on all eight counts were based on official acts taken by Dean Skelos that fall squarely within the requirements of *McDonnell*. *McDonnell* held that an official act must involve a "formal exercise of governmental power" on which the public official took or agreed to take an action, with the

action needing to be "something more" than "setting up a meeting" or "hosting an event." *McDonnell*, slip op. at 19-21.  Support of legislation plainly counts as official action under *McDonnell*, as does using one's "official position to exert pressure on another official to perform an 'official act.'"  *Id.* at 21.  That is exactly what the record at trial established here (and what the Supreme Court noted was absent in *McDonnell*): Dean Skelos casted votes on specific pieces of legislation on behalf of PRI and Glenwood, promised to cast such votes on behalf of Abtech, and pressured other elected officials to take official action on Abtech's behalf.  *See, e.g.*, Tr. 627, 1956, 2479-80, 2489, 2491, 2543, 2561, 2579, 2587; GX-8, GX-1337, GX-1438.  There is no "*McDonnell* issue" in this case; the defendants' corrupt conduct was, and continues to be, illegal under federal law.

According to the defendants, *McDonnell* creates a "substantial question" for all eight counts because (a) the jury instructions were in error and (b) there is a risk that the jury could have reached each one of its verdicts based solely on actions that are no longer illegal under *McDonnell*.  Def. Br. 1-2.  Both parts of this argument collapse under scrutiny.

First, this Court's jury instructions – when read as a whole – were entirely consistent with *McDonnell*, as they made clear that, in order to find the defendants guilty, the extorted parties had to reasonably expect that Dean Skelos would "exercise *official influence or decision making*" for their benefit, Tr. 2781 (emphasis added), and that the defendants could not be convicted if the extorted parties sought only to cultivate "goodwill" and not the performance of official action.  *Id.*  Second, even if the jury instructions were erroneous in light of *McDonnell*, the error would plainly be harmless, as there simply is no possibility, in light of the evidence presented and the contentions of counsel, that the jury based its verdict – on any of the eight counts of conviction, let alone all of them – on an act that does not meet the *McDonnell* standard.

2

For each of the three schemes at issue – PRI, Glenwood and Abtech – the proof was overwhelming that Dean Skelos took or agreed to take acts that by any definition constituted official action in exchange for the payments made to his son: legislation, votes, pressure on other public officials.  This case, unlike *McDonnell*, was never about the mere setting up of meetings or making of introductions; the extorted and bribe-paying parties wanted – and received – so much more from Dean Skelos.  That is undoubtedly why the defendants, until now, did not contest the Court's definition of official act in any substantive way.  Indeed, they never proposed an alternate definition, either before or during the charge conference.  And that is why the defendants have no choice but to ignore the actual record at trial in trying to create a "substantial question" for appeal where there is none.

For these reasons and those set forth below, the defendants' motion for bail pending appeal should be denied.

## STATEMENT OF FACTS

At trial, the Government presented overwhelming evidence that the defendants engaged in three separate but similar corrupt schemes in which the defendants enriched themselves by agreeing to take, and in fact taking, official actions on behalf of three companies with critical legislative interests in the New York State Senate.  The Government's proof at trial included, among other evidence: (i) testimony from 20 witnesses, including cooperating witnesses from PRI, Glenwood and Abtech, who testified that they arranged for payments to Adam Skelos in exchange for official actions from Dean Skelos, including, cricitically, *his support for legislation in the New York State Senate*; (ii) emails showing the defendants' solicitation of payments to Adam Skelos from PRI, Glenwood and Abtech, during time periods when the companies had legislation and other official business pending before Dean Skelos; and (iii) intercepted

3

telephone conversations and consensual recordings from December 2014 through April 2015 during which, among other things, the defendants discussed legislative actions and other steps being taken by Dean Skelos for the benefit of Abtech during the Senate's 2014-2015 legislative session.  With respect to each scheme, the Government proved beyond a reasonable doubt that the defendants obtained bribes and extortion payments for the benefit of Adam Skelos from companies with critical legislative business pending before Dean Skelos, in exchange for the performance of official actions by Dean Skelos.

Most of the evidence presented at trial was undisputed, including evidence of the payments made to Adam Skelos by PRI, Glenwood and Abtech, the substantial business all three companies had before the State, and the actions taken by Dean Skelos that favored all three companies.  As discussed below, the only real dispute at trial was whether the Government had established that the payments to Adam Skelos were made in exchange for Dean Skelos's official actions on the legislation and other benefits sought by PRI, Glenwood and Abtech, *i.e.*, the *pro* component of a *quid pro quo* offense.  As reflected in its swift convictions on all eight counts, the jury found that the Government proved that exchange beyond a reasonable doubt, a conclusion upheld by this Court in its denial of the defendants' Rule 29 motion.

The defendants' motion for bail pending appeal tellingly omits any reference to the damning and complex facts proved by the Government at trial, and instead relies on certain selected snippets taken misleadingly out of context from the Government's multi-hour jury addresses.  However, because the facts proven at trial – particularly in regard to official action taken by Dean Skelos – are critical to the bail analysis, the Government recites those facts in some detail below.

I.      **The PRI Scheme (Counts One, Two, Five and Eight)**

New York State legislation – and Dean Skelos's enormous official power over such legislation – lay at the heart of the PRI Scheme of which both defendants were convicted at trial. The PRI Scheme did not involve mere meetings or access to public officials.  To the contrary, the scheme arose out of the defendants' efforts to extract payments for Adam Skelos from PRI by agreeing to taking numerous actions – all plainly within Senator Skelos's official authority as Senate Majority Leader – with respect to New York state legislation.  Under any definition, including the definition announced by the Court in *McDonnell*, this scheme involved payments for official actions.

At trial, the Government proved that the defendants leveraged PRI's dependence on certain legislation that was controlled by Dean Skelos to obtain payments for Adam Skelos in the form of a no-show job at PRI and other payments, and that Dean Skelos took official action on behalf of PRI in exchange for those payments.  *See, e.g.*, Tr. 1899; GX-3307A (summary chart of legislation pending in the Senate from 2011-2015 on which PRI lobbied Dean Skelos).  In particular, Anthony Bonomo, PRI's CEO, testified at trial pursuant to a non-prosecution agreement that PRI's entire business depended on legislation colloquially known as "extenders," which prevented the New York State Department of Financial Services from liquidating PRI due to the company's negative balance.  *See* Tr. 1905, 1912.  These extenders, which uniquely affected PRI because the other large medical malpractice insurer in New York State did not carry a negative balance, required periodic renewal by the State legislature, and were up for renewal at several points during the charged conspiracy.  *See* Tr. 1906-07.

Specifically, as Bonomo testified, the PRI extender legislation was up for renewal in 2011, and beginning in late 2010, when it became clear that Dean Skelos would be the next

Senate Majority Leader, Dean Skelos began repeatedly asking Bonomo to direct PRI's court-reporting business to U.S. Legal Support, a company that employed Adam Skelos's then-fiancée, and later also Adam Skelos, on a commission basis.  Tr. 1914.  Ultimately, because of Dean Skelos's repeated requests and the importance of the extender legislation to PRI's survival as a company, Bonomo sent PRI's business to U.S. Legal Support as Dean Skelos requested.   Tr. 1889-90.  The defendants, however, wanted more.  Throughout 2011 and 2012, the defendants repeatedly expressed to Bonomo that the amount of commissions Bonomo was providing to Adam Skelos was insufficient.  Tr. 1918-19.

On January 2, 2013, as a direct result of Dean Skelos's repeated requests to Bonomo to help Adam Skelos financially, Adam Skelos started getting paid $78,000 per year, plus health benefits, as a full-time employee in PRI's Sales and Marketing Department, even though he did not have a license to sell insurance, and even though he failed to work even one full day during the time he was being paid by PRI.  Tr. 101, 108-09, 1946; GX-715.

In January 2003, approximately one week after Adam Skelos began getting paid by PRI despite not showing up for work, Dean Skelos made it clear to Bonomo that he expected Bonomo to keep paying Adam in exchange for Dean Skelos's legislative support for PRI.   Tr. 1948-51, 1956; GX-108.  After the conversation with Dean Skelos, which Bonomo described as different in tone than any other conversation between the two of them in over 30 years of knowing each other, Bonomo was left with the clear understanding that he had no choice but to continue to pay Adam Skelos regardless of whether Adam Skelos decided to perform any work for PRI, or else it could "become a problem for [Bonomo] in Albany."  Tr. 1956.  Bonomo further explained that "You know legislation could pass or fail.  And the fact that we had legislation that would have to go on the calendar, so to speak, and, you know, be put up for vote.

The threat was that if this was going to create a problem I didn't want that to get in the way of the ultimate passing of legislation or legislation not getting on the calendar." Tr. 1956.  Bonomo and PRI received the same message from Adam Skelos, who brought up his father's powerful position in the Senate to his co-workers, and threatened to "smash [Curcio's] fucking head in" when Curcio, his supervisor, dared to ask him whether he would be keeping more regular work hours. Tr. 152.

