FD-302 (Rev. 5-8-10)

-1 of 7-



UNCLASSIFIED//FOUO

FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/02/2015

BENJAMIN WEINSTOCK, date of birth (DOB) ███████████, who resides at
███████████████████████████████, was interviewed pursuant to a
proffer agreement at the United States Attorney's Office for the Southern
District of New York. Also present during the interview were Assistant U.S.
Attorney Jason Masimore and WEINSTOCK's attorneys, Noah Falk and Jacob
Warren from the firm Wilmer Hale. After being advised of the identity of
the interviewing Agent and the nature of the interview, WEINSTOCK provided
the following information:

WEINSTOCK began as an associate at RUSKIN MOSCOU FALTISCHEK P.C. (RMF)
in 1978. WEINSTOCK's professor at Brooklyn Law School was an RMF partner
and recruited WEINSTOCK to the firm. WEINSTOCK became an RMF partner in
1984. WEINSTOCK specializes in real estate law. WEINSTOCK never sat on the
hiring or compensation committee at RMF.

WEINSTOCK was a prosecutor in the Village of Cedarhurst, NY prior to
joining RMF. In 1994 or 1995, WEINSTOCK became a trustee in Cedarhurst.
Approximately 13 years ago, WEINSTOCK became the Deputy Mayor of
Cedarhurst. In February 2015, WEINSTOCK became Mayor of Cedarhurst after
the existing Mayor passed away.

DEAN SKELOS (SKELOS) joined RMF in 1995. The decision to bring SKELOS
into the firm was made at one of the RMF partner meetings. SKELOS was hired
by RMF because he was a prominent person who could grow the firm and add to
its stature. WEINSTOCK first met SKELOS at a fundraiser held at MICHAEL
FALTISCHEK's home prior to SKELOS' hire.

The Village of Cedarhurst is located in SKELOS' Senatorial district and
has received a number of federal, state, and county grants over the years.
State grants came primarily from legislative member items. Many of the
grants were used for business and road improvements. SKELOS had the ability
to direct member items to Cedarhurst and any other municipalities in his
district.

UNCLASSIFIED//FOUO

Investigation on  03/06/2015  at  New York, New York, United States (In Person)

File #  194A-NY-5636957                                    Date drafted  03/23/2015

by  PAUL M. TAKLA

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

WEINSTOCK 3584-02

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

194A-NY-5636957

Continuation of FD-302 of ___Interview of BENJAMIN WEINSTOCK___ , On __03/06/2015__ , Page __2 of 7__

   In 2008, the Village of Cedarhurst wanted to get out of the sewage business and undertook a project to transfer operations of the existing sewage plant to Nassau County. The project required $25 million of infrastructure to be put in place of the plant. The funds for the project flowed from the stimulus program that provided for "shovel ready" projects. SKELOS was not involved in the funding for this project; it was funded through the Nassau County Department of Public Works (DPW).

   WEINSTOCK was familiar with the Nassau County Industrial Development Association (IDA) through its work with RMF. ED AMBROSINO is counsel to the IDA on certain projects. WEINSTOCK never did any projects with the IDA. WEINSTOCK did not know how the IDA chose a title company.

   The Nassau County Village Officials Association (NCVOA) does not lobby the state directly. NCVOA presents issues to the New York Committee of Mayors (NYCOM) and NYCOM then forms a legislative policy and lobbies the state.

   RMF had clear cut rules against lobbying SKELOS directly or on behalf of an RMF client. RMF attorneys were forbidden to call SKELOS directly. Rather, CAROL LAHMANN spoke to SKELOS' secretary first who then reached out to SKELOS in Albany. These rules were discussed in the context of hiring SKELOS. When SKELOS became the Senate Majority Leader, these rules were enforced even more. RMF wanted no appearance of impropriety or conflict.

   JERRY KREMER, while working for RIFKIN RADLER, represented a client who had a lawsuit against an RMF client. KREMER then came to work for RMF. KREMER was a former Assemblyman and wanted to set up a lobbying firm. KREMER formed two entities, EMPIRE STRATEGIES and ISLAND STRATEGIES. One of the entities did lobbying and the other did consulting work during the height of the IPO era. WEINSTOCK had an ownership interest in EMPIRE and occasionally received distributions. WEINSTOCK did not know of any rules established for lobbying through EMPIRE. WEINSTOCK never used EMPIRE or anyone else for lobbying. On a few occasions where someone asked WEINSTOCK about lobbying, he referred the individual to KREMER. WEINSTOCK was not aware of situations in which EMPIRE lobbied SKELOS or RMF clients were referred to EMPIRE.

