UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

v.

DEAN SKELOS and ADAM SKELOS,

Defendants.
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JUNE 8, 2018

15-CR-317 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

The Government has charged Defendants Adam Skelos and Dean Skelos with extortion in violation of 18 U.S.C. §§ 1951–52, with honest services fraud in violation of 18 U.S.C. §§ 1343 and 1346, and with soliciting and accepting bribes and gratuities in violation of 18 U.S.C. § 666(a). Defendants have filed the following pretrial motions:

(1) a motion to dismiss the Indictment for various reasons;

(2) a motion for a hearing pursuant to Federal Rule of Criminal Procedure 6(e); and

(3) a motion for a transfer of venue under Federal Rule of Criminal Procedure 21(a).

For the reasons set forth below, the Court DENIES all three of Defendants' motions.

## I. MOTION TO DISMISS THE INDICTMENT FOR ERRORS IN THE GRAND JURY INSTRUCTIONS AND FOR FAILURE TO STATE AN OFFENSE

### A. Grand Jury Instructions

#### 1. Legal Standard

"[T]he grand jury is an institution separate from the courts, over whose functioning the courts do not preside." *United States v. Williams*, 504 U.S. 36, 47 (1992). "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. *Costello v. United States*, 350 U.S. 359, 363 (1956) (footnote omitted). Although courts have some "supervisory power" to dismiss grand jury indictments for prosecutorial misconduct, that power

is limited to situations where prosecutors violated "those few, clear rules which were carefully drafted and approved by th[e Supreme] Court and by Congress to ensure the integrity of the grand jury's functions." *See Williams*, 504 U.S. at 46 (quoting *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in judgment)); *accord Bank of Nova Scotia v. United States*, 487 U.S. 250, 260 (1988) ("Because the record does not reveal any prosecutorial misconduct with respect to these summaries, they provide no ground for dismissing the indictment."); *United States v. Howard*, 216 F.3d 1074 (2d Cir. 2000) (unpublished table decision) (quoting *Williams*, 504 U.S. at 46); *United States v. Gillespie*, 974 F.2d 796, 801 (7th Cir. 1992), *as amended* (Sept. 28, 1992) ("After *Williams*, then, nothing short of a violation of laws or procedural rules regulating grand jury matters will permit a court to exercise its supervisory authority in the grand jury arena.").

The violations of "clear rules" that permit a court to exercise its supervisory power include violations of Federal Rule of Criminal Procedure 6's requirement of grand jury secrecy and violations of various criminal statutes, such as statutes that criminalize making false statements to the grand jury. *Williams*, 504 U.S. at 46 n.6. Absent a violation of one of these rules by the prosecution team, a court lacks authority to dismiss an indictment. *See Bank of Nova Scotia*, 487 U.S. at 260. Indeed, even if a prosecution witness provides "misleading and inaccurate summaries" to the grand jury (and even if those misleading summaries "prejudice" defendants), the indictment cannot be dismissed where "the record does not reveal any *prosecutorial* misconduct." *Id.* (emphasis added).

The Supreme Court's decisions in *Williams* and *Bank of Nova Scotia* have severely limited the ability of courts to dismiss grand jury indictments. *See United States v. Strouse*, 286 F.3d 767, 775 (5th Cir. 2002) (holding that indictment cannot be dismissed based on "perjury which the government did not sponsor"); *United States v. Myers*, 123 F.3d 350, 356, 358 (6th

Cir. 1997) (holding that violation of Department of Justice Manual did not permit dismissal of indictment, because *Williams* "[e]ssentially remov[ed] all general supervisory authority over the grand jury from the federal courts"); *United States v. Silver*, 103 F. Supp. 3d 370, 377 (S.D.N.Y. 2015) (Caproni, J.) (explaining that violations of "applicable disciplinary or ethical rules" are, under *Williams*, "insufficient grounds to dismiss the indictment"); *Rosario-Dominguez v. United States*, 353 F. Supp. 2d 500, 514 (S.D.N.Y. 2005) (Rakoff, J.) ("Generally, extreme acts of prosecutorial misconduct must be demonstrated before an indictment will be dismissed."); *United States v. Mullen*, 243 F.R.D. 54, 66 (W.D.N.Y. 2006), *aff'd in part sub nom. United States v. Funderburk*, 243 F.R.D. 53 (W.D.N.Y. 2007) (denying motion for *in camera* review of allegedly misleading testimony by agent due to defendant's "failure to demonstrate that the Government was complicit in misconduct," even though the purportedly misleading testimony may have been the "sole evidence" of defendant's involvement in the conspiracy).

