

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 7, 2018

**By ECF and Email**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *United States* v. *Dean Skelos & Adam Skelos*, S1 15 Cr. 317 (KMW)

Dear Judge Wood:

The Government respectfully submits this letter-motion to seek authorization to cross-examine Dean Skelos regarding his employment at a law firm (the "Law Firm") for which he performed no legal work, but was instead paid as much as $170,000 a year to use his "prestige" as Senate Majority Leader to bring in new business. As set forth below, prior to the first trial, the Court correctly held that cross-examination on this subject was permissible. Moreover, the defendant's testimony thus far on direct examination has squarely opened the door to cross-examination on this subject, for at least four independent reasons:

- *First*, because the defendant has elected to testify, he has put his character for truthfulness at issue, just like any other witness. Accordingly, cross-examination about whether the defendant made and/or authorized others to make false or misleading statements concerning his employment at the Law Firm is appropriate to impeach the defendant's veracity.

- *Second*, through his testimony, the defendant has gone far beyond denying the specific allegations against him in this case, and has instead made broad assertions suggesting he has never engaged in unethical conduct. He has therefore opened the door to cross-examination on subjects—most notably the Law Firm evidence—that directly undermine his claim and show that, in fact, he has engaged in conduct that created a clear conflict of interest, violated ethical guidelines, and lied about it.

- *Third*, the defendant has testified that he saw "nothing wrong" with asking "friends" to give business to his son, and perceived no pressure, intimidation or threat in him asking these "friends" to do so. This testimony, which is clearly intended to suggest the lack of

Hon. Kimba M. Wood
July 7, 2018

any power imbalance in these "friendships," is severely undermined by the defendant's knowledge that the Law Firm was paying him not to do any legal work, but merely because of his official position, and his ability to leverage that official position to attract clients to the firm. A reasonable juror could infer, based this evidence, that the defendant's testimony in this regard was not credible, and that the defendant fully understood the significance, in the eyes of businesspeople, of the power he wielded as Senate Majority Leader.

- And *fourth*, defense counsel purported to elicit from the defendant a complete catalogue of the various positions of employment he held from childhood to college to law school to the Assembly to the Senate. And yet, this lengthy description notably *excluded* any reference to the defendant's years of employment at the Law Firm. It is critical that the Government be permitted to correct this misimpression on cross-examination.

## A.  **Background**[1]

Overview

As set forth below, through his employment at the Law Firm, Dean Skelos (1) engaged in conduct that created a clear conflict of interest by, among other things, voting for and speaking out in favor of legislation of direct benefit to Law Firm clients, (2) ignored the clear ethical guidelines the defendant received from the Nassau County Bar Association Ethics Committee about his conduct while associated with the Law Firm, and (3) attempted to conceal all of the above from his constituents by causing false and misleading statements to be issued in his name about the nature of the "work" he did for the Law Firm and the ethical guidelines to which he purported to adhere (collectively, the "Law Firm Evidence"). Prior to the first trial, the Court ruled that (1) and (3) were proper grounds for cross-examination, and reserved decision on (2). (Transcript of final pretrial conference dated November 9, 2015 ("11/9/15 Tr."), at 21-25.) Because Dean Skelos did not testify or call any character witnesses at the first trial, the Law Firm Evidence was not offered. In advance of the retrial, the Court held that it would reserve decision on these issues until such time as the defense put Dean Skelos's character at issue or otherwise opened the door. (Dkt. 363.)

The Facts

From in or about 1994 up until his arrest in 2015, Dean Skelos was employed as "Of Counsel" with the Law Firm, which also had an affiliated lobbying firm (the "Lobbying Firm"). During that time, Dean Skelos did not perform legal work for the Law Firm. Rather, as internal firm documents and the defendant's own statements on intercepted calls make clear, the

---

[1] This section is drawn in part from the Government's brief in opposition to the defendants' motions *in limine* (Dkt. 306). It is included herein for the Court's convenience.

Hon. Kimba M. Wood
July 7, 2018

defendant was not expected to "provide any 'work' capacity" but was instead expected to be a "rainmaker" bringing business to the firm by virtue of his official position. During his time at the firm, the defendant was compensated for bringing clients to the Law Firm and/or meeting with such clients, including numerous clients with business before the State.