Bonomo further testified that as a result of his communications with Dean Skelos,  PRI had no choice but to continue to pay Adam Skelos for nearly two years, despite Adam Skelos's failure to work and his disruptive presence when he did show up, in order to continue to receive favorable official action from Dean Skelos.  *See, e.g.*, Tr. 1959 ("I just felt that it was best to do nothing and to avoid the chance in Albany that, you know, that we would run into a problem with any legislation because of the fact that, you know, this had happened.").  Moreover, when specifically asked whether his continued payments to Adam Skelos stemmed from a desire to build general "goodwill" with Dean Skelos or whether he made the payments because of Dean Skelos's vote on specific legislation important to PRI, Bonomo testified "I was concerned about the legislative issues we had."  Tr. 2065.[1]

Thus, with respect to the PRI scheme, the evidence showed beyond a reasonable doubt that the official acts provided by Dean Skelos in exchange for the continued payments to Adam Skelos were specific exercises of formal government power: Dean Skelos's support of specific

---

[1]  As further evidence of Dean Skelos's understanding that he was engaged in a *quid pro quo* with PRI for his official actions, the Government presented proof that, among other things, Dean Skelos never told his staff or Senate colleagues that his son was being paid by PRI during the period he voted to pass legislation in the company's interests, *see* Tr. 288, 1794, 1872-73, and he brushed off a pointed warning from former United States Senator Alfonse D'Amato that Adam Skelos was treating his work at PRI as a no-show job, *see* Tr. 2083.

legislation that was critical to PRI.  Tr. 2065.  Of course, the proof included evidence of various

meetings, calls, and emails between PRI's lobbyists and Dean Skelos and/or his senior staff.  But

that in no way means, as the defendants would have it, that the scheme itself was only about

those meetings, calls, and emails.  To the contrary, each of the meetings, calls, or emails were

occasions in which Dean Skelos or staff members discussed PRI's specific legislative needs with

the company's representatives and Skelos's position on such legislation, and thus were critical

evidence not of a mere meeting without "something more," but of the *quid pro quo* itself—*i.e.*,

the corrupt bargain to trade votes on legislation beneficial to PRI in exchange for payments to

Adam Skelos.  *See* Tr. 2244-45, 2353-58, 2361-64, 2371; GX-806, GX-833, GX-838.  At no

time did Bonomo or any other witness testify that Adam Skelos was paid in exchange for Dean

Skelos's mere ability to arrange meetings for PRI.  *Compare McDonnell*, slip op. at 5 (aide

testified that she did not feel pressured by Governor or Mrs. McDonnell to do anything other

than have the meeting).  Rather, Bonomo testified to the exact opposite, that the continued

payments to the defendants were the result of "the legislative issues we had."  Tr. 2065.

## II.     The Glenwood Scheme (Counts One, Two, Three and Six)

As with PRI, the evidence at trial proved that Dean Skelos's official power over New

York State legislation was at the heart of the defendants' corrupt scheme to extract bribe and

extortion payments from Glenwood, which were paid to Adam Skelos in the form of a $20,000

payment disguised as a title commission and a $4,000 per month consulting contract with

Abtech, a stormwater management company which was connected to Glenwood through a

relatively large investment in the company by Glenwood's founding family.  In exchange for

those payments to Adam Skelos from Glenwood, Dean Skelos in fact voted to pass legislation

that was beneficial to Glenwood in the particular ways sought by the company.  As with the PRI

Scheme, there can be no doubt that the Glenwood scheme involved more than mere meetings and access, but rather actions taken by Dean Skelos within his official power as the Senate Majority Leader, *i.e.*, "official action," as that term was defined in *McDonnell*.

As shown through the testimony of cooperating witness Charles Dorego, Glenwood's General Counsel, as well as numerous other witnesses, documents and emails, Dean Skelos, as the leader of the Senate Republicans and the Senate Majority Leader, exercised enormous control over real estate tax breaks known as "421-a" and rent regulation laws that were critical to Glenwood's business.  As Dorego testified, 421-a provided substantial tax abatements to developers of residential real estate buildings in New York City and was an "absolute necessity" to Glenwood such that they "[could not] construct new buildings without it."  Tr. 366-68.  Many of Glenwood's buildings were also subject to State rent regulation laws, which determined, among other things, the rents that Glenwood could charge to tenants of its rent regulated apartments and the circumstances under which those rental rates could be deregulated.  *See* Tr. 371-73.  Similar to the extenders at issue in the PRI scheme, the 421-a and rent regulation laws expired periodically – in this case, every four years –  and were voted on for renewal by the State legislature.  Tr. 373.  There was no dispute that this legislation was worth tens of millions of dollars to Glenwood's business.  Tr. 368.

At trial, the jury heard voluminous and corroborated evidence that Dean Skelos monetized his power over the 421-a and rent regulation legislation critical to Glenwood's business by repeatedly pressuring Dorego and other Glenwood representatives to find income for Adam Skelos at the same time that Glenwood was actively seeking the Senator's assistance with respect to those laws during the 2010-2011 legislative session.  For example, on December 20, 2010, when it was clear that Dean Skelos would be the next Senate Majority Leader (and at the

same time he was pressuring Bonomo to give court-reporting commissions to Adam Skelos),

Dean Skelos met at Glenwood's offices with Dorego, Leonard Litwin, and other Glenwood

representatives to discuss the upcoming 421-a and rent regulation renewals.  At the meeting,

Dean Skelos asked Litwin, the founder of Glenwood, and Dorego, "if there was anything that

[Glenwood] could do to help Adam" to get title commissions from Glenwood.  Tr. 424.  Dorego

testified that Dean Skelos's request was inappropriate given the "major pieces of legislation"

Glenwood had in front of Dean Skelos.  Tr. 432.

The December 20, 2010 discussion between Dean Skelos and Glenwood representatives

regarding payments to Adam Skelos was one of approximately *ten* such occasions during which

Dean Skelos raised the issue of payments to Adam Skelos and also discussed Glenwood's

specific legislative interests in the upcoming session, and Dean Skelos's position on the

legislation.  *See, e.g.*, Tr. 459-60, 465-66, 483-86.  Given Dean Skelos's power to affect

Glenwood's significant legislative interests as the Senate's most powerful member, Dorego

testified that he had no choice but to respond to Dean Skelos's demands for payments to Adam

Skelos.  Tr. 466, 485-86.  Finally, in May 2011, at a meeting at which Glenwood's desired

outcome for the 421-a and rent regulation renewals again was discussed, Dorego told Dean

Skelos that he would arrange for Adam Skelos to receive a paid position at Abtech.  Tr. 483-84.

After Glenwood agreed to provide bribes and extortion payments to Dean Skelos through

payments to his son, Dean Skelos fulfilled his end of the bargain with Glenwood by voting in

Glenwood's favor on the legislation that was so critical to the company.  Thus, on June 24, 2011,

only weeks after Dorego informed Dean Skelos of the Abtech arrangement, Dean Skelos

sponsored and voted for the Rent Act of 2011, which renewed the 421-a tax breaks and rent

regulation laws for a period of four years in a manner that was beneficial to Glenwood.  Tr. 516;

GX-8, GX-306.  With respect to rent regulation laws in particular, the Rent Act of 2011 included compromises that Glenwood's lobbyist had specifically conveyed to Dean Skelos as acceptable to Glenwood in exchange for the extension of the 421-a tax breaks, but which were opposed by another real estate industry group that had also lobbied Dean Skelos.  *See* Tr. 483-84, 934-35.

The defendants, however, were not satisfied with Glenwood's arrangement to pay Adam Skelos through Abtech, and over the next approximate year and a half, Dean Skelos continued to pressure Dorego for more payments to Adam Skelos while also promising to act on behalf of Glenwood's legislative interests, including the same 421-a and rent regulation laws which would expire again in 2015, and the campaign finance reforms opposed by Glenwood.  Tr. 536-37, 553, 627-28; GX-1227, GX-1228, GX-3303 at p.1.  Over several exchanges, Dean Skelos "firm[ly]" made clear that the Abtech consultant agreement for Adam Skelos was "going to take a long time, [Adam]'s going to have to make a living in between," and asked "is there anything else that [Glenwood] might be able to help [Adam] with?"  Tr. 543-44.  As a result, Dorego explored several possible ways to direct payments to Adam Skelos in order to satisfy Dean Skelos's demands, including by directing Glenwood's significant energy business to Adam Skelos, GX-3303 at p. 2; Tr. 518, and later, by arranging for Adam Skelos to receive the $20,000 title commission check from American Land Services, a company that depended heavily on Glenwood's business and which agreed to disguise Glenwood's bribe as a commission check to Adam Skelos for title work.  Tr. 588-595, 856-59, 907; *see also* GX-2941-44 (emails between Dean Skelos and Adam Skelos regarding Dean Skelos's solicitation of title insurance commissions for Adam Skelos from Glenwood, which resulted in the $20,000 payment from Dorego).

There was no dispute at trial that Adam Skelos performed no work whatsoever for the $20,000 bribe from Glenwood.  Tr. 856-59.  In addition, in November 2012, Adam Skelos's consulting contract with Abtech for a base payment of $4,000 per month, plus bonuses and incentives, was finalized.  GX-2467; *see also* GX-2936, 2938, 2969 (emails between Dean Skelos and Adam Skelos regarding the Abtech consulting contract being arranged by Dorego).