   WEINSTOCK did some work for ENGEL BURMAN years ago. ENGEL BURMAN had facilities called The Bristals. WEINSTOCK did not know of any current relationship between RMF and ENGEL BURMAN.

   WEINSTOCK once represented SKELOS on the sale of a property. WEINSTOCK dealt with the title company on the transaction. This transaction occurred before SKELOS' son, ADAM SKELOS (ADAM), got involved in title insurance.

UNCLASSIFIED//FOUO

**UNCLASSIFIED//FOUO**

194A-NY-5636957

Continuation of FD-302 of   Interview of BENJAMIN WEINSTOCK                        , On   03/06/2015  , Page   3 of 7

WEINSTOCK met ADAM a few times. ADAM called WEINSTOCK and said he was going into the title insurance business. WEINSTOCK never referred title work to ADAM but heard that other RMF attorneys ordered some titles through ADAM. WEINSTOCK never discussed ADAM's title insurance business with SKELOS but may have discussed it with other RMF attorneys. WEINSTOCK did not know any RMF clients who used ADAM for title insurance.

WEINSTOCK was shown an e-mail chain dated July 25, 2006 and marked as Document #1. MARK MULHOLLAND was a client relationship partner. MULHOLLAND questioned whether or not a letter could have been sent to SKELOS because they were not allowed to lobby SKELOS. WEINSTOCK had general conversations with MULHOLLAND about what was allowed and not allowed regarding SKELOS but WEINSTOCK could not remember a specific conversation.

WEINSTOCK was shown an e-mail dated September 12, 2006 and marked as Document #2. ASHER MANSDORF was WEINSTOCK's childhood friend. WEINSTOCK handled the sale of MANSDORF's home. MANSDORF was elected to a local school board and tried to resolve a conflict between Yeshiva and public schools. WEINSTOCK introduced MANSDORF to SKELOS to help with the problem. Neither MANSDORF nor the school district were an RMF client. WEINSTOCK could not recall ever putting an RMF client in touch with SKELOS.

WEINSTOCK was shown an e-mail chain dated September 14, 2006 and marked as Document #4. TRACY LLOYD, a male, was SKELOS' Chief of Staff.

WEINSTOCK was shown an e-mail he sent to his friend, MARK HONIGSFELD, dated September 14, 2006 and marked as Document #5. HONIGSFELD was trying to get state accreditation for Kulanu, a Jewish special needs school. Kulanu was not an RMF client but ED AMROSINO represented the greater diocese for the last 10 years. WEINSTOCK assumed it was permitted to connect people and organizations who were not RMF clients to SKELOS.

The RMF compensation committee made recommendations on compensation and presented the information to the equity partners for a vote. SKELOS was not a part of these meetings. WEINSTOCK did not remember a specific meeting in which SKELOS' compensation was discussed but remembered the topic was discussed at some point. At one meeting, someone asked if it was worth paying SKELOS a certain level of compensation. Eventually, everyone agreed and the issue was settled. The argument raised to support SKELOS' compensation was that although there was no direct link between his compensation and firm revenue, SKELOS brought networking and his stature to RMF. Someone said that if RMF partners were not using SKELOS to help them meet people, then the partners were not utilizing SKELOS to their advantage.

MIKE GOLD was an investor in real estate properties. WEINSTOCK

**UNCLASSIFIED//FOUO**

represented GOLD's company, PHILLIPS INTERNATIONAL, on the sale of a home and purchase of a condominium. GOLD has a gay son. SKELOS opposed gay marriage so WEINSTOCK arranged for GOLD and his wife to talk to SKELOS about the issue.

WEINSTOCK may have owned a piece of IS VENTURES and received distributions from that entity. WEINSTOCK did not know anything about distributions made to SKELOS.