2.    Application

Defendants have moved to dismiss the Indictment on the ground that the grand jury may have been improperly instructed on the meaning of "official action."    (Defs.' Indictment Mem.,[1] at 5–7.)    Defendants contend that when the grand jury indicted Defendants in July 2015, the Government likely instructed the grand jury using this Circuit's then-controlling definition of "official action," which was much broader than the current definition provided by the Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355 (2016).    (Defs.' Indictment Mem., at 6.) Although the Court has not reviewed the grand jury minutes in this case, it will assume *arguendo* that the Government's legal instructions to the grand jury were, in fact, inconsistent with

---

[1]  "Defs.' Indictment Mem." refers to "Memorandum of Law in Support of Defendants' Motion to Dismiss the Indictment for Errors in the Grand Jury Instructions and Failure to State an Offense," ECF No. 248.

*McDonnell*.    But, even assuming that the government did provide incorrect legal instructions to

the grand jury, this Court lacks the authority to dismiss the Indictment based on that basis alone.

Under the Supreme Court's decision in *Williams*, this Court has authority to dismiss the

Indictment only if the prosecution team violated a formal rule enacted by the Supreme Court or

Congress.    504 U.S. at 46.    In the present case, prosecutors—at worst—instructed grand jurors

according to the then-prevailing law in this Circuit.    (*See* Defs.' Indictment Mem., at 6 (noting

that, "[a]t the time of the Indictment in 2015, Second Circuit precedent imposed virtually no

limits on the definition of official action").)    Because the Government's conduct did not violate

any formal rules (or even informal ones), this Court does not have authority to dismiss the

indictment based on the Government's legal instructions.      *See Williams*, 504 U.S. at 46.

Defendants contend that they have been prejudiced by the Government's improper legal

instructions.    (Defs.' Indictment Mem., at 7–11.)    Absent prosecutorial misconduct, however,

prejudice is not a sufficient basis to dismiss an indictment.    In *Nova Scotia*, the Supreme Court

specifically noted that the district court found that the petitioners were prejudiced by "misleading

and inaccurate summaries" given to the grand jury by IRS agents.    487 U.S. at 260–61.    Yet,

notwithstanding that prejudice, the district court lacked authority to dismiss the indictment,

because the record did not "reveal any prosecutorial misconduct."    *Id.*    Similarly here,

prejudice on its own is not enough to justify dismissal of the Indictment.

Accordingly, Defendants' motion to dismiss the Indictment on the basis of improper legal

instructions is DENIED.[2]

---

[2] Defendants have also moved to have the grand jury instructions disclosed to Defendants or to the Court.
(Defs.' Indictment Mem., at 11–14.)    Because a review of the grand jury transcript is not necessary to resolve
Defendants' motion, there is no need for the Court to review or release the transcript.    Defendants' request is
therefore DENIED.

## B.	Specific Acts of Bribery

Defendants contend that the Indictment should be dismissed because it "does not allege that Dean Skelos agreed to act on any *specific* official matter at the time he allegedly solicited or accepted payments for Adam Skelos." (Defs.' Indictment Mem., at 14.) Defendants' argument is foreclosed by Second Circuit precedent. The Second Circuit has held that an agreement for a specific official action is not required at the time a payment or payments are received; instead, proof of "quid pro quo" can be "satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts *or to perform such acts as the opportunities arise*." *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007) (emphasis added); *accord United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) ("The illegality of an 'as opportunities arise' quid pro quo agreement has been established in this Circuit for more than two decades.") (citing *United States v. Coyne*, 4 F.3d 100, 113–14 (2d Cir. 1993)). The *Ganim* panel specifically rejected the argument "that at the time a quid pro quo agreement is reached, a direct link must exist between a benefit received and a specifically identified official act." 510 F.3d at 142. The Government, therefore, is not required to show (and the Indictment is not required to allege) that when Dean Skelos received a particular benefit, he simultaneously agreed to take a particular official action. It is instead sufficient for the Indictment to allege that Dean Skelos received benefits and, in exchange for those benefits, took some official action or actions.

Defendants contend that *Ganim* and the "as the opportunities arise" theory are no longer good law, in light of *McDonnell*. (Defs.' Indictment Mem., at 16–17.) The holding in *McDonnell*, however, concerned the meaning of "official act," not the validity of the "as the opportunities arise" theory of bribery. 136 S. Ct. at 2372. For this reason, numerous other district courts in this Circuit have rejected the argument that *McDonnell* abrogated *Ganim*.

*United States v. Silver*, No. 15-CR-93 (VEC), 2018 WL 1406617, at *4 (S.D.N.Y. Mar. 20, 2018)

(Caproni, J.); *United States v. Mangano*, No. 16-CR-540 (JMA), 2018 WL 851860, at *4

(E.D.N.Y. Feb. 9, 2018) (collecting cases).   The Second Circuit's mandate in this case also

relied on the "as the opportunities arise" theory to reject Defendants' argument that their

conviction should be reversed for lack of sufficient evidence.   *United States v. Skelos*, 707 F.