The affiliated Lobbying Firm, which was founded and managed by a former New York State legislator who was also a partner at the Law Firm, lobbied state legislators on behalf of its clients and operated essentially as a practice group within the Law Firm. Among other things, the Lobbying Firm shared office space with the Law Firm, the Lobbying Firm's revenues were shared with the Law Firm, and the Law Firm partners worked with the Lobbying Firm to jointly develop business and serve overlapping clients. The Law Firm also determined compensation for the Lobbying Firm employees.

<u>The Scope of the Anticipated Testmony</u>

Prior to the first trial, and again in advance of the retrial, the Government moved to cross-examine Dean Skelos, if he testified, or otherwise offer evidence if he called character witnesses, about certain aspects of his association with the Law Firm, including the fact that he used his official position to get paid by the Law Firm and related Lobbying Firm not for doing any legal work but instead because the Law Firm and Lobbying Firm had clients with business before the state. (Dkt. 54 at 26-31.)

The Government also moved to cross-examine Dean Skelos, or offer other evidence, about certain statements he made and caused to be issued in his name, some of which were false. For example, he falsely stated, through a spokesperson, that "[t]here is a wall" between the Lobbying Firm and the Law Firm and that he "doesn't have anything to do with [the Lobbying Firm]. There is a total wall. They don't discuss it." These and similar statements were false. Among other things, the defendant's own emails amply demonstrate that he frequently met with clients of the Lobbying Firm to discuss their legislative interests pending or about to be pending before the State.

Similarly, the Government seeks to offer other statements by the defendant that confirm that he was being paid by the Law Firm despite not doing any meaningful work but instead by virtue of his official title. For example, in a January 2015 call, Senator Skelos refers to the internal law firm documents quoted above, saying that the Firm was "bringing me on, not that I'm going to be practicing law, but it'll add prestige and stuff like that to the law firm . . . And, and, and that's the case." (GX 1534). In another call in or about January 2015, the defendant was intercepted speaking with another Senator, stating that "I don't even open up e-mails at the law firm 'cause I don't want to know what's going on." (GX-1470-T).

Finally, the Government seeks to offer evidence that the Nassau County Bar Association Ethics Committee had advised Dean Skelos that he should not "make either a positive or

Hon. Kimba M. Wood
July 7, 2018

negative statement about the client's project" in his capacity as a Senator "because it would have the appearance of an impropriety or be prejudicial to the client," and that Dean Skelos had repeatedly failed to follow those Guidelines. (11/9/15 Tr. at 22-24.)  Specifically, the Government highlighted for the Court two instances in which, contrary to that ethics guidance, Dean Skelos spoke publicly in his capacity as a Senator in favor of legislation that would directly benefit clients of the Lobbying Firm. (*Id.* at 22-24.)  Finally, the Government sought to cross-examine Dean Skelos regarding his failure to disclose that ethics guidance—guidance, which as noted above, he was not following—to the Law Firm.

> The Court's Ruling at the First Trial

Prior to the first trial, the Court ruled that the Government could cross-examine Dean Skelos about the Law Firm Evidence, including as follows:

- The Government could offer evidence about statements, put out through Dean Skelos's spokesperson, that there was a "wall between the law firm and the lobbying firm, and that he had nothing to do with the latter" and offer evidence in a rebuttal case to disprove those statements. (11/9/15 Tr. at 21.)

- The Government could cross-examine Dean Skelos, about "whether he used his official position to get paid by a private firm that represented entities with business before the state, and that had a lobbying arm that directly lobbied the Senate, while Dean Skelos was in power" because it was "relevant to conflict of interest." (*Id.* at 21-22.)

- The Court reserved decision on whether the Government could offer evidence, including testimony, about the ethical guidelines from the Nassau County Bar Association and the instances in which Dean Skelos violated those guidelines. (*Id.* at 24.)