Dorego directly testified that he arranged for these payments to Adam Skelos because he feared that, if he did not, Dean Skelos would take legislative action against Glenwood, particularly in light of the Senator's unyielding requests that Glenwood find sources of payment for Adam Skelos.  For example, when asked what consequences he thought would result if he did not help Adam Skelos financially, Dorego testified that:

> A:  Well, we had major legislation . . . then in front of the senate.  I was being asked directly by the head of the senate to do these things, and I felt there could be a connection between the two that would be adverse to our business.
>
> Q:  What major piece of legislation were you referring to?
>
> A:  Rent regulation, 421-a.

Tr. 627.  Dorego further explained that Glenwood obtained income for Adam Skelos because Glenwood was "at a critical point in many different pieces, the two major pieces of legislation at the time" and did not want to cross Dean Skelos.  Tr. 486.

At every turn, and in every respect, the Glenwood scheme involved Dean Skelos's votes on and influence over specific legislation critical to Glenwood.  Once again, the scheme obviously involved numerous occasions in which Dean Skelos met with Dorego and other Glenwood representatives.  But these meetings are wholly different from the meetings at issue in *McDonnell*:  The meetings in this case were not a hands-off request to an agency to meet with a particular individual with purportedly no strings attached, but rather were part of the overarching

12

*quid pro quo* evidence presented at trial.  It was at these meetings with Dean Skelos that the corrupt bargain was negotiated and struck to pay Adam Skelos in exchange for Dean Skelos's official action on legislation.  At no time did Dorego or any other witness testify that Adam Skelos was paid in exchange for Dean Skelos's mere presence at these meetings or for his mere ability to arrange such meetings.  Rather, the witnesses made clear that Glenwood paid Adam Skelos because they had "major legislation . . . then in front of the senate" and Dorego "was being asked directly by the head of the senate" to pay Adam Skelos and "felt there could be a connection between the two that would be adverse to our business."  Tr. 627.

### III.  The Abtech Scheme (Counts One, Two, Four and Seven)

Finally, as with PRI and Glenwood, the Abtech Scheme was based fundamentally on Dean Skelos's use of his official influence over legislation and other elected officials to extract bribe and extortion payments from Abtech, a stormwater management company in which Glenwood's founding family had a substantial interest and which Dorego arranged as a source of income to Adam Skelos in order to satisfy Dean Skelos's repeated demands to Glenwood for payments to his son.[2]  As proof of the corrupt bargain between the defendants and Abtech, the Government presented the jury with, among other things, hours of wiretapped and consensual recordings made by a cooperating witness that contemporaneously captured the defendants' plan to pass New York State legislation beneficial to Abtech, as well as an April 10, 2013 email sent by Dorego to Abtech's CEO at the direction of the defendants that left no question that the Abtech scheme involved payments to Adam Skelos in exchange for Dean Skelos's official actions on legislation critical to the company. *See* GX-1337 (the "Hostage Email").

---

[2] As noted, in November 2012, Adam Skelos signed a consulting contract with Abtech, which was negotiated by Dorego, for a base payment of $4,000 per month, plus bonuses and incentives. GX-2467.

In particular, and similar to the defendants' schemes to extort and receive bribes from PRI and Glenwood, Dean Skelos and Adam Skelos sought to extract additional payments for Adam Skelos at a time when Abtech was the most vulnerable to their extortionate threats. In February 2013, at the urging of Abtech and with the assistance of Adam Skelos and Dean Skelos, Nassau County issued a request for proposal ("RFP") for a stormwater project. Both Glenn Rink, Abtech's CEO, and Bjornulf White, Abtech's Vice President of Business Development, testified that winning the Nassau County contract was critically important to Abtech, and that the company had spent significant resources in preparing its bid on the project. Tr. 1082, 1302.

On April 8, 2013, days after Abtech submitted its bid to Nassau County but before the bid was awarded—*i.e.*, at a time when the defendants had maximum leverage over the company—Adam Skelos called Dorego. Tr. 618-622. Dorego testified that Adam Skelos was "furious that he'd been doing all this and his father was helping him, and they were – he was angry that when they finally saw the breakdown of [the Abtech] project, that the engineers were going to make more money than [Adam Skelos]." Tr. 618. Adam Skelos informed Dorego that he and his father were "going to stop whatever they were doing" to benefit Abtech unless his Abtech payments were increased. Tr. 615. Adam Skelos further instructed Dorego to communicate that message to Abtech's CEO, Glenn Rink. Tr. 619. Adam Skelos's cellphone records show that he was in contact with Dean Skelos immediately after this call to Dorego. Tr. 619; GX-101.

In response to the call from Adam Skelos, Dorego sent an email to Rink (described at trial as "the Hostage Email"), which delivered the defendants' extortionate threat. Tr. 617-618; GX-1337. Dorego wrote to Rink that if Adam Skelos did not receive a "4% commission" on the expected $10,000,000 contract (which later rose to $12,000,000), the defendants did not think it was worth "pushing through" the "legislation and the RFP [Request for Proposal]" necessary for

14

Nassau County to award the contract to Abtech.  GX-1337; *see also* Tr. 2173 (county legislature approval requirement).   Dorego testified that the information in this email to Rink came directly from his earlier call with Adam Skelos.  Tr. 618-620.  Dorego then spoke to Rink by phone and communicated the same message delivered to him by Adam Skelos that he had memorialized in his earlier email to Rink.  Tr. 621-622.

Rink testified that he understood from Dorego's email and phone call that Dean Skelos and Adam Skelos would cease their attempts to influence the award of the Nassau County project to Abtech unless Adam Skelos was paid more.  Tr. 1065-67.  Rink viewed the email as a "death threat" to Abtech's chances of winning the Nassau County contract.  Tr. 1067.

Ultimately, in response to the defendants' threat, Abtech agreed to increase Adam Skelos's compensation to $10,000 per month, and Abtech began paying him that amount even though his contract only entitled him to $4,000 per month.  Tr. 1074-78, 1311; GX-2505A. After Abtech agreed to pay Adam Skelos in exchange for Dean Skelos's support in obtaining the contract with Nassau County, Dean Skelos repeatedly contacted Nassau County officials, over whom Dean Skelos had enormous official power, in order to facilitate the approval of the Abtech contract.  *See, e.g.*, Tr. 2170 (when asked why he prioritized action on the Abtech RFP, Deputy County Executive Robert Walker testified "I knew it was important to the county executive [Ed Mangano] because he had received the contact from the senator [Skelos], so I dealt with it right away"); *see also* Tr. 1854, 2162-63 (regarding Dean Skelos' power over Nassau County); GX 3303 at pp. 23-25 (summarizing contacts).  Abtech ultimately received the contract, which authorized a stormwater project by the company worth up to $12 million.  Tr. 1086.  The contract was also unusual for a county project, because it required that certain New York *State*

legislation be passed authorizing design-build projects before the contract could be fully funded. Tr. 1250-51, 2170; *see also* Tr. 1240 (explaining design-build).

Some of Dean Skelos communications with Nassau County officials were intercepted and recorded, which laid bare the pressure Dean Skelos placed on the local officials to take official action on behalf of Abtech, actions which included expediting payments to Abtech from the County, as well as allocating additional funds to the stormwater project pursuant to the company's existing contract with the County. Most notably, on January 3, 2015, Dean Skelos was intercepted making a telephone call to Nassau County Executive Ed Mangano to inquire—in guarded language—about the slow pace of the funding. Referring to an article in *Newsday* about the allocation of County funds for the privatization of its sewer system, Dean Skelos asked Mangano "where does that leave, you know, the other situation . . . the other RFP"—referring to Abtech. GX-1438. When Mangano told Skelos he would speak to him about it tomorrow, Skelos insisted that "somebody [Adam Skelos] just feels like they're just getting jerked around for the last 2 years." GX-1438. Dean Skelos then called Adam Skelos and told him he would "iron everything down" with Mangano the next day. GX-1439.

The following day, Dean Skelos reiterated his demand to Mangano that Abtech receive certain payments from the County at the funeral of a slain New York City police officer. Tr. 2184. Deputy County Executive Robert Walker, who was present for the conversation between Dean Skelos and Mangano, placed a phone call from outside the police officer's funeral to find out the status of the payments. Tr. 2185. Dean Skelos then called Adam Skelos from the funeral and, again using coded language, stated "[a]ll claims that are in will be taken care of." GX-1441. A few days later, Abtech was paid more than $11,000 on an outstanding invoice by the County. GX-1802I.

16

In addition to the evidence that Dean Skelos used his official power to help Abtech with Nassau County matters, the Government also presented ample evidence, including the defendants' own words captured on tape, that Dean Skelos agreed to pass New York State legislation to allocate budget funds to stormwater projects and to authorize "design-build" projects in exchange for the payments from Abtech. Both the budgetary allocations and the authorization of design-build for municipalities would have benefitted Abtech and potentially increased the company's payments to Adam Skelos.