WEINSTOCK was shown an e-mail from MURRAY ENGLARD dated October 26, 2006 and marked as Document #7. ENGLARD's daughter went to school with WEINSTOCK's daughter. ENGLARD was not an RMF client. WEINSTOCK did not know how SKELOS received the letter referenced in the e-mail. SKELOS knew to send the letter back to WEINSTOCK because WEINSTOCK was part of the Orthodox Jewish community and SKELOS contacted WEINSTOCK on those issues.

WEINSTOCK was shown an e-mail from ELIOTT FEINERMAN dated November 16, 2006 and marked as Document #8. FEINERMAN's father stole insurance premiums from clients and went to federal prison. FEINERMAN was not an RMF client. FEINERMAN wanted SKELOS to assist in moving FEINERMAN's father to another prison because FEINERMAN's father had cancer. WEINSTOCK forwarded FEINERMAN's letter to SKELOS. WEINSTOCK did not know how the issue was resolved.

WEINSTOCK was shown an e-mail chain dated January 8, 2007 and marked as Document #9. The e-mails discussed inviting local politicians, including SKELOS, to a fundraiser dinner for the expansion of WEINSTOCK's synagogue. The other individuals on the e-mail chain were WEINSTOCK's friends from the community.

WEINSTOCK was shown an e-mail chain dated March 8, 2007 and marked as Document #10. WEINSTOCK did not understand why the firm was taking SKELOS to real estate events for introductions. WEINSTOCK did not recall any meetings attended by SKELOS.

WEINSTOCK was shown an e-mail he wrote to JEFF GOODSTEIN dated July 2, 2008 and marked as Document #11. SKELOS was trying to help a Republican candidate, ARTHUR LUXEMBOURG, get elected to the Senate or Assembly. SKELOS' staff asked WEINSTOCK to set up a meeting with Jewish leaders because WEINSTOCK was involved in the Orthodox Jewish community. WEINSTOCK did pro bono work for Yeshiva University and represented the school on one matter.

WEINSTOCK was shown an e-mail he wrote to P.J. FORCINO dated October 26, 2008 and marked as Document #14. The "do me a favor letter" was invented by the former Mayor of Cedarhurst. SKELOS' office refunded RMF for postage

UNCLASSIFIED//FOUO

194A-NY-5636957

Continuation of FD-302 of  Interview of BENJAMIN WEINSTOCK _____ , On  03/06/2015 , Page  5 of 7

because otherwise it would have been viewed as a contribution to SKELOS' campaign.

WEINSTOCK was shown an e-mail chain dated November 3, 2008 and November 4, 2008 and marked as Document #15. AVI LAUER spent money on building up the security for Yeshiva University. LAUER wanted to obtain state security grants but WEINSTOCK did not know if it ever happened.

WEINSTOCK was shown an e-mail chain dated February 2, 2009 and marked as Document #16. WEINSTOCK did not know if SKELOS brokered a meeting with anyone else in his private capacity.

WEINSTOCK was shown an e-mail dated February 6, 2009 and marked as Document #17. The Village of Cedarhurst was looking for financing from M&T Bank on a sewer bond. Cedarhurst was not an RMF client.

WEINSTOCK was shown an e-mail dated March 13, 2009 and marked as Document #18. LARRY IROM was a member of WEINSTOCK's synagogue. WEINSTOCK did not believe anything came from the meeting between IROM and SKELOS.

WEINSTOCK was shown an e-mail chain dated August 27, 2009 and marked as Document #21. MIKE BEREY of First American Title was looking for an amendment to existing legislation. First American Title was not an RMF client. BEREY was acting on behalf of the title industry. WEINSTOCK never spoke to SKELOS to set up a meeting with BEREY.

WEINSTOCK was shown a memo from KREMER dated October 8, 2009 and marked as Document #22. WEINSTOCK knew nothing about the subject matter and never discussed it with KREMER. WEINSTOCK could not recall if RMF was opposed to particular legislation. WEINSTOCK was requested to contribute to RMFPAC by either KREMER, CHRIS MURRAY, or DAVE LENO. WEINSTOCK did not know how RMFPAC spent its money.

WEINSTOCK was shown an e-mail chain dated November 23, 2009 and marked as Document #23. DOUGLAS COOPER wrote the e-mail to give himself credit for a receiving an appointment. WEINSTOCK paid no attention to the matter and merely congratulated COOPER to be nice. RMF partners typically put their names on court websites to be eligible for appointments.