App'x 733, 738 (2d Cir. 2017) (quoting *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir.

2011).

     Accordingly, Defendants' motion to dismiss the Indictment on this basis is DENIED.

     **C.**     **Gratuity Charges**

          1.     <u>Statutory Interpretation of 18 U.S.C. § 666</u>

     Defendants contend that the charges under 18 U.S.C. § 666 should be dismissed because

that statute "does not prohibit gratuities."   (Defs.' Indictment Mem., at 21.)   As Defendants

point out, however, the Second Circuit has held that 18 U.S.C. § 666 does prohibit gratuities.

*United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007) ("We have interpreted § 666 to impose

criminal liability for both kinds of crime proscribed by § 201: bribery and illegal gratuities.").

     Defendants' motion to dismiss the charges under 18 U.S.C. § 666 is thus DENIED.

          2.     <u>Allegations in Indictment</u>

     Defendants contend that with respect to the illegal gratuities counts, "the Indictment does

not adequately allege that any of the payments were, in fact, illegal gratuities."   (Defs.'

Indictment Mem., at 23.)

     Under Federal Rule of Criminal Procedure 7(c)(1), an indictment "need do little more

than to track the language of the statute charged and state the time and place (in approximate

terms) of the alleged crime."   *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013)

Counts Six, Seven, and Eight of the Indictment allege that Defendants engaged in "[s]olicitation

of [b]ribes and [g]ratuities," and the language of the relevant paragraphs closely tracks the language of 18 U.S.C. § 666.   (*See* Indictment, ¶¶ 42–47.)   For this reason, the allegations in the Indictment are sufficient under Rule 7(c)(1).   The decisions upon which Defendants rely are inapposite because they do not address the level of specificity required of an indictment.   (*See* Defs. Indictment Mem., at 23–24 (citing *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 413–14 (1999) (vacating district court judgment because jury instructions were improper); *Ganim*, 510 F.3d at 146 (affirming district court's jury charges); *United States v. Tavares*, 844 F.3d 46, 55 (1st Cir. 2016) (holding that evidence submitted to jury was insufficient to support RICO conviction predicated on Massachusetts gratuities statute).)

Accordingly, Defendants' motion to dismiss the Indictment on the basis of insufficient allegations is DENIED.

### 3.   Constitutionality of Gratuity Charges

Defendants argue that if the Government argues that *McDonnell* does not apply to 18 U.S.C. § 666, then 18 U.S.C. § 666 is unconstitutional.   (Defs.' Indictment Mem., at 24–29.) For the purposes of this proceeding, the Government agrees that *McDonnell* applies to the definition of "official action" in 18 U.S.C. § 666.   (Gov't Opp'n, at 24.)

Accordingly, Defendants' motion is DENIED as moot.

### D.   Constitutionality of Honest-Services Fraud Statute

Defendants contend that the honest-services fraud claims against them should be dismissed because "the statute is unconstitutionally vague."   (Defs.' Indictment Mem., at 29.) The Supreme Court, however, has held that the honest services fraud statute is not unconstitutionally vague when defined "with reference to § 201 of the federal bribery statute." *McDonnell*, 136 S. Ct., at 2375; *accord Skilling v. United States*, 561 U.S. 358, 412 (2010) ("Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally

vague.").

Defendants' motion is thus DENIED.

**E.    Hobbs Act**

Defendants contend that the Hobbs Act claims against them should be dismissed because the Hobbs Act does not prohibit bribery.    (Defs.' Indictment Mem., at 31.)    As Defendants acknowledge, however, the Supreme Court has held that to prove Hobbs Act liability, "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."    *Evans v. United States*, 504 U.S. 255, 268 (1992).

Defendants' motion is thus DENIED.

## II.    MOTION FOR A HEARING PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 6(E)

Defendants contend that the Government has improperly revealed grand jury secrets, and move for a hearing under Rule 6(e) of the Federal Rules of Criminal Procedure.    (Defs.' 6(e) Mem.[3])    Prior to the first trial, the Court denied a similar motion made by Defendants.    (*See* ECF No. 47.)    For substantially the same reasons, Defendants' current motion is DENIED.

**A.    Legal Standard**

Federal Rule of Criminal Procedure 6(e)(2)(B) prohibits certain individuals, including "an attorney for the government," from disclosing any "matter occurring before a grand jury." Although Rule 6(e)(2) does not define a "matter occurring before the grand jury," courts have interpreted this rule to cover "not only the evidence actually presented to that body but also anything that may tend to reveal what transpired before it, such as summaries of grand jury

---

[3] "Defs. 6(e) Mem." Refers to "Memorandum of Law in Support of Defendants' Motion for a Rule 6(e) Hearing," ECF No. 251.

testimony." *United States v. E. Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991).