> The Current Trial

Prior to the retrial, the defendants moved *in limine* to exclude the Law Firm Evidence. (Dkt. 285 at 2-13.)  The Government opposed, arguing that "as the Court correctly ruled prior to the first trial, evidence of the conflict of interest created by Dean Skelos's decision to accept millions of dollars from the Law Firm knowing it and the affiliated Lobbying Firm represented clients with business pending before the Senate, will plainly be relevant should Dean Skelos testify or otherwise seek to offer evidence of his character," and that "[t]he same is true of evidence of the false statements that Dean Skelos made in an effort to conceal from public view the unethical conduct in which he was engaged." (Dkt. 306 at 2-11.)  In its ruling on the motions *in limine*, the Court reserved decision on this issue, pending Dean Skelos's decision to testify or otherwise put his character at issue. (Dkt. 363 at 7.)

Hon. Kimba M. Wood
July 7, 2018

**B.** <u>Applicable Law</u>

Where evidence of character is admitted by way of testimony as to reputation or opinion, Rule 405(a) of the Federal Rules of Evidence permits cross-examination "into relevant specific instances of conduct." Fed. R. Evid. 405(a). Similarly, under Rule 404(a), where a defendant offers evidence of the defendant's "pertinent trait," the Government "may offer evidence to rebut it." Fed. R. Evid. 404(a)(2)(A). "Once a defendant offers character testimony, the prosecution is afforded substantial latitude to rebut such evidence." *United States v. Russo*, 110 F.3d 948, 952 (2d Cir. 1997). As with any type of cross-examination, "[t]he scope and extent of cross examination lies within the discretion of the trial judge." *United States v. Blanco*, 861 F.2d 773, 781 (2d Cir. 1988). The trial court may, in its discretion, preclude questions for which the questioner cannot show a good-faith basis. *United States v. Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008). In cross-examining a character witness, the Government need not offer extrinsic evidence so long as it can point to a good-faith basis for its questions. *See United States v. Payton*, 159 F.3d 49, 58-59 (2d Cir. 1998).

Specific acts of a witness's conduct may be inquired into on cross-examination "if they are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1). "When a defendant offers an exculpatory explanation for the government's evidence, he 'opens the door' to impeachment of his credibility, even by previously inadmissible evidence." *United States v. Desposito*, 704 F.3d 221, 233-34 (2d Cir. 2013). Although the introduction of extrinsic evidence is not allowed to follow up on the inquiry under Rule 608(b), when a witness puts certain facts at issue in his testimony, the Government may seek to rebut those facts, including by resorting to extrinsic evidence if necessary." *United States v. Ramirez*, 609 F.3d 495, 499 (2d Cir. 2010) (citing *United States v. Beverly*, 5 F.3d 633, 639-40 (2d Cir. 1993)).

**C.** <u>Discussion</u>

The defendant's testimony thus far has established that the Court's ruling prior to the first trial was correct and should be adhered to. The Law Firm Evidence is a proper subject for cross-examination for four independent reasons:

*First*, because the defendant has elected to testify, his character for truthfulness is now at issue, just as it would be for any witness. Thus, the Law Firm Evidence is a proper subject for cross-examination because it directly bears on his veracity. *See* Fed. R. Evid. 608(b). As noted above, in connection with his employment at the Law Firm, the defendant made and/or caused others to make false statements, such as falsely claiming that "[t]here is a total wall" between the

Hon. Kimba M. Wood
July 7, 2018

defendant and the Lobbying Firm.[2]  Those false statements go squarely to the defendant's credibility as a witness.  *See, e.g.*, *United States v. Jones*, 900 F.2d 512, 520-21 (2d Cir. 1990) (prosecutor properly cross-examined defendant "about a number of false statements she had made").  Indeed, it was on this basis that the Court permitted the defendants to cross-examine Anthony Bonomo concerning alleged misrepresentations and omissions that had no relationship whatsoever to the issues at this trial, but nonetheless arguably undermined his credibility as a witness.