Although the defendants were ultimately unsuccessful in passing the design-build legislation (likely due to increased scrutiny after the arrest of Sheldon Silver in mid-January 2015, and news reports around that time of a federal investigation into Dean Skelos), the evidence at trial left no doubt that Dean Skelos had agreed to act on Abtech's desired legislation and took steps in furtherance of that agreement. Specifically, and among other things:

- In January 2015, Dean Skelos stated publicly that he would advocate for legislation allocating funds from the New York State budget to stormwater projects at the same time that Adam Skelos was attempting to sell Abtech's stormwater contracts to local municipalities by assuring them that funds would be made available by the State. Tr. 1787-1788; *see also* GX-1445 (wiretapped call in which Dean Skelos advised another State Senator to support inclusion of stormwater funds in the budget).

- In March 2015, as the New York State budget was being negotiated between Dean Skelos, the Governor, and the Speaker of the Assembly, Dean Skelos told Nassau County officials that he would support budget legislation to authorize Nassau County to execute design-build contracts, which would have increased payments from the County to Abtech. Tr. 2187. At the same time, Adam Skelos told Abtech, which was paying him $10,000 per month, that his father had assured him that he would enact the valuable legislation. GX-1606 (Adam Skelos to White: "And then later on, when it was just me and my dad, he said that he's, he's going to be sure that [the legislation] gets done."). White's testimony confirmed that he understood that, in exchange for the payments to Adam Skelos, Dean Skelos "would be available to help Abtech when it came to things like interactions with Ed Mangano with respect to Abtech's Nassau County contract. And then later on with respect to certain state legislation that would approve

potentially stormwater P3s that was in Abtech's interest, that [Dean Skelos] would be assisting that."  Tr. 1344-45.

- Finally, after Adam Skelos negotiated an additional contract with Abtech that would pay him commissions on any new fracking-related contracts Adam Skelos obtained on behalf of Abtech, Dean Skelos advocated legislative positions on fracking that would have been beneficial to Abtech, including lifting the moratorium on fracking in New York State.  GX-505; Tr. 1789-91.  In furtherance of Abtech's efforts to get the moratorium lifted (which would have resulted in lucrative payments to Adam Skelos), Dean Skelos used his Senate staff to set up a meeting between Abtech and the New York State Department of Health regarding Abtech's fracking technology.  Tr. 1374, 1835-36.

## ARGUMENT

I.   **The Defendants' Motions for Bail Pending Appeal Should Be Denied**

### A.  Applicable Law

Title 18, United States Code, Section 3143(b) provides that a court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the judicial officer finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released," and "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal [or] an order for a new trial." 18 U.S.C. § 3143(b)(1).  That provision gives effect to Congress' view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even to permit it in the absence of exceptional circumstances."  *United States* v. *Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)).  Following a guilty verdict and sentencing, there is a "presumption in favor of detention."  *United States* v. *Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

A "substantial question" is "a 'close' question or one that very well could be decided the other way."  *United States* v. *Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (quoting *United States* v.

*Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).  "If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'"  *Id.* (quoting *United States* v. *Miller*, 753 F.2d at 23).  With respect to all of these issues, "the burden of persuasion rests on the defendant." *Id.*  In order to carry their burden, the defendants must show that the appeal raises a substantial question likely to result in a reversal or new trial as to *all* of the eight counts for which they received prison sentences.  *Id.* at 125-26.

With respect to the question that the defendants claim here, a defendant challenging a jury instruction must demonstrate that (1) he requested a charge that "accurately represented the law in every respect" and (2) the charge delivered was erroneous and prejudicial.  *United States* v. *Applins*, 637 F.3d 59, 72 (2d Cir. 2011) (quotation marks omitted).  As a general matter, no particular wording is required for an instruction to be legally sufficient, but, rather, the Court must "look to the charge as a whole to determine whether it adequately reflected the law and would have conveyed to a reasonable juror the relevant law."  *United States* v. *Mulder*, 273 F.3d 91, 105 (2d Cir. 2001) (quotation marks omitted).

The Second Circuit reviews "a properly preserved claim of error regarding jury instructions *de novo*, reversing only where viewing the charge as a whole, there was prejudicial error." *United States* v. *Coplan*, 703 F.3d 46, 87 (2d Cir. 2012) (quotation marks omitted).  But where, as here, a defendant fails to preserve his objection, the Second Circuit's review is only for plain error.  *See United States* v. *Skelly*, 442 F.3d 94, 99 (2d Cir. 2006).  To establish plain error, the defendant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which

in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States* v. *Marcus*, 560 U.S. 258, 262 (2010) (quotation marks and alterations omitted).

**B.  The Supreme Court's Decision in *McDonnell***

The only basis cited by the defendants for bail pending appeal is the Supreme Court's decision in *McDonnell* v. *United States*, No. 15-474 (2016), which was issued on June 27, 2016. In that case, Robert McDonnell, the former Governor of Virginia, was charged with, among other things, honest services fraud and extortion under color of official right, stemming from his relationship with Jonnie Wiliams, the chief executive of Star Scientific, a Virginia-based company that had developed a nutritional supplement made from anatabine, a compound found in tobacco. *McDonnell*, slip op. 1.  The Government there argued that, in exchange for personal benefits, then-Governor McDonnell had taken official action on Williams's behalf, including "arranging meetings for Williams with other Virginia officials to discuss Star Scientific's product, hosting events for Star Scientific at the Governor's Mansion, and contacting other government officials concerning studies of anatabine."  *Id.* at 2 (quotations omitted).  The Government also "argued more broadly that these activities constituted 'official action' because they related to Virginia business development, a priority of Governor McDonnell's administration."  *Id.*  In his defense, McDonnell presented evidence at trial (including his own testimony) that he did not pressure or influence any state official to take action on Williams's anatabine product, and he argued both before the District Court and on appeal that "merely setting up a meeting, hosting an event, or contacting an official – without more – does not count as an 'official act.'"  *Id.*  The jury convicted McDonnell of the honest-services-fraud and extortion offenses, and the Fourth Circuit affirmed.

The Supreme Court granted certiorari and vacated the Fourth Circuit's judgment affirming McDonnell's conviction. In reaching that conclusion, the Supreme Court explained that the jury instructions given by the District Court "lacked important qualifications," without which the jury was permitted to convict McDonnell for receiving personal benefits in exchange merely for "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)." *McDonnell*, slip op. at 21-22, 25. The Supreme Court held that an "official action" under the honest services fraud and extortion statutes must involve a "formal exercise of governmental power" that is "more specific and focused than a broad policy objective." *Id.* at 25-26; *see also id.* at 17 (stating that official action in this context "conveys something within the specific duties of an official position – the function conferred by the authority of his office"). While merely setting up a meeting, "without more," does not constitute official action under this definition, *McDonnell* reaffirmed that a public official takes official action by "exert[ing] pressure on another official to perform an official act" or "advis[ing] another official, knowing or intending that such advice will form the basis for an official act by another official." *Id.* at 21.

### C. The Defendants Present No Substantial Question Likely to Result in Reversal or New Trial

The defendants claim that in light of *McDonnell*, the Court's jury instructions did not properly define "official act," and that as a result, the jury could have convicted the defendants based on actions that do not meet *McDonnell*'s requirements. As a threshold matter, the defendants' argument is unpreserved because they proposed no instruction whatsoever on the definition of official act.[3] This Court need not reach that issue, however, because the

---

[3] Instead of proposing charging language, the defendants generically attempted to incorporate by reference a 16-page brief seeking to dismiss the Indictment which, for obvious reasons, did not propose language appropriate for a jury instruction. *See* Dkt. 59 (parties' joint RTC) at 76; Tr.

defendants' argument is entirely without merit under any standard of review.  Viewed as a whole, the jury instructions defined "official act" in a way that captured all the key concepts that were found by the Supreme Court to be lacking in *McDonnell*.  Moreover, even if there was error in the jury instructions, any such error was harmless because the evidence that Dean Skelos performed and agreed to perform undisputably official acts – including casting votes on legislation and pressuring other elected officials to take official actions on behalf of the companies that bribed him – in exchange for payments and other financial benefits to his son was overwhelming, such that any rational jury would have convicted even if they had been instructed using the precise language announced in *McDonnell*.  For these reasons, the defendants have presented no substantial question likely to result in reversal or a new trial.