In 2005 or 2006, WEINSTOCK was appointed to the New York Real Estate Board by Governor GEORGE PATAKI. SKELOS recommended WEINSTOCK for that position. WEINSTOCK thanked SKELOS when they saw each other at a Christmas party or some other event. WEINSTOCK was elected Secretary and remained there for 10 years. WEINSTOCK could not remember anyone within RMF discussing how position appointments were one of the values SKELOS brought to the firm.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

194A-NY-5636957

Continuation of FD-302 of  Interview of BENJAMIN WEINSTOCK                    , On  03/06/2015 , Page   6 of 7

   WEINSTOCK was shown an e-mail chain dated December 1, 2010 and marked as Document #31. WEINSTOCK played no part in writing the press release. WEINSTOCK did not know why SKELOS was not mentioned as Of Counsel to RMF in the press release.

   WEINSTOCK was shown an e-mail chain dated May 5, 2011 and marked as Document #37. WEINSTOCK did not know if SKELOS ever taught at Yeshiva University. When Yeshiva University pitched SKELOS about enhancing its security, representatives from the school walked SKELOS through campus. WEINSTOCK once took SKELOS to a Yeshiva University golf outing. Yeshiva could not pay for SKELOS' attendance, which would have required writing a letter to SKELOS' office, so RMF paid for SKELOS.

   WEINSTOCK was shown e-mails dated September 28, 2010 and marked as Documents #27, #28, and #29. MANHATTAN BEER was not an RMF client. GEORGE WERTHEIMER was a member of WEINSTOCK's synagogue. WERTHEIMER asked if WEINSTOCK could arrange a meeting with SKELOS to discuss legislation pertaining to refunds on bottle deposits. MANHATTAN BEER pitched SKELOS but WEINSTOCK did not know how the issue was resolved.

   RMF does not have any cases before SKELOS' brother, Judge PETER SKELOS. Either PETER SKELOS or RMF recuses themselves when such client matters arise.

   WEINSTOCK was shown an e-mail dated October 25, 2012 and marked as Document #44. SKELOS never requested contributions for his brother. WEINSTOCK made personal contributions to a number of political organizations. WEINSTOCK met PETER SKELOS twice at an outside fundraiser and once at an RMF breakfast prior to PETER SKELOS' most recent election. SKELOS was not present at the breakfast.

   WEINSTOCK was shown an e-mail dated December 9, 2013 and marked as Document #45. SKELOS brought in VERIZON as a client but WEINSTOCK received origination credit for VERIZON. The e-mail related to origination credit for the purchase of a VERIZON property in Long Island. RMF had originally represented VERIZON on the purchase of a printing facility in Hicksville, NY. Typically, once an RMF attorney brought in a client, the attorney received origination credit for all subsequent matters for that client. IRV BRUM resolved origination credit disputes between RMF partners.

   WEINSTOCK was shown an e-mail chain dated February 11, 2014 and marked as Document #46. The e-mail discussed the deliberations involved in deciding whether or not to make DAVE LENO an RMF partner. JOE CAIRO was the leader of the Republican Party in Nassau County. WEINSTOCK had no business with CAIRO but RMF may have had business with him. SKELOS had a political

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

194A-NY-5636957

Continuation of FD-302 of  Interview of BENJAMIN WEINSTOCK                    , On   03/06/2015   , Page    7 of 7

connection to CAIRO. WEINSTOCK did not know what LENO was pushing for on
the political side as indicated in the e-mail. WEINSTOCK did not know how
LENO advanced the relationship with SKELOS or CAIRO.

LENO represented a daycare center for the children of jockeys at Belmont
Racetrack. WEINSTOCK went to the ribbon cutting ceremony for that facility.
LENO also did pro bono work for a jockey organization.

WEINSTOCK was shown an e-mail dated June 22, 2011 and an attached letter
marked as Document #38. CHARLES HARARY is an attorney and a member of
WEINSTOCK's synagogue. HARARY was the liaison to the Jewish community in
the Five Towns area of Long Island. WEINSTOCK did not know if Yeshiva
University ever received grants to enhance its security.

**UNCLASSIFIED//FOUO**