"[I]nformation obtained independently of a grand jury investigation," however, is not subject to Rule 6(e), including information obtained from a parallel criminal investigation. *Id.*; *accord In re Grand Jury Subpoena*, 103 F.3d 234, 238 (2d Cir. 1996) ("The Third, Fourth, and Tenth Circuits have similarly held that when information is produced by a criminal investigation that parallels but is independent of a grand jury investigation, disclosure of the information is not a violation of grand jury secrecy because it is not a matter occurring before the grand jury."); *United States v. Blaszczak*, No. S1 17-CR-357 (LAK), 2018 WL 1322192, at *4 (S.D.N.Y. Mar. 12, 2018) (Kaplan, J.) (holding that defendant failed to establish that statement disclosed in news article had "occurred before the grand jury," because the article did not specifically refer "to a grand jury investigation as opposed to the SEC or some other parallel investigation").

Rule 6(e)(2)(A) states that "[n]o obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)." Grand jury witnesses, and other individuals who are *not* enumerated in Rule 6(e)(2)(B), are permitted to disclose information occurring before the grand jury. *In re Grand Jury Subpoena Subpoena to Facebook*, No. 16-MC-1300 (JO), 2016 WL 9274455, at *6 (E.D.N.Y. May 12, 2016) ("The cited rule [6(e)(2)] does not make any provision for imposing an obligation of secrecy on a witness or subpoena recipient."); *In re Am. Historical Ass'n*, 49 F. Supp. 2d 274, 283 (S.D.N.Y. 1999) (Leisure, J.) ("Thus, pursuant to Rule 6(e)(2), any grand jury witness may disclose publicly anything that occurred therein, including the questions asked of the witness and the answers given.").

When moving for a hearing to establish a violation of Rule 6(e), "the defendant must establish a *prima facie* case of a violation." *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996). When the defendants' basis for a *prima facie* violation of Rule 6(e) is a news article or articles, courts in this circuit consider "(1) whether the media reports disclose matters occurring

before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e)." *Id.* at 662. Where the government submits an affidavit denying any wrongdoing, the court may consider that affidavit in determining whether the defendant made out a *prima facie* case. *Id.* (holding that district court's reliance on government affidavit was "certainly proper," and noting that "[m]any courts have considered such evidence in determining whether a violation of Rule 6(e) occurred"). Relying on such a government affidavit is particularly appropriate where the source of the information in a news article is not "definite." *In re Grand Jury Investigation*, 610 F.2d 202, 219 (5th Cir. 1980) ("The inability to show a definite source for some of the information contained in the articles might cause a prima facie case to fail if a responsive affidavit denying the allegations is made.").

### B. Discussion

In support of their motion, Defendants rely on thirteen documents that refer to the grand jury proceedings in this case, before those proceedings were public. (*See* Defs. 6(e) Mem.) None of these sources, however, is sufficient to create a *prima facie* case that grand jury secrets were improperly disclosed.

### 1. Evidence on which Defendants Previously Relied

In their current motion, Defendants rely on two news articles and one letter from a New York Times reporter that Defendants relied on in their prior motion for a 6(e) hearing. (*See* Defs.' 6(e) Mem., at 4–6 (citing January 29, 2015 News 4 Report (ECF No. 25, Ex. F); April 2, 2015 Letter from William Rashbaum (ECF No. 25, Ex. C); April 15, 2015 NY Times Article (ECF No. 25, Ex. J)).) This Court previously held that these articles were insufficient to show that a violation of Rule 6(e) had occurred. (ECF No. 47, at 18–19.) The Court sees no reason to depart from its prior ruling.

As the Court previously noted, the disclosures in these reports "refer to information that could have been discovered in the course of either [the grand jury or the federal] investigation and do not pertain specifically to the workings of the grand jury itself." (*Id.*, at 18.) The January 29, 2015 News 4 Report does not mention a grand jury investigation, but instead a "federal investigation." (*See* ECF No. 25-6.) This report, then, does not reveal any violation of Rule 6(e). *See In re Grand Jury Subpoena*, 103 F.3d 234, 238 (2d Cir. 1996) ("[W]hen information is produced by a criminal investigation that parallels but is independent of a grand jury investigation, disclosure of the information is not a violation of grand jury secrecy . . . .")

The April 2, 2015 letter from the New York Times mentions that the New York Times had previously reported that an individual "received a grand jury subpoena" in December 2015, and asks if Dean Skelos would like to comment on the "federal investigation." (ECF No. 25-3.) The letter does not reveal the source of the information about the "grand jury subpoena." Defendants have therefore not made a *prima facie* case that this disclosure came from a prohibited source, as opposed to the recipient of the subpoena. *See Blaszczak*, 2018 WL 1322192, at *5 (denying motion for hearing because "neither the article's attribution of sources . . . nor its substance sufficiently points to the government"). Defendants contend that the questions asked by the New York Times reporter in this letter suggest that he had improper access to grand jury testimony. (Defs.' 6(e) Mem., at 18–19.) Although the questions posed by the New York Times reporter do suggest that the reporter had a high level of familiarity with the investigation, they do not suggest that that he had access to grand jury testimony in particular. Instead, a person familiar with the parallel criminal investigation could have disclosed this information to the reporter, and thus the disclosure was not necessarily prohibited by Rule 6(e). *See In re Grand Jury Subpoena*, 103 F.3d at 238.