*Second*, the Law Firm Evidence properly rebuts the defendant's broad assertions during his direct examination that he has always conducted himself ethically.  For example, the defendant testified that in his discussions with Adam Skelos, he always told his son to "do the right thing."  (Tr. 2347.)  When asked, "[D]id you ever trade your office for any benefit to Adam in connection with PRI or AFP?," the defendant did not simply say "no," but instead asserted more broadly that he "[n]ever would."  (Tr. 2369.)  When describing his request to Glenwood to direct title work to his son, the defendant did not simply deny seeking a *quid pro quo*, but instead asserted more broadly that he "didn't see *any problem* with it."  (Tr. 2375 (emphasis added).)  He stated that he "felt total at ease" in asking Glenwood's lobbyist, Richard Runes, whether Glenwood would be directing title work to his son.  (Tr. 2380.)  And, again, when he was asked, "At any time in the conversations with Mr. Litwin, Mr. Dorego, Mr. Runes, did you ever intend to trade your office in exchange for something for Adam?," the defendant did not simply say "no," but instead asserted more broadly, "Absolutely not, and that's not the way I was brought up to conduct yourself."  (Tr. 2381.)

This testimony was plainly designed to create the impression that the defendant has conducted himself in an appropriate and ethical manner at all times, particularly when it comes to any potential abuse of his office.  The Law Firm Evidence is thus critical to rebut that false claim.  *See* Fed. R. Evid. 404(a)(2)(A) (Where a defendant offers evidence of the defendant's "pertinent trait," the Government "may offer evidence to rebut it").  "Once a defendant offers character testimony, the prosecution is afforded substantial latitude to rebut such evidence."  *Russo*, 110 F.3d at 952; *see also United States v. Nektalov*, No. S2 03 Cr. 828 (PKL), 2004 WL 1637010, at *2 (S.D.N.Y. July 21, 2004) (a defendant's decision to put his character in issue "[i]s thus a tactical one, as direct examination about the defendant's character 'opens the door' to cross-examination about specific acts of the defendant").  The Law Firm Evidence establishes Dean Skelos's willingness to use his powerful position in the Senate to enrich himself in the private sector.  Further, it demonstrates his willingness to ignore not only the *appearance* of a conflict of interest but actual ethical guidelines issued by the local Bar Association, and, when

---

[2] This particular false statements was issued by Scott Reif.  In Kelliann Cummings's testimony at this retrial, she stated that she and Mr. Reif were both spokespersons for Senator Skelos, and that neither of them ever issued a statement on the Senator's behalf without first obtaining his express preapproval.  (Tr. 1434-35.)  Indeed, based on that testimony, the defense did not object to the introduction of a newspaper article which included a statement by Mr. Reif.  (GX 429.)

Hon. Kimba M. Wood
July 7, 2018

confronted about that conduct, to publicly lie about it. *Cf. United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (evidence of prior bad act sufficiently similar to allow jury to draw inference about defendant's knowledge); *see also, e.g.*, *United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998) (When a defendant offers an innocent explanation he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination." (collecting cases)).

*Third*, the Law Firm Evidence rebuts the defendant's claim that he did not believe that businessmen such as Dorego and Bonomo were intimidated, pressured, or in any way affected by the power the defendant wielded as Senate Majority Leader. In particular, the defendant's testimony thus far has left the jury with the clear impression that these were benevolent requests made from one friend to another, entirely omitting any mention of the substantial power dynamic at play. Along these lines, defense counsel has elicited the defendant's views that Bonomo and Dorego were effectively happy to help Adam Skelos – that Dorego was "most, most agreeable" to one of the Senator's requests, for example. And the defendant has broadly denied any intention to threaten or pressure Bonomo or Dorego—and denied believing they were, in fact, threatened or pressured—in connection with paying Adam Skelos. (*E.g.*, Tr. at 2368, 2375, 2377-78).

The clear implication of this testimony was that the defendant had no reason to believe that his powers as Senate Majority Leader had anything to do with how or why businessmen such as Bonomo or Dorego would react in the way they did to his requests. The defendant wholly disclaimed any belief that these men would be in any way intimidated or even impressed by the power he wielded as Senate Majority Leader. But the Law Firm Evidence directly rebuts and draws into question the credibility of those claims. As the defendant well knows, the reason the Law Firm paid him so well was not because of any legal work he did, but because the mere fact that he was Senate Majority Leader would make it easier for him to attract other business to the Law Firm. Indeed, the defendant fully understood that members of the business community were willing to pay—and pay lots of money—to the Law Firm based on its affiliation with the Senate Majority Leader. Eliciting the fact of his employment along with the nature of the "work" the defendant provided for the Law Firm is thus essential in order to challenge the defendant's testimony that it did not occur to him that his position as Senate Majority Leader had any bearing whatsoever on his requests of, and interactions with, Dorego, Litwin, Runes, and Bonomo.