---

2128-29 (noting objection during charge conference but not articulating basis).  This was not sufficient to preserve their claim of instructional error.  *See United States* v. *Carson*, 464 F.2d 424, 432 (2d Cir. 1972) (reviewing for plain error when defendant did not request an alternative definition of official act and just made general objection); *United States* v. *Skelly*, 442 F.3d at 99.  Although Federal Rule of Criminal Procedure 30(d) does not specifically require that a defendant propose alternative language to preserve an objection, *see United States* v. *Hassan*, 578 F.3d 108, 129 (2d Cir. 2008), the defendant must state his objection with sufficient specificity to permit the district court to resolve the issue in the first instance.  *See United States* v. *Ghailani*, 733 F.3d 29, 52 (2d Cir. 2013).  The defendants did not do so here.  The Court's denial of the motion to dismiss, a lengthy judicial opinion complete with alternative holdings, legal citations, and parentheticals that was issued before a single day of evidence was presented at trial, cannot credibly be cited by the defendants as a final adjudication of the legal instruction that would be given to the jury on the definition of official act at the conclusion of the trial.  *See* Tr. 1773-76 (parties sought guidance late in the trial as to how the Court would instruct the jury on, *inter alia*, the definition of official action).  Rather than proposing an instruction as to what the Court should say, the defendants sat back, waited for the jury verdict, and then, months later, seized on a subsequently issued decision to claim error regarding what the Court did not say.  This was undoubtedly a strategic decision – at the time of the charge conference, the defendants were well aware that Governor McDonnell's petition for certiorari on this issue was pending before the Supreme Court.  *See, e.g.*, Tr. 2279-80; *see Puckett* v. *United States*, 556 U.S. 129, 134 (2009) (plain error review intended to prevent such belated objections).  The defendants' argument will therefore be reviewed by the Second Circuit for plain error.

### 1. Read in Context and Taken As a Whole, The Jury Instructions Were Not Erroneous—Plainly or Otherwise

The defendants argue that the definition of "official act" used in this case is erroneous in light of *McDonnell*.  However, the defendants ignore that, when reviewing jury instructions, the Second Circuit "view[s] the charge as a whole."  *United States* v. *Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010) (quoting *United States* v. *Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006)).  That is, the Court of Appeals "emphatically do[es] not review a jury charge on the basis of excerpts taken out of context, but in its entirety, to determine whether considered as a whole, the instructions adequately communicated the essential ideas to the jury."  *Id.* (internal quotations omitted).

In this case, the Court instructed the jury that:

> The term "official act" includes any act taken under color of official authority. These decisions or actions do not need to be specifically described in any law, rule, or job description, but may also include acts customarily performed by a public official with a particular position.  In addition, official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end.

*See* Tr. 2798.  To be sure, this single excerpt, read in isolation, was similar to the instructions found to be incomplete in *McDonnell*.  But when the instructions are viewed as a whole, as they must be, it is clear that the jury was instructed on each of the legal concepts required by *McDonnell*.

As set forth above, *McDonnell* explains that the jury should be instructed that the official action at issue must involve a "formal exercise of governmental power" that is "more specific and focused than a broad policy objective."  *McDonnell*, slip op. at 25-26; *see also id.* at 17 (stating that official action in this context "conveys something within the specific duties of an official position—the function conferred by the authority of his office").  *McDonnell* also holds that the public official must "make a decision or take an action *on that*" formal exercise of

governmental power, or agree to do so.  *Id.* at 19.  While merely setting up a meeting, "without

more," does not constitute official action, *McDonnell* reaffirms that a public official takes

official action by "exert[ing] pressure on another official to perform an official act" or

"advis[ing] another official, knowing or intending to such advice will form the basis for an

official act by another official."  *Id.* at 21.

Each of these concepts was communicated to the jury here.  *First*, in instructing the jury

on the elements of Hobbs Act extortion, the Court explained that the Government must prove

that the extorted party was motivated by the reasonable expectation that, as a result of the

payment, "Dean Skelos would exercise *official influence or decision making* for the benefit of

the extorted party, and that Dean Skelos was aware of their motivation."  Tr. 2781 (emphasis

added); *accord Ocasio* v. *United States*, 136 S. Ct. 1423, 1434 (2016).   Similarly, in instructing

the jury on the elements of federal program bribery under 18 U.S.C. § 666, the Court explained

that the Government must prove that "Dean Skelos acted corruptly with the *intent to be*

*influenced or rewarded* with respect to a *transaction* of the State of New York" and that the

value of that transaction must be at least $5,000.  Tr. 2791(emphasis added); *see also* Tr. 2796.[4]

By so instructing the jury, the Court made clear that the act taken "under color of official

authority" must focus on Dean Skelos's official decision-making and influence over a specific

issue, and not on some amorphous policy objective.  Moreover, a "transaction," is, by its

common meaning, a specific and focused act rather than a "broad policy objective."  *McDonnell*,

slip op. at 25-26.  These instructions therefore capture *McDonnell*'s teaching that official action

"conveys something within the specific duties of an official position—the function conferred by

---

[4] Section 666 was not charged in *McDonnell* and accordingly no similar instruction was given in
that case.

24

the authority of his office." *Id.* at 17.  Indeed, the pre-*McDonnell* Second Circuit case law on

which the jury instruction was based has long recognized the same point.  *See United States* v.

*Ganim*, 510 F.3d 134, 141 (2d Cir. 2007) (explaining that honest service fraud and extortion

under color of official right "criminalize[] . . . a government official's receipt of a benefit in

exchange for an act he has performed, or promised to perform, in the exercise of his official

authority"); *United States* v. *Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (same).

*Second*, the jury in this case was instructed on the concept of influence in language nearly

identical to the Supreme Court's holding.  Where the Supreme Court stated that an official act

includes "exert[ing] pressure on another official to perform an official act," *McDonnell*, slip op.

at 21, this Court instructed that "[t]he official action can either be actually performing an act

himself, or *exerting influence over an act performed by another person*."  Tr. 2783 (emphasis

added).  It cannot be seriously contended that the jury understood these instructions to

criminalize the type of mere access that *McDonnell* feared.  Indeed, the concept of influence—as

opposed to mere access—was baked into the legal instructions on each and every offense given

by this Court to the jury.  *See* Tr. 2771 ("It is sufficient if the defendants understood that the

public official was expected, as a result of the payment, to exercise particular kinds of influence

as specific opportunities arose."); 2781 ("The Government must also prove beyond a reasonable

doubt that the extorted party was motivated, at least in part, by the reasonable expectation that, as

a result of the payment, Dean Skelos would exercise official influence or decision making for the

benefit of the extorted party . . . ."); 2792 (payment must be made "for the purpose of influencing

or rewarding Dean Skelos" in connection with a transaction of the State of New York).  Each of

these instructions on influence preceded the definition of "official act," such that, by the time the

jury heard the definition of that term, it had already been told three different times that it must

find that Dean Skelos exerted influence on another public official or intended to be influenced in his own actions.  *Accord McDonnell*, slip op. at 21.

In addition, the jury was repeatedly instructed that it was not enough for the Government to show that the payments to Dean Skelos were made solely to cultivate goodwill—*i.e.*, to "nurture a relationship" with the public official so as to gain access—but rather must be made in exchange for the promise or performance of official action.  Tr. 2781; *see also* Tr. 2772, 2793.  Such a "generalized goodwill" instruction was absent in *McDonnell*.  *See United States* v. *McDonnell*, 792 F.3d 478, 514-15 (4th Cir. 2015) (trial court declined to provide such a goodwill instruction over McDonnell's objection).  For all these reasons, the Court's instructions in this case fall comfortably within the requirements set forth in *McDonnell*.

Moreover, even if the alleged error in the jury instructions could have been plain in some other case, the facts of this one demonstrate that any correction was unnecessary.  From the start of *McDonnell* to its conclusion, the case was about whether or not the routine courtesies performed by Governor McDonnell constituted "official acts," because there was no allegation that McDonnell ever voted on legislation or otherwise formally exercised governmental power.  *See McDonnell*, slip op. at 10 (listing alleged official actions).  Here, in stark contrast, the evidence at trial, particularly as to PRI and Glenwood, overwhelmingly focused on Dean Skelos's votes on major pieces of legislation critical to their businesses; there was never any dispute over whether Dean Skelos took these actions (he did) or whether these actions were "official" (they were).  Rather, the defense focused entirely on the alleged lack of a connection between the *quid* and the *quo – i.e.*, the "*pro*." *See, e.g.*, Tr. 52, 61, 64, 74, 75 (Dean Skelos opening); Tr. 83, 85, 87 (Adam Skelos opening); Tr. 2594, 2597, 2599, 2609, 2622, 2624, 2627, 2629, 2630, 2632 (Dean Skelos closing); Tr. 2643, 2652, 2662 (Adam Skelos closing).  Thus,

because the focus of this case was the existence of a *quid pro quo*, rather than whether the Government had established that Dean Skelos took official acts, the concerns about criminalizing mere constituent services that drove the *McDonnell* opinion – particularly in light of the Court's "generalized goodwill" instruction – simply were not present here, *see McDonnell*, slip op. at 22, and as such there was no need for further additional qualifying language .

*Finally*, the defendants suggest that the definition of "official action" used in this case was broader than the definition used in *McDonnell* because this Court did not use the definition set forth in 18 U.S.C. § 201 (the "Section 201" definition).  Def. Br. 6, 9.  They are mistaken.  As the Second Circuit has explained, Section 201 is the definition applicable to the federal bribery statute, and need not apply to other public corruption statutes, such as those with which the defendants were charged.  *See United States* v. *Ganim*, 510 F.3d 134, 142 n.4 (2d Cir. 2007) (Sotomayor, J.).  Nowhere in *McDonnell* did the Supreme Court purport to hold that the Section 201 definition applies in all federal corruption prosecutions.  Rather, as the Court emphasized, it was interpreting that statutory language because the parties had *agreed* to use that language in instructing the jury.  *See McDonnell*, slip op. at 9.  The Government agrees that the Supreme Court's elaboration on the meaning of official act and the concepts that must be included in jury instructions will also be applicable in non-Section 201 cases.  But that is nothing new.  As this Court held in a pretrial ruling, the definition of Section 201 "may provide guidance as to what *does* constitute official action."  *See* Dkt. 47 at 7 (emphasis in original); *see also* Dkt. 27 at 24-25 (Government brief citing numerous Section 201 cases when dicussing meaning of official act).  The defendants have not identified, nor has the Government found, a case in which an act was deemed "official" under the "color of official authority" definition but not the Section 201

definition.  The "color of official authority" definition is not broader; it simply says in eight words what Section 201 says in 45.