The April 15, 2015 New York Times article, similarly, contains information that may

have come from the federal investigation (and not the grand jury investigation).   (*See* ECF No. 25-10.)   Although the article does note that prosecutors have "begun presenting evidence to a grand jury," that fact could have been disclosed from one of the many people who were subpoenaed.   As the Court noted in its prior decision, "[i]n the months leading up to the grand jury, the Government issued subpoenas to more than 100 individuals and entities."   (ECF No. 47, at 20.)   In light of the Government's affidavit denying that any government prosecutors or agents spoke to the press, Defendants have not made a *prima facie* case that the information in this article was improperly disclosed by a government agent.   *See In re Grand Jury Investigation*, 610 F.2d at 219 (noting that where source of information is not definite, a responsive affidavit can cause "a prima facie case to fail").

### 2.   April 16 and 17, 2015 *New York Post* and *Newsday* Articles

Defendants rely on *New York Post* and *Newsday* articles published on April 16 and 17, 2015, that disclose that state senators had been subpoenaed as part of a grand jury investigation. (Defs. 6(e) Mem., at 7–8 (citing Apr. 16, 2015 *New York Post* Article (2015 WLNR 11163680); Apr. 16, 2015 *Newsday* Article (2015 WLNR 11041897); Apr. 17, 2015 *New York Post* Article (2015 WLNR 11263204).)   The April 16, 2015 *New York Post* article states that "[l]aw-enforcement sources told The Post that state senators have been subpoenaed in the investigation, and evidence has been presented to the grand jury."   2015 WLNR 11163680.   The April 17, 2015 *New York Post* article relies on a "government source" for the claim that County Executive Ed Mangano "appeared before the secret panel" and "was asked about various contracts signed by the county."   2015 WLNR 11263204.   The April 16, 2015 *Newsday* article also describes Mangano's testimony before the grand jury, but attributes that information only to "sources." 2015 WLNR 11041897.

These articles do not specify whether the "[l]aw enforcement sources" or the

"government source" were federal officials privy to the grand jury investigation, or instead officials from Mr. Mangano's office or other non-federal law enforcement officials with general knowledge of the investigation. If the information described in these articles came from Mr. Mangano's office or from local law enforcement, the disclosures would not violate Rule 6(e), because witnesses are not prohibited from disclosing their own grand jury testimony. *See In re Am. Historical Ass'n*, 49 F. Supp. 2d at 283. Defendants contend that the "[l]aw-enforcement source" referred to in that article must be a federal agent because only a federal officer that would privy to this information. (Defs.' 6(e) Reply,[4] at 9 n.5.) That is not necessarily true. Local law enforcement officials could have received information about the grand jury proceedings from speaking with one of the many witnesses or individuals who received subpoenas. Because the news articles do not specify whether the information came from federal government sources, and because the Government submitted an affidavit plainly denying that any members of the prosecution team spoke with the press, these articles do not create a *prima facie* case that the Government violated Rule 6(e). *See Rioux*, 97 F.3d at 662 (affirming district court order denying motion for hearing under Rule 6(e), based largely on consideration of "government affidavits denying that [government officials] were the source of the information").

### 3. April 16 and 17, 2015 Articles Citing *New York Times*

Defendants cite multiple news articles published on April 16 and April 17 that mention the existence of a grand jury investigation, but cite the New York Times as the source of that information. (Defs.' 6(e) Mem., at 8–9 (citing Apr. 16, 2015 *Metro – New York* Article (2015 WLNR 11244256); Apr. 16, 2015 *Washington Post* Article (2015 WLNR 11080070); Apr. 16,

---

[4] "Defs. 6(e) Reply" refers to "Reply Memorandum of Law in Support of Defendants' Motion for a Rule 6(e) Hearing," ECF No. 296.

2015 *N.Y. Daily News* Article (2015 WLNR 11119989); Apr. 17, 2015 *Times Union (Albany)* Article (2015 WLNR 11255656)).)   The *New York Times* article to which these articles refer is the April 15, 2015 article discussed above.   Because this Court has already held that this *New York Times* article does not provide a *prima facie* basis for concluding that the Government violated Rule 6(e), these articles, similarly, do not provide a basis for a violation.