And *fourth*, the Law Firm Evidence is necessary to correct the misimpression created by the defendant's testimony about his prior employment, in which he purported to catalogue every position he has ever held, yet notably omitted any reference to the Law Firm. Defense counsel asked the defendant to describe, in great detail, his educational and employment history. Much of this testimony was utterly irrelevant and served no purpose other than to elicit sympathy for the defendant's ostensibly humble upbringing.

7

Hon. Kimba M. Wood
July 7, 2018

For instance, after he testified that, "[g]rowing up, we all worked in the bakery," defense counsel inquired, "When you say 'the bakery,' what are you referring to?"  The defendant took this as an invitation to tell the jury about his grandfather emigrating from Greece, traveling the country to learn how to make different types of pastries and breads, and eventually opening up a bakery, "called 'George's Bakery,' [t]hat's why my middle name is George.  And we used to work there as kids helping bake apple pies . . . ."  (Tr. 2339.)  The defendant proceeded to testify about going to law school at night and working as a "paint[er], doing odd jobs like that" (Tr. 2340); going on to work for a judge (*id.*); then working part-time with a law firm and part-time as counsel to an Assemblyman (*id.*); then becoming an Assemblyman himself (Tr. 2340-41); then getting elected to the Senate (Tr. 2341-42); then becoming Deputy Majority Leader (Tr. 2343); and finally becoming Majority Leader in 2008 (Tr. 2344).

From this lengthy testimony, the jury will surely infer that they have learned everything there is to know about the defendant's employment history.  And they will assume it was one wholesome job after another, from baking apple pies to "holding Adam in my arms" while making speeches at "chicken dinners" on weekends.  (Tr. 2345.)  Yet, this story is plainly misleading.  Starting in 1994, the defendant was also monetizing his public office by drawing a significant law firm salary in exchange for little to no work.  .  The Government has a right to correct the flagrant misimpression that the defendant's testimony has created for the jury.  Thus, the Law Firm Evidence is admissible for this reason as well.

In sum, because the Law Firm Evidence impeaches the defendant's character for truthfulness; rebuts his claim that he has always acted ethically; rebuts his claim that he did not believe that Bonomo, Dorego, and other businessmen were impressed or intimidated by his power; and corrects a flagrant misimpression about his employment history, it is a proper subject for cross-examination.[3]

* * *

In addition, for many of the same reasons set forth above, the Government submits that the records of the defendant's income—which were previously offered (GXs 206 and 207) and on which the Court reserved decision—are properly admissible.  The Government should be

---

[3] In their *in limine* briefing, the defendants have previously argued that even if the Law Firm Evidence is an appropriate subject for cross-examination under Rules 405(a) and 608(b), it should be excluded under Rule 403.  (*See* Dkt. 285 at 4 n.2.)  This argument is baseless for the reasons set forth in the Government's opposition.  (*See* Dkt. 306 at 8-11.)

Hon. Kimba M. Wood
July 7, 2018

permitted to offer evidence of the defendant's annual law firm salary which, as noted herein, was approximately $150,000-$170,000 annually during the relevant time period.[4]


Respectfully submitted,

ROBERT S. KHUZAMI
Attorney for the United States,
Acting Under Authority Conferred by 28 U.S.C. § 515

By: /s Douglas S. Zolkind
Edward B. Diskant
Thomas McKay
Douglas S. Zolkind
Assistant United States Attorneys
(212) 637-2268


cc: Counsel of Record

---

[4] In asking the Court to exclude these exhibits, defense counsel argued that they might be unduly prejudicial because they reflected an annual salary of $500,000 which is "quite high for some of these jurors." (Tr. at 1495.) That is simply not accurate. The defendant's law firm salary never exceeded $170,000, and when combined with his Senate salary, his total combined annual income was typically about $270,000 a year, a significant sum to be sure, but not one that is unfairly prejudicial in the context of this case.