Furthermore, the Second Circuit has long interpreted "official act"—both in the Section 201 context and in non-201 cases—in a manner that is consistent with *McDonnell*.  For example, in *United States* v. *Carson*, the Second Circuit held that the Section 201 definition of official act covers "any situation in which the advice or recommendation of a Government employee would be influential" and that "[i]t is the corruption of official positions through misuse of influence in governmental decision-making which the bribery statutes make criminal."  464 F.2d 424, 433, 434 (2d Cir. 1972).  From 1914 until today, it has been and still is official action when a congressional staffer exerts the influence he has by virtue of his official position on a Department of Justice official in connection with a pending prosecution.  *Id.* at 433-34 (citing *United States* v. *Birdsall*, 233 U.S. 223, 230-31 (1914)); *compare McDonnell*, slip op. at 21 (citing *Birdsall*).  In non-Section 201 cases, the Second Circuit has similarly interpreted the phrase "under color of official authority" by focusing on the concept of influence on official decision-making that was central to *McDonnell*, and which this Court used throughout its jury instructions.  *See, e.g.*, *United States* v. *Middlemiss*, 217 F.3d 112, 116, 118 (2d Cir. 2000); *United States* v. *McDonough*, 56 F.3d 381, 389 (2d Cir. 1995).[5]

---

[5] Moreover, in *McDonnell*, the Supreme Court expressly reaffirmed numerous longstanding propositions of Second Circuit law that the Court relied on in this case.  For instance, the Supreme Court reaffirmed that "a public official is not required to actually make a decision or take an action . . .; it is enough that the official agree to do so."  *McDonnell*, slip op. at 19; *accord United States* v. *Ganim*, 510 F.3d at 145; Tr. 2771 (jury instructions in this case).  Similarly, "[t]he agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain."  *McDonnell*, slip op. at 19; *accord United States* v. *Rosen*, 716 F.3d at 700; Tr. 2771.  "Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so."  *McDonnell*, slip op. at 19; *accord United States* v. *Myers*, 692 F.2d 823, 840-41 (2d Cir. 1982); Tr. 2771.

On the facts of this case, therefore, the jury was adequately informed about the applicable law.  And even if deemed insufficient in some respect, in no event was any error "so egregious and obvious that a trial judge and prosecutor would be derelict in permitting it in a trial held today."  *United States* v. *Bastian*, 770 F.3d 212, 220 (2d Cir. 2014).

### 2.   Even Assuming There Was Error, The Defendants Were Not Prejudiced

Assuming, *arguendo*, that there was error in the instructions, the defendants did not suffer prejudice.  Whether reviewed under a plain error standard or harmless error standard, the outcome is the same.  The overwhelming evidence of Dean Skelos's performance of and agreement to perform acts that are official under any definition will result in the affirmance of the defendants' convictions.  *See United States* v. *Castono*, 999 F.2d 615, 618 (2d Cir. 1993) ("The strength of the prosecution's case is probably the single most critical factor in determining whether error was harmless.").

### PRI

There was no dispute at trial that Dean Skelos repeatedly performed the quintessential official act—voting on legislation—on behalf of PRI.  He voted for the extender legislation in 2011, 2012, and 2015, as well as other legislation lobbied for by PRI, and also ensured that the legislation would come up for renewal in a timely fashion which, as Bonomo testified, was also important to PRI.  GX-8; Tr. 1899, 1907-1912.  There was no dispute that this legislation was critical to PRI's business.  Tr. 1905.  And there was no dispute that Adam Skelos received payments from PRI—court-reporting commissions, salary payments, consulting payments, and health benefits.  Tr. 104, 1889, 1969.  The only real dispute at trial was whether the payments and official actions were linked—the "*pro*" in the *quid pro quo*.  *See, e.g.*, Tr. 2624 (Dean Skelos

closing: "There's no intent to link any of that to legislation, for PRI, certainly not . . . . There's no linkage there. No quid pro quo.").

In denying the defendants' post-trial motions, the Court emphatically rejected the defendants' arguments, holding that "[e]vidence in the form of Defendants' own emails and telephone conversations show that they intended to link payments by Glenwood and PRI to Adam Skelos *to specific legislation* favorable to Glenwood and PRI." Rule 29 Op. 12 (emphasis added). As set forth above, the overwhelming evidence demonstrating the *quid pro quo* included the testimony of Anthony Bonomo, PRI's CEO, who specifically testified that he felt he had no choice but to continue paying Adam Skelos because of Dean Skelos's power over legislation critical to PRI. Tr. 1956; *see also* Tr. 1949-51, 1959, 2065.[6]

Moreover, in summation, the Government repeatedly emphasized Dean Skelos's votes on legislation critical to PRI, *see* Tr. 2469, 2571, 2573-77, 2582-84, and specifically argued that this was the subject of the *quid pro quo*:

> These were payments for Senator Skelos' work in the capitol building in Albany, not for Adam Skelos' work at PRI's building in Roslyn. It was the price that the senator thought his family was owed for the good legislative deeds he had done for Anthony Bonomo in the past and would do in the future. *This was the quid pro quo, pure and simple*.

Tr. 2587 (emphasis added).

The defendants now attempt to seize on a few isolated statements in summation (to which they did not object) that, they claim, are inconsistent with *McDonnell*. Specifically, in

---

[6] Bonomo's testimony was corroborated by, among other things, phone records, *see* GX-101, GX-104, GX-108, GX-3303; documentary and testimonial evidence of Adam Skelos's flagrant non-performance of his job, *see, e.g.*, GX-706, GX-715; Tr. 108-09, 152; evidence that Dean Skelos ignored pointed warnings about Adam Skelos's non-performance of his job, *see, e.g.*, Tr. 1948-51, 2083; emails and other communications between Dean Skelos, his senior staff, and PRI's lobbyists regarding PRI's legislative needs, *see, e.g.*, Tr. 2244-45, 2353-58, 2361-64, 2371; GX-806, GX-833, GX-838; and evidence that Dean Skelos hid Adam Skelos's employment from his colleagues and senior staff members, *see, e.g.*, Tr. 288, 1794, 1872-73.

summarizing what PRI got in return for its payments to Adam Skelos, the Government stated: "This is the quo, votes for PRI extenders, there's other legislation you heard about from Nick Barrella that the senator supported and you saw those charts. They have multiple pieces of legislation going on at all times. And then lobbyist meetings. Anthony Bonomo told you that the senator was always very good about giving access to his lobbyists. And you heard the testimony that meetings with lobbyists are always taken in the senator's official capacity." Tr. 2588.

It was never the Government's argument, however, that the payments to the defendants were in exchange for meetings and nothing more. To the contrary, at each and every opportunity, the Government presented evidence and argument that the payments to Adam Skelos were given in exchange for Dean Skelos's vote on the extenders and other legislation that was critical to the financial health of PRI. *See, e.g.*, Tr. 2469, 2571, 2573-77, 2582-84, 2587. Reference to meetings between Dean Skelos and PRI's lobbyists were presented to the jury as part of an ongoing relationship wherein Dean Skelos and/or his senior staff met with PRI's lobbyists in order to learn about, and then enact, PRI's specific legislative agenda. *See, e.g.*, Tr. 2475 ("Just like with Glenwood, the senator asked PRI for payments to Adam in the same conversations he discussed the specific legislation that was critical to the company."). The *McDonnell* decision does not immunize from prosecution any scheme that involved setting up meetings as part of the scheme. As the Supreme Court specifically held, "[i]f an official sets up a meeting, . . . on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act." *McDonnell*, slip op. at 20. More than just setting up meetings with other officials, Dean Skelos *himself* participated in meetings with PRI's lobbyists, and discussed with them the specific legislative actions he was

31

prepared to take on behalf of PRI's interests.  These meetings were important evidence of Dean

Skelos's agreement to take an official act—to vote on legislation—because they were where

Dean Skelos learned what PRI needed and how to cast his vote.  Thus, viewing the summation

and the evidence at trial as a whole, the Government's argument was fundamentally different

from the argument advanced at trial in *McDonnell*, and was consistent with the Supreme Court's

holding in that case.

To conclude that the jury may have convicted on an improper theory, the Second Circuit

would have to find a reasonable possibility that the jury ignored the vast majority of the evidence

and argument on these counts regarding the extenders and other pieces of legislation favorable to

PRI, and seized on an isolated reference in a multi-hour closing as the basis for their convictions.