### 4.  Articles that Do Not Cite a Source

Defendants cite an April 20, 2015 article from the *New York Daily News* and a May 1, 2015 article published in the *Wall Street Journal*.   (*See* Defs. 6(e) Mem., at 9, 10 (citing Apr. 20, 2015 *New York Daily News* Article, 2015 WLNR 11492710; May 1, 2015 *Wall Street Journal* Article, ECF No. 25-12).)   Although these articles state that information is being "presented to the grand jury," they do not provide a specific source for that information, and so do not make out a *prima facie* violation of Rule 6(e).   *See Blaszczak*, 2018 WL 1322192, at *5.

### 5.  May 2, 2015 *New York Post* Article

Defendants cite a May 2, 2015 New York Post article that cites "law-enforcement sources" for the claim that a "federal grand jury is planning to indict" Skelos.   (Defs.' 6(e) Mem., at 9–10.)   Defendants were not indicted, however, until May 28, 2015, and at least as late as May 26, 2015, the grand jury was still hearing evidence.   (ECF Nos. 10, 252-6.)   It is unlikely that a Government source with knowledge of the case would provide incorrect information.   *See Blaszczak*, 2018 WL 1322192, at *5 (denying motion for hearing under Rule 6(e) and noting that the "obvious flaw" in one of defendant's arguments was the unlikelihood that a government agent would be the source of incorrect information).   For this reason, this article does not provide a *prima facie* basis for concluding that a government source made this (incorrect) disclosure.

6. Disclosures in *Walters*

Defendants also argue that a hearing is warranted because, in another case, it was revealed at a Rule 6(e) hearing that an FBI agent in the New York Field Office disclosed grand jury secrets.   (*See* Defs.' 6(e) Mem., at 11–14 (citing docket of *United States v. Walters*, 16-CR-388, ECF No. 46 (S.D.N.Y.) (Castel, J.).)

There is no evidence, however, that the FBI agent in that case, David Chaves, was involved in the investigation in this case or was privy to matters occurring before the grand jury here.   The mere fact that an FBI agent in a different case conducted himself improperly does not lessen Defendants' burden here to make out a *prima facie* case.   Defendants also note that, in the *Walters* case, the court held a 6(e) hearing even though the Government submitted a declaration denying disclosures to the press.   *United States v. Walters*, 16-CR-338, ECF No. 46 (S.D.N.Y. Nov. 11, 2016) (Castel, J.).   The declaration in that case, however, was not as thorough as the one submitted here.   Whereas that declaration affirmed only that the undersigned AUSA and one other FBI agent did not speak to the press (16-CR-338, ECF No. 44, ¶ 17), the declaration here affirms that all of the AUSAs, investigators, and FBI agents involved in this investigation did not speak to the press, (ECF No. 27-1, ¶¶ 2–3, 14–16).   The Court has considered all of the news articles Defendants submitted in support of their motion, along with the declaration the Government has submitted in this case.   When taken together, Defendants have not made out a *prima facie* violation of Rule 6(e).

Accordingly, Defendants' motion for a 6(e) hearing is DENIED.

## III.   MOTION FOR TRANSFER OF VENUE UNDER RULE 21(A)

### A.   Legal Standard

Under Federal Rule of Criminal Procedure 21(a), a court must transfer a proceeding to a different district if "the defendant cannot obtain a fair and impartial trial" in the district from

which the defendant requests transfer. "[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool." *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003). For this reason, courts often wait until *after* voir dire has begun to decide whether to transfer venue. *See United States v. Ayala*, 64 F. Supp. 3d 446, 452 (E.D.N.Y. 2014) ("[T]he Court concludes that the issue of potential prejudice from negative media coverage of MS–13 is best determined during or after voir dire examinations.") (internal quotation marks omitted) (quoting *United States v. Volpe*, 42 F. Supp. 2d 204, 218 (E.D.N.Y. 1999)); *see also United States v. Wilson*, 925 F. Supp. 2d 410, 413 (E.D.N.Y. 2013) ("[A]s jury selection progresses, the parties and the court will be in a better position to determine whether a change of venue is necessary.").

Although courts have held in certain cases that news coverage can "so saturate a community" that the impossibility of a fair trial should be "presumed," the situations requiring such a presumption are "very rare." *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010) (citation and internal quotation marks omitted); *accord United States v. Salim*, 151 F. Supp. 2d 281, 283 (S.D.N.Y. 2001) (Batts, J.) ("[P]rejudice is presumed in the context of pretrial publicity very rarely and only in extreme circumstances."). To determine whether prejudicial news coverage will prevent a fair trial, courts consider several factors, including "the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially." *Sabhnani*, 599 F.3d at 233 (internal quotation marks and citation omitted). "Coverage of actual developments in a criminal case generally will not rise to the level of prejudicial publicity that will warrant a venue change." *Id.* at 233.