That did not happen.  It is not only illogical in light of the clear focus of the evidence and

argument presented at trial, but also legally impossible.  To convict the defendants of Count

Eight—charging the defendants with violating 18 U.S.C. § 666 with respect to the PRI scheme—

the jury was instructed that it must find that the corrupt payments related to a transaction of the

State of New York worth at least $5,000. Tr. 2792; *see* 18 U.S.C. § 666(a)(1)(B).  At trial, the

Government presented evidence of the value of the extender legislation, *see* Tr. 1899, 1905, and

in closing the Government argued that "you're also going to hear that the transaction at issue has

to be more than $5,000. And here you heard the transactions for Glenwood, PRI, and Abtech

were all worth millions of dollars to them," Tr 2591.  The Government presented no evidence or

argument as to the value of lobbyist meetings.  *Cf. United States* v. *Nouri*, 711 F.3d 129, 140 (2d

Cir. 2013) (post-*Skilling* error on honest services count harmless where verdict on other count

demonstrated that jury necessarily found bribery).

32

PRI did not pay Adam Skelos to get access to meetings with Dean Skelos, and the Government did not argue that it did.  To contrary, the Government argued to the jury that PRI "paid Adam Skelos for no work so that Senator Skelos would keep on renewing those laws that PRI needed to survive," Tr. 2579, just as PRI's CEO specifically testified that PRI paid Adam Skelos because of "the legislative issues we had," Tr. 2065.  The defendants' after-the-fact attempt to change the focus of this trial from legislation and influence to meetings and access does not amount to a substantial question.

**Glenwood**

As with PRI, there was no dispute at trial that Dean Skelos repeatedly performed the classic official act of voting on legislation favorable to Glenwood.  *See* GX-8; Tr. 516.  There was no dispute that this legislation was critical to Glenwood's business.  Tr. 366-68.  And there was no dispute that Adam Skelos received payments arranged by Glenwood.  GX-1016, GX-2467.  The only real dispute at trial was whether Dean Skelos' votes on legislation could be linked to the payments to his son such that it established a *quid pro quo*.  *See, e.g.*, Tr. 2597, 2652.

Once again, this Court emphatically rejected the defendants' arguments on this point, holding that  "[e]vidence in the form of Defendants' own emails and telephone conversations show that they intended to link payments by Glenwood and PRI to Adam Skelos *to specific legislation* favorable to Glenwood and PRI."  Rule 29 Op. 12 (emphasis added).   As set forth above, the overwhelming evidence included the testimony of Charles Dorego, Glenwood's General Counsel, who specifically testified that Glenwood directed payments to Adam Skelos

because of the "major legislation . . . then in front of the senate" that was critical to Glenwood's business.  Tr. 627.[7]

The defendants ignore this evidence when they argue that the jury may have improperly convicted the defendants based on mere meetings.  On the Glenwood counts, the testimony, evidence, and arguments at trial focused almost exclusively on Dean Skelos's support for specific pieces of legislation and whether the Government could prove the connection between those votes and Glenwood's payments to Adam Skelos.  Throughout the evidentiary portion of the trial and in summations, the jury heard over and over about the 421-a and rent regulation laws, Glenwood's position on such laws vis-a-vis other real estate groups, and its fears about Dean Skelos's ultimate positions on these pieces of legislation.  Tr. 2469, 2472, 2475, 2477, 2490-94, 2501-02, 2506, 2512.  And the Government specifically identified legislation as the "quo" in the corrupt bargain:  "*That is the quid pro quo, ladies and gentlemen. Adam Skelos would get money, and, in exchange, the senator would help with legislation*." Tr. 2504 (emphasis added); *see also* Tr. 2491 ("[W]hen it's money for legislation, when it's money for official action, it's a crime.").

To be sure, the Government also made reference in its summation to the numerous meetings Dean Skelos attended with Glenwood's representatives and lobbyists, and argued that

---

[7] Dorego's testimony was corroborated by, among other things, phone records, *see, e.g.*, GX-101, 108, 109B, 3303; emails between Dean and Adam Skelos and between Adam Skelos and Dorego regarding Dean Skelos's solicitation of title insurance commissions for Adam Skelos from Glenwood, which resulted in the $20,000 payment from Dorego, *see, e.g.*, GX-1290-1293, 2941-2944; the $20,000 title commission check and testimony from an executive of the company that gave Adam Skelos the check that Adam Skelos did no work whatsoever for it, *see* Tr. 856-59, GX-1016; an email in which Dorego specifically instructed others that discussion of Adam Skelos's $20,000 check was "not for emails," *see* GX-1316; emails and testimony regarding Glenwood's efforts to obtain a consulting contract for Adam Skelos with Abtech, *see, e.g.*, GX-2467, 2936, 2938, 2969; Tr. 555-56; and the Hostage Email sent by Dorego to the CEO of Abtech, *see* GX-1337, 2502.

"[e]very time the senator met with one of them on a lobbying meeting for Glenwood, that's official action." Tr. 2517. But it was never the Government's argument that the only action Dean Skelos took in exchange for the payments to Adam Skelos was merely attending these meetings. Rather, as the Government explained to the jury, these meetings were evidence of the corrupt bargain because "Senator Skelos was asking Dorego to pay his son in the very same meetings that Dorego was asking the senator to pass legislation." Tr. 2473; *accord* Tr. 2517. These meetings were where the corrupt bargain was struck – where Dean Skelos demanded payments and Glenwood representatives told him how to vote:

> So what do they talk about in the first half of the meeting? Well, Glenwood's chief lobbyist tells Senator Skelos exactly what Glenwood wanted in the rent law. . . . They communicated that to the senator. That's their legislative position. That's what they want. So what else happens at the meeting? This is the same exact meeting where Dorego tells the senator he has come up with [the] Abtech idea for Adam Skelos. *That is the quid pro quo, ladies and gentlemen.* Adam Skelos would get money, and, in exchange, the senator would help with legislation.

Tr. 2503-04 (emphasis added). The Government's argument was therefore quite different from the argument advanced in *McDonnell*, because although the Government concededly called these meetings themselves official action, it did so because they were part and parcel of the corrupt scheme to exchange money for legislation. The core allegation was always that "Adam Skelos would get money, and, in exchange, the senator would help with legislation." Tr. 2503.

Thus, to conclude that the jury may have convicted on an impermissible basis as to the Glenwood counts, the Second Circuit would have to find a reasonable possibility that the jury ignored the overwhelming focus of the evidence and argument and compartmentalized the mere existence of meetings from what took place at the meetings: Dean Skelos's own words in which he linked payments to his son with his vote on 421-a and the rent laws. It would have to find a reasonable possibility that the jury ignored the actions Dean Skelos then took on that legislation,

and convicted based solely on his attendance at those meetings.  Once again, that is not only illogical but also legally impossible, in light of this Court's clear instruction regarding the value of the transaction exceeding $5,000, Tr. 2791, and the fact that the Government only introduced evidence of the value of legislation, not meetings, Tr. 368.

Thus, as with the PRI counts, the defendants cannot identify a "substantial" issue likely to result in reversal or a new trial on the Glenwood counts.

### Abtech

In both their closing statements and post-trial motions, the defendants argued that the Abtech counts rise and fall with a single email—the Hostage Email.  Counsel for Adam Skelos argued that "if Senator Skelos had nothing to do with this email, then you must acquit Adam and his dad on both of these AbTech counts because this is the centerpiece of the government's case. *This is the quid pro quo that they're talking about.*"  Tr. 2681 (emphasis added); *accord* Dkt. 161 at 6 (defendants' post-trial motions arguing that "the Abtech charges are essentially based on a lone email").  The defendants' brief now studiously avoids that email—the same email they themselves called the "centerpiece" of the Abtech case—because it had nothing whatsoever to do with mere meetings, and everything to do with Dean and Adam Skelos's threat to block undisputedly official action on a valuable contract.

Here is what that email, which was sent from Charles Dorego to Abtech's CEO Glenn Rink and titled "Adam," said:

> I'm told he's about 45 days away from producing *the legislation and the RFP* to do up to ten million project with you. He's hesitant (and his dad called) to do it with the engineer's making more money than him. If he doesn't get like a 4% commission I think *they don't think it's worth pushing through*.

GX-1337 (emphasis added).  As Dorego testified, and phone records corroborated, he sent that explicitly extortionate email shortly after receiving a call from an irate Adam Skelos and did so

as the result of pressure from Dean and Adam Skelos.  Tr. 618-22; GX-101.  The defendants

cannot contend that "pushing through" county legislation and a county-issued request for

proposal would not constitute official action, *see McDonnell*, slip op. at 19, and thus their brief

makes no mention of what they themselves described as the centerpiece of the Abtech counts.