Many courts have noted that large metropolitan districts have jury pools so large and

diverse that finding untainted jurors is easier than in smaller or more insular districts.   *Salim*, 151 F. Supp. 2d at 284 (denying motion to transfer venue in part because the Southern District of New York is "one of the largest and most diverse districts in the country"); *accord Columbia Broad. Sys., Inc. v. U.S. Dist. Court for Cent. Dist. of California*, 729 F.2d 1174, 1181 (9th Cir. 1984) ("[I]n a populous metropolitan area, the pool of potential jurors is so large that even in cases attracting extensive and inflammatory publicity, it is usually possible to find an adequate number of untainted jurors.").   Indeed, the Supreme Court has noted that it is "hard to sustain" the possibility that in a district with a "large, diverse pool of potential jurors . . . 12 impartial individuals could not be empaneled."   *Skilling v. United States*, 561 U.S. 358, 381 (2010).

### B.   Application

Defendants request that this Court transfer venue without even attempting to select a jury. (*See* Defs.' Venue Mem.[5])   In support of their motion, Defendants have attached 128 articles that they contend show that they cannot receive a fair trial in this district.   (*See* ECF Nos. 256, 299.)   Of those articles, ninety-one are from over two years ago.   (*See* Defs.' Venue Exs.[6] 1– 85, 95, 109, 110, 116, 117, 118.)   Publicity from that long ago does not create a reasonable likelihood that Defendants will be prejudiced at the start of trial.   *See Yousef*, 327 F.3d at 155 (affirming district court decision to deny motion to transfer venue, where key events "had taken place two years earlier"); *In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015) (affirming district court's order denying defendant's motion for change of venue for Boston Marathon bombing case, in part because "nearly two years" had had passed, allowing "the decibel level of

---

[5]  "Defs.' Venue Mem." refers to "Memorandum of Law in Support of Defendants' Motion for a Transfer of Venue Under Rule 21(a)."

[6]  "Defs.' Venue Exhibits" refers to those exhibits attached to the Declaration of John J. Kenney, dated March 1, 2018, ECF No. 256.

publicity . . . to drop"). For this reason, this Court is not persuaded that press coverage from 2015 and 2016 would prevent Defendants from receiving a fair trial or would require a change of venue.

The remaining thirty-seven articles Defendants have cited largely follow "actual developments" in this case or in similar corruption cases, and so do "not rise to the level of prejudicial publicity" requiring a change of venue. *See Sabhnani*, 599 F.3d at 233. Thirteen of these articles were published in the days following the Second Circuit decision overturning Defendants' convictions.[7] Nine were published shortly after other events in this case, such as setting a trial schedule, changing bail conditions, or the Defendants' filing of pretrial motions.[8] Twelve were published shortly after events in other public corruption cases or the passage of anti-corruption laws, and Defendants are not the primary focus of those articles.[9] The remaining articles mention Defendants only in passing or merely note that Defendants' retrial is

---

[7] (Defs.' Venue Exs. 88 (article discussing the Second Circuit's decision in this case, published same day as the Second Circuit's decision), 89 (same), 90 (same), 91 (same), 92 (same), 93 (same), 115 (same), 119 (same), 120 (same), 121 (same), 114 (statement of U.S. Attorney's Office issued same day as Second Circuit decision), 94 (article discussing Second Circuit's decision in this case, published the day after the Second Circuit's decision was published), 98 (letter to the editor published days after Second Circuit's decision, in response to article about the Second Circuit's decision).)

[8] (Defs.' Venue Exs. 86 (reporting on oral argument before the Second Circuit, the same day that argument was given), 99 (article published same day as and reporting on order setting trial date), 111 (article published same day as and reporting on order for Adam Skelos to undergo mental health treatment), 112 (same, but published day after order was issued), 113 (same); Declaration of John J. Kenney, April 13, 2018, ECF No. 299 ("Defs.' Venue Reply Exs."), Exs. 1 (article reporting on Defendants' motion to transfer venue, published less than a week after that motion was filed), 3 (same), 4 (same), 5 (article about Defendants' motion to change venue, a day after that motion was filed).)

[9] (Defs.' Venue Exs. 87 (article primarily reporting on the Second Circuit's reversal of Sheldon Silver's conviction), 96 (article primarily reporting on federal appeals court decision not to overturn bribery conviction of William Boyland, Jr.), 97 (article primarily reporting on Second Circuit's order vacating Sheldon Silver's convictions), 103 (article primarily reporting on trial of Joe Percoco), 104 (reporting on new legislative bill that would change definition of "official act," with Defendants mentioned along with others), 105 (article primarily reporting on indictment of Pamela Harris), 106 (article primarily reporting on trial of Joe Percoco), 107 (article primarily reporting on the arrest of Todd Howe), 108 (article primarily reporting on Todd Howe and trial of Joe Percoco); Defs.' Venue Reply Exs. 2 (article primarily reporting on conviction of Joe Percoco), 7 (same), 6: (article primarily reporting on anti-corruption order by Nassau County Executive Laura Curran).)

occurring this year.[10]   Because the release of these articles was largely clustered around new events in this case or related cases, they do not show that New Yorkers have been barraged daily or weekly with news about this trial.   For this reason, the coverage has not been "massive," "pernicious," or "pervasive."   *See Sabhnani*, 599 F.3d at 233; *Maldonado-Rivera*, 922 F.2d at 967.   Indeed, in situations with more extreme publicity than here, including where articles were "averaging slightly more than one article per week over a three-year period," courts have denied transferring venue.   *See Maldonado-Rivera*, 922 F.2d at 967.   Transfer of venue is therefore not warranted in this case.