Moreover, although the Hostage Email was certainly important, it was far from the only

example of uncontroverted evidence of Dean Skelos's commission of an undisputedly official act

in exchange for payments from Abtech.  As this Court held, "[e]vidence in the form of

Defendants' own emails and telephone conversations show that they . . . intended to link

increased in Adam Skelos's pay to Dean Skelos's official actions promoting AbTech's interest in

obtaining the Nassau County contract, and promoting legislation favorable to AbTech."  Rule 29

Op. 12.  For example, when Nassau County was slow to release payments to Abtech under the

contract, Dean Skelos stepped in and leaned on County Executive Ed Mangano to expedite those

payments.  Dean Skelos was captured on an intercepted telephone call making guarded

references to the Abtech contract and telling Mangano that Adam Skelos "just feels like [he's]

just getting jerked around for the last 2 years."  GX-1438.  The next day, Dean Skelos reiterated

his demand to Mangano that Abtech needed to be paid, Tr. 2185, and, after receiving

confirmation the payments would be made, Dean Skelos was intercepted telling Adam Skelos

that "[a]ll claims that are in will be taken care of."  GX-1441.  These "claims" are indisputable

official actions – government money going to Abtech.  *Accord McDonnell*, slip op. at 17-18

(whether to allocate grant money for particular study is an official act).  And, as the Supreme

Court held in *McDonnell*, a public official performs an official act by "using his official position

to exert pressure on *another* official to perform an 'official act.'"  *Id.* at 19.  As the Government

repeatedly argued in closing, the pressure Dean Skelos placed on Count Executive Mangano to take official action beneficial to Abtech is exactly what Abtech paid for:

> Ladies and gentlemen, this is Senator Skelos . . . using his power over the county executive who needs his support, using his power to get Abtech money because Abtech pays his son. *This for that. That call is a quid pro quo in real time. This check for that call. . . .*
>
> *This check in exchange for Senator Skelos pressuring county officials. That's what Abtech's money bought. This for that.*

Tr. 2479-80 (emphasis added); *see also* Tr. 2543 ("[T]he senator is pushing Mangano to get Abtech's RFP out the door. He's doing it in exchange for the payments that are coming to Adam Skelos. That is a quid pro quo.").

Further, the jury also was presented with overwhelming evidence of Dean Skelos's agreement to help pass New York State legislation to allocate budget funds to stormwater projects and to authorize "design-build" projects, both of which would have benefitted Abtech. *See, e.g.*, Tr. 1787-88; GX-1445 (wiretapped call in which Dean Skelos advised another State Senator to support inclusion of stormwater funds in the budget); GX-1606 (wiretapped call of Adam Skelos telling Abtech employee his dad will make sure the legislation gets done).   This, too, was explicitly identified as a *quid pro quo* exchange in the Government's closing:

> [Adam Skelos] was getting paid to have the senator push through legislation but they weren't actually going to be able to do it. The senator knew at this time it's the only reason Adam Skelos is getting paid $10,000. He's getting paid for the senator's official actions. That's why Adam Skelos, Dean Skelos said, should have seen it coming.   It was quid pro quo. So once it became clear the senator couldn't deliver the quo, *the legislation,* they knew that the quid, meaning the payments, would stop. That's how a quid pro quo works.

Tr. 2561 (emphasis added).

Based on this "far-reaching" and "enormous" amount of evidence, *see* Rule 29 Op. at 7-8, the defendant's guilt on the Abtech counts was crystal clear.  Unlike with the PRI and

Glenwood counts, however, the Government concedes that, in one respect, it argued that Dean Skelos took an action for Abtech that does not, without more, constitute an "official act" after *McDonnell*. Specifically, the Government contended that Dean Skelos took an official action when he asked his staff to set up a meeting between Abtech and the Department of Health ("DoH") so that Abtech could explain their technology as it related to the DoH's ongoing review of whether to lift the moratorium on fracking. *See* Tr. 2523-24, 2550, 2699. The Government agrees that, absent evidence that Dean Skelos exerted pressure on the DoH officials in their decision-making, the act of arranging this meeting, standing alone, likely would not count as an official act after *McDonnell*. But as the Supreme Court made clear, a public official is not required to actually take an official action, "it is enough that the official agree to do so," and evidence of meetings like the DoH meeting may "serve as evidence of an agreement to take an official act." *McDonnell*, slip op. at 19, 20. The DoH meeting was not presented as a stand-alone *quid pro quo*. It was yet another devastating example of how Dean Skelos had agreed to help Abtech obtain favorable state action as needed.

Moreover, there simply is no reasonable possibility that the jury rested its verdict on the Abtech counts on this meeting alone. The testimony about the DoH meeting took up mere pages of transcript in a four week trial and mere lines in a four-hour summation. Its significance paled in comparison to the days upon days of testimony from, among many others, Abtech executives Rink and White, Deputy County Executive Walker, Dean Skelos's own staff, and the hours and hours of wiretapped and consensually recorded calls about Abtech's pursuit of favorable New York State legislation and the dozens of emails about Abtech's efforts to secure and obtain additional payments under the Nassau County contract. The Government repeatedly argued in summation that the *quid pro quo* consisted of payments for legislation and for exerting pressure

39

on county officials, not payments for the DoH meeting.  *See, e.g.*, 2479-80, 2543, 2561.  The evidence that Dean Skelos threatened to block County legislation and leaned on County Executive Mangano in the performance of his official actions was conclusive.  And, as noted, the jury was specifically instructed they had to find the value of the "transaction" at issue to be more than $5,000, Tr. 2791, and there was no evidence of the value of the DoH meeting, only evidence of the value the Nassau County contract and the design-build legislation, *see* Tr. 1086.  Thus, it strains credulity to argue, as defendants now have, that they were so prejudiced by the evidence and argument concerning the single DoH meeting such that the Second Circuit is likely to grant them a new trial on the Abtech counts.

**********************************************

The defendants' brief makes no effort to address the mountains of evidence of their guilt.  Indeed, it is devoid of even a single citation to the trial testimony or evidence.  Instead, it seeks refuge in *McDonnell* and briskly asserts that, despite the critical factual differences between the two cases, a retrial is in order.  But as the Second Circuit has explained, "it does not follow that reversal is necessary in every case in which the District Court erred by failing to give [a particular jury] instruction."  *United States* v. *Botti*, 711 F.3d 299, 311 (2d Cir. 2013).  Rather, "the determination as to whether an instructional error was harmless depends significantly on the context in which the instruction was provided and the other evidence presented at trial."  *United States* v. *Andrews*, 681 F.3d 509, 522 (3d Cir. 2012).  For that reason, the Court must undertake a "thorough examination of the record."  *Neder* v. *United States*, 527 U.S. 1, 19 (1999).

A thorough examination of this record reveals that, even if there were instructional error (and there was none when the jury instruction is viewed as a whole, as it must be), it was plainly harmless.  If the Court is looking to post-*Skilling* caselaw for guidance, *see* Def. Br. 13, it need

40

look no further than *Skilling* itself.  On remand from the Supreme Court, the Fifth Circuit found that the instructional error was harmless beyond a reasonable doubt because the evidence of the defendant's guilt on a valid theory was overwhelming and, although the Government made references to an invalid theory in closing, it focused primarily on the valid theory.  *United States* v. *Skilling*, 638 F.3d 480, 483 (5th Cir. 2011); *see also United States* v. *Nouri*, 711 F.3d 129, 140 (2d Cir. 2013) (affirming conviction post-*Skilling* where, in light of overwhelming evidence, court found no reasonable likelihood that properly instructed jury would have reached a different verdict); *Bereano* v. *United States*, 706 F.3d 568, 578-79 (4th Cir. 2013) (denying relief where "the core of the Government's case" was a valid theory post-*Skilling*).

More recently, the Second Circuit found that *McDonnell* was irrelevant where, as here, the defendant public official engaged in acts that were indisputably "official" under *McDonnell*. In *United States* v. *Halloran*, 821 F.3d 321, 340 n.13 (2d Cir. 2016), the defendant – a former member of the New York City Council – was convicted of participating in two bribery schemes. In the first, the defendant accepted bribes in exchange for promising to funnel City funds to the bribe payors, and in the second, the defendant was paid to help his co-defendant, Malcolm A. Smith (a Democrat), bribe Republican Party officials to issue what is known as a "Wilson-Pakula," which would have permitted Smith to run for mayor of New York City as a Republican. *Id.* at 325.  Halloran argued that the Second Circuit should hold his appeal in abeyance for the Supreme Court's decision in *McDonnell*.  *Id.* at 340.  The Second Circuit declined to do so, even though some of the actions taken by Halloran involved meetings, explaining that: "[b]ecause there can be no dispute that disbursing public funds and issuing a Wilson-Pakula are official acts, *McDonnell* has no apparent relevance to the issues in this appeal."  *Id.* at 340 n.13.

Any court that examines the record in this case will reach the same conclusion.  The defendants' contentions therefore do not amount to a substantial question.

## CONCLUSION

For the foregoing reasons, the defendants' motions should be denied.[8]

Dated:  New York, New York
        July 25, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Tatiana Martins/Thomas McKay
Assistant United States Attorneys
(212) 637-2215 /-2268

---

[8] The defendants' request to stay the financial penalties pending appeal should also be denied. For the same reasons the defendants' argument does not present a "substantial question," the defendants' low likelihood of success on appeal counsels against granting the stay of the financial penalties.  *See United States* v. *Bestway Disposal Corp.*, 724 F. Supp. 62, 70 (W.D.N.Y. 1988).