Defendants contend that they have been prejudiced because some of the news coverage has cast them in an unfavorable light.   (*See, e.g.*, Defs.' Venue Mem., at 1.)   It is worth noting, however, that most of the recent articles Defendants have cited are neutral, including many that merely mention in passing that Defendants are set to be re-tried.   (*See, e.g.*, Ex. 101.)   Only a small minority of the articles are denigrating, and even those are far tamer than articles in other cases where courts denied motions to transfer venue.   In *Sahnani*, for example, the Second Circuit affirmed a district court's decision to deny a motion to transfer venue, even though the press referred to that case as the "Slave Case," labeled one of the defendants "Cruella," and published "details of the methods that the [defendants] allegedly used to torture their victims." 599 F.3d at 232.   Nothing approaching that level of denigration or inflammation is present here.

In arguing for a transfer of venue, Defendants have cited many decisions where courts did decide to transfer venue.   (*See* Defs.' Venue Mem., at 4–5.)   These decisions are largely inapposite, however, because they are out-of-Circuit or involve situations where venue was

---

[10]  (Defs.' Venue Exs. 95, 100–102.)

transferred from a small or insular district.    As one example, Defendants rely on *United States v. Casellas-Toro*, a decision in which the First Circuit held that a presumption of prejudice existed in Puerto Rico, a community the district court described as "compact, insular, [and] highly susceptible to the impact of local media."    807 F.3d 380, 386–87 (1st Cir. 2015).    The First Circuit's decision in *Tsarnaev*, 780 F.3d at 21, however, is far more similar to this case.    In *Tsarnaev*, the First Circuit held that a jury in Boston would be capable of fairly trying the Boston Marathon Bombing Case, because Boston was "a large, diverse metropolitan area."    780 F.3d at 21.    The Southern District of New York is, itself, also "one of the largest and most diverse districts in the country."    *Salim*, 151 F. Supp. 2d at 284.

The one decision Defendants cite from this circuit, *United States v. Florio*, is easily distinguished.    13 F.R.D. 296, 297–988 (S.D.N.Y. 1952) (Kaufman, J.).    In that case, an "avalanche" of news coverage on the morning of jury selection caused the court to find it "reasonable to assume that every reader of newspapers in this district had read these disclosures and was shocked by them."    *Id.*    Here, by contrast, it is too early to know what will happen the morning of voir dire, but the Court expects that it will be possible to find jurors who have not been tainted by the coverage that has occurred in this case.

Defendants also contend that venue should be transferred because the Government is responsible for some of the bad publicity Defendants have faced.    (Defs.' Venue Mem., 14–15.) Much of Defendants' evidence of purported Government misconduct is from over two years ago, and so is unlikely to prevent a fair trial now, as discussed above.    Defendants also point to a statement made by the U.S. Attorneys' Office on September 26, 2017, the same day that the Second Circuit vacated Defendants' convictions.    (Ex. 114.)    In that statement, the acting U.S. Attorney claimed that there was "overwhelming evidence of Dean Skelos and Adam Skelos's guilt" and that "[c]leaning up corruption is never easy."    (*Id.*)    Defendants point out that

several news sources picked up on this statement and quoted it. (Exs. 88, 92, 115.) Although it is generally inappropriate for the Government to make extrajudicial statements about guilt (*see* S.D.N.Y. Local Crim. R. 23.1(d)(7)), these statements were not so prejudicial or widely disseminated that they will prevent Defendants from receiving a fair trial in this district. Instead, it is highly likely that the Court will be able to find jurors who have not been prejudiced by (or even heard of) these statements.

Accordingly, because it is likely that the Court and the parties will be able to select a jury that has not been prejudiced by the pretrial publicity in this case, Defendants' motion is DENIED. If during jury selection it becomes apparent that no fair jury could be empaneled, Defendants may renew their motion.

## IV. CONCLUSION

For the foregoing reasons, Defendants' pretrial motions are denied. This Opinion and Order resolves docket entries 247, 250, and 255.

SO ORDERED.

Dated: New York, New York
     June 8, 2018

                                      KIMBA M. WOOD
                               United States District Judge