I75TSKE1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                          15 Cr. 317 (KMW)
 4

 5   DEAN SKELOS and ADAM SKELOS,

 6                                           Trial
                 Defendants.
 7   ------------------------------x
                                             New York, N.Y.
 8                                           July 5, 2018
                                             9:15 a.m.
 9   Before:

10                     HON. KIMBA M. WOOD,

11                                           District Judge

12                           APPEARANCES

13   ROBERT S. KHUZAMI
          Acting United States Attorney for the
14        Southern District of New York
     EDWARD B. DISKANT
15   THOMAS A. McKAY
     DOUGLAS S. ZOLKIND
16        Assistant United States Attorneys

17   GAGE SPENCER & FLEMING LLP
          Attorneys for Defendant D. Skelos
18   G. ROBERT GAGE, Jr.
     BERNARD W. OZAROWSKI, III
19        -and-
     SHAPIRO ARATO LLP
20   ALEXANDRA A.E. SHAPIRO
     FABIEN M. THAYAMBALLI
21
     HOGUET NEWMAN REGAL & KENNEY LLP
22        Attorneys for Defendant A. Skelos
     JOHN J. KENNEY
23   ALLISON N. ANGEL
     JULIAN S. BROD
24
     Also Present:  Yolanda Bustillo, Paralegal Specialist
25                  Special Agent Tracee Mergen, FBI
                    Jessica Kaplove, Paralegal
```

I75TSKE1

1           (Jury not present)

2           THE COURT:  Do counsel wish to raise anything right

3    now?

4           MR. GAGE:  One very brief issue, your Honor.

5           THE COURT:  Yes.

6           MR. GAGE:  At the end of Mr. Barrella's direct the

7    last time, who I understand to be the nest witness, two

8    questions were asked which implied that Mr. Skelos had a duty

9    to make disclosures to Mr. Barrella about conversations he had

10   had with Adam.  And I am hoping and assuming those questions

11   aren't going to be asked this time because there is no duty to

12   talk to a lobbyist.  We had a discussion about that issue with

13   regard to others, but if those questions are going to be asked,

14   I just want to note we object.  I don't want to have to stand

15   up in front of the jury and raise an objection, but we would

16   like an objection to any question which even remotely implies

17   that Dean Skelos had a duty to disclose conversations with his

18   son to Mr. Barrella.

19           MR. DISKANT:  Your Honor, I don't plan to say anything

20   about a duty to disclose.  I certainly do plan to elicit from

21   the witness that notwithstanding the fact that he was

22   representing PRI and had many conversations with Senator Skelos

23   about PRI, Senator Skelos at no point told him that PRI was

24   employing his son.  The ruling that the Court has given us on

25   this issue I will adhere to.

I75TSKE1

1          MR. GAGE:  Your Honor, the difficulty I have with

2     that -- the objection I have to that is it really does imply

3     that there is some duty or omission and that there is something

4     improper about that, and that's the basis for our objection.

5          I don't see that the government needs that.  They can

6     ask, to the extent appropriate, we're not waiving our right to

7     object to other questions, but:  What did Senator Skelos say to

8     you and what did you say to him?  That should be sufficient for

9     this witness.

10          MR. DISKANT:  Your Honor, I think the problem with the

11     what-did-you-say-to-him-and-what-did-he-say-to-you question,

12     which in the ordinary course I do use, is that it doesn't get

13     to an omission, but if nothing was said about the subject,

14     there is no way of eliciting the fact that nothing was said

15     about the subject without asking:  What, if anything, was said

16     about the subject?

17          MR. GAGE:  That is precisely my point, your Honor.

18     When you ask about an omission, you are implying that there was

19     something wrongful about that omission, and that is the basis

20     of our objection.  Again, there is absolutely no duty for Dean

21     Skelos to disclose everything he discussed with his son to a

22     lobbyist.

23          MR. DISKANT:  I am happy to continue on this, your

24     Honor.

25          THE COURT:  Go ahead.

I75TSKE1

```
 1          MR. DISKANT:  I think you ruled on it many, many times
 2   at this point.  I'm prepared to ask the questions your Honor
 3   permitted us to.
 4          THE COURT:  In connection with a public official's
 5   duty of honest and faithful service to the public, if that
 6   official has obtained a corrupt payment for himself or for
 7   another person in exchange for official action taken or to be
 8   taken, he has breached his duty of honest, faithful and
 9   disinterested service.  That's what I held.
10          MR. GAGE:  And we respectfully object, because there's
11   no deputy to disclose to Mr. Barrella.
12          THE COURT:  I hear you.
13          MR. KENNEY:  If I may, your Honor, I have a small
14   point.  I have a 3 o'clock before Judge Sweet, which is a bail
15   hearing in a CJA case, which shouldn't take more than probably
16   20 minutes.  But I would be happy to -- I wouldn't want to
17   interrupt wherever we are, perhaps during the charge
18   conference, so could I be excused and have Julian Brod present
19   for that purpose while I'm gone?
20          THE COURT:  Certainly.
21          MR. KENNEY:  Thank you.
22          THE COURT:  Ms. Shapiro.
23          MS. SHAPIRO:  Ms. Angel put in a letter objecting to
24   the chart that I think is going to come in on the second
25   witness this morning, so I just wanted to make sure the Court
```

I75TSKE1

1    ruled on it.

2              THE COURT:  Okay.  I believe that the jury can see the

3    chart that I have seen and can take it with them into the jury

4    room.  It would not be admitted as evidence.  It's being

5    admitted as a pedological device that is useful to the jury in

6    accord with the Second Circuit decision in *Casamento*,

7    C-A-S-A-M-E-N-T-O.

8              MS. ANGEL:  Your Honor, may we be heard on this?

9              THE COURT:  Yes, you may.  Let me tell you what my

10   tentative ruling is and then you can speak to that.

11             MS. ANGEL:  Apologies.  I thought you were done.

12             THE COURT:  No, you're quite right.

13             The charts will not be deemed evidence.  The jury will

14   be told they're free to disregard the charts if they wish.

15   They will be told that they summarize portions of the evidence

16   chosen by counsel, and that the best evidence is still the

17   originals that have been entered into evidence.

18             I would be allowing the charts in under Rule 611(a)

19   with respect to controlling the presentation of evidence to

20   make the presentation effective for determining the truth and

21   to avoid wasting time.

22             Go ahead, Ms. Angel.

23             MS. ANGEL:  Your Honor, demonstrative aids and

24   pedological devices aren't supposed to go into the jury room

25   with the jury.  They can be shown on summation as aids or with

I75TSKE1

 1    the witness, but they shouldn't go into there to guide their

 2    deliberations.

 3              THE COURT:  What is your view of *Casamento*?

 4              MS. ANGEL:  Your Honor, I don't think the chart in

 5    *Casamento* was remotely as argumentative as the chart that we

 6    have been discussing.

 7              THE COURT:  Have you seen it?

 8              MS. ANGEL:  No, I read the case.

 9              THE COURT:  I read the case, too, which says that the

10    charts, through graphs, maps or brief written descriptions,

11    summarized the evidence that the government had presented, much

12    consisted of the testimony of the government agents regarding

13    observations made occurring surveillance, transcripts of

14    intercepted telephone conversations, and seized items.

15              MS. ANGEL:  Your Honor, transcripts of intercepted

16    calls are not the same as indicating calls that had taken place

17    when there was not a wiretap, and it requires and in fact

18    invites speculation and inference regarding the substance of

19    those calls, which inviting inference and speculation in a

20    chart is argumentative in and of itself.  The majority of the

21    calls in the chart were not -- did not take place when the

22    wiretap was up.  So just to be blunt, no one knows what was

23    actually spoken about on those calls.  So just listing the fact

24    that there's a large volume of calls around the dates and

25    events that the government seeks to highlight invites inference

I75TSKE1

1    that these calls were all about the various events that they

2    want to draw attention to.

3            But as I pointed out in our letter, the defendants

4    spoke that frequently on -- routinely throughout the various

5    years from 2010 to 2015, but that's also not indicated in the

6    charts, so it looks like all they do is speak in and around the

7    events that the government seeks to highlight.  And the only

8    way to correct that would be for us to introduce a dueling

9    chart, at which point that's just misleading and confusing to

10   the jury and undermines the purpose of a pedological device,

11   and it does shift the burden to the defense to prove this case.

12           MR. McKAY:  Your Honor, just briefly, if I may, I

13   think all the points that Ms. Angel just made can very

14   adequately be made on cross-examination, and I'm sure they

15   will.  They are entitled to put on their own charts.  That's

16   not burden shifting, they just have an option; if they want

17   present a different narrative, they are certainly welcome to.

18           The other case I point your Honor to is *United States*

19   *v. Pinto*, 850 F.2d 927.  And I think this is important because

20   this discusses both the issue of whether they're admissible

21   summary charts but also whether they can go back to the jury.

22   And I think what the Court is ruling here, if I understand the

23   Court correctly, is that the charts are not themselves

24   evidence.  The jury will be instructed that the evidence is the

25   underlying exhibits, and they are to consider whether they

I75TSKE1

1   think the charts fairly and accurately summarize that

2   underlying evidence.  They're allowed to go back to the jury

3   for that purpose, as the court said in *Pinto*, however, with the

4   instruction that we have proposed, which the Court has in its

5   draft instruction.

6           THE COURT:  Yes.

7           MS. ANGEL:  Your Honor, in reality, each of the

8   various phone records that they cite to are -- I don't want to

9   say each of them, but they're hundreds of pages.  The first

10  one, 101 I believe, is over 500 pages.  The jury, just because

11  they have that in there, if they have a 17-page chart telling

12  them what they need to look at, they're not likely to take out

13  the 500-page record and GO back and verify the accuracy and/or

14  look at how frequently other calls were made when it requires

15  matching up whose number went to who and on what dates and for

16  how long.  And that's the case for every one of the phone

17  records, which off the top of my head I'm not remembering the

18  number, but there are eight different phone records that are at

19  least hundreds of pages each.

20          THE COURT:  That argument supports equally the

21  government's position.

22          MS. ANGEL:  I do understand that it is a summary

23  chart, your Honor, and that's the point of it, but the way that

24  it's presented is argumentative, and the fact that the

25  underlying evidence is in there with them does nothing to cure

I75TSKE1

1     that because realistically the jury is not going to look at it.

2                 THE COURT:  I rule that the chart is admissible under

3     611(a) for the reasons I stated this morning.  When I say

4     "admissible," I do not mean as evidence, I mean it can be given

5     an identifying number or set of letters, can be used during

6     summation and can go to the jury.

7                 Any other points anyone would like to raise?

8                 MR. McKAY:  Has the Court decided on whether or not we

9     can admit what has been called the Greek diner call?

10                THE COURT:  Yes.

11                MR. McKAY:  Yes, you decided?

12                THE COURT:  I have decided but I haven't put it on the

13    record.

14                MR. McKAY:  Will you let us know, your Honor?

15                THE COURT:  Yes, I will, just a second.

16                The probative value of the Greek diner call is that it

17    refers to Adam Skelos' quote "reach" and his refusal to discuss

18    what benefits he could arrange for the diner owner -- and other

19    diner owners, I note -- strongly suggesting that it is an act

20    in furtherance of the conspiracy and probative of Adam Skelos'

21    awareness that what he was offering was not an innocent act.

22    Thus, 404(b) allows its admission.  It essentially furthers the

23    conspiracy to monetize Dean Skelos' position for Adam Skelos'

24    financial benefit, notwithstanding that it did not succeed, and

25    hence, it is not an "other" act within the meaning of Rule

I75TSKE1

1    404(b).

2            Evidence that Adam Skelos did not want to discuss on

3    the telephone how he could use his "reach" to benefit the Greek

4    diner owner, who was a representative of an association of

5    4,000 Greek diner owners, shows Adam Skelos' awareness that

6    this type of act is not innocent.  The Second Circuit has

7    adopted an "inclusionary" approach to other act evidence under

8    Rule 404(b).  Thus, I find that it is offered for a proper

9    purpose, it's relevant to a material act in dispute, and its

10   probative value is not substantially outweighed by the danger

11   of unfair prejudice.

12           The prejudice that defendants claim is that Adam

13   Skelos' aggressive tone and harsh language and dismissive

14   treatment of the diner owner paints Adam Skelos in a bad light

15   and is likely to cause the jury to dislike him.  In my view,

16   the defendant's own words and tone are probative rather than

17   prejudicial.  To the extent that there is any prejudice against

18   Adam Skelos that would flow from admission of this call, I find

19   that it is heavily outweighed by the probative value of the

20   call.

21           MR. BROD:  Thank you, your Honor, we just ask that our

22   objection be noted for the record.

23           THE COURT:  It is.

24           MS. SHAPIRO:  Your Honor, could we get a limiting

25   instruction to the effect that the call is only against Adam

I75TSKE1

1      Skelos and not Dean Skelos?

2              MR. McKAY:  I think you just ruled that it's an act in

3      furtherance of the conspiracy, and they're co-conspirators.

4              THE COURT:  I did.

5              I note your objection.

6              MR. McKAY:  Your Honor, we have one scheduling matter

7      to take up, but if the jury is ready, we could do it later.

8              THE COURT:  The jury is here.

9              MR. McKAY:  So then we'll talk about this at the

10     break.

11             THE COURT:  Okay.  I'm reading a note from Christine

12     Pena, the juror who wants to be able to drive her partner home

13     on July 9.

14             Dear Judge:  Confirmed that my domestic partner's

15     appointment is 3:30 p.m. on July 9, 2018, not 2:30 p.m., as I

16     stated earlier.  He will be seen by Dr. Jonathan Davis, 136

17     Sagamore Road, Tuckahoe, New York 10707, 914-337-6400.

18             I will reiterate to her that we will make sure she can

19     get to that appointment.

20             It will be marked as Court Exhibit 13.

21             (Continued on next page)

22

23

24

25

I75TSKE1                    Barrella - Direct

1            (Jury present)

2            THE COURT:  Good morning, ladies and gentlemen.  I

3   hope you had a good July 4th, you got some rest, and you're

4   ready to come back.  Thank you.

5            We're ready to proceed.

6            MR. DISKANT:  Thank you, your Honor.  The government

7   would at this time offer Government Exhibit 1434, which is a

8   call dated December 22nd, 2014, between Adam Skelos and

9   Demetrios Raptis.

10           And that's admitted, your Honor?

11           THE COURT:  Yes.

12           (Government's Exhibit 1434 received in evidence)

13           MR. DISKANT:  Thank you.

14           THE COURT:  It's admitted over objection.

15           MR. DISKANT:  And the jury will not have this in their

16  binder, but we'll bring it up on their screens for them.

17           (Audio recording played)

18           MR. DISKANT:  Your Honor, the government calls

19  Nicholas Barrella.

20   NICHOLAS BARRELLA,

21       called as a witness by the Government,

22       having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MR. DISKANT:

25  Q.  Good morning, Mr. Barrella.

I75TSKE1                    Barrella – Direct

1    A.  Good morning.

2    Q.  Where are you employed?

3    A.  Capitol Group LLC.

4    Q.  What is Capitol Group LLC?

5    A.  It's a lobbying firm.

6    Q.  And how long have you been employed at Capitol Group?

7    A.  20 years.

8    Q.  What's your position?

9    A.  Managing partner.

10   Q.  What is lobbying?

11   A.  Lobbying in the general sense is you represent clients on

12   issues before the state legislature, the governor's office,

13   state agencies and public authorities.

14   Q.  And you mentioned the state legislature?

15   A.  Yes.

16   Q.  Would that include the state senate?

17   A.  Yes, it does.

18   Q.  Is there any particular state that you focus your lobbying

19   efforts on?

20   A.  New York.

21   Q.  As part of your lobbying efforts, have you met with New

22   York State senators?

23   A.  Yes, I have.

24   Q.  Have you met with members of their staff?

25   A.  Yes, I have.

1   Q.  Are you familiar with Senator Dean Skelos?

2   A.  Yes, I am.

3   Q.  How long have you known Senator Skelos?

4   A.  Probably since I have started lobbying, 25 years.

5   Q.  And focusing your attention on the time period of 2010 to

6   2015, was your relationship with Senator Skelos purely

7   professional?

8   A.  No, we were friends.

9   Q.  And so focusing on the friends or the personal side of the

10  relationship during that time period, what did that entail?

11  A.  Going to dinner a number of times with our wives.

12  Q.  Did you see each other outside of the State of New York?

13  A.  Yes, we did.

14  Q.  Where did you see each other?

15  A.  In Florida.

16  Q.  How did you come to see each other in Florida?

17  A.  I had a condo in Naples, Florida and he had a condo in Fort

18  Myers, Florida.

19  Q.  Are you familiar with a company called Physicians

20  Reciprocal Insurers or PRI?

21  A.  Yes, I represented them.

22  Q.  When you say you represented them, in what capacity did you

23  represent them?

24  A.  As a lobbyist.

25  Q.  How did it come to be that you were a lobbyist for PRI?

1   A.   The late Senator Guy Velella introduced me to Anthony

2   Bonomo, who was the CEO of PRI, and suggested that he add me to

3   their lobbying team.

4            MR. DISKANT:  And if we could show the witness,

5   Ms. Bustillo, in hard copy, it may be easier, what have been

6   marked for identification as Government Exhibits 704, 712, 713,

7   716, 717, 718 and 719.

8   Q.   Mr. Barrella, do you recognize these documents?

9   A.   I do.

10  Q.   What are they?

11  A.   They are contracts between Capitol Group LLC and Physician

12  Reciprocal Insurers.

13  Q.   What kind of contracts?

14  A.   Lobbying contracts.

15           MR. DISKANT:  The government offers 704, 712, 713 and

16  716 through 719.

17           MR. GAGE:  No objection.

18           THE COURT:  The Court receives with no objection

19  Government Exhibits 704, 712, 713 and 716 through 719.

20           (Government's Exhibits 704, 712, 713 and 716 through

21  719 received in evidence)

22           MR. DISKANT:  Ms. Bustillo, if we could publish

23  Government Exhibit 716.

24  Q.   So Mr. Barrella, this is a contract for the year

25  February 1, 2009 to December 31, 2009.  Do you see that down at

I75TSKE1                          Barrella - Direct

1   the bottom of the first paragraph?

2   A.  Yes, I do.

3   Q.  Does your signature appear here?

4   A.  Yes, it does.

5   Q.  And someone has signed on behalf of Physicians Reciprocal

6   Insurers or PRI?

7   A.  Yes.

8   Q.  Was this roughly the start of your relationship with PRI?

9   A.  Yes, it was.

10  Q.  And sticking with that first paragraph, you charge a fee of

11  $4,000 per month plus reasonable expenses?

12  A.  That's correct.

13  Q.  Did you extend this contract for years after 2009?

14  A.  Yes, I did.

15          MR. DISKANT:  So Ms. Bustillo, if we could bring up --

16  Q.  I'm sorry, focusing on that for just a minute, as part of

17  your agreement, you are being retained to represent them in

18  front of the New York State Executive Chamber, the New York

19  State Legislature, and the New York State agencies and public

20  authorities, do you see that?

21  A.  Yes.

22  Q.  For issues relating to insurance and medical malpractice?

23  A.  That's correct.

24  Q.  And just to confirm, would the New York State Legislature

25  include the New York State Senate?

I75TSKE1                     Barrella - Direct

1    A.  Yes, it does.

2             MR. DISKANT:  Ms. Bustillo, if we could bring up

3    Government Exhibit 717, and just zoom in on the three

4    paragraphs of the letter.

5    Q.  So Mr. Barrella, this particular contract covers the

6    following year, that is January to December of 2010?

7    A.  Yes.

8    Q.  And the fee for this year is $6,000 a month?

9    A.  That's correct.

10   Q.  Did the general scope of your retention, that is, the scope

11   of the services you were going to provide, did it change?

12   A.  No.

13   Q.  And we offered a bunch of other exhibits, do those

14   generally cover the years 2010 to 2015?

15   A.  They do.

16   Q.  During each of those years, that is 2010 to 2015, did

17   Capital Group lobby the New York State Senate on behalf of PRI?

18   A.  Yes, it did.

19   Q.  During those same years did you meet with senators on

20   behalf of PRI and its legislative interests?

21   A.  Yes, I did.

22   Q.  Which senators did you meet with?

23   A.  Senator Skelos, Senator DeFrancisco, Senator Hannon and

24   Senator Martins.

25   Q.  And focusing on Senator Skelos in particular, in addition

1    to meeting with the senator himself, did you ever meet with

2    members of his staff?

3    A.  Yes, I did.

4    Q.  Do you recall which members?

5    A.  Diane Burman when she was counsel, Rod Mujica, who was

6    chief of staff and secretary of the finance committee, and then

7    Beth Garvey when she was chief counsel, and Tom Wickham.

8    Q.  When you met with those members of Senator Skelos' staff,

9    did you believe they had the ability to vote on legislation?

10   A.  No.

11   Q.  So why did you meet with them?

12   A.  It's very important, if you're a good lobbyist, to meet

13   with the senior staff of leadership or his programming counsel

14   staff so you can explain the issue and get them to understand

15   what you're trying to do.

16   Q.  And you mentioned leadership.  What was Senator Skelos'

17   position between 2010 and 2015?

18   A.  He was senate majority leader.

19   Q.  So from a lobbying perspective, is there a functional

20   difference between meeting with Senator Skelos' staff or

21   meeting with him in person?

22   A.  No.

23   Q.  And when you met with senior staff, did you have an

24   expectation of what, if anything, they would do with the

25   information you provided?

I75TSKE1                    Barrella - Direct

1   A.  Yes, they would certainly brief the senator and apprise him

2   of the situation.

3   Q.  So going back to PRI, through your work as a lobbyist for

4   PRI, did you develop an understanding of PRI's various

5   legislative interests?

6   A.  Yes, I did.

7           MR. DISKANT:  Ms. Bustillo, could we bring up what is

8   in evidence as Government Exhibit 3307A.

9           THE COURT:  Mr. Barrella, if you bring your mike down

10  a bit, we'll get less feedback.

11          THE WITNESS:  Okay.

12  Q.  Mr. Barrella, do you recognize the chart we're looking at?

13  A.  Yes, I to.

14  Q.  Have you seen it before?

15  A.  I have.

16  Q.  Up top it says PRI select state law interests 2011 to 2015.

17  Do you see that?

18  A.  Yes, I do.

19  Q.  I just want to talk with you about a few of these.

20  Starting on the very left-hand side of the chart, 2011, the top

21  box says risk-based capital extension.  Do you see that?

22  A.  Yes.

23  Q.  And the one below it says liquidation restriction

24  extension, do you see that?

25  A.  Yes.

1    Q.  So let's go through those issues.  Just very generally,

2    what is the risk-based capital extension?

3    A.  Risk-based capital was a provision in insurance law that is

4    applied to general commercial carriers and medical malpractice

5    carriers.

6    Q.  And why did it need to be extended?

7    A.  We needed to extend our exemption from that because of the

8    situation of PRI.

9    Q.  Were these bills that lapsed or had set time periods to

10   them?

11   A.  Yes, they had sunset dates.

12   Q.  And just below that there's the liquidation restriction

13   extension.  Just very briefly, what is that issue?

14   A.  That, again, another provision of insurance law dealing

15   with liquidation and rehabilitation of a carrier who may have

16   financial stress.

17   Q.  Are you familiar with the term "extenders?"

18   A.  Yes.

19   Q.  Are these types of bills sometimes referred to as

20   extenders?

21   A.  Yes.

22   Q.  You mentioned that the CEO of PRI was someone named Anthony

23   Bonomo?

24   A.  That's correct.

25   Q.  Did you discuss the extender legislation with Anthony

1    Bonomo?

2    A.  A number of times.

3    Q.  Based on those conversations, did you develop an

4    understanding of whether or not the extender legislation was

5    significant to him?

6    A.  It was very apparent that it was significant to him.

7    Q.  Did you have an understanding of why it was significant to

8    PRI?

9    A.  Yes, he felt that for the stability of his company he

10   needed to push these extenders out to get some relief from

11   these provisions.

12   Q.  Looking down at the bottom left box, the bad doctors or

13   insurance pool, do you see that issue?

14   A.  Yes.

15   Q.  Are you familiar with that issue?

16   A.  Yes.

17   Q.  Can you tell us very generally what that issue is.

18   A.  The MMIP is the Medical Malpractice Insurance Pool, and

19   that is where the high-risk doctors are, and also cases left

20   over from these high-risk doctors.

21   Q.  Did you discuss this issue with Anthony Bonomo?

22   A.  Yes.

23   Q.  And based on those discussions, did you develop an

24   understanding of whether or not this issue was significant to

25   PRI?

1    A.  It was important to PRI.

2    Q.  And with respect to the three issues we have now talked

3    about, that is the risk-based capital extension, the

4    liquidation restriction extension and the bad doctors insurance

5    pool, which, if any, of these did you lobby the senate for on

6    behalf of PRI?

7    A.  All three.

8    Q.  And which of these did you lobby Senator Skelos for on

9    behalf of PRI?

10   A.  All three.

11   Q.  So focusing on 2011 --

12          MR. DISKANT:  Ms. Bustillo, if we could keep that up.

13   Q.  -- was PRI seeking legislative action on the risk-based

14   capital extension?

15   A.  Yes.

16   Q.  And how did PRI hope to accomplish that?

17   A.  By having it placed in the budget.

18   Q.  When does the budget typically pass?

19   A.  March 31st.

20          MR. DISKANT:  Ms. Bustillo, if we could bring up for

21   the witness what has been marked for identification as

22   Government Exhibit 806.

23   Q.  Mr. Barrella, do you recognize this email chain?

24   A.  Yes.

25   Q.  Are you on it?

I75TSKE1                        Barrella - Direct

1    A.   Yes.

2    Q.   Who are you communicating with?

3    A.   Rob Mujica, chief of staff of the senator, and Tom Wickham,

4    who handled health issues for the senator.

5    Q.   Does this pertain to PRI's legislative interests?

6    A.   Yes, it does.

7              MR. DISKANT:  The government offers 806.

8              MR. GAGE:  No objection.

9              THE COURT:  Government Exhibit 806 is received without

10   objection.

11             (Government's Exhibit 806 received in evidence)

12   Q.   Starting at the bottom, your email is to a J. Wickham and

13   to a Robert Mujica?

14   A.   Right.

15   Q.   Who is Mr. Wickham?

16   A.   Again, he was on the counsel program staff and he was the

17   expert on health issues.

18   Q.   To which particular senator is he a staff member?

19   A.   The senate majority leader.

20   Q.   Senator Skelos?

21   A.   Yes.

22   Q.   Robert Mujica, remind us who he is.

23   A.   Chief of staff and secretary of the finance committee.

24   Q.   And this is dated March 27, 2011?

25   A.   Yes, it is.

1    Q.  And you write down at the bottom:  Is my insurance language

2    for the medical practice insurers in?

3              Do you see that?

4    A.  Yes.

5    Q.  What are you referring to?

6    A.  To PRI's extenders.

7    Q.  And what's the purpose of communicating this issue to

8    Mr. Wickham and Mr. Mujica?

9    A.  Certainly they're negotiating it and they would know the

10   answer to the question.

11   Q.  So Mr. Mujica responds a little bit later that it's still

12   open.  Do you see that?

13   A.  Yes.

14   Q.  And what do you understand him to be telling you?

15   A.  That the health table, as they call it, was still open,

16   that all the health issues hadn't been closed.

17   Q.  Still being negotiated?

18   A.  Yes.

19   Q.  Did the language you were seeking, the PRI language, make

20   it into the budget in 2011?

21   A.  It did.

22   Q.  And what was the significance, if any of that, to PRI and

23   your client?

24   A.  Well, it certainly gave him relief until 2014.

25              MR. DISKANT:  Ms. Bustillo, if we bring back up 3307A.

1    Q.  And sticking with 2011, Mr. Barrella, did PRI have a

2    legislative interest with respect to its bad doctors insurance

3    pool?

4    A.  Yes.

5    Q.  Did you conduct lobbying activities in 2011 on behalf of

6    PRI with respect to this issue?

7    A.  Yes.

8    Q.  What, in general terms, did you do?

9    A.  We had language drafted and introduced in the senate.

10            MR. DISKANT:  So if we could bring up for the witness

11   what has been marked as Government Exhibit 809, and just

12   zooming in on the top there.

13   Q.  Mr. Barrella, do you recognize this calendar invite?

14   A.  I do.

15   Q.  Is it for a meeting you attended?

16   A.  Yes, it is.

17   Q.  And did it pertain to PRI and its legislative interests?

18   A.  Yes, it did.

19            MR. DISKANT:  The government offers 809.

20            MR. GAGE:  No objection, your Honor.

21            THE COURT:  Government Exhibit 809 is received without

22   objection.

23            (Government's Exhibit 809 received in evidence)

24   Q.  Mr. Barrella, this appears to be a calendar invite for

25   Friday, June 3rd, 2011, with Robert Mujica.  Do you see that?

1   A.  Yes.

2   Q.  Is that the same individual we have just been talking

3   about?

4   A.  It is.

5   Q.  The chief of staff for Senator Skelos?

6   A.  It is.

7   Q.  And at the top is says the subject the meeting is S5440

8   DeFrancisco med mal, do you see that?

9   A.  Yes.

10  Q.  Are you familiar with that bill?

11  A.  Yes, I am.

12  Q.  What, in general terms, did that bill refer to?

13  A.  It had to do with the contingent liabilities from the

14  medical malpractice insurance pool.  It gets placed on the four

15  regulated medical malpractice carriers in New York State.

16          MR. DISKANT:  Ms. Bustillo, if we could bring up for

17  the witness what has been marked for identification as

18  Government Exhibit 810.

19  Q.  Mr. Barrella, do you recognize this calendar invite?

20  A.  I do.

21          MR. DISKANT:  The government offers 810.

22          MR. GAGE:  No objection, your Honor.

23          THE COURT:  Government Exhibit 810 is received without

24  objection.

25          (Government's Exhibit 810 received received in

I75TSKE1                        Barrella - Direct

1    evidence)

2    Q.  So this appears to be a little later in June of 2011, again

3    a meeting with Robert Mujica with you with someone named Greg

4    Serio, do you see that?

5    A.  Yes.

6    Q.  Who is Mr. Serio?

7    A.  Greg Serio was the former deputy superintendent of

8    insurance in New York State under Governor George Pataki.

9    Q.  And what, if any, relationship did he have with PRI?

10   A.  He was senior lobbyist and consultant on insurance matters

11   to PRI.

12   Q.  So just another lobbyist?

13   A.  Yes.

14   Q.  What was the subject matter of this meeting?

15   A.  Again Senate 5440, the DeFrancisco bill.

16   Q.  Was this a bill of significance to PRI?

17   A.  Yes.

18   Q.  Did S5440, the bill we have been talking about, it did go

19   smoothly?

20   A.  No, it did not.

21   Q.  What happened?

22   A.  Very complex medical malpractice issue, and it just --

23   people just weren't grasping it.

24   Q.  Did S5440 pass?

25   A.  No.

1   Q.  After it failed to pass, did PRI take any additional steps

2   with regard to this type of legislation?

3   A.  Yes, we drafted other iterations of this bill.

4           MR. DISKANT:  If we could bring up for the witness

5   only what has been marked for identification as Government

6   Exhibit 314.

7           Let's publish 314.  Let's go to page 2.

8   Q.  Mr. Barrella, do you recognize this bill?

9   A.  Yes, I do.

10  Q.  What do you recognize it to be?

11  A.  It is the revised edition of the previous bill, Senate

12  5808A by Senator DeFrancisco.

13  Q.  What, if any, role did PRI and its lobbyist have with

14  respect to drafting this particular bill?

15  A.  We drafted the bill.

16  Q.  Did the bill pass?

17  A.  It did.

18  Q.  And just remind us, how does Senate 5808A relate to S5440,

19  the bill that did not pass?

20  A.  This is a more palatable, something that people could work

21  with.

22  Q.  And turning to page 5 of the exhibit, up at the top, which

23  committee did this bill go through?

24  A.  Senate rules committee.

25  Q.  Who was the chair of the senate rules committee?

I75TSKE1                         Barrella – Direct

1   A.  Senator Dean Skelos.

2   Q.  How did Senator Skelos vote for the bill in the committee?

3   A.  Voted yes.

4   Q.  If we turn to the next page of the exhibit, the floor vote,

5   how did Senator Skelos vote on the floor?

6   A.  He voted yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. DISKANT:

2    Q.  In addition to casting his vote, what, if anything, did you

3    understand Senator Skelos to have done in support of passage of

4    this bill?

5    A.  He allowed it to get to the Senate floor.

6    Q.  To your understanding, if Senator Skelos, the Majority

7    Leader, had opposed the legislation, would it have come to the

8    floor for a vote?

9    A.  No.

10   Q.  Does the Senate Majority Leader have the ability to block a

11   bill?

12   A.  Yes, he does.

13   Q.  If we can bring up for the witness what what is been marked

14   for identification as Government Exhibit 936?

15           Mr. Barrella, do you recognize this e-mail chain?

16   A.  Yes, I do.

17   Q.  Are you on it?

18   A.  Yes, I am.

19   Q.  Does it pertain to the piece of legislation we have been

20   discussing?

21   A.  Yes, it does.

22           MR. DISKANT:  The government offers 936.

23           MR GAGE:  No objection.

24           THE COURT:  Government Exhibit 936 is received,

25   without objection.

I755ske2                          Barrella - direct

 1          (Government's Exhibit 936 received in evidence)

 2   BY MR. DISKANT:

 3   Q.  Ms. Bustillo, if we can zoom in on the top half of the

 4   e-mail?

 5          So, Mr. Barrella, this is an e-mail from you on June

 6   20th, 2011; do you see that?

 7   A.  Yes.

 8   Q.  And the subject line, the bill number, the F5808, the bill

 9   that we have been talking about?

10   A.  Yes.

11   Q.  And you are writing to Anthony Bonomo?  Do you see that?

12   A.  Yes.

13   Q.  And there are a couple of other folks on the e-mail chain;

14   Greg Serio.  Do you see that?

15   A.  Yes.

16   Q.  And Katy Neer and Tim Sheridan?

17   A.  Yes.

18   Q.  And Ms. Neer and Mr. Sheridan are the other employees of

19   your firm?

20   A.  They were.

21   Q.  And you write down below:  Passed 58 to 4.

22          And then just below that you say:  You need to call

23   and thank -- and you list three different senators.  Do you see

24   that?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I755ske2                         Barrella - direct

1    Q.  And then, down at the bottom:  Of course, a very special

2    thanks to Senator Skelos.  And you provide a phone number for

3    him?

4    A.  Yes.

5    Q.  Why are you telling Mr. Bonomo that he should give a very

6    special thanks to Senator Skelos?

7    A.  Because he allowed the bill to get to the floor.

8    Q.  Did this bill ultimately become law?

9    A.  It did not.

10   Q.  Why not?

11   A.  It did not pass the Assembly at all.

12   Q.  Ms. Bustillo, can we bring back up Government Exhibit

13   3307-A?

14           So, Mr. Barrella, we have talked about 2011.  I now

15   want to move to 2012, and you see there are some legislative

16   interests listed for 2012?

17   A.  Yes.

18   Q.  Did you lobby the State Senate with respect to those?

19   A.  Yes, I did.

20   Q.  And focusing on the first two, the risk-based capital

21   extension and the liquidation restriction extension?

22   A.  Yes.

23   Q.  Now, you testified a moment ago that those extensions

24   passed in 2011?

25   A.  Yes.

I755ske2                          Barrella - direct

1  Q.  Why are you lobbying to have them extended again in 2012?

2  A.  Anthony Bonomo wanted to put the sunset out further past

3  2014.

4  Q.  Did you have an understanding of the potential consequences

5  for Mr. Bonomo and PRI if the extender legislation was allowed

6  to expire?

7  A.  It could be serious.

8  Q.  With respect to the bad doctors pool, the one we were

9  talking about that didn't pass --

10 A.  Right.

11 Q.  -- did PRI continue to pursue such a bill?

12 A.  Later on, we did.

13 Q.  If we can bring up for the witness what has been marked for

14 identification as Government Exhibit 825.

15         Mr. Barrella, do you recognize this calendar invite?

16 A.  I do.

17 Q.  Is it for a meeting that you attended?

18 A.  Yes, it is.

19 Q.  Does it pertain to PRI's legislative interests?

20 A.  Yes.

21         MR. DISKANT:  Government offers 825.

22         MR GAGE:  No objection.

23         THE COURT:  Government Exhibit 825 is received,

24 without objection.

25         (Government's Exhibit 825 received in evidence)

I755ske2                         Barrella - direct

1   BY MR. DISKANT:

2   Q.  So, Mr. Barrella, this is now late 2011 and it is a meeting

3   with you and Greg Serio, re budget and medical malpractice

4   insurance.

5           Do you recognize this?

6   A.  Yes.

7   Q.  And it is with Robert Mujica.  Do you see that?

8   A.  Yes.

9   Q.  During this meeting, to the best of your recollection, what

10  was discussed?

11  A.  The extenders and other medical practice issues.

12  Q.  What was the purpose of having the meeting?

13  A.  To start to have a discussion, particularly on getting the

14  extenders in the budget again.

15  Q.  The extenders that we were just talking about?

16  A.  Yes.

17  Q.  So, turning then to 2012, and these extenders, did there

18  come a time when you met personally with Senator Skelos?

19  A.  I believe so.

20  Q.  If we can bring up for the witness only what has been

21  marked for identification as Government Exhibit 828.

22          Mr. Barrella, do you recognize this calendar invite?

23  A.  I do.

24  Q.  Is it for a meeting that you attended?

25  A.  Yes, it is.

I755ske2                         Barrella - direct

1   Q.  Did it pertain to PRI and its legislative interests?

2   A.  Yes, it did.

3            MR. DISKANT:  The government offers 828.

4            MR GAGE:  No objection.

5            THE COURT:  Government Exhibit 828 is received,

6   without objection.

7            (Government's Exhibit 828 received in evidence)

8   BY MR. DISKANT:

9   Q.  So, let's just go through the attendees for this particular

10  meeting which looks like it happened on January 18 of 2012.

11  Who attended the meeting?

12  A.  Myself, Anthony Bonomo, Greg Serio, Senator Skelos, Rob

13  Mujica and I believe there was other staff in the room.

14  Q.  And during this meeting with Senator Skelos, which

15  legislative interests did PRI raise?

16  A.  A number of them; extenders, overall issues in the medical

17  malpractice insurance field.

18  Q.  And how did Senator Skelos react?

19  A.  I think he was attentive and perhaps he would be

20  supportive.

21  Q.  Focusing your attention on the extender legislation in

22  particular, as of this time, as of January of 2012, did you

23  have an understanding of how or at what point you were going to

24  try and get that legislation passed?

25  A.  Yes.  In the budget.

1   Q.   If we can bring up for the witness what has been marked for

2   identification as Government Exhibit 833, Mr. Barrella, do you

3   recognize this e-mail chain?

4   A.   Yes, I do.

5   Q.   Who are you communicating with?

6   A.   Senator Skelos.

7        MR. DISKANT:  Government offers 833.

8        MR GAGE:  No objection.

9        THE COURT:  Government Exhibit 833 is received,

10  without objection.

11       (Government's Exhibit 833 received in evidence)

12  BY MR. DISKANT:

13  Q.   So, Mr. Barrella, this is now about two months later, March

14  18, 2012?

15  A.   Correct.

16  Q.   And just remind us, when did the budget typically pass?

17  A.   March 31st.

18  Q.   So, you write down at the bottom:  Hey Leader, what is

19  going on with the budget?

20       Do you see that?

21  A.   Yes.

22  Q.   Why are you asking Senator Skelos what's going on with the

23  budget?

24  A.   Trying to understand where they are in negotiations and if

25  he felt it was going to come together in time.

I755ske2                          Barrella - direct

1    Q.   And by it coming together, what are you referring to?

2    A.   Agreements on all aspects of the budget.

3    Q.   And this was the budget in which PRI was hoping to see its

4    extenders included?

5    A.   Yes.

6    Q.   And Senator Skelos responds:  Not this week.

7    A.   That's correct.

8    Q.   If we can bring up for the witness what has been marked as

9    Government Exhibit 838 and Government Exhibit 841.

10            Mr. Barrella, do you recognize these e-mails?

11   A.   Yes, I do.

12   Q.   Who are you communicating with?

13   A.   With Senator Skelos.

14            MR. DISKANT:  Government offers 838 and 841.

15            MR GAGE:  No objection.

16            THE COURT:  Government's Exhibits 838 and 841 are

17   received, without objection.

18            (Government's Exhibits 838 and 841 received in

19   evidence)

20   BY MR. DISKANT:

21   Q.   If we can start, Ms. Bustillo, with 838?

22            So, Mr. Barrella, the last e-mail chain we were

23   looking at was March 18, I believe; this is about a week later?

24   A.   Yes.

25   Q.   And you are writing to Senator Skelos:  Is the budget done?

I755ske2                    Barrella - direct

1   A.  That's correct.

2   Q.  And why are you sending this e-mail to him?

3   A.  I am trying to get the status of the budget because I have

4   issues, particularly the PRI issue.

5   Q.  And Senator Skelos responds:  Intro some bills last night,

6   should intro rest today?

7   A.  That's correct.

8   Q.  And then you say:  Is health done?

9   A.  Yes.

10  Q.  What are you referring to?

11  A.  The Health Article 7 budget bill.

12  Q.  And why is that of concern to you?

13  A.  Because PRI's language would be in that budget bill.

14  Q.  And Senator Skelos responds:  No?

15  A.  "No."

16  Q.  And if we can now bring up Government Exhibit 841.

17          This is now the next day?

18  A.  Yes.

19  Q.  Did PRI's language make it into the budget in 2012?

20  A.  It did not.

21  Q.  So, down at the bottom you write to Senator Skelos:  I know

22  you are very busy.  Anthony's language did not get in.

23  Assembly and Senate agreed but I am hearing Governor's office

24  said no.  It is a big blow to Anthony and he is very

25  disappointed.  Is there anything that could be done?

I755ske2                     Barrella - direct

1          Starting with "Anthony's language did not get in,"

2     what are you referring to?

3     A.   The extender language.

4     Q.   It didn't make it into the budget?

5     A.   No.

6     Q.   You write:  "Assembly and Senate agreed but I am hearing

7     Governor's office said no."  What do you mean by that?

8     A.   That I was under the impression the Senate and Assembly had

9     agreed to language but the Governor's staff rejected it.

10    Q.   And "it is a big blow to Anthony and he is very

11    disappointed," is that Anthony Bonomo?

12    A.   Yes.

13    Q.   And Senator Skelos responds:  Wrong.  Shelly and Gov

14    rejected.

15    A.   That's correct.

16    Q.   And what did you understand him to mean by that?

17    A.   That meant the Assembly speaker and his staff rejected it,

18    along with the Governor's staff.

19    Q.   Mr. Barrella, did you have an understanding of why the

20    extender language was rejected?

21    A.   To the best of my understanding and ability is that we just

22    could not get traction in the assembly, they just would not --

23    they were not buying into it and I know the governor's office

24    had some concerns, particularly coming from the Department of

25    Insurance.

1   Q.  From your perspective, were these extender bills, these

2   issues, were they easy or were they hard?

3   A.  I thought they were very hard to work on.

4   Q.  Once the language was rejected from the budget in 2012,

5   what, if anything, did PRI try to do with respect to

6   legislation for the extenders?

7   A.  Our strategy was to introduce a Senate bill and an Assembly

8   bill, same-as bills, and get it done through the legislative

9   process.

10  Q.  And did you have occasion to meet with Senator Skelos'

11  staff regarding that strategy?

12  A.  Yes.

13  Q.  Ms. Bustillo, if we can bring up for the witness what has

14  been marked for identification Government Exhibit 842?

15          Mr. Barrella, focusing on the bottom half of the

16  e-mail; do you recognize it?

17  A.  Yes, I do.

18  Q.  Is this an e-mail chain that you are on?

19  A.  I'm on the chain.

20          MR. DISKANT:  Government offers 842.

21          MR GAGE:  No objection, your Honor.

22          THE COURT:  Government Exhibit 842 is received,

23  without objection.

24          (Government's Exhibit 842 received in evidence)

25  BY MR. DISKANT:

I755ske2                        Barrella - direct

1    Q.  Ms. Bustillo, if we can go to page 2?

2            So, Mr. Barrella, down at the bottom this starts as an

3    e-mail chain from you on 4/3/2012?

4    A.  That's correct.

5    Q.  So, a couple of days after the budget doesn't pass?

6    A.  That's correct.

7    Q.  You are saying:  Any chance that Greg Serio and I can meet

8    with Rob tomorrow?

9    A.  That's right.

10   Q.  What are you seeking a meeting for?

11   A.  Talk about the extenders.

12   Q.  Ms. Bustillo, if we can bring up for the witness what has

13   been marked as 307, unless it is in?  It is in.  Outstanding.

14   If we can publish 307?

15           Mr. Barrella, do you recognize this bill?

16   A.  Yes, I do.

17   Q.  What is it?

18   A.  It is the Senate Assembly version of the extender bill.

19   Q.  The stand-alone bill we were just talking about?

20   A.  Yes.

21   Q.  And if we can turn to page 2, which committee does this

22   bill go through?

23   A.  The Rules Committee.

24   Q.  Senator Skelos is the chair of the Rules Committee?

25   A.  Yes, he is.

I755ske2                          Barrella - direct

1    Q.  How does he vote for it in committee?

2    A.  He votes yes.

3    Q.  And turning to the next page, the floor vote, this passes

4    the floor?

5    A.  Yes, it does.

6    Q.  And how does Senator Skelos vote?

7    A.  He votes yes.

8    Q.  What, if anything, did PRI do to get this particular bill

9    passed?

10   A.  Worked very hard at it.

11   Q.  And aside from casting his vote what, if anything, do you

12   understand Senator Skelos to have done in support of this bill?

13   A.  He allowed it to get to the floor.

14   Q.  Did you continue to lobby for PRI in 2013?

15   A.  Yes.

16   Q.  Did you lobby Senator Skelos?

17   A.  Yes.

18   Q.  And how about 204?

19   A.  Yes.

20   Q.  And did you meet with Senator Skelos or lobby Senator

21   Skelos in 2014?

22   A.  Yes.

23   Q.  2015; did you lobby on behalf of PRI?

24   A.  Yes.

25   Q.  Do you know someone named Adam Skelos?

I755ske2                           Barrella - direct

1   A.  I do.

2   Q.  How do you know him?

3   A.  He is the son of the Senate Majority Leader.

4   Q.  Did there come a time when you came to learn of a

5   connection between Adam Skelos and PRI?

6   A.  There did.

7   Q.  And what did you understand that connection to be?

8   A.  That he had a job there.

9   Q.  When, approximately, did you learn that information?

10  A.  Probably late December of 2014.

11  Q.  Did you learn that information from Dean Skelos?

12  A.  No.

13  Q.  Who did you learn it from?

14  A.  Greg Serio.

15  Q.  What, if any reaction, did you have to that information?

16  A.  Shocked, and I was a bit concerned about it.

17  Q.  So, why were you shocked and a bit concerned?

18  A.  Concerned that Adam was working at --

19          MR GAGE:  Objection.  What is the relevance of this

20  witness?

21          THE COURT:  I will permit it.

22          Go ahead.

23          THE WITNESS:  Just concerned that Adam was working at

24  PRI.

25  BY MR. DISKANT:

I755ske2                          Barrella - direct

1    Q.  At a time when you had been lobbying for PRI?

2    A.  Yes.

3    Q.  Between January 2014 and when you learned about Adam

4    Skelos' job with PRI in I think you said late December 2014,

5    did you speak with Senator Skelos?

6    A.  Yes.

7    Q.  How many times?

8    A.  A number of times.

9    Q.  Did you lobby Senator Skelos on behalf of PRI?

10   A.  Yes.

11   Q.  Did you discuss with Senator Skelos issues of legislative

12   interest to PRI?

13   A.  Yes.

14   Q.  Did you see Senator Skelos socially?

15   A.  Yes.

16   Q.  In any of those meetings and conversations did Senator

17   Skelos say anything about Adam Skelos having a job at PRI?

18   A.  No.

19   Q.  By the way, during that same period of time January 2013 to

20   late December 2014, did you communicate with Anthony Bonomo?

21   A.  Yes, I did.

22   Q.  How many times?

23   A.  Many times.

24   Q.  And did you communicate with Anthony Bonomo about your plan

25   to lobby Senator Skelos?

I755ske2                        Barrella - direct

1    A.  Yes, I did.

2    Q.  During any of those conversations what, if anything, did

3    Anthony Bonomo say about the fact that PRI was paying Adam

4    Skelos?

5    A.  He didn't say anything.

6    Q.  Sir, we talked briefly a moment ago about the fact that you

7    continued to lobby on behalf of PRI in 2015; is that correct?

8    A.  Yes.

9    Q.  If we can bring up for the witness what has been marked as

10   Government Exhibit 927?

11           Mr. Barrella, do you recognize this e-mail chain?

12   A.  Yes, I do.

13   Q.  Are you on it?

14   A.  Yes.

15   Q.  And does it pertain to PRI and its legislative interests?

16   A.  Yes, it does.

17           MR. DISKANT:  Government offers 927.

18           MR GAGE:  No objection.

19           THE COURT:  Government Exhibit 927 is received,

20   without objection.

21           (Government's Exhibit 927 received in evidence)

22   BY MR. DISKANT:

23   Q.  So, this is an e-mail to Peter Faherty.  Do you see that?

24   A.  Yes.

25   Q.  Who is Mr. Faherty?

I755ske2                          Barrella - direct

1   A.   At the time he was counsel to Senator Martins.

2   Q.   Another state senator?

3   A.   Yes.

4   Q.   And there is an attachment:  Martins 2015 PRI budget

5   request?

6   A.   That's correct.

7   Q.   And you write below:  Thanks for the meeting with you and

8   the Senator regarding PRI.  Attached is the PRI budget request.

9   A.   That's correct.

10  Q.   And, just to be clear, by PRI you are referring to the same

11  Anthony Bonomo company we have been talking about?

12  A.   Yes.

13  Q.   Ms. Bustillo, if we can turn to page 2, the attachment; and

14  this appears to be a letter addressed to Rob Mujica and Beth

15  Garvey?

16  A.   That's correct.

17  Q.   Just remind us again, who is Rob Mujica?

18  A.   Rob Mujica was chief of staff and secretary of the finance

19  committee and Beth Garvey was the chief counsel.

20  Q.   Chief of staff of Senator Skelos.

21  A.   Yes.

22  Q.   The same chief of staff you had met with regarding the

23  prior legislation?

24  A.   That's correct.

25  Q.   Why are you sending Senator Martins' staff this proposed

I755ske2                    Barrella - direct

1    letter to Rob Mujica and Beth Garvey?

2    A.  Because Anthony Bonomo of PRI wanted to get the extenders

3    in the budget again and extend them to December 31st, 2019.

4    Q.  Let me ask a little different question.

5         Did you have an expectation of what Senator Martins

6    would do with this letter?

7    A.  Yes.

8    Q.  What was that expectation?

9    A.  He would definitely write this letter to Rob and Beth and

10   work very hard at getting it done.

11   Q.  And what did you expect Rob, that is, Rob Mujica and Beth

12   Garvey, to do with this letter?

13   A.  As with all budget requests, they would have discussed it

14   with the Senator.

15   Q.  Senator Skelos?

16   A.  Yes.

17   Q.  And just down at the very bottom of this letter in bold:  I

18   respectfully ask that these two exemptions be extended until

19   December 31st, 2019, and this be included in the Senate

20   one-house budget bill.

21   A.  That's correct.

22   Q.  Whose request is that?

23   A.  That's Senator Martins' request.

24   Q.  Taking a step back; are these the extenders that PRI was

25   seeking?

1    A.  Yes.

2    Q.  Did this language make it into the budget in 2015?

3    A.  It did.

4    Q.  And, do you have an understanding of what, if any role,

5    Senator Skelos played in causing this language to make it into

6    the final budget?

7    A.  He approved it.

8    Q.  Now, we talked a minute ago about Adam Skelos.  Did there

9    come a time when you began working with Adam Skelos?

10   A.  Yes.

11   Q.  How did that come to be?

12   A.  In the fall of 2014, probably around September, I got a

13   call from Adam Skelos and he was, said that he had a client he

14   would like to refer to me.

15              THE COURT:  Could you keep your voice up, please?

16              THE WITNESS:  Okay.

17   BY MR. DISKANT:

18   Q.  Do you recall approximately when you got this call from

19   Adam Skelos?

20   A.  Possibly September 14th.

21   Q.  September 2014?

22   A.  2014, yes.

23   Q.  And what, if anything, did Adam Skelos tell you about what

24   you would be doing for or with respect to this client?

25   A.  Primarily working on public/private partnerships.

I755ske2                          Barrella - direct

1    Q.  And what are public/private partnerships?

2    A.  That is where the government can sell an asset to a private

3    company for a period of time for them to -- like toll roads,

4    sewers, projects like that, and they would run it and pay the

5    government a fee.

6    Q.  And, to your understanding in this time period, September

7    2014, were government public/private partnerships along the

8    lines of what you just described, were they legal in the State

9    of New York?

10   A.  No, they were not.

11            THE COURT:  Would you pull your mic down a bit?

12   A.  Okay.

13   Q.  In this call with Adam Skelos in which he proposed a

14   meeting with a new client, on the call, did you agree to take

15   the meeting?

16   A.  No, I did not.

17   Q.  Why not?

18   A.  Because before I did that I wanted to call the senator.

19   Q.  Which senator?

20   A.  Senator Skelos?

21   Q.  Now, is it typical or a typical for you to call Senator

22   Skelos before taking on a new client?

23   A.  Atypical.

24   Q.  Why did you feel in this circumstance that you had to call

25   Senator Skelos?

I755ske2                         Barrella - direct

1   A.  It was his son, he is my friend, and he is Senate Majority

2   Leader and it was appropriate for me to do that.

3   Q.  Did there come a time when you in fact placed a call to

4   Senator Skelos about this issue?

5   A.  Yes; a few days later.

6   Q.  And, to the best of your recollection on this call, what

7   did you say to Senator Skelos and what did he say to you?

8   A.  I told him that Adam had called me about a client he wanted

9   to refer to me.  And I asked him, you know, what would you like

10  me to do?

11  Q.  And why are you asking Senator Skelos what would you like

12  me to do?

13  A.  It's his son calling me so I think -- for the sake of

14  appropriateness, I needed to tell him this.

15  Q.  How did Senator Skelos react to you giving him this

16  information?

17  A.  I think there was a little bit of a pause and then he said

18  to me, Nick, under no circumstances is Adam to lobby or go to

19  Albany.

20  Q.  Did Senator Skelos ask you any questions about who this

21  client was?

22  A.  I don't recall any.

23  Q.  Did there come a point when you met with Adam Skelos and

24  the potential client?

25  A.  Yes.

I755ske2                          Barrella - direct

1    Q.   When was that?

2    A.   September 22nd.

3    Q.   Of 2014?

4    A.   Yes.

5    Q.   Where was the meeting?

6    A.   At the Grand Havana, in New York City.

7    Q.   Here in Manhattan?

8    A.   Yes.

9    Q.   How was the meeting set up?

10   A.   It was set up between myself and Adam Skelos.

11   Q.   How long did the meeting last?

12   A.   Approximately three hours.

13   Q.   Who attended?

14   A.   Myself, Adam Skelos, and Bjornulf White.

15   Q.   Did it occur over a meal?

16   A.   Yes, it did.

17   Q.   What meal?

18   A.   Dinner.

19   Q.   So it was a dinner meeting?

20   A.   Yes.

21   Q.   What issues were discussed at the dinner meeting?

22   A.   Public/private partnership and fracking.

23   Q.   So we have talked a little bit about public/private

24   partnership, but what is fracking?

25   A.   Fracking is the methodology of getting natural gas out of

 1    shale.

 2    Q.  And, as of this time period, September 2014, was that kind

 3    of fracking that you just described permitted in the State of

 4    New York?

 5    A.  It was not.

 6    Q.  Was Bjornulf White at the table for the entire dinner

 7    meeting?

 8    A.  No, he was not.

 9    Q.  And did there come a point when you and Adam Skelos were

10    left alone at the table?

11    A.  Yes.

12    Q.  Did you have a conversation with just Adam Skelos?

13    A.  I did.

14    Q.  What did you say to him and what did he say to you?

15    A.  I just relayed to him that going forward, I wanted to let

16    him know that his father was very clear, no going to Albany and

17    no lobbying.

18    Q.  And how did Adam Skelos respond?

19    A.  He seemed to understand it.

20    Q.  Did there come a time when you entered into a formal

21    agreement with Mr. White's company, with AbTech?

22    A.  Yes.

23    Q.  If we can bring up what I believe is in evidence as

24    Government Exhibit 2015 and just turn to page 3?

25              Mr. Barrella, do you recognize this?

1    A.  I do.

2    Q.  Is this your agreement with Bjornulf White and his company?

3    A.  It is.

4    Q.  And, focusing down on the first paragraph of the letter,

5    the retainer provides for a time period, do you see that,

6    November 1st, 2014 to September 30th, 2015?

7    A.  Yes.

8    Q.  It provides for a fee of $11,000?

9    A.  Yes.

10   Q.  How did you arrive at that number?

11   A.  I arrived at that number because we were going to engage

12   another lobbying firm.

13   Q.  What was that other firm?

14   A.  Meara, Avella, Dickinson.

15   Q.  And was there any particular person at that firm that you

16   planned to work with?

17   A.  Mike Avella.

18   Q.  He is another lobbyist?

19   A.  Yes.

20   Q.  And much as the case for the prior agreements we looked at,

21   this one appears to include lobbying the New York State

22   legislature.  Do you see that?

23   A.  Yes, it did.

24   Q.  That would include the New York State Senator Skelos?

25   A.  Yes, it does.

I755ske2                          Barrella - direct

1    Q.  After signing this contract, did you participate in a call

2    regarding your new clients and next steps?

3    A.  Yes.

4    Q.  Who was on the call?

5    A.  Bjornulf White, myself, Tim Sheridan, and Adam Skelos.

6    Q.  And you mentioned Tim Sheridan?

7    A.  Yes.

8    Q.  Who was he?

9    A.  He was -- he is my former partner.

10   Q.  What was the purpose of the call?

11   A.  To discuss strategy.

12   Q.  And during that call, did Senator Skelos come up?

13   A.  Yes.

14   Q.  What was said with regard to Senator Skelos on the call?

15   A.  It was --

16            MR GAGE:  Objection, your Honor.

17            THE COURT:  Hearsay.

18            MR. DISKANT:  Your Honor, I believe first it is not

19   coming in for the truth, it is coming in for the fact that it

20   was said; but second, the witness is the one who is speaking.

21            THE COURT:  All right.  I misunderstood the objection.

22            Members of the jury, what you are about to hear is

23   coming before you not for the truth of what was said but for

24   the fact that it was said.

25            Go ahead.

I755ske2                    Barrella - direct

1          MR. DISKANT:  Thank you, your Honor.

2     BY MR. DISKANT:

3     Q.  So, on this call with you and Mr. White and Adam Skelos,

4     what was said with regard to Senator Skelos?

5     A.  It was my belief and Mike Avella's belief that we were not

6     going to lobby the Senator directly but work with other

7     senators and his staff.

8     Q.  And why was it your belief that you were not going to lobby

9     Senator Skelos directly?

10    A.  Because we thought it was -- we were going to be very

11    appropriate and handle this very circumspect.

12    Q.  If we can bring up for the witness what is in evidence as

13    Government Exhibit 2621?

14          Starting down at the bottom, this is a forward from

15    Mike Avella?

16    A.  Yes.

17    Q.  Are you on it?

18    A.  Yes, I am.

19    Q.  Does it pertain to AbTech and some of AbTech's interests?

20    A.  It does.

21          MR. DISKANT:  Government offers 2621.

22          MR GAGE:  Is it forwarded -- pardon me, your Honor?

23    Just a moment.

24          THE COURT:  Yes.

25          (Counsel conferring)

1          MR. BROD:  No objection, your Honor.

2          THE COURT:  Government Exhibit 2621 is received,

3    without objection.

4          (Government's Exhibit 2621 received in evidence)

5    BY MR. DISKANT:

6    Q.  So, starting down at the bottom, this is from Mike Avella

7    to you.  Do you see that?

8    A.  Yes.

9    Q.  Remind us who Mike Avella is?

10   A.  He was the lobbyist at Meara, Avella, Dickinson that was

11   working on this issue with us.

12   Q.  And down below it says:  Below from following, re

13   infrastructure.

14          Do you see that?

15   A.  Yes.

16   Q.  It is a piece by Jeffrey D. Klein?

17   A.  That's correct.

18   Q.  Who was Jeffrey Klein?

19   A.  He was the Senate leader of the Democratic Independent

20   Conference.

21   Q.  Another state senator?

22   A.  Yes.

23   Q.  If we can zoom out, Ms. Bustillo, and just focusing down on

24   the first paragraph of the article by Mr. Klein down at the

25   bottom.  See it is an article about financing infrastructure

I755ske2                      Barrella - direct

1   projects?

2   A.  That's correct.

3   Q.  And was this of significance to your new client AbTech?

4   A.  Yes.

5   Q.  We can zoom out, Ms. Bustillo.

6            You forward this on to Adam Skelos?

7   A.  Yes, I did.

8   Q.  And he responds at 8:38 a.m:  No one listens to that guy

9   anymore.

10           Do you see that?

11  A.  That's correct.

12  Q.  This is on December 8, 2014?

13  A.  That's correct.

14           MR. DISKANT:  Ms. Bustillo, if we can leave that up

15  and bring up next to it what is in evidence as Government

16  Exhibit 1409 and we would ask the jurors to turn to 1409-T.

17  This is a call between Dean Skelos and Adam Skelos dated

18  December 8, 2014, at 8:41 a.m.

19           Ms. Bustillo, if you now want to bring up the

20  transcript, that's fine.

21           (Audio played)

22  BY MR. DISKANT:

23  Q.  Mr. Barrella, you indicated that in addition to

24  public/private partnerships you were retained by AbTech to help

25  with fracking?

1    A.   Yes.

2    Q.   Did you have an understanding of what, if any, business

3    interest AbTech had with respect to fracking?

4    A.   They, I believe, had a sponge that dealt with taking the --

5    recycling the water that comes out of the fracking process.

6    Q.   Would AbTech be able to sell that product in the State of

7    New York at the time that you were retained?

8    A.   No.

9    Q.   What needed to happen?

10   A.   Well, obviously, the government would have to approve

11   fracking.

12            MR. DISKANT:   Your Honor, at this time the government

13   would like to publish a portion of Government Exhibit 1419 that

14   is in evidence.

15            Ms. Bustillo, we can take down 2621.

16            This is a call between Adam Skelos and Nick Barrella

17   dated December 12, 2014 at 7:24 p.m.   We are going to play from

18   the beginning to the bottom of page 2.

19            (audio played)

20   BY MR. DISKANT:

21   Q.   Mr. Barrella, what is the general subject matter of the

22   call we just listened to?

23   A.   Fracking.

24   Q.   Did you know at the time that this call was being recorded?

25   A.   I had no idea.

I755ske2                         Barrella - direct

1   Q.  Now, we started at the top with:  Who is Zucker?

2   A.  Yes.

3   Q.  Who is Zucker?

4   A.  Acting health commissioner.

5   Q.  And what, if any relevance, was the acting health

6   commissioner to the issue of fracking?

7   A.  He was supposedly going to do a report on, I believe, the

8   water quality.

9   Q.  Okay.

10  A.  It wasn't relevant to me, but.

11  Q.  Down at the bottom of page 1 there is reference to Zucker

12  going around in the Senate.

13        Do you see that down at the bottom of page 1?

14  A.  Yes.

15  Q.  If we go to the top of page 2, this would be a great spot.

16        You say:  Well, I talked to your father last night.

17        Who are you referring to?

18  A.  Senator Skelos.

19  Q.  And Adam Skelos responds:  Well, I have somebody right next

20  to me that you just said --

21        Who do you understand him to be referring to?

22  A.  His father.

23  Q.  And you cut him off and say:  Okay.  All right.

24        Why did you cut him off?

25  A.  I wish he hadn't called me with his father standing there.

1     I didn't think it was right.

2     Q.  As of this time period, December 2014, did you have an

3     understanding of Senator Skelos' position on fracking?

4     A.  Yes.

5     Q.  What was that understanding?

6     A.  That he supported it.

7     Q.  And directing your attention to 2010, do you recall the New

8     York State Senator Skelos taking up a bill to ban fracking?

9     A.  Yes, I do.

10    Q.  If we can bring up for the witness only what has been

11    marked Government Exhibit 302?

12            Mr. Barrella, do you recognize this?

13    A.  I do.

14    Q.  Is this the 2010 bill to ban fracking?

15    A.  It is.

16            MR. DISKANT:  Your Honor, the government offers 302.

17            MR GAGE:  No objection.

18            THE COURT:  Did you say no objection?

19            MR GAGE:  I said no objection.  Sorry.

20            THE COURT:  Government Exhibit 302 is received,

21    without objection.

22            (Government's Exhibit 302 received in evidence)

23    BY MR. DISKANT:

24    Q.  Starting up in the top left-hand corner of what we are

25    looking at, the title of the bill:  Suspend hydrauliuc

1   fracturing for the extraction of natural gas or oil?

2   A.  That's correct.

3   Q.  Is hydraulic fracturing another way of referring to

4   fracking?

5   A.  It is.

6   Q.  Ms. Bustillo, if we can turn to page 2 this goes to the

7   Rules Committee?

8   A.  It does.

9   Q.  How does Senator Skelos vote on the bill to ban fracking?

10  A.  He votes yes.

11  Q.  And if we can turn to page 3, the floor vote, how does

12  Senator Skelos vote on the bill to ban fracking?

13  A.  He votes yes.

14  Q.  Let's switch gears.  If I can direct your attention to

15  January of 2015, did an event of significance to Albany occur?

16  A.  Yes, it did.

17  Q.  What occurred?

18  A.  The speaker was arrested.

19  Q.  Who was the speaker?

20  A.  Speaker Shelly Silver.

21  Q.  And, do you recall approximately when Mr. Silver was

22  arrested?

23  A.  Mid-January.

24  Q.  2015?

25  A.  Yes.

I755ske2                         Barrella - direct

1    Q.  Did there come a point thereafter in January of 2015 when

2    you recall learning of news reports regarding Dean Skelos?

3    A.  Yes, I do.

4    Q.  What was the general nature of those reports?

5    A.  That he was under investigation.

6    Q.  Did you and Capital Group take any action based on those

7    reports?

8    A.  Yes.  In concert with Mike Avella, we terminated the AEWS.

9    Q.  If we can bring up for the witness what has been marked for

10   identification Government Exhibit 2308.

11          Mr. Barrella, do you recognize this?

12   A.  I do.

13   Q.  What do you recognize it to be?

14   A.  It is Meara, Avella, Dickinson's termination letter with

15   Capital Group.

16          MR. DISKANT:  Government offers 2308.

17          MR GAGE:  No objection.

18          THE COURT:  Government Exhibit 2308 is received,

19   without objection.

20          (Government's Exhibit 2308 received in evidence)

21   BY MR. DISKANT:

22   Q.  So, just remind us, Mr. Barrella, were you working alone in

23   your lobbying efforts on behalf of AbTech?

24   A.  No.

25   Q.  Who was working with you?

I755ske2                    Barrella - direct

1    A.   My partner Tim Sheridan and Mike Avella.

2    Q.   This is a letter dated January 30th, 2015?

3    A.   That's correct.

4    Q.   And Mr. Avella signs this?

5    A.   Yes.

6    Q.   And down below you sign it?

7    A.   I did.

8    Q.   It says:  Please be advised that the lobbying agreement

9    authorization between Meara, Avella, Dickinson and the Capital

10   Group on behalf of AEWS Engineering has been terminated January

11   30th, 2015.

12          Do you see that?

13   A.   Yes.

14   Q.   Remind us, AEWS, that's the AbTech company you had been

15   working for?

16   A.   Yes.

17   Q.   It says:  As no lobbying was done and no compensation

18   received for lobbying, there are no reporting requirements.

19   A.   That's correct.

20   Q.   Mr. Barrella, based on your participation in some of the

21   events we discussed, did you agree that no lobbying had been

22   done?

23   A.   No.

24   Q.   Focusing on the component that says no compensation was

25   received, had you been paid by AEWS?

I755ske2                         Barrella – direct

1   A.  Yes.

2   Q.  We can direct your attention to March of 2015.  Did you

3   have a conversation with Senator Skelos about Adam Skelos?

4   A.  Yes, I did.

5   Q.  Where were you?

6   A.  At my house.

7   Q.  Who was present?

8   A.  Just myself and the senator.

9   Q.  During that conversation, focusing on Adam Skelos, what did

10  the senator say to you?

11  A.  Just in passing that he was -- that Adam had been let go by

12  the water company.

13  Q.  And, what did you understand him to mean by the water

14  company?

15  A.  AbTech.

16  Q.  Did you respond?

17  A.  I did not.

18  Q.  Why not?

19  A.  Didn't feel it needed a response.

20          MR. DISKANT:  Your Honor, if I can just have a moment?

21          THE COURT:  Yes.

22          MR. DISKANT:  Nothing further.

23          THE COURT:  Mr. Gage?

24          MR GAGE:  Thank you, your Honor.

25  CROSS EXAMINATION

i755ske2                     Barrella - cross

 1   BY MR GAGE:

 2   Q.  Good morning, Mr. Barrella.

 3   A.  Mr. Gage.

 4   Q.  I represent Dean Skelos, as does Ms. Shapiro and

 5   Mr. Ozarowski.

 6           I want to go back and just talk about the function of

 7   lobbying generally.  One thing a lobbyist does all the time is

 8   set up meetings; is that correct?

 9   A.  That's correct.

10   Q.  That really is a core function of a lobbyist, right?

11   A.  I would say so.

12   Q.  And the purpose of setting up meetings is to educate the

13   audience, correct?

14   A.  That is correct.

15   Q.  And those can be elected representatives?

16   A.  Yes.

17   Q.  And they can also be, I believe you mentioned, government

18   agencies?

19   A.  Yes.

20   Q.  And, in connection with New York State government, what

21   government agencies, for example, would you set up meetings

22   for?

23   A.  Department of Insurance, Environmental Conservation, Health

24   pretty much.

25   Q.  Generally speaking, what were the purpose of those

i755ske2                    Barrella - cross

1    meetings?

2    A.   Would be to talk about possibly bring a client in or talk

3    about an issue that affected our client by those agencies, be

4    it a law or a regulatory issue.

5    Q.   Often it would be with regard to government agencies, for

6    example, to educate those agencies, correct?

7    A.   That is correct.

8    Q.   And, at times you would bring in subject matter experts,

9    correct?

10   A.   Yes.

11   Q.   Now, in connection with meetings you would often deal with

12   staff I believe you have testified?

13   A.   Yes.  That's true.

14   Q.   And that's because staff often included various subject

15   matter experts, correct?

16   A.   That is correct.

17   Q.   And obviously we have seen the names of some of Senator

18   Skelos' staff, correct?

19   A.   Yes.

20   Q.   Robert Mujica, for example?

21   A.   Yes.

22   Q.   I take it you view him as a highly knowledgeable, highly

23   qualified individual?

24   A.   Extremely professional.

25   Q.   And Ms. Elizabeth Garvey, I take it you have the same

i755ske2                    Barrella - cross

1    opinion of her?

2    A.   Yes.

3    Q.   Extremely professional and knowledgeable?

4    A.   Without a doubt.

5    Q.   Now, I want to go back and look at some of the legislation

6    the government showed you.  If we could start with, I believe

7    it is Government Exhibit 304.  Do you recognize this,

8    Mr. Barrella, as the 2011 extender legislation?

9    A.   Yes.

10   Q.   And Mr. Ozarowski, if we could scroll to the floor vote,

11   please?

12            Mr. Barrella, do you see the floor vote there on March

13   30th, 2011?

14   A.   I do.

15   Q.   The government asked you how Senator Skelos voted but what

16   was the floor vote on the senate?

17   A.   57 yes.

18   Q.   How many nays?

19   A.   4.

20            THE COURT:  Let me ask you to slow down a bit.

21   Q.   Again, what was the vote on the floor?

22   A.   57 yes, and -- oh, sorry -- 5 nos.

23   Q.   Fair to say the Senate support for the extender was

24   overwhelming, correct?

25   A.   Yes.

i755ske2                          Barrella - cross

1   Q.  And you understood Senator Skelos, obviously, was

2   supportive of the extender?

3   A.  Correct.

4   Q.  And heading into this session you understood Senator Skelos

5   was supportive of the extender?

6   A.  I did.

7   Q.  And for as long as you have known him or lobbied to him,

8   Senator Skelos has always been in support of the extender,

9   correct?

10  A.  That's correct.

11  Q.  Let's go to the next piece of legislation the government

12  showed you, I believe it is Government Exhibit 307.

13          This is the extender legislation for 2012, correct?

14  A.  That is correct.

15  Q.  And Mr. Ozarowski, if we could go to the floor vote,

16  please?

17          The government asked you how Senator Skelos voted and

18  as you responded he voted yes.  What was the floor vote on the

19  Senate?

20  A.  58 yes, one no.

21  Q.  So, again, fair to say the support in the Senate for the

22  2012 extender was overwhelming, correct?

23  A.  Correct.

24  Q.  Let's go back, if we could, Mr. Ozarowski, to Government

25  Exhibit 841, please.

1                Now, Mr. Barrella, if we could step back and talk a

2        little bit about during this time frame from 2010 -- why don't

3        we say 2011 through 2015.  Fair to say there are three branches

4        of government in New York State, correct?

5        A.  That is absolutely correct.

6        Q.  And during that time frame there was always a democratic

7        governor, correct?

8        A.  Correct.

9        Q.  And there was always a democratic controlled assembly,

10       correct?

11       A.  That's correct.

12       Q.  And for legislation to become law, it wouldn't be just the

13       Senate but would also have to be -- the Assembly would have to

14       pass the bill and the Governor would have to sign the bill,

15       correct?

16       A.  That is correct.

17       Q.  So now we are going back to the effort that you have

18       described to include the extender in the budget bill in 2012,

19       correct?

20       A.  That's correct.

21       Q.  And as you testified, that wasn't successful, correct?

22       A.  It was not.

23       Q.  Senator Skelos supported that, correct?

24       A.  He did.

25       Q.  But it was blocked by the Assembly Speaker Sheldon Silver?

i755ske2                    Barrella - cross

1    A.  Yes.

2    Q.  And Governor Cuomo, correct?

3    A.  That's correct.

4    Q.  So, what we are seeing there in Government Exhibit 841 is

5    Dean telling you that the reason the extender was not included

6    in the budget bill at the end of March 2012 is because

7    Mr. Silver and Governor Cuomo blocked it, correct?

8    A.  That's correct.

9    Q.  He was supportive of it being included, correct?

10   A.  Yes, he was.

11   Q.  And the Senate was supportive of it being included,

12   correct?

13   A.  Yes.

14   Q.  Let's go to Government Exhibit 314, please, and go to the

15   next page if we could, Mr. Ozarowski, and the next page after

16   that, if we have one.  Got it.  Thank you.

17          This, too, is a situation where the governor and the

18   assembly had some concerns about the proposed legislation,

19   correct?

20   A.  Yes.

21   Q.  And, as you pointed out, it wasn't just Senator Skelos who

22   you would lobby in connection with legislation, correct?

23   A.  That's correct.

24   Q.  Senator Seward, for example?

25   A.  Yes.

i755ske2                    Barrella - cross

1    Q.  Who was Senator Seward?

2    A.  Chairman of the Senate Insurance Committee.

3    Q.  Who is Senator DeFrancisco.

4    A.  Chair of the Senate Finance Committee.

5    Q.  You lobbied Senator DeFrancisco also?

6    A.  Yes.

7            THE COURT:  Please, slow down.

8            MR GAGE:  Pardon, your Honor.

9    Q.  And Senator Hannon?

10   A.  Yes, we did.

11   Q.  Who is Senator Hannon?

12   A.  Chair of the Senate Health Committee.

13   Q.  And why did you lobby these gentlemen?

14   A.  Pretty much they all had input and oversight on this issue

15   because it was insurance but health policy.

16   Q.  I understand.

17           Stepping back again it is fair to say, and I guess we

18   have seen an example of it, but legislation, passing

19   legislation often involves compromise; is that correct?

20   A.  That's correct.

21   Q.  There has to be a give and take, correct?

22   A.  That's correct.

23           THE COURT:  Please slow down for the court reporter.

24   Q.  Now, in connection with the 2012 extender, why did you

25   approach Senator Martins about supporting that legislation?

i755ske2                        Barrella - cross

1    A.  Senator Martins' district, PRI -- PRI's offices were in his

2    Senate district and there was 400 jobs.  So, he would certainly

3    be interested in supporting this.

4    Q.  And the other senators we have mentioned, Senator

5    DeFrancisco, Senator Hannon, Senator Seward, the leaders of the

6    various committees, I take it they also supported the extender

7    legislation, correct?

8    A.  Yes.

9    Q.  No doubt about that, correct?

10   A.  No.

11   Q.  And you explained that certain legislation that you

12   attempted to advance on the behalf of PRI just go too bogged

13   down because it was too complicated, correct?

14   A.  That's correct.

15   Q.  And part of the function of that legislation you have

16   described, I'm not going to go back over it in detail --

17   A.  Right.

18   Q.  -- but it got bogged down because the Assembly would not be

19   supportive of it, correct?

20   A.  Yes.

21   Q.  Now, are you aware of a de-authorization order that was

22   issued on July 6, 2017 and directed to AFP?

23            MR. DISKANT:  Objection.

24            THE COURT:  Just a moment.

25            Grounds?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

i755ske2                    Barrella – cross

1              MR. DISKANT:  Relevance, and 608.

2              THE COURT:  I will permit it.

3              MR. DISKANT:  Your Honor, can we approach on this?

4              THE COURT:  Yes.

5              (Continued next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

i755ske2                    Barrella - cross

                    (At side bar)

                    MR. DISKANT:  So, it seems like where we are about to

go is getting into the DFS order that Mr. Bonomo was

cross-examined about.  Now, there are a number of problems with

that.

                    First, this witness has no firsthand knowledge of that

so anything this witness would know about would be some

combination of hearsay or speculation.  That's problem number

one.  Problem number two is that to the extent it is being

elicited to try and impeach Anthony Bonomo, then it runs a foul

of 608 which prohibits them from offering extrinsic evidence to

impeach Mr. Bonomo.  And three, it has absolutely no relevance

to the scope of this witness' testimony which focuses very

squarely on 2010 to 2015 and his interactions with Senator

Skelos.

                    MR GAGE:  The witness, in response to the government's

questioning, has, on multiple occasions, explained the purpose

essentially of the extender, as other witnesses, to preserve

this not negative capital status for PRI.  If the witness had

known that in fact significant monies were being diverted by

Anthony Bonomo away from the business purpose of PRI, the

witness might have had a different view of the position he took

in connection with his employment by and support of that

extender.  So, for example, your Honor, when the witness heard

about press stories relating to Senator Skelos, it caused him

i755ske2                        Barrella - cross

to terminate his employment relationship with AbTech, I think

technically AEWS Engineering.  So, I think it is fair game to

ask would he have, after some foundation, have continued to

represent Anthony Bonomo if he knew that the conduct described

in the de-authorization order was occurring.  And, of course,

the conduct in the de-authorization order was during the

2010-2014 time period.

          MR. DISKANT:  There are two problems with that, your

Honor.  The first is that it assumes something that is not in

evidence which is that it assumes whatever Mr. Bonomo was doing

would have some impact on these legislative interests.

Mr. Gage didn't explore that with Mr. Bonomo because I think he

knows the issue is far more complicated than that.  So, the

entire foundation that this is going to be feeding the witness

information that, one, is not entirely accurate, and two, I

assure you the witness has no fisthand knowledge of.  The

second thing is even assuming that the witness was way in the

weeds on these issues, which is he is not, it has no relevance

here except to impeach Anthony Bonomo which is impermissible

under 608.

          THE COURT:  I agree with the government on 608 and

relevance so I sustain their objection.

          MR GAGE:  I understand.

          If I may, I disagree with the government's

characterization of the examination of Mr. Bonomo, but I

i755ske2                        Barrella - cross

1    understand your Honor's ruling and so I will move on.

2                THE COURT:  Thank you.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (In open court)

2             THE COURT:  Members of the jury, I sustain the

3    objection.

4    BY MR. GAGE:

5    Q.  Mr. Barrella, I ask if we could pull up Government

6    Exhibit 314 again.

7             And we talked about some of this legislation, but I

8    want to refer you to January 1st -- pardon me, January 4, '12,

9    you see it says died in assembly, correct?

10   A.  That's correct.

11   Q.  With regard to the news stories that you observed and you

12   say caused you to terminate your relationship with AEWS, do you

13   recall that one was an NBC news report?

14   A.  I do not recall that.

15   Q.  What reporting did you observe?

16   A.  I don't recall the specific issue, and it sort of went

17   beyond just those stories.

18   Q.  Now the extender also passed in the budget bill of

19   March 2015, is that correct?

20   A.  That is correct.

21   Q.  And once again the Republican senate support for that was

22   overwhelming, correct?

23   A.  Yes.

24   Q.  Never a doubt the Republican senate would support the

25   extender, correct, in the majority?

1  A.  Yes, that's correct.

2  Q.  Now if we could go to Government Exhibit 2308, please.

3       By the way, going back for just a minute to 2012, when

4  you say it was difficult, it was difficult because as, we have

5  seen in Government Exhibit 481, the governor and the assembly

6  were not in support, correct?

7  A.  That is correct.

8  Q.  The difficulty was that you knew Senator Skelos supported

9  the bill -- the extender, correct?

10  A.  That is correct.

11  Q.  So the difficulty wasn't Senator Skelos, and we've seen the

12  floor vote of the Republican senate, correct?

13  A.  That's correct.

14       THE COURT:  Please slow down.

15  Q.  Okay.  If we could take a look at Government Exhibit 2308,

16  and specifically, the second paragraph.

17       Let me ask you first -- well, it says as no lobbying

18  was done.  Let me back up it, if I could.  The letter is

19  addressed -- I want to look at who the letter was addressed to.

20       So this letter is addressed to the New York State

21  Commission on Public Ethics, correct?

22  A.  That's correct.

23  Q.  And this letter is a public filing, is that correct?

24  A.  That is correct.

25  Q.  That you are required under law to make, correct?

I75TSKE3                         Barrella - Cross

1    A.  Yes.

2    Q.  And now if we can go to the first paragraph, it says:

3    Please be advised the lobbying agreement/authorization between

4    Meara, Avella, Dickinson and the Capitol Group LLC, on behalf

5    of AEWS Engineering, has been terminated on January 30, 2015.

6             Do you see that?

7    A.  Yes, I do.

8    Q.  As I understand it, your firm is the Capitol Group,

9    correct?

10   A.  That's correct.

11   Q.  And when you were contacted by AEWS Engineering, you

12   brought in the firm of Meara, Avella, Dickinson, is that

13   correct?

14   A.  I did.

15   Q.  And the combination of the two of you were charging AEWS

16   Engineering $11,000 a month?

17   A.  That is correct.

18   Q.  And it says "as no lobbying was done," that statement is

19   false, correct?

20   A.  In my opinion, yes.

21   Q.  "And no compensation received," that statement is also

22   false, correct?

23   A.  Capitol Group did receive compensation.

24   Q.  So you told the New York State Commission on Public Ethics

25   that no lobbying was done when in fact lobbying was done,

1   correct?

2   A.  Mike Avella was telling me that.

3   Q.  Well --

4   A.  Mike Avella was telling me that based on his opinion, and

5   he supposedly -- opinion of other opinion that he had received,

6   so I'm not saying it.

7   Q.  Well, sir, you're a highly experienced lobbyist.

8   A.  I'm a highly experienced lobbyist, and at the time there

9   was a lot going.  And he was former counsel to majority

10  leaders, and he said this is what I'm telling you, you're going

11  to sign this letter.

12  Q.  And you have been a lobbyist for over two decades, correct?

13  A.  Yes.

14  Q.  And you know what lobbying is, correct?

15  A.  I thought I did.

16  Q.  And you knew when you signed this letter that you had in

17  fact lobbied on behalf of AEWS Engineering?

18  A.  The Capitol Group lobby -- that's not saying Capitol Group

19  didn't lobby, that's saying Avella, Dickinson, Meara didn't

20  lobby.

21  Q.  I'm asking you, sir, did you lobby on behalf of AEWS

22  Engineering?

23  A.  I did.

24  Q.  Did you receive compensation on behalf from AEWS

25  Engineering?

I75TSKE3                        Barrella - Cross

1   A.  I did.  I certainly did.

2   Q.  And in the bottom left-hand corner of the document, if we

3   could highlight that, you can see that you have signed the

4   document?

5   A.  I did.

6   Q.  So you are affirming the false statement that no lobbying

7   was done, correct?

8   A.  At the time that is not what I thought I was doing, but

9   again, we had a difference over -- myself and Mike Avella and

10  my partner Tim Sheridan, we had a definite difference of

11  opinion of what went on.

12  Q.  But sir, that's your signature?

13  A.  Yes, it is my signature.

14  Q.  You're affirming that, the statement that no lobbying went

15  on, correct?

16  A.  Yes.

17  Q.  And you're also affirming the false statement that you

18  received no compensation, correct?

19  A.  No, that's not correct.  That's Mike Avella saying that.

20  I'm not saying that.  He's terminating from me.  He returned

21  the check to me that I gave him.  And he is saying in that

22  letter that he did no lobbying and that he received no

23  compensation.

24          I want to point out that Capitol Group filed all their

25  reports and insisted that AEWS file a semi annual report.  We

1  never said -- Capitol Group never said to J. Co. that we did no

2  lobbying.

3  Q.  Mr. Avella returned the money that he received in

4  connection with AEWS?

5  A.  Yes, he did.

6  Q.  Did you return the money you received in connection with

7  AEWS lobbying?

8  A.  I did not.

9  Q.  And as a consequence, of signing -- strike that.

10          No action was taken against you as a result of signing

11 this letter?

12 A.  Correct.

13 Q.  And no action was taken against your firm, the Capitol

14 Group, for having signed this letter?

15 A.  That is correct.

16 Q.  Despite the fact that it has the representations in it that

17 we have gone over?

18 A.  That's correct.

19 Q.  One last topic, if I may, which is you talked about the

20 lobbying team at PRI had in place when you joined it.

21 A.  Yes.

22 Q.  Would you describe the lobbying team.

23 A.  Brian Meara, who was the managing partner of Meara, Avella

24 & Dickinson, Greg Serio, who was a partner in Park Strategies,

25 and then myself.

I75TSKE3                    Barrella - Cross

1    Q.  So three separate lobbying firms?

2    A.  Yes.

3    Q.  And who was the first, Mr. Meara?

4    A.  Brian Meara.

5    Q.  And what was his specialty, so to speak?

6    A.  He was one of the best lobbyist in Albany.

7    Q.  Did he focus on any particular group?

8    A.  He could lobby both houses, particularly he was strong in

9    the assembly.

10   Q.  And Mr. Serio, who was Mr. Serio employed by?

11   A.  Greg Serio was at Park Strategies.  He was a partner to

12   Senator Al D'Amato, and he had been a former superintendent of

13   insurance.

14   Q.  And yourself completed the group?

15   A.  That's correct.

16            MR. GAGE:  Thank you.

17            No further questions at this time, your Honor.

18            THE COURT:  Mr. Brod.

19            MR. BROD:  Thank you, Judge.

20   CROSS-EXAMINATION

21   BY MR. BROD:

22   Q.  Good morning, Mr. Barrella.

23   A.  Good morning.

24   Q.  My name Julian Brod, and with my colleagues John Kenney and

25   Allison Angel, I represent Adam Skelos in this matter.

I75TSKE3                         Barrella - Cross

1                  You and I have never spoken before, have we?

2    A.   We have never spoken.

3    Q.   You've known my client, Adam Skelos, for much of his adult

4    life, correct?

5    A.   Yes.

6    Q.   Known him since his early 20s, right?

7    A.   Yes.

8    Q.   You first met him at a fund raiser, correct?

9    A.   Yes.

10   Q.   And during the time that you have known Adam, he was a

11   familiar face at fundraisers and political events, correct?

12   A.   Yes, to some degree.

13   Q.   In Albany and in New York City, too?

14   A.   Albany, I could say Albany.

15   Q.   You live in Albany, right?

16   A.   Yes.

17   Q.   And most of your work as a lobbyist focuses on Albany,

18   correct?

19   A.   That's correct.

20   Q.   And it's your job to know what's going on in the state

21   capital, right?

22   A.   That's correct.

23   Q.   It's your job to provide information about what is going on

24   in the state capital to your clients, right?

25   A.   That is correct.

I75TSKE3                         Barrella - Cross

1    Q.  You've spoken about a couple of your lobbying clients

2    today, PRI and AEWS, but you have a number of other clients --

3    all over the years you have had a number of clients, correct?

4    A.  That's correct.

5         THE COURT:  The court reporter is indicating that it's

6    difficult to keep up with you.  Could you slow down?

7         MR. BROD:  I will, Judge.

8    Q.  And in September of 2015, Adam Skelos told you that he

9    wanted to introduce you to a company called AEWS, correct?

10   A.  That is correct.

11   Q.  I apologize, in September 2014.

12   A.  That's correct.

13   Q.  And he told you a little bit about AEWS, correct?

14   A.  Yes, he did.

15   Q.  And you understood it was an engineering firm based in

16   North Carolina, correct?

17   A.  Yes, I did.

18   Q.  And you understood it was a subsidiary of a company called

19   AbTech, correct?

20   A.  I didn't clearly understand that that was -- it was more a

21   sister company in some way.  I don't think it was ever made

22   clear it was a subsidiary.

23   Q.  You understood they were affiliated?

24   A.  They were affiliated.

25   Q.  And you came to understand that Adam was a consultant for

I75TSKE3                      Barrella - Cross

1   AbTech, correct?

2   A.  Yes.

3   Q.  And that he was being paid by AbTech, correct?

4   A.  No, he was going to be paid by AEWS.

5   Q.  I think you misunderstood my question.  You understood that

6   Adam was being paid by AbTech?

7   A.  Yes, I'm sorry.

8   Q.  You didn't think that Adam was making this introduction

9   merely as a volunteer?

10  A.  No.

11          THE COURT:  If you slow the wording of your questions

12  we won't need to interrupt.

13          MR. BROD:  Will do.

14  Q.  And before you undertook to go further with the engagement,

15  you placed a call to Senator Dean Skelos, correct?

16  A.  That is correct.

17  Q.  And you did that in part because you and he were friends,

18  correct?

19  A.  That is correct.

20  Q.  And the discussions about this representation had been

21  between you and the senator's son, correct?

22  A.  That is correct.

23  Q.  And you did it in part because he was senate majority

24  leader, correct?

25  A.  That is correct.

I75TSKE3                         Barrella - Cross

1   Q.  And you didn't want him to find out through other channels

2   that you were working with his son, correct?

3   A.  That is correct.

4   Q.  And then there came a time when you met with Adam Skelos

5   and Bjornulf White, correct?

6   A.  Yes.

7   Q.  And you testified, I think, that that occurred in

8   Manhattan, correct?

9   A.  That did.

10  Q.  And you understood that Mr. White was the president and

11  chief executive of AEWS?

12  A.  Yes, I did.

13  Q.  And it was your understanding at that point that he would

14  be your point of contact on this representation?

15  A.  Yes.

16  Q.  He was your client, correct?

17  A.  He was my client.

18  Q.  Okay.  And at that first meeting Mr. White did a lot of the

19  talking, correct?

20  A.  He did.

21  Q.  And he told you -- well, he told you that AEWS was in need

22  of design build or P3 legislation?

23  A.  Yes, he did.

24  Q.  He told you that that was because they have a project out

25  in Nassau County, correct?

1    A.  I believe he referred to that project, but he was looking

2    at -- I think he was looking at more of a state-wide approach

3    to it.

4    Q.  And you and he discussed how similar public private

5    partnership legislation had been done in other states, correct?

6    A.  Yes, I believe we talked about that.

7    Q.  And it seemed reasonable to you to attempt to do this in

8    New York, correct?

9    A.  I thought that Bjornulf was very intelligent, articulate on

10   the subject matter, and I saw no reason why, based on the way

11   he presented it, why we shouldn't go forward with it.

12   Q.  So ultimately you entered into a lobbying agreement with

13   AEWS, right?

14   A.  That's correct.

15   Q.  And that was in early November, correct?

16   A.  Yes.

17   Q.  And the agreement was effective November -- withdrawn.

18        And under the terms of your lobbying agreement with

19   AEWS, you were being paid $11,000 a month, correct?

20   A.  That's correct.

21   Q.  And you brought in another lobbying firm of Avella,

22   Dickinson to assist, correct?

23   A.  That is correct.

24   Q.  Why did you do that?

25   A.  I think that this was a big issue, and it was going to

I75TSKE3                    Barrella - Cross

1   require a lot of work, not just in the senate but in the

2   assembly and with the governor's office.

3   Q.   And a lot of your lobbying work over the years has focused

4   on New York State Republicans, correct?

5   A.   No, I wouldn't characterize that.  I can work -- I work

6   bipartisan.

7   Q.   But one of the reasons that you brought in Mike Avella was

8   because he has focused his lobbying work on Democrats, correct?

9   A.   No.  Mike came from the Senate Republicans.

10  Q.   And so your initial understanding was you would be lobbying

11  on P3 legislation, correct?

12  A.   Correct.

13  Q.   And there came a time when Mr. White and Mr. Skelos asked

14  to you help them with regard to fracking, correct?

15  A.   Yes.

16  Q.   And at the time there was a moratorium in New York on

17  fracking?

18  A.   There was.

19  Q.   A moratorium imposed by the executive branch?

20  A.   Yes.

21          THE COURT:  Please slow down.

22  Q.   And a moratorium is essentially the same thing as a ban,

23  correct?

24  A.   Yes.

25  Q.   Towards the end of 2014 there were rumors that Governor

1   Cuomo was going to lift the moratorium on fracking in New York,

2   correct?

3   A.  There were some rumors.

4   Q.  You didn't think it was going to happen though, did you?

5   A.  I worked for his father, no.  I didn't have a crystal ball,

6   but I just thought the environmental advocates, the River

7   Keepers, and there was a Kennedy working on this, that in the

8   end they were going to prevail.

9   Q.  One of the reasons that AEWS asked for your help with

10  regard to fracking was to set up a meeting with the New York

11  State Department of Environmental Conservation, correct?

12  A.  That is correct.

13  Q.  And why did they want that meeting?

14  A.  Because the Department of Environmental Conservation had

15  issued the old AEGI, whatever they called it, the AEGIS sort of

16  regulations, and they were going to have oversight on all

17  aspects of fracking.  They share -- they would share oversight

18  with the health department, but they would -- certainly on

19  issues like trucking water or recycling wastewater from the

20  fracking method, they were going to -- they already had issued

21  sort of a regulation on that.  So they were going to have

22  oversight on that.

23  Q.  And AEWS, that's the company that Mr. White was running,

24  wanted the Department of Environmental Conservation to

25  implement regulations requiring a hundred percent recycling of

1   wastewater, correct?

2   A.  That is correct.

3   Q.  Fair to say Mr. White was a challenging client?

4   A.  Yes, he was.

5   Q.  He wasn't sufficiently engaged with the representation,

6   correct?

7   A.  No, he was hired to get in contact with and asked him to

8   come to meetings.

9   Q.  Adam Skelos stepped into this vacuum, fair?

10  A.  Yes.

11  Q.  And as the representation progressed, he became your

12  primary point of contact for representation?

13  A.  I'd call him the go between.

14          THE COURT:  Please slow down.

15  Q.  And just focusing on fracking, in mid-December 2014,

16  Governor Cuomo did indeed make a decision on the moratorium,

17  correct?

18  A.  He did.

19  Q.  He decided to keep the moratorium in place, correct?

20  A.  Absolutely.

21  Q.  And at that point you and your colleagues refocused on the

22  P3 legislation, correct?

23  A.  That's correct.

24  Q.  And in January 2015, Adam started pushing you and your

25  colleagues quite hard on the P3 legislation, right?

1   A.  Right.

2   Q.  And Mike Avella, who we have spoken about, came up with the

3   idea of setting up meetings with senators, correct?

4   A.  He did.

5   Q.  And you and he identified two particular senators who it

6   would be a good idea for Mr. White to meet with, correct?

7   A.  I believe so.

8   Q.  Those senators were Senators Croci and Venditto, correct?

9   A.  Venditto, yes.

10  Q.  Venditto, thank you.

11          THE COURT:  I think it would be a good idea for

12  Mr. Barrella to pause.  After you hear a question, just pause

13  so the court reporter can accurately reflect what's being said.

14          THE WITNESS:  Yes, your Honor.

15  Q.  And these are both senators from Long Island, correct?

16  A.  That is correct.

17  Q.  And both of their districts had been impacted by Hurricane

18  Sandy, correct?

19  A.  Yes.

20  Q.  So they knew firsthand the problems that can be associated

21  by stormwater, correct?

22  A.  That is correct.

23  Q.  And stormwater is a perennial problem on Long Island,

24  correct?

25  A.  From my understanding, that's correct.

I75TSKE3                     Barrella - Cross

1    Q.   Just taking a step back, part of your job as a lobbyist is

2    to identify legislators who may be helpful with a particular

3    piece of legislation, correct?

4    A.   That is correct.

5    Q.   And you do that based on your knowledge of Albany and your

6    connections, right?

7    A.   Yes.

8    Q.   That's part of the value that you bring as a lobbyist,

9    right?

10   A.   To some degree, yes.

11   Q.   And you go to senators who you think may be sympathetic to

12   your client's position and you try and garner their support,

13   correct?

14   A.   That is correct.

15   Q.   That's in fact what you did here in this representation for

16   AEWS, correct?

17   A.   That is correct.

18   Q.   And you were being paid $11,000 a month, correct?

19   A.   Yes.

20   Q.   Part of that was going to another firm, Dickinson Avella,

21   correct?

22   A.   Yes.

23   Q.   And you never at any point felt like you were a front for

24   lobbying activity by Adam Skelos, did you?

25   A.   No.

1    Q.  And the idea in setting up these meetings with Senator

2    Croci and Senator Venditto was to get the P3 legislation on

3    about governor's budget, correct?

4    A.  Yes.

5    Q.  That was a budget which you anticipated would be passed in

6    April, correct?

7    A.  Just before April.

8    Q.  End of March?

9    A.  Yes.

10   Q.  And you set up meetings for Mr. White in January 2015 with

11   these two senators, correct?

12   A.  I believe we did.  I didn't do it directly.

13   Q.  But your firm did, correct?

14   A.  Yes.

15   Q.  And Mr. White did not actually attend those meetings, did

16   he?

17   A.  No, he did not.

18   Q.  And you also set up a meeting for Mr. White with Adam

19   Spence, correct?

20   A.  I believe my partner did.

21   Q.  And Mr. Spence at the time was the governor's assistant

22   secretary for economic development, correct?

23   A.  That is correct.

24   Q.  And this was part of the effort to get the P3 legislation

25   and the governor's budget, correct?

I75TSKE3                          Barrella - Cross

1    A.   That's right.

2    Q.   And that budget you anticipated would be forthcoming in

3    March, the end of March 2015, correct?

4    A.   Correct.

5    Q.   And Mr. White did not attend the meeting with Mr. Spence,

6    did he?

7    A.   No, he did not.

8    Q.   And is it fair to say that you felt that AEWS was not as

9    committed to this engagement as maybe they should be?

10   A.   Well, I think our opinion was we were very troubled that we

11   could not get Bjornulf to give his undivided attention on a

12   very serious matter.

13   Q.   You tried to do your job and your client got in the way,

14   right?

15   A.   Yes, in some ways that happened.

16   Q.   Focusing your attention on the middle of January 2015,

17   January 22nd, Assembly Speaker Sheldon silver was arrested on

18   federal corruption charges, correct?

19   A.   That is correct.

20   Q.   And Speaker Silver was at the time one of most powerful

21   politicians in New York State, correct?

22   A.   That is correct.

23   Q.   Just describe briefly the powers that he, as assembly

24   speaker, had at that time.

25   A.   Well, he certainly controlled the ebb and flow of

I75TSKE3                       Barrella - Cross

1   legislation through the assembly.  He had a large majority, so

2   he certainly had a lost of influence over policy issues and

3   other issues, legislation.

4   Q.  Just to remind the jury, the state assembly has, over the

5   last quarter century, largely been controlled by the Democrats,

6   correct?

7   A.  That is correct.

8   Q.  While Republicans have largely controlled the state senate,

9   correct?

10  A.  That is correct.

11  Q.  So it was a shock when Speaker Silver was arrested, right?

12  A.  Yes.

13  Q.  Can you describe the atmosphere in Albany at that time?

14  A.  It was very chaotic.

15  Q.  People were anxious?

16  A.  Certainly.

17  Q.  Politicians were anxious?

18          MR. McKAY:  Objection to foundation.

19  A.  Yes, they were.

20          THE COURT:  Sustained.

21  Q.  I think you testified that you do most of your lobbying

22  work in Albany, correct?

23  A.  Yes.

24  Q.  And it's your job to take the temperature of the state

25  capital and relay that information to your clients, correct?

1   A.  It is.

2   Q.  Fair to say that you know an awful lot about what goes on

3   in Albany, correct?

4   A.  Yes.

5   Q.  Okay.  Lobbyists after Sheldon Silver's arrest were

6   nervous, right?

7   A.  Very much so.

8   Q.  In fact, you knew at the time that one of your lobbyists,

9   Brian Meara, who you mentioned, had been subpoenaed?

10          MR. DISKANT:  Objection, relevance.

11          THE COURT:  I'll permit it.

12  Q.  You knew at the time that a lobbyist, Brian Meara, who you

13  mentioned in your testimony, had been subpoenaed?

14  A.  What time frame are we talking about?  I'm not sure I knew

15  in January.

16  Q.  In early 2015.

17  A.  Yes.

18  Q.  And you knew that politicians in Albany were also nervous

19  and anxious about federal investigations?

20  A.  Yes.

21  Q.  It was a time of high stress in the state capital, right?

22  A.  Without question.

23  Q.  It was around this time or the end of January 2015, about a

24  week after Sheldon Silver's arrest, that you terminated your

25  lobbying agreement with AEWS, correct?

1    A.  Correct.

2           MR. BROD:  Could we bring up for the witness

3    Government Exhibit 2308, which is in evidence.

4    Q.  And you've testified about this document.  This is Meara

5    Avella's termination notice, correct?

6    A.  That is correct.

7    Q.  And it was transmitted to the Joint Commission on Public

8    Ethics, correct?

9    A.  It is.

10   Q.  And you signed the document, right?

11   A.  I did.

12   Q.  And you testified earlier today that there are statements

13   in here that you do not think were accurate, correct?

14   A.  Fair to say that.

15   Q.  And it was on this day, give or take one, that you

16   terminated your representation of AEWS, correct?

17   A.  Correct.

18   Q.  And the reason you terminated your representation of AEWS

19   was your feelings of anxiety about what was going on in Albany,

20   correct?

21   A.  A little more than that.  Mike Avella, who I respect, and

22   his lawyer, former counsel to the majority leaders, came up and

23   said I'm giving you advice that we're terminating, and I

24   strongly recommend that you terminate.  So that entered into

25   the equation.

I75TSKE3                    Barrella - Cross

Q.  Is it fair to say that in times of anxiety, such as the

last week of January 2015, people do things that -- people make

mistakes, correct?

          MR. DISKANT:  Objection.

          THE COURT:  Sustained.

Q.  You testified earlier that you found out that Adam had been

working for PRI in December 2014, correct?

A.  Approximately that time.

Q.  You testified that you were shocked to find this out,

right?

A.  Yes.

Q.  Do you remember having a dinner with my client, Adam

Skelos, and your wife and Adam's uncle, Charles Silverstein,

and his wife Carla Silverstein at a restaurant called Amo's in

the winter of 2013 and 2014?

A.  I don't recall.

Q.  Do you recall in 2015 you met with the government several

times to discuss this case?

A.  I never met with the governor to the discuss this case.

          THE COURT:  I'm sorry, what was the answer?

A.  Did you say the government or the governor?

Q.  I think you misunderstood my question.  You met with the

government, the prosecutors.

A.  Yes.

Q.  And you told the prosecutors that upon discovering that

1   Adam was working for PRI, you had concerns?

2   A.  Yes.

3   Q.  You did not tell them that you were shocked, did you?

4   A.  I don't recall the exact words, but concern was definitely

5   in there.  Shock could have been in there, but let's say

6   concern.

7   Q.  Okay.  Do you recall telling them, as you testified today,

8   that you found out about Adam's work at PRI from Greg Serio?

9   A.  That is correct.

10  Q.  Do you recall telling them that about a year after you

11  found out about Adam's work with PRI you discovered Adam was

12  having attendance problems at PRI?

13  A.  I don't recall talking about Adam's attendance problems at

14  all.

15          MR. BROD:  Could we call up just for the witness

16  3503-11.  Just focusing on the middle -- the third paragraph

17  down, please.

18  Q.  If you could review that, Mr. Barrella, and I'll have some

19  questions about it.

20  A.  That refreshes my memory.

21  Q.  You recall now that you told the government in 2015 that

22  Greg Serio had told you about Adam's work at PRI?

23  A.  Yes.

24  Q.  And you recall now that a year or so later you learned that

25  Adam had been -- had not been showing up to work, correct?

I75TSKE3                        Barrella - Cross

1    A.   What I learned all came from Greg Serio.

2    Q.   Yes, but does this refresh your recollection that you told

3    the government that it was about a year after you first learned

4    about Adam's employment with PRI that you learned that he was

5    having attendance problems?

6              MR. DISKANT:   Your Honor, could we approach on this?

7    I think the document is not being read correctly.

8              THE COURT:   All right.   Yes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (At sidebar)

2         MR. DISKANT:  So as an initial matter, I intentionally

3    avoided eliciting this because it is hearsay, and I thought

4    they would object to it, but the witness is certainly prepared

5    to testify to exactly what Serio told him.  I think the year or

6    so later here refers to when after the job started Mr. Barrella

7    found out about it, which is entirely consistent with what he

8    said all along, if the job started in 2013, he had that

9    conversation with Greg Serio in late 2014.  I think the witness

10   is getting confused with an imprecise paragraph, but don't

11   think there's an inconsistency here.

12        MR. BROD:  Judge, on the hearsay point, I'm not

13   looking to elicit to content of the conversation that occurred,

14   I'm just focused on the time period.  He testified that he

15   found out in December 2014 about Adam's work with PRI and he

16   was shocked at that point.  I think he found out much earlier.

17   I think that's consistent with -- I will show the Court the

18   language, but it says that he had a conversation with Serio and

19   a year or so later Barrella learned that.  That's what I'm

20   trying to get out, that he learned about it earlier, and the

21   testimony about "shocked" is a little implausible.  That's all

22   I'm trying to do.

23        MR. DISKANT:  If the questions come out that way, they

24   come out that way, but I don't think an inconsistency has been

25   established yet.

1          MR. KENNEY:  Your Honor, our client has gone to the

2    bathroom.  Could we take a short break?

3          THE COURT:  Yes.  How much longer?

4          MR. BROD:  About two minutes, your Honor.

5          MR. KENNEY:  He should be back in a minute.

6          MR. McKAY:  Perhaps we could linger at sidebar until

7    his return.

8          MR. DISKANT:  If we're going to spend a moment here, I

9    think it's worth pointing out that this report says that when

10   Mr. Barrella first found out, they were concerned about Adam's

11   job and thought it was inappropriate because PRI lobbied the

12   state government.

13         So I'm not really sure where Mr. Brod is going with

14   this, but this is very clearly consistent with what he has

15   said, that whenever it is he found out about it, whether a year

16   later or he found out about it months later, his reaction is

17   exactly what he testified to.  And the problem with the way

18   Mr. Brod is presenting this to the jury is it leads to the

19   false impression that Mr. Barrella has somehow changed his

20   story, and I don't think there's an adequate basis in the

21   document for that line of questioning.

22         MR. BROD:  I think he may be mistaken about the date

23   when he first learned about it, and I want to question his

24   question his testimony that he was shocked.

25         THE COURT:  I'm sure you're trying to slow down, but

I75TSKE3                           Barrella – Cross

1    it's very challenging for the court reporter to follow you.

2              MR. BROD:  I apologize.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (In open court)

2     BY MR. BROD:

3     Q.  Mr. Barrella, does reviewing the document that I showed you

4     refresh your recollection that at some point you learned from

5     Greg Serio about Adam Skelos' employment at PRI, and that a

6     year or so later you learned that Adam had not been showing up

7     to work?

8     A.  Yes.

9     Q.  Okay.  But it's fair to say that in December 2014 you had

10    concerns about Adam's employment at PRI?

11    A.  It's fair to say that.

12                  MR. BROD:  And could we call up for the witness and

13    the jury Government Exhibit 2615, which is in evidence, and

14    could we move through to I think the third page.

15    Q.  Mr. Barrella, you have been asked a couple of questions

16    about this document.  This is your engagement letter with AEWS,

17    correct?

18    A.  That's correct.

19    Q.  Provides for you to be paid $11,000 a month, correct?

20    A.  That is correct.

21    Q.  Doesn't include a term, correct, it's not like a contract

22    for one year or any other term like that, is it?

23    A.  It ends September 15, 2015.

24    Q.  But you understood you had the right to terminate this

25    agreement if you saw fit to do so, correct?

I75TSKE3

1    A.  Yes.

2    Q.  And you continued your engagement for AEWS through the end

3    of January 2015, correct?

4    A.  I believe we terminated at the end of January, so I would

5    have to say yes.

6    Q.  And you knew during December and January that Adam was a

7    consultant for AbTech, correct?

8    A.  Yes.

9    Q.  Which was an affiliate of AEWS, correct?

10   A.  Yes.

11   Q.  And knew he was working closely on this matter, correct?

12   A.  Unfortunately, yes.

13   Q.  And --

14          THE COURT:  Please slow down.

15          MR. BROD:  Yes, Judge.

16   Q.  And the P3 legislation that we have spoken about, that was

17   ultimately not included in the governor's budget, was it?

18   A.  That's correct.

19   Q.  And it was not passed by the senate?

20   A.  I don't think any legislation was introduced.

21          MR. BROD:  Thank you.  No further questions.

22          MR. DISKANT:  No redirect.

23          THE COURT:  All right.  Thank you, you may step down.

24          THE WITNESS:  Thank you.

25          THE COURT:  Members of the jury, I'm going to have a

I75TSKE3

 1    brief sidebar and then we'll talk about scheduling.

 2              (At sidebar)

 3              THE COURT:  Can you give me your view of scheduling?

 4              MR. McKAY:  Yes, your Honor.  We'll offer a few

 5    exhibits through stipulation now or when we resume, and Special

 6    Agent Mergen, the summary witness, is probably 10 to 20 minutes

 7    on direct.  And at that point, after cross is done, we would be

 8    prepared to rest.

 9              Our understanding had been that the defense was going

10    to have their Nassau County witness today.  I understand that's

11    not the case.  They would like to start tomorrow.  So I guess

12    the question is should we push through with Agent Mergen now or

13    break for lunch?

14              THE COURT:  Well, I think from the jury's standpoint

15    it would be better to bring for lunch.

16              Your witness is definitely not available today?

17              MR. BROD:  Judge, we understood from the discussion on

18    Tuesday that the government was going to call their two

19    witnesses, rest, we would go straight into the charging

20    conference and the defense case would begin Friday.

21              THE COURT:  I understand.  That's where we left it.

22              MR. BROD:  I just didn't want to leave the impression

23    we were doing anything wrong.

24              THE COURT:  I was just hoping that had changed.

25              MR. BROD:  No, we informed the Nassau County witness

I75TSKE3

1      if he testifies, he will testify tomorrow, and we'll be able to

2      make a decision on his testimony at the conclusion of the

3      government's case.

4              THE COURT:  I thought you were all going to be

5      negotiating about a stipulation.

6              MR. BROD:  It's a different witness, your Honor.  It's

7      Ken Arnold, but if he testifies he will testify not just as a

8      records custodian but substantively.

9              MR. McKAY:  So we understand, your Honor, we haven't

10     yet learned whether in fact they're going to call this witness,

11     and so we can talk about that at the lunch break?  We should

12     probably excuse the jury.

13             THE COURT:  For the day?

14             MR. McKAY:  No, just for the lunch break.  We need to

15     do the summary witness.

16             MR. KENNEY:  I might add, your Honor, the witness has

17     been subpoenaed and has agreed to show up tomorrow morning.

18             THE COURT:  All right.  I'll let the jury go to lunch

19     and we'll resume at 12:20.

20             (In open court)

21             THE COURT:  Members of the jury, the trial is

22     progressing more quickly than anticipated initially.  We're

23     going to have a brief break in your presence here in order for

24     us to take up legal matters this afternoon.  So you will have

25     extra time this afternoon and then we'll resume Friday.

I75TSKE3

                We'll take a lunch break now until 12:20.

                MR. McKAY:  Your Honor, could we be clear the jury is
coming back at 12:20?

                THE COURT:  Yes, you're coming back at 12:20.

                (Jury not present)

                THE COURT:  See you at 12:20.

                MR. DISKANT:  To dovetail with the issue we raised at
sidebar, we have no 3500, no defense exhibits for any
witnesses, we don't have any firm sense of the order of which
the witnesses are going to testify.  They told us about two
potential witnesses, Mr. Arnold and another witness who is
available tomorrow.  We don't have a representation as to
whether or not there will be any witnesses beyond those two,
including whether or not if the defendants plan to testify,
which would obviously be a very significant event.  So ask for
guidance from the defense on witness order, how many witnesses
they intend to call, when they intend to produce 3500 material
and exhibits.

                THE COURT:  The government is certainly entitled to
that.  Who is speaking for Dean Skelos?

                MR. GAGE:  Your Honor, I will.  We will be calling one
witness in the morning.  We are trying to determine what
exhibits, if any -- I think there will be some we will use with
that witness, we'll alert the government when we're able to do
that.

I75TSKE3

1              THE COURT:  What are the exhibits?

2              MR. GAGE:  Largely related to legislation, including

3      some of the exhibits just produced today.  I think they would

4      include the Red Act 2011, these various extenders and other

5      legislation that has been referenced.

6              THE COURT:  All right.  Now you're saying you may call

7      another witness tomorrow?

8              MR. GAGE:  We will definitely be calling one witness.

9      I would defer to Adam Skelos' counsel as to whether or not they

10     will be calling the witness from Nassau County and/or we could

11     enter into a stipulation to admit certain documents.  I should

12     let them speak for themselves, but I think there are certain

13     documents that they -- we'll join them, we seek to admit by

14     agreement.

15             THE COURT:  And Senator Dean Skelos will not testify?

16             MR. GAGE:  Your Honor, we'll make that decision when

17     the defense rests, but I will say right now the government -- I

18     said the defense, when the government rests, pardon me, your

19     Honor, long morning.

20             THE COURT:  Yes.

21             MR. GAGE:  This afternoon I anticipate we will advise

22     the government of how we intend to proceed on that.

23             THE COURT:  Thank you.

24             Mr. Brod.

25             MR. BROD:  Judge, we may call the Nassau County

I75TSKE3

witness who we discussed at sidebar.  If so, I think he will

probably be the first witness on tomorrow.  He will not be a

long witness.

         Mr. Diskant said we have not given them any guidance

on additional witnesses.  We have.  We sent them a witness list

and advised them that we're intending to call the four or five

people on that list.  We advised them of that several days ago.

So I think they have a good sense of what we may do.

         As to 3500 material, I don't believe we have any 3500

material for this Nassau County witness.  He's someone who the

government is familiar with, has interviewed.  And as for

exhibits, we will, of course, if we do call him, provide those

exhibits to the government this afternoon or early evening.

The government will not be surprised by what they are.  They

are all documents that the government produced to us and which

they're familiar with.

         THE COURT:  And as to your client?

         MR. BROD:  I think, Judge, just at this moment I

wouldn't be prepared to put a representation on the record as

to his testimony, but it's something that we would anticipate

being able to inform the government of later this afternoon if

not earlier.

         THE COURT:  All right.  Good.

         MR. McKAY:  Just one quick question, your Honor,

perhaps we can -- once we get a better sense of the defendants,

I75TSKE3

1    whether they're testifying, in the event that they have two

2    short witnesses, the two they just referenced, I assume we

3    would finish tomorrow morning.  We would be prepared to go to

4    closings tomorrow afternoon if the defendants don't testify,

5    but we would like to get a sense of whether the Court would

6    like us to do that.  We certainly won't be able to do

7    everyone's closings tomorrow afternoon, but I imagine we could

8    start our closing and get through some portion, if not most of

9    the way through it, but we wanted to get a sense from the Court

10   as to that.

11            THE COURT:  Assuming that we finalize the charge

12   today, that would I think that would be a good use of jury

13   time.

14            Do defense counsel wish to be heard on this?

15            MR. KENNEY:  Your Honor, we're prepared to proceed as

16   the Court wishes.

17            MR. GAGE:  And we agree, your Honor.

18            THE COURT:  Good.  Thank you.  If there's nothing

19   else, we'll take a lunch break until 12:20.

20            MR. McKAY:  Thank you, your Honor.

21            (Luncheon recess taken)

22            (Continued on next page)

23

24

25

I755ske4

                    A F T E R N O O N   S E S S I O N

                              12:20 p.m.

           THE COURT:  While he is checking, just a moment on

    scheduling.  How long do counsel need to review the latest

    draft of the charge?  I don't know if you have already done it

    or whether you need time.

           MR. McKAY:  We have reviewed it and are ready to

    proceed, as soon as the Court is ready.

           MS. SHAPIRO:  Your Honor, we have reviewed it.  We may

    need like a 10 or 15-minute break between when you let the jury

    go and when we start the charge conference, if that's all

    right.

           THE COURT:  Certainly.

           MR. KENNEY:  That will be fine with us, your Honor.

           THE COURT:  Good.  Thank you.

           I'm sorry we weren't able to red line this for you.

    There were so many lines, rainbows running into rainbows.

           We are now ready for the jury.

           (Continued on next page)

I755ske4

1              (Jury present)

2              THE COURT:  The government calls?

3              MR. McKAY:  The government calls Special Agent Tracee

4     Mergen.

5      TRACEE MERGEN,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8              THE COURT:  You may.

9              MR. McKAY:  Thank you, your Honor.  And before I begin

10    questioning the witness, I will read a stipulation and offer a

11    few exhibits.

12             First we offer Government Exhibit 1, which is a

13    stipulation between the parties.  Can you publish that,

14    Ms. Bustillo?

15             It is hereby agreed, between the parties, that during

16    each year, from 2010 through 2015, New York State received more

17    than $10,000 in federal benefits.

18             Is that admitted, your Honor?

19             THE COURT:  Yes, it is.  It is Government Exhibit 1.

20    Government Exhibit 1 is received, without objection.

21             (Government's Exhibit 1 received in evidence)

22             MR. McKAY:  I will also now offer a number of exhibits

23    pursuant to Government Exhibit 10, which is already in

24    evidence, that's the stipulation regarding phone records.  I

25    will offer the following exhibits:  103, 104, 105, 107, 109-A,

I755ske4

1    110, 111, 113, 114, 115-B through 115-D, 117, 119.

2              THE COURT:  Is there any objection?

3              MR. KENNEY:  No objection.

4              THE COURT:  I receive, without objection, Government's

5    Exhibits 103, 104, 105, 107, 109-A, 110, 111, 113, 114, 115-B

6    through 115-D, 117, and 119.

7              (Government's Exhibits 103, 104, 105, 107, 109-A, 110,

8    111, 113, 114, 115-B through 115-D, 117, 119 received in

9    evidence).

10             MR. McKAY:  Lastly, your Honor, I will offer, pursuant

11   to Government Exhibit 12, which relates to Dean Skelos'

12   official calendars, I will offer the following exhibits:

13   2010-A-1, 2010-B, 2011-A through 2011-D, 2011-F through 2011-I,

14   2011 I-1, 2011-J, 2011-K, 2012-A, 2012-C, 2012-E, 2012-F,

15   2012-F-1, 2012-G, 2012-H, 2012-I, and 2012-J, 2013-A, 2013-C

16   through 2013-F, 2014-B and 2014-C, and 2015-A through 2015-E.

17             THE COURT:  I take it there is no objection?

18             MR. KENNEY:  No objection.

19             MR GAGE:  No objection.

20             THE COURT:  Government's Exhibits 2010-A, 2010-B,

21   2011-A through 2011-D, 2011-F through 2011-I, 2011-I-1, 2011-J,

22   2011-K, 2012-A, 2012-C, 2012-E, 2012-F, 2012-F-1, 2012-G,

23   2012-H, 2012-I and 2012-J, 2013-A, 2013-C through 2013-F,

24   2014-B and 2014-C, 2015-A through 2015-E.

25             (Government's Exhibits 2010-A, 2010-B, 2011-A through

I755ske4                    Mergen - direct

1   2011-D, 2011-F through 2011-I, 2011-I-1, 2011-J, 2011-K,

2   2012-A, 2012-C, 2012-E, 2012-F, 2012-F-1, 2012-G, 2012-H,

3   2012-I and 2012-J, 2013-A, 2013-C through 2013-F, 2014-B,

4   2014-C, 2015-A through 2015-E received in evidence).

5          MR. McKAY:  Thank you, very much, your Honor.

6   DIRECT EXAMINATION

7   BY MR. McKAY:

8   Q.  Special Agent Mergen, where do you work?

9   A.  The FBI.

10  Q.  What is your title?

11  A.  Special agent.

12  Q.  How long have you been with the FBI?

13  A.  A little over two years.

14  Q.  Are you in a particular unit?

15  A.  I am.

16  Q.  What unit?

17  A.  The public corruption unit.

18  Q.  Did there come a time when you became involved in this

19  case?

20  A.  Yes; in approximately April of 2018.

21  Q.  In connection with this case, have you been asked to review

22  and analyze certain records and documents that were admitted

23  into evidence at this trial?

24  A.  I have.

25  Q.  What types of records and evidence?

I755ske4                          Mergen - direct

1    A.  I analyzed a lot of e-mails, phone records which are also

2    called toll records, and I analyzed Senator Skelos' official

3    calendar.

4    Q.  Were you asked to review certain charts that had been

5    created that summarized that evidence?

6    A.  I was.

7    Q.  Who created those charts?

8    A.  Another FBI agent who used to be in my squad created them,

9    along with the prosecutors in this case.

10   Q.  And, did you compare those charts to the underlying

11   evidence to review the accuracy of the information in the

12   charts?

13   A.  I did.

14   Q.  With respect to phone numbers that are represented in the

15   charts, how were you able to verify the phone numbers that were

16   used in the charts?

17   A.  Well, many ways.  Some of the phone numbers were testified

18   to in this trial, many of the phone numbers were verified

19   through exhibits admitted in this trial such as toll records

20   which included subscriber information which means that --

21            THE COURT:  A little slower, please?

22            THE WITNESS:  I apologize -- which includes subscriber

23   information which refers to the person who -- the person who

24   subscribes to that, who the phone belongs to.

25   Q.  Ms. Bustillo, will you bring up for the witness what's been

I755ske4                      Mergen - direct

1   marked for identification as 3303-B?

2            Do you recognize this, Special Agent Mergen?

3   A.  I do.

4   Q.  What is it?

5   A.  It is the charts that we were just talking about.

6            MR. McKAY:  The government offers Government Exhibit

7   3303-B.

8            THE COURT:  I am accepting this with an instruction to

9   the jury.

10           MR. KENNEY:  We note our objection, your Honor.

11           THE COURT:  Yes.

12           The government is about to show you a chart that

13   summarizes certain evidence that has already been admitted.

14   The chart was created by the government and it is not, itself,

15   evidence.  It is being shown to you merely as the government's

16   analysis and summary of voluminous documents.  When you view

17   this chart, you should keep in mind that it is the underlying

18   evidence that determines what weight, if any, the chart

19   deserves.  It is for you to decide whether the chart correctly

20   presents the information contained in the evidence on which it

21   is based.

22           MR. McKAY:  Thank you, your Honor.

23           THE COURT:  I receive Government Exhibit 3303-B, over

24   objection.

25           (Government's Exhibit 3303-B received in evidence)

I755ske4                          Mergen - direct

1    BY MR. McKAY:

2    Q.   Special Agent Mergen, looking here at the first of this

3    chart, let's walk the jury through what this represents.

4              First, what date does this page refer to?

5    A.   February 8, 2012.

6    Q.   If we look at the first line that begins 11:00 a.m.; what

7    does that represent?

8    A.   It refers to a meeting that took place at the RSA office,

9    both Dean Skelos and Leonard Litwin attending that meeting,

10   among others.

11   Q.   Where do you get that information from?

12   A.   From an exhibit admitted in this trial, specifically

13   GX- 2012-B.

14   Q.   If you see after where it says Dean meeting, that's the

15   citation to the exhibit?

16   A.   Correct.

17   Q.   Then if we look down at 11:51 a.m., what does that line

18   represent?

19   A.   It represents a phone call made by Dean Skelos to Adam

20   Skelos.

21   Q.   And if you look next to Dean there is an asterisk.  What

22   does it mean when there is an asterisk next to a phone record?

23   A.   It means that the person who made the call made it but the

24   recipient did not answer the call.

25   Q.   And how are you able to tell that that is a missed call?

I755ske4                    Mergen - direct

1    A.  I was able to tell because the call does not appear on the

2    recipient's telephone records, in this case Adam Skelos.

3    Q.  So, if we look down at the bottom right-hand corner do you

4    see the indication GX- 101 and GX- 108?

5    A.  I do.

6    Q.  What does that represent?

7    A.  Those refer to exhibits admitted at this trial,

8    specifically they were exhibits of the toll records of both

9    Dean and Adam Skelos.

10   Q.  So, if you look at the next line, 11:57 a.m., there are no

11   asterisks there.  What does that mean?

12   A.  That means the call was connected.

13   Q.  And so, can you see that call on both parties' phone

14   records?

15   A.  Yes.

16   Q.  We don't see it on this page but in some instances there

17   are one-minute phone calls that have two asterisks.  What does

18   that represent?

19   A.  When there are two asterisks that means that we are not

20   sure whether or not the phone connected or not.  We know that

21   the caller made the call but because we don't have the

22   recipient's toll records, we don't know whether they answered

23   it.

24   Q.  So, for calls that have one or two asterisks -- let me ask

25   you this.

1          Next to each phone call you have either one minute or,

2    here, three minutes.  What does that represent?

3    A.  That's the duration of the call.

4    Q.  For calls that either are or may be missed calls, what did

5    you list as the duration?

6    A.  One minute.

7    Q.  Are there also some calls that were connected that were

8    actually just a minute long?

9    A.  Correct.

10   Q.  So the way you tell is whether there is an asterisk or not?

11   A.  Correct.

12   Q.  If we look at the fourth line, 12:28 p.m.; what does that

13   represent?

14   A.  This refers to an e-mail admitted into evidence.  It was

15   sent by Charles Dorego to Steven Ross and Bruce Beal.

16   Q.  You see there it says:  E-mail:  I saw Dean today...

17   A.  Correct.

18   Q.  Where does that come from?

19   A.  It comes from the content of the e-mail.

20   Q.  Is that GX- 1228?

21   A.  Correct.

22   Q.  Just to be clear, when there is an e-mail and you have a

23   dot, dot, dot like that, is that the whole e-mail or just the

24   relevant portion of the e-mail?

25   A.  Just the relevant portion.

1   Q.  So, let's take another example, if you can turn to slide 2.

2   What dates does this page refer to?

3   A.  September 19th and 25th, 2012.

4   Q.  And if we look at the entry on September 19th at 12:30

5   p.m.; what does that represent?

6   A.  It represents a meeting, a REBNY meeting attended by both

7   Dean Skelos and Charles Dorego.

8   Q.  And if we look -- by the way, do you see the far left

9   column we have got "9/19 Wed."  Is that Wednesday?

10   A.  Yes.

11   Q.  Is and then below that 9/25 Tuesday?

12   A.  Correct.

13   Q.  So, everything to the right of that is on that date?

14   A.  Correct.

15   Q.  Now, looking at September 25th, six days after the 19th, at

16   9:25 a.m. what does Mr. Dorego say to Adam Skelos?

17   A.  Mr. Dorego e-mails Adam:  BTW, who do you sell title

18   insurance for?

19   Q.  And what does Adam say back at 10:25?

20   A.  Adam replies:  I work with a company in Long Island, East

21   Coast Abstract.

22   Q.  What's the next line at 10:41?

23   A.  Adam makes a call to Dean Skelos.

24   Q.  What happens at 10:56?

25   A.  Adam sends another e-mail to Charles Dorego.

I755ske4                    Mergen - direct

1   Q.  What is first sentence of that e-mail?

2   A.  "I just heard there may be some bad history there with

3   Stan.  I had no idea."

4   Q.  If we can turn to the next page, Ms. Bustillo?

5           Is this a continuation of the same series, Special

6   Agent Mergen?

7   A.  It is.

8   Q.  So, at 1:25 p.m. what does Dean say to Adam?

9   A.  Dean sends Adam an e-mail with the title of "Title."  He

10  says:  Following up.  Be patient.

11  Q.  Two minutes earlier, at 1:23, what had happened?

12  A.  Dean placed a call to Richard Runes.

13  Q.  And this is a double asterisk so what does that mean?

14  A.  Correct.  It means we don't know whether or not they

15  actually connected.

16  Q.  Is that because you don't have Runes' tolls?

17  A.  Yes.

18  Q.  What happens at 3:50 p.m.?

19  A.  Charles Dorego places a call to Rich Runes' cell phone.

20  Q.  And what does Dorego do 10 minutes later?

21  A.  Charles Dorego places a call to ALS, which stands for

22  American land services.

23  Q.  And Ms. Bustillo, if we can go to slide 17?

24          What date does this refer to?

25  A.  January 10, 2013.

I755ske4                          Mergen - direct

1    Q.   What are the first two calls at the top?

2    A.   It is Adam Skelos calling the PRI land line.

3    Q.   What is the next entry from?

4    A.   The next entry is from notes made by Christopher Curcio who

5    is Adam Skelos' supervisor at PRI.

6    Q.   What does Mr. Curcio's note say?

7    A.   They say I call Adam on his cell phone and asked where he

8    was.  He said on appointments and again mentioned his

9    arrangement between Anthony and his father regarding him

10   working two days a week.

11   Q.   We go down to 10:42 a.m.  What happens there?

12   A.   Dean Skelos calls Anthony Bonomo's cell phone.

13   Q.   And the three lines above that call, what do those

14   represent?

15   A.   Adam makes two calls to Dean that went unanswered and then

16   Dean calls back shortly thereafter.

17   Q.   And then, so, at 10:42 Dean calls Anthony Bonomo's cell; is

18   that right?

19   A.   Correct.

20   Q.   And do you see where it says next call next to that?

21   A.   Yes.

22   Q.   What does that mean?

23   A.   It means it was the next call for Dean Skelos.

24   Q.   As compared to the call that was listed right above that?

25   A.   Right.

I755ske4                              Mergen - cross

1    Q.  And then what happens at 11:07 a.m.?

2    A.  A PRI land line calls Dean Skelos.

3    Q.  And how long was that call?

4    A.  21 minutes.

5    Q.  And what is Dean Skelos' next call?

6    A.  Dean Skelos then calls Adam Skelos.

7          MR. McKAY:  No further questions, your Honor.

8          THE COURT:  Ms. Angel?

9    CROSS EXAMINATION

10   BY MS. ANGEL:

11   Q.  Good afternoon, Agent Mergen.

12   A.  Good afternoon.

13   Q.  My name is Alison Angel and I represent Adam Skelos, along

14   with this back table here.

15          Now, you said on direct that the data you reviewed was

16   from 2010 to 2015; is that correct?

17   A.  Correct.

18   Q.  And you will have to forgive my math but with 365 days in a

19   year times five, I would say that's hundreds of days of data

20   that you have reviewed; is that correct?

21   A.  Well, we focused on particular days.  I wouldn't say I

22   reviewed every day within that five-year period.

23   Q.  Okay.  And you say when we focused on particular days, who

24   is "we?"

25   A.  It's myself and the prosecution team.

1  Q.  And I notice that your chart also focuses on particular

2  days; is that correct?

3  A.  Correct.

4  Q.  And there were about 17 pages so, again, I count that it is

5  roughly about 17 days focused on in that chart?

6  A.  More or less.

7  Q.  Out of the full period from 2010 to 2015?

8  A.  Correct.

9  Q.  Who selected what dates should be focused on in that chart?

10  A.  I believe it was the agent who initially created the

11  charts, along with the prosecution team at the time.

12  Q.  You believe or you know?

13  A.  I know.

14  Q.  You know.  The agent that created the chart selected the

15  dates in the chart?

16  A.  Along with the prosecution team.

17  Q.  Along with the prosecution team.  Okay.

18          So, when you have a certain date in the chart, I

19  noticed that there will be several calls from that date

20  selected; is that true?

21  A.  For some days, yes.

22  Q.  For some days.

23          Are those all the calls that the people on that chart

24  made that day?

25  A.  Generally speaking, no.

1    Q.  How did you decide which calls to include in the chart?

2    A.  We tried to include calls that related to the e-mails and

3    meetings on those particular dates.

4    Q.  Isn't it true that the wiretap that had gone up on the

5    defendant's phones in this case was not in place for any of the

6    calls that are reflected in the chart?

7    A.  No, that's incorrect.

8    Q.  What part of that isn't correct?

9    A.  I believe the final chart is from December 2014, and there

10   is a call on that chart between Dean and Adam Skelos that was

11   captured in the wiretap.

12   Q.  Okay.  I apologize then.

13           So, all of the calls except the one that you

14   identified took place before the wiretap was up?

15   A.  Correct.

16   Q.  So, were you able to tell what the substance of those phone

17   calls were?

18   A.  From the toll records themselves, no, but multiple

19   witnesses in this trial testified to the substance of many of

20   the calls.

21   Q.  But when you created the chart you were looking at the toll

22   records; is that correct?

23   A.  I didn't create the chart.

24   Q.  When the chart was created it was based off of the toll

25   records; is that correct?

1    A.  I believe so, yes.

2    Q.  And, do the toll records indicate what the substance of the

3    phone calls that are in the chart were about?

4    A.  The toll records themselves do not indicate content, no.

5    Q.  So, when you tried to select phone calls that you believed

6    were about the e-mails and dates that you had mentioned, how

7    did you know which calls you were selecting?

8           MR. McKAY:  Your Honor, the witness has testified that

9    she did not create the charts in the first instance.

10          THE COURT:  That's correct.

11          MS. ANGEL:  Understood.

12   BY MS. ANGEL:

13   Q.  Do you know if any of the calls that you included in the

14   chart that were included in the chart, again, I acknowledge

15   that you did not make it, do you know if any of those calls

16   were personal calls between the two people on the calls?

17   A.  I believe some witnesses testified that personal matters

18   were discussed in some of the calls but, beyond that, I think

19   they were relevant to the schemes in question.

20   Q.  Well, a number of calls in the chart were between Dean and

21   Adam Skelos; is that right?

22   A.  Correct.

23   Q.  Dean and Adam Skelos have not commented on the content of

24   these calls that you have seen; is that correct?

25   A.  Except for the one captured by the wiretap; that's correct.

1  Q.  So, do you have any way of knowing what was discussed on

2  the calls between Dean and Adam that occurred during the time

3  when there was no wiretap in place?

4  A.  I do not know what was discussed on those calls.

5  Q.  Very well possible it could have been them discussing

6  personal events, dinner plans, anything?

7  A.  It is possible.

8  Q.  And the information in the chart would not reflect that; is

9  that correct?

10 A.  No.  The information in the chart does not reflect the

11 content of those calls were not captured.

12 Q.  It is limited to identifying who made the call and who

13 picked up and, on occasion, how long the call was; is that

14 correct?

15 A.  Correct.

16 Q.  Does the chart show all of the calls that are in evidence

17 or that were discussed in this case?

18 A.  No.

19 Q.  In fact, you said you reviewed the underlying telephone

20 records; is that correct?

21 A.  Correct.

22 Q.  So, for example, Government Exhibit 101, that would be Adam

23 Skelos' phone records, correct?

24 A.  I believe so, yes.

25 Q.  And you reviewed that?

I755ske4                         Mergen - cross

1   A.  Yes.

2   Q.  And, again, the exact number is escaping me but that was an

3   over 500-page record; is that correct?

4   A.  Yes, and I did not look at every phone call within the 500

5   pages.

6   Q.  Do you know how many calls between Dean and Adam Skelos

7   occurred that are not reflected in the chart?

8   A.  I do not.

9   Q.  Do you know how many calls between Dean and Adam Skelos

10  occurred in, say, 2012?

11  A.  Total?  No.

12  Q.  2013?

13  A.  No.

14  Q.  Do you know how frequently they spoke in 2012?

15  A.  No.

16  Q.  In 2013?

17  A.  I do not.

18  Q.  In any of the years that are reflected in the chart?

19  A.  No.

20  Q.  So, just for example, one of the dates in the chart that --

21  sorry.  Strike that.

22          One of the days in the chart is January 10th, 2013; is

23  that correct?

24  A.  Correct.

25  Q.  And that date indicated that there were some calls between

1   Dean and Adam Skelos is that are noted in the chart; is that
2   correct?
3   A.  I believe so, but I don't have it in front of me.
4   Q.  Do you know how many calls there were between Dean and Adam
5   Skelos on, say, January 9th, 2013?
6   A.  Offhand, no.
7   Q.  On January 11th, 2013?
8   A.  No.
9   Q.  Do you know if Dean and Adam Skelos spoke more on January
10  10th than they did on January 9th or January 11th, of 2013?
11  A.  I don't know offhand, no.
12  Q.  One moment here?  (pause)  There are also a number of
13  e-mails reflected in this chart; is that correct?
14  A.  Correct.
15  Q.  And for the most part they're not full e-mails; is that
16  right?
17  A.  Some are, some are not.
18  Q.  Several of the e-mails are just select quotes from a longer
19  chain of e-mails; is that correct?
20  A.  Correct.
21  Q.  Who selected which quotes from the e-mails to use?
22  A.  Again, the creator of the charts, along with the
23  prosecution team.
24  Q.  Along with the prosecution team?
25  A.  Correct.

I755ske4

1    Q.  Do you know how many e-mails between the parties whose

2    names are reflected in your chart were omitted from the chart?

3    A.  No.

4    Q.  Do you know how frequently say, Dean and Adam emailed with

5    each other on the days that are not reflected in your chart?

6    A.  I do not offhand, no.

7    Q.  Does this chart accurately summarize all of the evidence in

8    the case?

9           MR. McKAY:  Objection, your Honor.

10   BY MS. ANGEL:

11   Q.  Sorry.  Does this chart summarize all of the evidence in

12   this case?

13   A.  Not all of the evidence.

14   Q.  Does this chart summarize the government's theory of the

15   case?

16          MR. McKAY:  Objection.

17          THE COURT:  Sustained.

18          MS. ANGEL:  No further questions.

19          MR GAGE:  No questions, your Honor.

20          MR. McKAY:  We have no redirect, your Honor.

21          THE COURT:  Thank you very much.  You may step down.

22          (Witness steps down)

23          MR. McKAY:  Your Honor, the government rests.

24          THE COURT:  Members of the jury, we are now going to

25   turn to legal matters that we need to do.  We can let you go

I755ske4

1   for the day and ask that you be back at 9:30 tomorrow morning.

2          Thank you.  Have a good evening.  Please, remember my

3   admonitions.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I755ske4

```
 1              (Jury not present)

 2              THE COURT:  Have a seat.

 3              Ms. Shapiro said 15 to 20 minutes would be enough.  Do

 4    you think that is enough?

 5              MS. SHAPIRO:  My only hesitation is my associate was

 6    on his way down and I think he should be here any minute.  But,

 7    that should be fine.

 8              We do just want to, before we do that, move under Rule

 9    29 on behalf of Dean Skelos to dismiss the case on the grounds

10    that the government has failed to establish the essential

11    elements of each of the charged counts.

12              THE COURT:  I have had, in mind, this motion all

13    along, and I deny it.  There is sufficient evidence.

14              MR. KENNEY:  We move under Rule 29 on the same basis,

15    your Honor.

16              THE COURT:  I deny that as well.  There is sufficient

17    evidence.

18              Okay.  We will be on a break then until, shall we say

19    1:20?

20              MR. McKAY:  Thank you, your Honor.

21              THE COURT:  Thank you.

22              MS. SHAPIRO:  That's fine, your Honor.  Can Dean

23    Skelos -- he wants to waive his presence for the charge

24    conference, is that all right?

25              THE COURT:  Certainly.
```

I755ske4

1          MS. SHAPIRO:  Thank you.

2          THE COURT:  Does Adam Skelos?

3          MR. KENNEY:  Could we make the same request, your

4    Honor?

5          THE COURT:  Yes.  I grant it.

6          See you at 1:20.

7          (recess)

8          (Continued next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Shall we begin at the beginning and go

2     page by page?

3          MR. McKAY:  Judge, we're happy to proceed however you

4     would like.  I'm sure the defense has a view about how best to

5     to this.  I guess what I would say is we have reviewed the

6     draft you circulated last night, compared it to our draft.

7     Obviously there are some changes that you made that the defense

8     had requested that we disagree with, but we don't intend to

9     revisit every single point and have arguments on every single

10    point.  We have I think about ten pages of -- or ten points

11    that we would like to revisit, so we're happy to go to just

12    those or go page by page, however the Court would like to.

13         THE COURT:  I think it would be fine to go topic by

14    topic the points you care about.

15         What do you think?

16         Who is speaking, Ms. Shapiro?

17         MS. SHAPIRO:  I am, your Honor.

18         I think -- I actually think it would we better to go

19    page by page, although there are obviously numerous pages that

20    we don't have to raise with the Court, but I want to make sure

21    that I don't miss anything.  And I organized my notes based on

22    pages, not by topics.

23         THE COURT:  Let's go page by page.

24         MR. KENNEY:  If I may make this comment for procedure,

25    it will not surprise the Court that we worked together, the two

1   counsel teams.  So Ms. Shapiro will take the lead and if we

2   have anything to say, we may, but generally we'll probably rely

3   on her comments.

4                THE COURT:  Thank you.

5                Ms. Shapiro, where is your first edit?

6                MS. SHAPIRO:  Page 14, and also there's a point at

7   which my printout seems like it may be different, but I'm

8   referring to sympathy.  That was the first thing I had -- page

9   where I had a comment.

10               THE COURT:  If your page is different, maybe Alex

11  could bring you my 14 sympathy.  Does anyone have anything else

12  on 14?

13               MS. SHAPIRO:  I actually have a copy that we received

14  from Alex, so I will use that.

15               So this was just a small point.  So in the first

16  paragraph, I guess second sentence, it says:  You are to be

17  guided solely by the evidence in the case, and the crucial

18  question you must ask yourself is whether the guilt of each

19  defendant has been proven beyond a reasonable doubt based on

20  the evidence or lack of evidence at trial.

21               We would ask the Court to remove the phrase "based on

22  the evidence or lack of evidence," move it up to right after

23  where it says "ask yourselves."  Because at least one of

24  interpretation of it at the end is that it could be interpreted

25  to suggest that guilt could be proved based on a lack of

I75TSKE5                    Charge Conference

1    evidence, so we just thought it would be better to put it right

2    after "ask yourselves" at the beginning of the third line.

3              THE COURT:  I added in "lack of evidence" because

4    defense counsel often requests that.  I would be happy to take

5    it out if you think it's in any way confusing.

6              MS. SHAPIRO:  I don't think it needs to be taken out.

7    We thought it would be clearer if it came after "ask yourselves

8    based on the evidence or lack of evidence whether the guilt of

9    each defendant, blah, blah, blah.  That's fine with me.

10             MR. McKAY:  No objection.

11             THE COURT:  So it will be you must ask yourselves,

12   based on the evidence or the lack evidence at trial, whether

13   the guilt of each defendant has been proven beyond a reasonable

14   doubt.

15             MS. SHAPIRO:  Thank you, your Honor.

16             THE COURT:  I'll ask Ms. Shapiro her next one and then

17   the government can tell me if they have something in between.

18             MS. SHAPIRO:  The next one we have is on page 17,

19   which is the end of the reasonable doubt instruction.

20             THE COURT:  Right.

21             MS. SHAPIRO:  So I assume the Court already took this

22   into account, but we would request that the Court take out the

23   last paragraph because it just seems to unbalance the

24   instruction and emphasize that it's easier -- easy to find

25   reasonable doubt.

1          THE COURT:  I always include it, and I think it's

2   helpful.  I don't think it's inaccurate.

3          MS. SHAPIRO:  Okay, your Honor.  Thank you.

4          The next one I had was on page 19, punishment.

5          THE COURT:  Okay.

6          MS. SHAPIRO:  So we just object to the very last

7   sentence because obviously the jury does need to be instructed

8   that they can't consider punishment, and that if they find

9   guilt that that's up to the Court, but we thought it was

10  unnecessary and somewhat prejudicial to then go on to explain

11  to the jury how the Court determines punishment, since the

12  whole subject is supposed to be irrelevant.  And so we would

13  request that that last sentence be struck.

14         THE COURT:  Well, it is irrelevant to the job they are

15  doing, but they may be very concerned about how the job will be

16  done by the judge.  And so I think it is helpful to the jury to

17  get this completely out of their mind to know that someone else

18  is looking into things that they might be thinking about.  I

19  understand that it would be more pro-defendant if I took it

20  out.

21         MS. SHAPIRO:  Okay.

22         THE COURT:  Your next one?

23         MS. SHAPIRO:  So I just -- maybe I don't need to do

24  this page by page, but I guess the next one I have is on page

25  22 in the summary of the indictment.  And the middle paragraph

1     describing Counts Three, Four and Five uses the word "payment"

2     in each case, and we would request that the Court use a more

3     neutral word like maybe "benefits" or something like that,

4     because -- obviously this came up during the testimony, there

5     was some objections to whether, for example, salary could be

6     characterized as a payment.  And the government has its

7     arguments to at least some of them, we have our arguments.

8            So that would be the request, that in those three

9     places describing Counts Three, Four and Five, in this

10    paragraph that the word "payments" be replaced by something

11    like "benefits."  And same would be true in the third paragraph

12    which describes Counts Six, Seven and Eight.

13           MR. KENNEY:  We would like to join in that, your

14    Honor, and note that we made the point in our cross-examination

15    that the money that came to Adam came from American Land and

16    was presented from the beginning by Dorego as participating in

17    insurance, and the documents reflect nothing to the contrary

18    until American Land and Dwyer and Dorego start a communication

19    by email as to how the money would be paid, and our client is

20    not on these emails.

21           THE COURT:  I think you're talking about the second

22    sentence in the second paragraph on page 22.

23           MR. KENNEY:  I'm talking about PRI.

24           THE COURT:  Judge Caproni uses "something of value"

25    often as a substitute.

1          MR. KENNEY:  "Something of value" would be fine, but
2   "payment from PRI is kind of a conclusion."
3          THE COURT:  I agree.
4          MS. SHAPIRO:  We're fine with that, too.  So would the
5   Court replace it in each of these places.
6          THE COURT:  Yes.  We have the word "payments" in the
7   last three lines of the second paragraph on page 22.  What
8   about "property?"  Do you want to leave the word in the first
9   sentence of the paragraph "property?"
10         MS. SHAPIRO:  Your Honor, I think that's fine because
11  it's describing an allegation, and that's -- I think we're fine
12  with that because that's what the crime is.
13         MR. McKAY:  Your Honor, may I point out just this is a
14  summary of the indictment.  The indictment uses the word
15  "payments."  The defense is going to be able to argue that
16  "payments" is not accurate description.  In fact, it is.  A
17  salary is a payment.  But if we're summarizing the indictment,
18  I think we should use the word the indictment uses.
19         THE COURT:  Well, I think that's uncontroversial.
20  Perhaps we should.
21         MS. SHAPIRO:  Well, I guess what I would say -- and
22  part of the reason I proposed the substitute is that I think
23  this would be a bit cumbersome, that even though this is a
24  summary of the indictment, it doesn't say in each place
25  "alleged payments."  So it says Count Three relates to payments

 1    obtained from Glenwood Management, for example, and each of

 2    other sentences that we're talking about is phrased similarly,

 3    and I think as phrased it implies that there were payments.

 4               MR. McKAY:  We would be fine with "alleged payments."

 5               MR. KENNEY:  If I may, your Honor, that doesn't

 6    address the issue of --

 7               THE COURT:  How would -- I think I understand your

 8    point, Mr. Kenney.  If we change "payment" to "something of

 9    value" --

10               MR. KENNEY:  "Something of value" would be fine with

11    us, your Honor.

12               THE COURT:  I don't think that would be confusing to

13    the jury.  Does the government want to object any further?

14               MR. McKAY:  Maybe you just say "things of value"

15    rather than "something of value."

16               THE COURT:  Yes, "things of value."  We'll replace

17    "payments" in the last three lines of the second paragraph on

18    page 22.

19               MS. SHAPIRO:  And the third paragraph as well, your

20    Honor?

21               THE COURT:  Yes.  That would be the three places where

22    "payments" appears in the last two sentences of page 22.

23               MS. SHAPIRO:  Correct, your Honor.

24               The next thing I had --

25               MR. KENNEY:  If I may on that, I'm looking at summary

I75TSKE5                          Charge Conference

1   of the indictment, and I think paragraph --

2              THE COURT:  We can't hear you.

3              MR. KENNEY:  I said I think paragraph two has

4   "payments" three times, and the last paragraph has "payments"

5   several times.  Is your Honor addressing both paragraphs?

6              THE COURT:  They each have "payments" three times.

7              Ms. Shapiro, anything else?

8              MS. SHAPIRO:  I was going to say I just want to make a

9   comment with regard to page 23.  So as the Court is aware, we

10  preserved objections and briefing on the motions to dismiss.

11  And I'll just relate this to the extortion as well as some

12  similar issues that come up with other counsel so I don't have

13  to repeat it, but we made arguments to preserve the argument

14  that with respect to extortion that it shouldn't cover bribery.

15             Similarly, with respect to 666 we've argued it

16  shouldn't cover gratuities, and with respect to the conspiracy

17  to commit honest services fraud we've argued that it's

18  unconstitutionally vague.  I understand that the Court has

19  applied law that is settled in this circuit, and in the case of

20  honest services that it was decided in *Skilling* at least for

21  now, so I'm not going to repeat all that, but I want to be

22  clear that, to the extent we're discussing these instructions,

23  we're preserving those objections.

24             THE COURT:  That is noted.

25             The word "payments" appears on this page.

1          MS. SHAPIRO:  Your Honor, that's a good point.  I

2    guess we would ask that the same changes be made wherever.

3          THE COURT:  Things of value?

4          MS. SHAPIRO:  Yeah.  In all honesty, it says "alleged"

5    here, but I guess we would prefer that it change, because I

6    think it's better that way.

7          THE COURT:  Okay.  The government will tell me if you

8    have you have anything in between.

9          MR. McKAY:  Our first point is on page 23.

10          THE COURT:  Okay.

11          MR. McKAY:  So the defense had objected to the

12    language that explains the difference between traditional

13    extortion and extortion under color of official right.  The

14    Court had included part of our instruction, I think a reworded

15    version of it, as the last sentence here on 23.  We do think

16    the Court should include the next sentence as well, which is

17    that in the context of extortion under color of official right

18    is the public official's misuse of his office to obtain money

19    for himself or another person that supplies the element of

20    coercion.

21          And the reason we ask for that is, first of all, that

22    it's settled law, it comes straight out of -- I think *Margiotta*

23    is the case.  But most importantly, when a layman hears the

24    term "extortion," they think about the concept of coercion.

25    And so I understand the defense's objection to taking the place

1   of pressure or threats, we're happy to leave out the pressure

2   or threats part of it, but we do think the word "coercion"

3   needs to be used because I think that is sort of a legal

4   concept that might not be apparent to the average juror.

5            I would note this is particularly important because

6   throughout the charge we had used the phrase "obtaining

7   property under color of official right."  The defense objected

8   to that every time, and the Court I think granted most or all

9   of those objections and struck out "obtaining property" and

10  just wrote "extortion under color of official right."

11           The jury is going to hear the word "extortion,"

12  "extortion," "extortion," which is a defined term with a

13  particular meaning, so we ask that you just include the part

14  about coercion in this last sentence.

15           THE COURT:  I think that sounds reasonable.  Any

16  objection?

17           MS. SHAPIRO:  Your Honor, we don't think that's

18  necessary because the instruction goes on to explain each of

19  the elements in detail and what's required, and it seems

20  superfluous.  So we would object to that.

21           THE COURT:  "Misuse of his office" is broad.

22           MR. McKAY:  Your Honor, "misuse of his office" does

23  come directly as a quote from *Margiotta*, but understanding that

24  the defense will argue that that's intention with official

25  action, we don't need the phrase "misuse of his office."  The

1    key part is that it is the official power or the ability to

2    take official action, that is what supplies the element of

3    coercion.  That's the concept that we think has to be

4    communicated to the jury.

5            THE COURT:  Okay.  Is there any objection on that from

6    the defense before we move on?

7            MS. SHAPIRO:  Sorry, can you just tell me again what

8    language you're adding?

9            MR. McKAY:  I suppose I would just take a direct quote

10   from *Margiotta*, which is as follows -- and we could modify the

11   misuse part after I'm done, but it is, "The public officer's

12   misuse of his office supplies the necessary element of

13   coercion, and the wrongful use of official power need not be

14   accompanied by actual or threatened force, violence or fear."

15           Now that's the direct quote from *Margiotta*.

16           MS. SHAPIRO:  Your Honor, with all due respect --

17           THE COURT:  He's not finished.

18           MS. SHAPIRO:  I'm sorry.

19           MR. McKAY:  I was going to say instead of saying

20   misuse of his office, we could just adopt what they have in the

21   second portion of that sentence, which is the public officer's

22   official power supplies the necessary element of coercion.  We

23   think that would satisfy that concern.

24           THE COURT:  I think that's quite neutral.

25           MS. SHAPIRO:  Your Honor, I disagree, and I think that

1    part of the problem here is that the particular elements

2    that -- it may well be that sentence is in the *Margiotta* case,

3    but there's lots of reasoning in cases that doesn't need to be

4    conveyed the jury, and the jury needs to know what the elements

5    are and how to understand how to apply them.  And I think

6    that's just going to confuse them because it's not

7    specifically -- they need to follow the later instructions that

8    specifically define each element, and this misuse concept is

9    unduly vague, particularly in light of the *McDonnell* case and

10   it's going to create confusion.

11          THE COURT:  I would like to hear the exact text of it

12   as you proposed it to the Court.

13          MR. McKAY:  The public -- well, let me start it by

14   saying in the context of extortion under color of official

15   right, it is the public officer's official power that supplies

16   the necessary element of coercion, and the wrongful use of

17   official power need not be accompanied by actual or threatened

18   force, violence or fear.

19          And I can give the Court the cite for this as well,

20   which is 688 F.2d 130-131, and I directly quoted that except

21   the misuse of his office to reflect the defense's objection to

22   that.

23          THE COURT:  Okay.

24          MS. SHAPIRO:  Your Honor, we think that it's

25   prejudicial and confusing to start talking about coercion and

1    how it's -- well, it's not really necessary because here it's

2    just supplied by the status of the defendant's office.  And I

3    do think it's completely unnecessary, because what the jury is

4    supposed to do, as I indicated earlier, is apply the actual

5    instructions that relate to particular elements.

6              THE COURT:  I think that the government's proposed

7    addition will be helpful to the jury, so I will take it over

8    objection.

9              Your next point, Ms. Shapiro?

10             MS. SHAPIRO:  It's page 27.  I don't know if the

11   government has anything before that.

12             MR. McKAY:  We have something on the same page, so

13   they can go first if they would like.

14             MS. SHAPIRO:  I'm sure it comes as no surprise to

15   Court, and I'm sure the Court thought about this carefully,

16   that we object to the "as opportunities arise language"

17   wherever it appears in the charge.  I will note it later, but

18   here it appears twice on this page, once at the end of the

19   second paragraph and once in the third line of the third

20   paragraph.

21             And we briefed this extensively.  I will just note for

22   the record, for example, in our motion to dismiss, docket

23   number 248 at 14 to 20, at the reply on the motion to dismiss,

24   docket number 295 at pages 9 to 12, as well as in the two sets

25   of objections we filed and our July 1st, 2018 letter.  I think

1   we briefed this extensively.  I know the government responded
2   and I'm sure the Court has thought about it, so I won't belabor
3   the record, but I do want to highlight one thing, because I do
4   think that -- just so it's entirely clear that our argument is
5   a little bit different than the arguments that some defendants
6   who have raised these objections in district courts have made,
7   which is to say that our focus is on the matter, and we're not
8   arguing that a specific decision on that matter has to be
9   identified, we're simply arguing that the specific matter has
10  to be identified, and that's the problem with the "as
11  opportunities arise" language.
12          THE COURT:  How would you define "matter" there?
13          MS. SHAPIRO:  Well, let me see if I can --
14          THE COURT:  It seems much broader.
15          MS. SHAPIRO:  No, we would define matter the way
16  McDonnell does.
17          THE COURT:  Which is?
18          MS. SHAPIRO:  Give me a moment.
19          If you look at docket 385, which is our most recent
20  red line, which we filed on Tuesday, on page 36 -- and I guess
21  this will come up when we get to the official action
22  definition, but we -- so actually -- sorry, 37.
23          The way we propose it there, and we think this is
24  entirely consistent and mostly quoting the McDonnell opinion,
25  that what McDonnell says is that the matter has to involve a

1  formal exercise of governmental power that is similar in nature

2  to a lawsuit before a court, a determination before an agency

3  or a hearing before a committee.  It must be specific, focused

4  and concrete, the kind of thing that could be put on an agenda

5  and checked off as complete.  It cannot be a broad policy

6  objective like economic development or tax reform.

7          So the point being that --

8          THE COURT:  The wording you're suggesting is on page

9  30 of these instructions.

10         MS. SHAPIRO:  I guess, just to be clear, I was just

11 clarifying why we object to the "as opportunities arise"

12 language that's on page 27, that we think it's too vague and

13 too broad because it could apply to anything that might come up

14 later that somebody could later say fit the definition under

15 *McDonnell* of an official action.  But what we're saying is that

16 for all the reasons that we briefed extensively that the

17 *McDonnell* opinion requires greater specificity.  So that's why

18 we object to the whole concept of "as opportunities arise."

19         THE COURT:  I'm not sure whether it's me or you who is

20 conflating "action" with "opportunity."  The actions are

21 defined just as you think they should be on page 30, official

22 action.

23         MS. SHAPIRO:  Maybe I'm not being clear, your Honor.

24 Maybe Mr. Thayamballi can supplement what I said and make it a

25 little clearer.

1           MR. THAYAMBALLI:  Your Honor, you're correct that in

2    your definition of official action you describe in certain

3    parts the matter component and the action component which are

4    about the two parts that are described in *McDonnell*.

5           Our point is that our whole objection to the "as

6    opportunities arise" theory that's been advanced by the

7    government is that a faithful reading of *McDonnell* will show

8    that the matter that is the matter component of the official

9    action must be agreed to at the time of the quid pro quo.  And

10   so it's different from the argument that other defendants have

11   made, and certainly the cases cited by the government, which is

12   that the entire official action, the matter and the action on

13   that matter, have to be specified in advance.  And we

14   understand that that's not a reasonable interpretation.

15          THE COURT:  That your own is not reasonable?

16          MR. THAYAMBALLI:  No, that the other argument that

17   we're disclaiming is not reasonable.

18          THE COURT:  I see.  Well, I disagree with your view of

19   the law here.

20          MR. THAYAMBALLI:  We understand, your Honor.

21          THE COURT:  I take your objection.

22          MS. SHAPIRO:  Okay.

23          THE COURT:  Next page?

24          MR. McKAY:  Your Honor, we have two small points on

25   that page, if we could.

1          THE COURT:  Yes.

2          MR. McKAY:  Consistent with what we just been

3    discussing, if you look at the third full paragraph, which

4    begins, "The government must prove."

5          THE COURT:  Yes.

6          MR. McKAY:  The last sentence of that paragraph lacks

7    the "as opportunities arise" language, and since it's breaking

8    down a different part of the intent element, it's now focusing

9    on the payor's intent --

10          THE COURT:  We would add comma at the end, as

11    opportunities arise?

12          MR. McKAY:  I think the proper place for it would be

13    the second to last line of that paragraph begins, "Benefit of

14    that party," I would add "as opportunities arise" there, "and

15    that Dean Skelos," and it goes on.

16          THE COURT:  All right.

17          MR. KENNEY:  If I might make a point on that, your

18    Honor, it may be an overemphasis, and it seems so to me, that

19    paragraph one ends "as opportunities arise," paragraph two ends

20    "as opportunities arise," paragraph three, the end of the first

21    sentence reads "opportunities arose," and now that same

22    paragraph will have the same phrase again.  I was thinking

23    three is a lot.

24          THE COURT:  I understand.  I think it's a difficult

25    concept and it belongs in each place where it now is.

1          You had another point on this page?

2          MR. McKAY:  We did, your Honor, and this is a point

3     that recurs I think at least three times in the charges, but I

4     will raise is once now, and that is the good will instruction.

5     So as the Court will recall most likely from the first trial,

6     there's a lot of back and forth over the good will instruction.

7     Last time we ultimately agreed upon with the defense including

8     the language that we had proposed.  We're fine with that

9     language.

10          THE COURT:  What is that language?

11          MR. McKAY:  It is the first sentence of this paragraph

12     at the bottom of 27, "If either the person giving the property

13     or Dean Skelos," that language, but what follows, the next two

14     sentences, are directives as to what is not a crime.

15          THE COURT:  Right.

16          MR. McKAY:  And our concern with those is twofold.

17     The first is that they're largely redundant of what has just

18     been said, that the property was given solely to cultivate good

19     will or nurture a relationship.  The next sentence says a

20     general attempt to curry favor.  We think it's largely saying

21     the same thing twice.

22          And second, to say something is not a crime, first of

23     all, that's typically not the way jury instructions are phrased

24     in terms of a directive as to what is not unlawful.  It may

25     well -- I'm not saying we're charging this crime, but it may

1   well be a state crime or some kind of gratuities violation,

2   what is being described, so that is probably not entirely

3   accurate.  But the general point here is that the first

4   sentence about good will and nurturing a relationship more than

5   adequately cover the concept, and so to repeatedly rephrase it

6   in several different ways we think is unnecessary, and so we

7   would object to those next two sentences.

8           MS. SHAPIRO:  May I respond?

9           THE COURT:  Yes.

10          MS. SHAPIRO:  We disagree, and I think it's critically

11  important that the instructions be balanced, and there are many

12  places in the charge, and I will raise some for later but I'm

13  sure I won't raise all of them, where the charge goes on and on

14  to talk about how easy it is prove the crime in some ways that

15  are quite repetitive.  So this is absolutely critical to

16  defense, your Honor, and we have been thinking about proposing

17  a theory of defense charge but I think we probably will not if

18  it's adequately covered in the charge.  And we think it's very

19  important that the jury understand this concept, it's just

20  central to the arguments we're going to be making in summation.

21          And it is correct as phrased, and I don't think the

22  government has pointed to any authority suggesting otherwise.

23  And indeed, if there were a state crime along the lines that

24  Mr. McKay described, I submit it's pretty obvious, based on the

25  reasoning in the *McDonnell* case, that the Supreme Court would

1   find that to be unconstitutional.  So we think it's very

2   important to keep this in, and we would request that the Court

3   leave the language as it is in your draft charge, your Honor.

4           THE COURT:  I understand both points, that is, that

5   the first sentence really encompasses what follows.  But I

6   think that what follows is helpful to the jury as they try to

7   figure out what is lawful and what is not.  So I would keep

8   that.

9           MS. SHAPIRO:  Thank you, your Honor.

10          We had, I think, one other thing on this page.  At the

11  end of the third paragraph we had proposed in our requests or

12  recent objections, rather, which is docket 385-1 on page 31,

13  just to end this paragraph with an additional sentence:  In

14  other words, there must be an agreement, explicit or implicit,

15  to trade official acts for payment.  And we ask that be

16  included.  I think it's a correct statement of the law.  We

17  cited *McDonnell*, the *Silver* case in the Second Circuit as well

18  as --

19          THE COURT:  If I may interrupt, it's redundant of

20  paragraph two, the second sentence.

21          MS. SHAPIRO:  Well, your Honor, we think it's

22  important for clarification to the end of this third paragraph.

23          THE COURT:  Let me just read it from the screen.

24          It's not clear from the realtime, so could you read it

25  one more time?

1          MS. SHAPIRO:  The proposal would be to add the

2     following sentence:  In other words, there must be an

3     agreement, explicit or implicit, to trade official acts for

4     payment.  And this was on page 31 of our filing on Tuesday.

5          THE COURT:  Yes?

6          MR. McKAY:  I'm happy to respond.  We agree that it is

7     redundant of what has gone before.  If the court were to

8     include it, we would have a number of changes that would need

9     to be made.

10          THE COURT:  I don't think I should include it.  I

11     think the point has been made, that it's redundant.

12          MR. KENNEY:  Your Honor, I hope I'm not out of sync

13     here, I'm looking at your draft that's been circulated and I

14     note that on page 28, on paragraph -- the bottom paragraph uses

15     the word "payor" three times.  I wonder if that shouldn't be

16     changed.

17          THE COURT:  "Payors" changed to?

18          MR. GAGE:  "Giver" since we said "a thing."

19          THE COURT:  Has anyone thought of a better word?

20          MR. McKAY:  Your Honor, we think "payor" is the

21     correct word, but -- I still don't understand the objection to

22     "payment," but if you would like to change it to "giver," I

23     think this probably isn't --

24          I actually think the way we proposed this in some of

25     the places is "victim," and it is an extortion charge.  So

1   "giver" has a bit of a different connotation then.  The fact of

2   the matter is that all of these schemes involved payment to

3   Adam Skelos; whether you want to call it a salary, whatever,

4   that is a payment.  And so the person who is making that

5   payment is a payor.

6              THE COURT:  I cannot think of anything better than

7   payor.

8              MR. KENNEY:  It may be, your Honor, I withdraw that,

9   because I don't think it's confusing, I think it's later, so I

10  withdraw my request.

11             MS. SHAPIRO:  Your Honor, I had a couple of other

12  comments on this page.  At the end of the first full paragraph

13  that starts "Again," we had proposed that it be balanced with a

14  sentence that says, "The in exchange for requirement is not

15  satisfied simply because the thing of value is followed by an

16  official act, the thing of value must be given to procure the

17  official act."  And we cited authorities, including the recent

18  *Percoco* instructions in both sets of our objections to that

19  effect.

20             THE COURT:  Does the government have a view?

21             MR. McKAY:  We do.  We think it's, A, unnecessary,

22  because we have now described quid pro quo several times, and

23  it's also inaccurate because the timing can differ.  It doesn't

24  have to be payment then vote or vote then payment, it could be

25  either way.  So the sentence is both we think unnecessary and

I75TSKE5                         Charge Conference

1   inaccurate.

2              THE COURT:  I do think it's unnecessary.  Let's move

3   on.

4              MS. SHAPIRO:  Okay, your Honor, we preserve that

5   objection for the reasons set forth in our filings.

6              One moment, your Honor.

7              (Pause)

8              MS. SHAPIRO:  Your Honor, in the next paragraph, the

9   one that starts "This element," in the last sentence, "Thus if

10  you find that the transfer of property was for entirely

11  innocent reasons stemming from friendship or any other innocent

12  reason," we feel like "entirely innocent" is a bit too strong

13  and would suggest something like "for other reasons," and then

14  leaving "stemming from friendship or any other innocent

15  reason," rather than that phrase "entirely innocent."

16             THE COURT:  I agree.

17             MR. McKAY:  Well, your Honor, the phrase "entirely" is

18  critical because the law is clear that it doesn't have to be

19  the sole motive for something.  So if we change it to just "for

20  other reasons," that would be an incorrect statement of the

21  law.  If you find that the transfer of property was for

22  entirely different reasons perhaps would be a better statement

23  of law, but the "entirely" is key because this is a sole versus

24  partial motivation question.

25             MS. SHAPIRO:  I think that's fine, your Honor.

1          THE COURT:  So the only change we'll make on page 28,

2    second full paragraph, is to change the word "innocent" to

3    "different."

4          MS. SHAPIRO:  And your Honor, it appears -- I

5    neglected to mention this, it appears twice in the paragraph,

6    there's a couple of lines above the one I read, so if we could

7    say "entirely different."

8          THE COURT:  Okay.

9          MS. SHAPIRO:  In the last paragraph on page 28 the

10   sentence that says, "The official action can either be actually

11   performing an act himself or exerting influence over an

12   official act performed by another official," I think this is a

13   little confusing here because this is -- this relates to the

14   definition of official action, not the quid pro quo

15   requirement.  And, of course, the definition of official action

16   is explained in detail later.  And in addition, obviously

17   exerting influence isn't enough under *McDonnell* anyway, because

18   the defendant has to advise or pressure the other official.  So

19   we would just ask that this sentence be stricken from this part

20   of the charge.

21         THE COURT:  Is there any objection?

22         MR. McKAY:  Your Honor, we're fine with that.

23         THE COURT:  Okay.  We're striking the words "the

24   official action can either by actually performing an act

25   himself or exerting influence over an official act performed by

I75TSKE5                    Charge Conference

1     another public official."

2            Next.

3            MS. SHAPIRO:  The next issues we had were on page 30,

4     the definition of official action.  So --

5            MR. McKAY:  I had assumed there would be no objection

6     to this, your Honor.

7            MS. SHAPIRO:  There's always an objection.

8            So your Honor, I think there's a couple of points.

9     Number one, we think that the instruction does not as clearly

10    set forth the precise test in *McDonnell* as the proposal that we

11    had which was in our most recent set of objections, docket

12    number 385 at 36 to 39, which we talked about a little bit in

13    the letter we submitted on July 1st.  But we think that the

14    proposal more clearly set out the two-part test in *McDonnell*,

15    and so we would request that the Court give that instruction

16    rather than this one.

17           And then a couple of specific points with respect to

18    the draft, the Court's draft instruction, the second to last

19    paragraph where it says -- where it has some examples, we think

20    the example of approving regulatory action is kind of vague as

21    an example, and we would propose changing that to ordering

22    regulatory action.

23           And more generally, we think the Court's definition

24    doesn't clearly explain why something like setting up meetings

25    doesn't qualify as a decision or action on the question or

1  matter, and that the examples given in *McDonnell* make clear

2  that the public official has to actually decide the question or

3  matter or pressure or advise another official to do so.

4           So that's the nature of the objection.

5           MR. McKAY:  Judge, as far as I can tell, both parties

6  have proposed substantially the same language, it's just the

7  order is flipped.  I think the way that we proposed and the

8  Court has drafted is clearer, so I would be inclined to stick

9  with that language.  The phrase "approving regulatory action"

10  versus "ordering regulatory action" doesn't really make a

11  difference to us.

12           THE COURT:  Well, then I will change it to "ordering."

13           MS. SHAPIRO:  Thank you, your Honor.

14           THE COURT:  But I will keep the language otherwise

15  here.

16           MS. SHAPIRO:  Your Honor, the next thing I had was

17  just on 33, the attempt charge.  It seems to me, given the

18  evidence in the case, that I'm not sure this is relevant that

19  government has some theory of attempt.  It appears they're

20  arguing that crimes were conflated.  So we don't think it's

21  necessary.  I don't think there's anything legally incorrect

22  about the instruction, but we would -- we're concerned that it

23  might be confusing given the nature of the evidence in the

24  case.

25           MR. McKAY:  Your Honor, we're permitted to charge and

1    argue both theories, and in fact there is a good basis for both

2    theories.  The best example is probably AbTech.  The defense

3    has vigorously argued in cross-examination, and I'm sure they

4    will in closing, that no official action was ever taken so no

5    extortion ever took place.  So we do think that there's a clear

6    attempt theory in this case, and we think we're entitled to the

7    instruction.

8             THE COURT:  All right.  I will keep it.

9             MS. SHAPIRO:  Your Honor, I realized I missed one

10   thing on the page before that, page 32.  Since the interstate

11   commerce element is the last element of Counts Three through

12   Five, we would just ask that the Court add an instruction

13   consistent with the one that ends, "The last element for all

14   the other counts," which is along the lines of "if you find

15   that all of the required elements of extortion under color of

16   official right have been proven beyond a reasonable doubt, then

17   you must find Dean Skelos guilty of that charge.  On the other

18   hand, if you find any element has not been proven beyond a

19   reasonable doubt then you must find Dean Skelos not guilty of

20   that charge."

21            THE COURT:  And you would be adding that to the end of

22   which paragraph?

23            MS. SHAPIRO:  To the end of paragraph 32.

24            THE COURT:  At the very end?

25            MS. SHAPIRO:  That's consistent with the way the Court

1   has done it with respect to other instructions.

2           MR. McKAY:  Your Honor, we think that's unnecessary.

3   You've quite clearly instructed the jury already that they need

4   to find each element beyond a reasonable doubt.  The first

5   sentence of every single element says the government must prove

6   beyond a reasonable doubt.  At this point we're just adding

7   more and more words for the jury to sit through and listen to

8   that don't say anything new.  And so I think Ms. Shapiro is

9   right that this is included at the end of some counts but not

10  all counts.  We agree it should be consistent, but our view is

11  that this paragraph is unnecessary at the end of any count

12  since the Court has quite clearly set forth the reasonable

13  doubt requirement.

14          THE COURT:  So you're suggesting omitting the last

15  paragraph?

16          MR. McKAY:  You have omitted it here.

17          THE COURT:  Yes.

18          MR. McKAY:  I think in honest services you included

19  it.  We would have omitted it there.

20          THE COURT:  So you would omit it here and honest

21  services?

22          MR. McKAY:  Yes, your Honor.

23          THE COURT:  I think that's reasonable.

24          MS. SHAPIRO:  Your Honor, it's quite standard language

25  that comes at the end of the last element of particular

1    statutes that is standard in most charges.  I think that's why

2    it was -- the Court had it at the end of the other charge.

3            THE COURT:  But it's in the first line of this charge

4    on 32.

5            MR. McKAY:  Just to be clear, your Honor, I was

6    referring back not only to that but also if you go back to page

7    24, you begin by saying, "In order to sustain the charge, the

8    government must prove beyond a reasonable doubt the following

9    four elements."  You then list them, and the first sentence of

10   every single element you say "beyond a reasonable doubt."

11           With respect to the notion this is standard, it was

12   not in the Court's charge from the last trial, and it's been

13   included in some places because it was a defense proposal, but

14   I don't think it's all that common.  I think it's common to

15   state at the outset that you must consider all the elements.

16           MS. SHAPIRO:  Well, your Honor, I think it's important

17   to keep the charge balanced.  It was in all the *Percoca*

18   instructions.  The government isn't arguing that there's

19   anything legally incorrect, nor could it.  So we would

20   certainly object to it being taken out of the places it already

21   is.  And we think it should be at the end of each description

22   of the different substantive charges.

23           THE COURT:  I don't think it's needed on page 32 where

24   line one speaks of beyond a reasonable doubt.

25           The next point.

1          MS. SHAPIRO:  Your Honor, we would reiterate the

2    objections that we previously made, and this applies to a

3    number of the Court's instructions, but the first time I think

4    this comes up is on page 35 and 36 with respect to the elements

5    of agreement in the Count One conspiracy, and that is the

6    following:  There's, of course, the standard lengthy and

7    detailed circumstantial evidence charge earlier in the charge,

8    and yet nonetheless, in numerous places here and that follow,

9    there's additional language about circumstantial evidence which

10   we respectfully submit is unnecessary and unbalanced.

11         THE COURT:  Let me say that I reviewed in each

12   instance whether I thought it was helpful to the jury.  I think

13   it's helpful to repeat it with respect to reading someone

14   else's mind because it's such a foreign concept to a juror.  I

15   think that in a legal proceeding they should do that.

16         MS. SHAPIRO:  Well, I understand, your Honor, I just

17   think that it's unnecessary.  And if you read this entire

18   instruction, it's extremely unbalanced.  And in fact, most of

19   the language is about sort of how easy it is to infer such an

20   agreement.  And so we submit that it's not necessary, and we

21   object to repeating it here, and I will make the same objection

22   in other places.

23         THE COURT:  Could you point me to the specific

24   paragraph?

25         MS. SHAPIRO:  Sure, your Honor.

1              THE COURT:  Paragraph three?

2              MS. SHAPIRO:  The easiest point -- well, just a

3    moment, your Honor.

4              (Pause)

5              MS. SHAPIRO:  So we proposed -- I mean obviously the

6    Court rejected it, but we proposed the Judge Caproni

7    formulation because we thought it was simpler and more

8    straightforward, but the specific language I'm talking about

9    includes -- sorry, I'm trying to look at the red line and

10   compare it -- try to see where it is.

11             In the paragraph that starts "It is sufficient," at

12   the bottom of page 35, the second sentence -- yeah, the second

13   sentence that says "express language or specific words are not

14   required to indicate assent or attachment to a conspiracy, nor

15   is it required that you find any particular number of alleged

16   co-conspirators joined in the conspiracy," that's one example.

17             THE COURT:  I didn't follow along with you.  What

18   paragraph?

19             MS. SHAPIRO:  Sorry, this is -- it's at the very

20   bottom of page marked -- the paragraph that -- actually before

21   I get to that there's one other thing.  So in the paragraph

22   above of that, the one on page 35 that starts "To establish a

23   conspiracy" --

24             THE COURT:  Yes.

25             MS. SHAPIRO:  -- about five or six lines down it

I75TSKE5                    Charge Conference

1    says -- after explaining using the standard language that

2    people don't need to sit around a table and enter into a solemn

3    compact and so forth, there's a sentence that says, "Indeed, it

4    would be extraordinary if there were such a formal document or

5    specific oral agreement."  We would ask that that specific

6    sentence be struck.

7          It then goes on to explain that much is left to

8    unexpressed understanding, which I understand the Court thinks

9    is an important concept to elaborate on.

10          And then in addition to that, at the bottom of the

11    page, the last line, the sentence that starts "Express

12    language," we had asked the Court to strike that sentence and

13    the next one.

14          And then just to illustrate -- I mean I understand the

15    Court is inclined to leave a lot of this, but just to

16    illustrate why we think it's unbalanced, the instruction then

17    goes on later on page 36 -- sorry, your Honor, I'm trying to

18    track what was taken out.

19          (Continued on next page)

20

21

22

23

24

25

1            THE COURT:  That's okay.

2            MS. SHAPIRO:  I mean, I guess what I would say is I

3     understand the Court struck out some of the language we

4     objected to but it goes on and it really goes on and on for

5     multiple paragraphs explaining the government's perspective, if

6     you will, on this.  So, we think it would be more balanced if

7     it was shorter and didn't include as much language such as the

8     two sentences I focused the Court on earlier.  I just think it

9     is unbalanced.

10           MR. BROD:  Your Honor, if we could supplement the

11    point that Ms. Shapiro is making?  On page 35, middle of the

12    paragraph, there is a sentence following the "it would be

13    extraordinary" which Ms. Shapiro has objected to.  The Court

14    says:  When people agree to enter into a criminal conspiracy,

15    much is left to unexpressed understanding.

16           In our view it would be more balanced for the Court to

17    stick to, in a sense, the dry legal concept which is that a

18    conspiracy may be proven by showing only the unexpressed

19    understanding of the parties rather than the sort of more

20    general observation which tend to imply in the Court's

21    experience people can enter into a conspiracy which, in our

22    view, tends to imply that the people at the table here may --

23    and I know that's not what the Court would be saying, but "when

24    people enter into a conspiracy" language invites a conclusion

25    about experience rather than law and I think we would prefer

1    something slightly dryer.

2            THE COURT:  I understand.  I think conspiracy is very

3    hard for jurors to understand and that it warrants a long

4    explanation so I am inclined to leave it as it is.

5            MS. SHAPIRO:  Thank you, your Honor.

6            So, the next thing we have is on the membership

7    element.

8            THE COURT:  37.

9            MS. SHAPIRO:  Yes.  I need to switch to the other

10   document because at this point my pages change.

11           THE COURT:  Take your time.  I know it is hard.

12           MS. SHAPIRO:  Yes, page 37.

13           So, I guess a couple things.  One of the reasons we

14   proposed the shorter instruction that Judge Caproni gave here

15   is because we think it is more balanced but the Court,

16   obviously, has opted for the longer version and we think that

17   there are a couple problems with it in terms of the balance.

18   One is, again, I believe that the Court goes on, at some

19   length, to discuss circumstantial evidence and this is not only

20   after the main circumstantial evidence instruction but also

21   after having the previous instruction that we were just

22   discussing.  And at the same time, and I don't know if this was

23   in our objections, we may not have caught it earlier but the

24   concept, although it is alluded to here and there that the

25   defendant has to intend to join the agreement knowing of its

1    unlawful aims, we feel like it is not adequately explained and,

2    among other things, and this is consistent with the language of

3    the indictment, there is typically an instruction that talks

4    about knowingly, willfully, and intentionally and willfully is

5    not in here.  So, our first choice actually would be if the

6    Court could make some changes to add some specific language

7    that's in Sand along those lines and I can propose it or, at a

8    minimum, to strike some of the repetitive circumstantial

9    evidence language but --

10            THE COURT:  I think I want to keep the circumstantial

11   evidence point but I want to hear you on that.

12            MS. SHAPIRO:  Thank you, your Honor.

13            THE COURT:  Isn't willfully included in the concepts

14   of intentionally and knowingly?

15            MS. SHAPIRO:  Well, your Honor, I think it is fairly

16   standard to include it as a separate -- well, maybe I could

17   just propose the language and the Court can think about it.

18            So, the first, it is just in two places that we would

19   propose and, again, this is taken from Sand instruction 19-6.

20   So, at the end of the second paragraph -- sorry -- in the

21   second paragraph on page 37 at the end of the first sentence,

22   so after the phrase, "awareness of the generally unlawful

23   nature of his acts," we would propose adding the following

24   language:  And the specific intention of furthering its illegal

25   objective.

I755ske6                        charge conference

1          And then there is one other place where we would

2     propose adding some language on this page.  So the other one

3     would be a little further down the page after the penultimate

4     paragraph right before the one that starts "now," we would

5     propose adding a paragraph that, again, is contained in that

6     same Sand instruction and adapt it from the honest services

7     fraud conspiracy instructions, it says:  The defendant must

8     have acted willfully, meaning with an intent to do something

9     that the law forbids, that is to say with bad purpose either to

10    disobey or disregard the law.

11          THE COURT:  I think that's standard.

12          Does the government object?

13          MR. McKAY:  Well so, your Honor, first of all, despite

14    having about five different red lines of this document, this is

15    the first we are hearing of this so it is a little difficult to

16    agree on the fly.  But, as I recall from the first trial, and I

17    am looking at our instructions now, we did not have willfully

18    in the extortion conspiracy, we did have it in the honest

19    services conspiracy and that's because they're two different

20    conspiracy statutes.  You will note that when we get to the

21    honest services instruction here we do have willfully included

22    and I think the distinction for that, as I recall, is by virtue

23    of statute but I'm --

24          MS. SHAPIRO:  Your Honor, just to be clear, and I know

25    the Court is aware of this but I wasn't involved at all in the

1    first trial and I apologize that, you know, that I am just

2    bringing this to the Court's attention now.

3              THE COURT:  It is not a problem.

4              MS. SHAPIRO:  It just occurred to me when I was

5    reeding the draft but "willfully," there is nothing in the

6    extortion statute that is different in this regard but

7    "willfully," the notion of "willfully," the notion that the

8    defendant has to understand that the conspiracy has a purpose

9    to disobey or disregard the law is true in all conspiracy

10   statutes.  That's the *mens rea* for conspiracy and for

11   intentionally joining a conspiracy, the second element, and it

12   doesn't change with regard to the type of conspiracy.  I am not

13   aware of any case that would suggest that.

14             MR. McKAY:  Your Honor, just two points.

15             The first is that if the concern is that the *mens rea*

16   include knowledge of its unlawful purpose and in furtherance of

17   the unlawful object, that sentence appears exactly one

18   paragraph above what Ms. Shapiro is now trying to edit so that

19   *mens rea* is fairly included.

20             We are happy to take whatever suggestions she has

21   under advisement and look into whether there is some case law

22   supporting what she is saying but it is a little bit hard when

23   this is the first time we are hearing of this despite all these

24   different red lines we have done back and forth.

25             THE COURT:  I am not clear on how "willfully" differs

I755ske6                        charge conference

1   from an act that is done deliberately and purposefully.

2           MS. SHAPIRO:  Well, your Honor, it is quite different

3   in the following sense.

4           So, the intentionally point is that the defendant knew

5   what he was doing, if you will, that it wasn't a mistake and he

6   didn't realize he was doing it, whereas the point of willfully

7   in this particular context is that the defendant has to have

8   understood that the purpose of the conspiracy was to do

9   something the law forbids.  And so, I think intentionally is

10  slightly different, it is like an absence of mistake and it

11  doesn't necessarily require any showing of consciousness that

12  the purpose is something that's illegal.  That's the

13  distinction.  And I think it is very important in this

14  particular case, especially given we had testimony about ethics

15  training and so forth, and on the particular facts of this case

16  obviously the defense is that there wasn't a corrupt intent,

17  there wasn't an intent to do something that the law

18  specifically forbids and it is absolutely crucial to the

19  defense.

20          THE COURT:  So you want to get in, I take it, the

21  concept of you are doing it with knowledge that the law forbids

22  it.

23          MS. SHAPIRO:  Correct, your Honor.  That you are

24  joining the conspiracy understanding that its purpose is to

25  break the law.

I755ske6                        charge conference

1              THE COURT:  Okay.

2              MR. McKAY:  Your Honor, if I may?

3              First of all, "willfully" is a legal term of art that

4    have different meanings in different contexts.  There are

5    contexts in which it means actually knowing the specific law

6    that you are violating.  That's not the specific case.  But it

7    is a confusing legal term.

8              What Ms. Shapiro is advocating for is exactly what the

9    Court has said, at second paragraph of 37:  Intentionally and

10   knowingly entered into the conspiracy or agreement with a

11   criminal intent, that is, with awareness of the generally

12   unlawful nature of the acts.

13             That's exactly what she is arguing for.

14             THE COURT:  It is here, yes.

15             MS. SHAPIRO:  Your Honor, I guess part of the point

16   here is that we've objected to this particular instruction

17   which goes on for numerous pages and extensively gets into the

18   circumstantial evidence point yet again, now the third time in

19   the instructions, and we think when you read this instruction,

20   as a whole, it's unbalanced.  So, we are suggesting some

21   additional language.  It may be alluded to earlier but we think

22   it is important to keep the instruction balanced and that

23   without it, it is too heavily weighted in favor of the other

24   language about how easy it is to find that someone has joined

25   an illegal conspiracy.  That's really the point.

I755ske6                      charge conference

1           So, if the Court wants to go back to a shorter version

2     we are happy with that, that's what we initially proposed but

3     we feel quite strongly that in this, with this instruction, if

4     the Court is going to keep the extensive discussion that

5     follows about circumstantial evidence, that it's important even

6     if it's maybe a little repetitive to include, make sure that

7     the concept that the jury has to find this concept of

8     willfulness, as it applies in the context of this element of

9     conspiracy, even clearer.

10          THE COURT:  In my view, each paragraph here has a

11    separate purpose and I do not think that repeating the notion

12    of willfulness or that one knew that he was doing something

13    unlawful, will add.  I think it may detract and be more

14    confusing.

15          Let's go to the next point.

16          MS. SHAPIRO:  The next, I know the Court has thought

17    about this because it was briefed extensively but just to note

18    for the record our objection.

19          We did ask several times in original requests to

20    charge, the objections we filed on Tuesday as well as in our

21    July 1, 2018 letter, that the Court instruct the jury that it

22    had to unanimously agree on at least one company that was the

23    intended victim of the conspiracy.  I understand Court has no

24    doubt considered that but I just want to preserve the

25    objection.

I755ske6                      charge conference

1           THE COURT:  I think that is not the law.

2           The next point?  Does the government have anything up

3    to page 41?

4           MR. McKAY:  Not until page 44, your Honor.

5           MS. SHAPIRO:  This is another thing I am sure the

6    Court has thought about but I want to note.  On 43, we had

7    proposed -- well, hold on one second.  (pause)  The only thing

8    actually, and again I know the Court took additional briefing

9    from the government but we do object to the third paragraph on

10   page 43 and the sentence that says:  Additionally, a defendant

11   need not be a fiduciary for the reasons.

12          We are not aware of any Second Circuit authority for

13   this, we think it is confusing and unnecessary given that it is

14   a conspiracy charge and I think we laid this out both in our

15   most recent objections at page 60, note 58 and in our initial

16   objections at 66, note 50.

17          THE COURT:  You are saying that the third paragraph is

18   inconsistent with the law?

19          MS. SHAPIRO:  This notion that the defendant need not

20   be a fiduciary, just that sentence.

21          THE COURT:  And what is wrong with that?

22          MS. SHAPIRO:  Well, I don't think that's the law, your

23   Honor.  I think that the reasoning of the case law is that the

24   reason is that public officials do have a fiduciary duty and in

25   the private context that's not the case, that it's not

I755ske6                        charge conference

1    required.

2              THE COURT:  I think maybe you and I are reading this

3    differently.

4              To me what this is saying is that someone can be found

5    guilty of honest services fraud if that person participates in

6    a scheme intended to deprive the public of right to a public

7    officials honest service.  So, it is not talking about the

8    general liability of an individual, it is talking about an

9    individual who participates in a scheme to deprive the public

10   of the public official's honest services.

11             MS. SHAPIRO:  I see what you are saying, your Honor.

12   I guess maybe that it is more of an issue for Adam Skelos, I

13   guess, than Dean.

14             THE COURT:  Right.

15             MS. SHAPIRO:  I don't know if they have any comments

16   on it or not.  I found it confusing, so.

17             THE COURT:  It may be that it is the first clause that

18   is confusing.

19             MS. SHAPIRO:  Yes.  I mean I think, again, they can

20   speak for their client but it might be clearer if -- I think

21   that is what's confusing.  Obviously we are not disputing that

22   a private citizen can be found guilty if they participate in a

23   scheme to deprive the public of the public official's honest

24   services.

25             THE COURT:  I think it would be better to phrase it

I755ske6                         charge conference

1    positively rather than negatively, as you are doing.  I mean

2    positively as are you doing.

3            MR. KENNEY:  You are taking out the language in the

4    first line.

5            THE COURT:  We are considering what the lead-in should

6    be to the third paragraph on page 43.  It begins with a

7    negative proposition which is not usually as useful as the

8    positive one.

9            MR. KENNEY:  May I make a suggestion, your Honor:

10   Additionally, a private citizen -- strike for instance -- does

11   not owe a duty of honest services to the public but can be

12   found guilty of honest services fraud, etc.

13           THE COURT:  How about:  Someone who is not a fiduciary

14   can be guilty of this offense, a private citizen, for instance,

15   and so on.

16           MR. KENNEY:  It seems to me for the jury "fiduciary"

17   is not particularly meaningful and maybe that should come out.

18           THE COURT:  How about someone who is not a public

19   official --

20           MR. KENNEY:  Yes.

21           THE COURT:  -- can be guilty of this crime, of this

22   offense.

23           MR. KENNEY:  That's clear.

24           THE COURT:  That is better, I think.

25           Any objection to that?

I755ske6                         charge conference

1          MR. McKAY:  So it would be --

2          THE COURT:  I will read it, if you would like:

3     Someone who is not a public official can be guilty of this

4     offense.  And then you go on with the rest of the paragraph, a

5     private citizen.

6          MR. McKAY:  No objection.

7          THE COURT:  Okay.  Thank you for that.  That does make

8     it clearer.

9          I don't think we need to keep in "additionally."

10         MS. SHAPIRO:  That's right, your Honor.

11         MR. McKAY:  No objection.

12         THE COURT:  Okay.

13         Ms. Shapiro, one point of yours may have gotten

14    inadvertently lost.  On page 37, paragraph 2, first sentence at

15    the end of it you were proposing to add?

16         MS. SHAPIRO:  Yes.

17         THE COURT:  "And the specific intention of furthering

18    its illegal objective."

19         MS. SHAPIRO:  Correct, your Honor.

20         THE COURT:  I haven't heard the government on that.

21         We are on page 37, paragraph 2, line 3.  At the end of

22    that sentence that ends on line 3, after the word acts, add:

23    And the specific intention of furthering its objective.

24         MS. SHAPIRO:  Its illegal objective.

25         THE COURT:  Its illegal objective.

1              MR. McKAY:  Your Honor, I think the point that I had

2    made is that if you look three lines up it says:  Participated

3    in the conspiracy with knowledge of its unlawful purpose and in

4    furtherance of its unlawful objective.

5              THE COURT:  I think it is taken care of there.  Okay.

6              MS. SHAPIRO:  So the next thing we have is something

7    on 44 but I think the government said it had something on 44 as

8    well.

9              MR. McKAY:  Also on 44.

10             THE COURT:  Okay.

11             MS. SHAPIRO:  You go first.

12             MR. McKAY:  So, the first paragraph begins by defining

13   whether a statement is false and then the third sentence says:

14   The government must prove that the defendant made false

15   representations deceitfully, that is, with the specific intent

16   to harm or defraud the State of New York.

17             Our concern on that is that, first of all, that

18   doesn't talk about what is false and what is not false and

19   scheme to defraud has been defined just earlier on page 43,

20   second to last paragraph:  That, thus, a scheme to defraud in

21   this context is a plan to deprive the State of New York and its

22   citizens of their right to Dean Skelos' honest services through

23   bribery.

24             So, we think this sentence is redundant of that --

25             THE COURT:  Yes.

1          MR. McKAY:  -- so it should be left out.  Though, if

2    it were to be included, we think it should just be consistent

3    with the prior sentence because our understanding is that the

4    consideration here is defraud the citizens of its honest

5    services, not a specific harm --

6          THE COURT:  Right.

7          MR. McKAY:  -- to the State of New York which specific

8    harm implies something different.

9          THE COURT:  I will take out the last sentence of the

10   first paragraph on page 44.

11         Go ahead, Ms. Shapiro.

12         MS. SHAPIRO:  I was just going to, just observe that

13   the discussion just illustrates how ill-suited the statute is

14   to cover bribery but that's a debate for another day.

15         That's fine with us, your Honor.

16         THE COURT:  Okay.

17         MS. SHAPIRO:  I had something just two paragraphs down

18   and I know the Court has considered this because we briefed it

19   on July 1st and the government responded, I believe last night,

20   but I do want to preserve our objection and note that we

21   believe that we are entitled to an instruction as we proposed

22   in, most recently, in the red line we submitted on July 3rd; at

23   page 61 towards the bottom, that an omission of material facts

24   may only constitute a false representation if the government

25   proves that Dean Skelos had an affirmative duty to disclose the

1    omitted facts.  If the government fails to prove that Dean

2    Skelos had such a duty, then any omission alleged by the

3    government cannot constitute a false representation and must be

4    disregarded.  And we cited several authorities in footnote 60

5    for that proposition.

6              So, I just want to note our objection to that on those

7    grounds.

8              THE COURT:  Thank you.  I did consider that.

9              MS. SHAPIRO:  Then, I just want to also again for the

10   same purpose we have already discussed it, but on page 45 there

11   are a couple of places where the -- the "as opportunities

12   arise" language appears again and for the same reasons --

13             THE COURT:  Yes.

14             MS. SHAPIRO:  -- we object to that.

15             THE COURT:  That's noted.

16             MR. McKAY:  We have one page on page 45, or perhaps

17   two things.

18             THE COURT:  Okay.

19             MR. McKAY:  The second full paragraph which begins the

20   government does not have to prove.  The second sentence refers

21   to being influenced to take a specifically identified official

22   action.  We think that phrase is inconsistent with the "as

23   opportunities arise."

24             THE COURT:  It is.

25             MR. McKAY:  And should be struck.

1            MS. SHAPIRO:  We object, your Honor.

2            THE COURT:  So, you would take out, in exchange for

3    being influenced to take a specifically identified official

4    action.

5            MR. McKAY:  We would just take out the phrase:

6    Specifically identified.  Oh, I guess then it says the same

7    thing twice.

8            THE COURT:  Right.

9            MR. McKAY:  It is fine to say it once in exchange for

10   being influenced to take official action as the opportunities

11   arose.

12           THE COURT:  Yes.  I will make that change.

13           MS. SHAPIRO:  Again, we object, your Honor.

14           THE COURT:  Right.

15           Should "opportunity" be singular or plural?  Does it

16   matter?

17           MR. McKAY:  Probably plural.

18           THE COURT:  Okay.  Yes.

19           MR. KENNEY:  May I note, your Honor, I will be going

20   to Judge Sweet's courtroom for 20 minutes and I will be back.

21           THE COURT:  Okay.  Thank you.

22           MR. BROD:  And of course I'm still present here for

23   Adam Skelos.

24           THE COURT:  You are in charge.

25           MS. SHAPIRO:  Your Honor, we had a couple points on

I755ske6                          charge conference

1    page 46.

2              THE COURT:  Okay.

3              MS. SHAPIRO:  On the top of the page at the end of the

4    first line the sentence starts, "Also," yet again, the Court is

5    repeating the circumstantial evidence point --

6              THE COURT:  Right.

7              MS. SHAPIRO:  -- we just submit it has been -- it

8    appears so many times in the charge and for all the reasons I

9    discussed earlier, we think it is unnecessary and repetitive

10   and makes the charge unbalanced.  So, we ask the Court to

11   consider taking that out here.

12             THE COURT:  Again, for the reasons I have expressed

13   earlier where a concept is likely to be somewhat foreign for a

14   juror, I think it bears repeating.

15             MS. SHAPIRO:  Understood, your Honor.

16             And then two other things in the second paragraph on

17   this page, one is just in the third line we object to "as

18   opportunity arise" for the same reasons.

19             THE COURT:  Right.

20             MS. SHAPIRO:  And then the last sentence says:  On the

21   other hand, if you find that the government has proven that

22   Dean Skelos accepted payments or things of value intending, at

23   least in part, to take official action in return for those

24   payments, again, as the opportunities arise, then this element

25   of the substantive crime will have been proven.

1          In addition to the "as opportunities arise" issue, we

2     think at least in part is objectionable, it is confusing, and

3     may mislead the jury into believing that the public official

4     does not need to intend to make good on the corrupt bargain and

5     the Court has, I think otherwise, accepted our argument that at

6     least the official has to have the intent to make good on the

7     bargain so we would ask the Court to strike that phrase at, at

8     least in part.

9          MR. McKAY:  Your Honor, may I propose a compromise

10    which is, at least in part in our view it is critical for the

11    dual intent point that the Court has settled, I believe, in our

12    favor.  So, to remove any confusion there you could remove "at

13    least in part" to after "in return."  So it would say:  To take

14    official action in return, at least in part for those payments.

15         THE COURT:  I think that's clearer.

16         MS. SHAPIRO:  Yes, that's better, your Honor.

17         THE COURT:  Okay.  We will make that change.  We are

18    moving, on page 46, three lines from the bottom, we are taking

19    the words "at least in part" out of that, placing them right

20    after, "in return," on the second line from the bottom.

21         MS. SHAPIRO:  Your Honor, the next thing I have is on

22    page 47.

23         So, I know what you are going to say about this but

24    towards the bottom of the page on the last paragraph, once

25    again it says circumstantial evidence, if believed, is of no

1  less value than direct evidence and we object to that for the

2  same reason, that it's again repetitive and makes the charge,

3  as a whole, unbalanced to discuss that so many times.

4          THE COURT:  I am going to reread the paragraph.  I

5  think we could take out the second sentence which I think is

6  redundant.

7          MR. McKAY:  Your Honor, is that the one that begins

8  circumstantial evidence, if believed.

9          THE COURT:  If believed, right.

10          MR. McKAY:  That's fine.

11          THE COURT:  I will take that out.

12          MS. SHAPIRO:  The next thing I had, again I understand

13  the Court considered this and we discussed it earlier in

14  connection with the other instruction but we just want to

15  preserve our objection that we request that the Court instruct

16  the jury that it has to unanimously agree on one company that

17  was the intended victim for the reasons we argued previously.

18          THE COURT:  I note your objection.

19          MS. SHAPIRO:  Thank you, your Honor.

20          THE COURT:  Does anyone think we should keep conscious

21  avoidance?

22          MR. McKAY:  Your Honor, we have one thing before we

23  get to that --

24          THE COURT:  Okay.

25          MR. McKAY:  -- which is page 50.

1          Here you have if you find all the required elements

2     language that was not included in the extortion count and, as

3     we discussed, it is redundant of the fact that the Court has

4     already made clear that the jury needs to find each element

5     beyond a reasonable doubt.  So, we think it's better to strike

6     it both because it's correct and for consistency purposes.

7          MS. SHAPIRO:  And, your Honor, we object for the

8     reasons discussed earlier.

9          THE COURT:  I am going to take it out, noting your

10    objection.

11         Conscious avoidance.

12         MS. SHAPIRO:  Well, your Honor, we object.  We think

13    first of all that, and we have briefed this a little bit but

14    there is no legal basis for it.  We think on the facts of this

15    case it makes absolutely no sense.  There is no evidence to

16    suggest that Dean Skelos was aware of a high probability of any

17    particular fact that he should have known and failed,

18    deliberately failed to investigate or failed to verify it.  I

19    have no idea what the conceivable basis could be for the

20    instruction and the facts in this case but I don't know what

21    the government's position is.  I asked them before the break

22    and they said they were going to confer.  And so, maybe they're

23    not asking for it.

24         MR. DISKANT:  Your Honor, we are asking for it.

25         We think it is appropriate on these facts because we

I755ske6                        charge conference

think the defendants have put in dispute the defendants'

knowledge of certain elements that are essential to a finding

of guilty and there is a factual predicate from which the jury

could in fact find the defendants deliberately closed their

eyes to them.

          THE COURT:  Can you remind me?

          MR. DISKANT:  Absolutely, your Honor.

          So, I think perhaps the easiest example is the PRI

scheme in which there is really no question that there is an

agreement or at least a jury could find that there is an

agreement between Dean and Adam Skelos which is going to

involve Adam Skelos getting a job or getting payments from PRI.

And there is also facts from which the jury could find that

Dean Skelos was put on notice of any number of red flags about

this situation -- the call from Anthony Bonomo, for example, in

which he is told about the fact that his son is not showing up

for work and is causing a disturbance when he does, the visit

from al D'Amato when Al D'Amato provides the same information.

A jury could conclude on those facts that by not asking are to

more information and by not doing more, Dean Skelos was

deliberately closing his eyes to information that would lead a

reasonable person to see the full criminal nature of the

agreement.

          This is directly on point, I should note, with Second

Circuit law on this very instruction.  The Second Circuit's key

case on this is United States v. Reyes which is 302 F.3d 48.

In Reyes you had a defendant who is charged with conspiring to

distribute stolen air bags, I believe it was, and there is no

question that the defendant in that case had agreed with other

people to distribute air bags.  There was also no question that

there were lots of facts from which the defendant should have

known that the air bags in question were stolen.  But the

defendant denied knowing that the air bags were stolen which is

effectively denied knowing that everything around him happening

was criminal.  The Second Circuit said there was a factual

predicate there and was properly given there because there are

facts in the record from which the jury could conclude that the

defendant should have been on notice, should have been aware of

the full criminal nature of what he was doing.

          So, we think that the record, as it has come in here,

supports giving the instruction.

          MS. SHAPIRO:  Your Honor, may I respond?

          THE COURT:  Yes.

          MS. SHAPIRO:  Respectfully, that makes no sense.

          This isn't a case about stolen property where the

government has to show that the defendant knew the property was

stolen.  The government has not cited a single case involving

the charges here and it doesn't make any sense.  This is a

bribe -- these are all bribery-related crimes, there has to be

a quid pro quo.  Either Dean Skelos was aware that there was a

I755ske6                        charge conference

 1    quid pro quo or he wasn't, but it is hard for even me to

 2    understand how this concept could have anything to do with this

 3    case.  It just doesn't make any sense, your Honor, and I think

 4    it is going to be incredibly confusing for the jury and there

 5    isn't any -- it just doesn't make any sense in the context

 6    there isn't an element, they're not even explaining what he

 7    would have known that would have made him guilty if he wasn't,

 8    under their theory, already guilty because he was supposedly

 9    engaged in this bribery-related scheme.

10        I mean, it just doesn't make any sense in the context

11    of a bribery scheme.

12        THE COURT:  I think I finally understand it, which is

13    as was just described.

14        If Dean Skelos purposely avoided learning the extent

15    of the unlawfulness of paying Adam for a no-show job, he was

16    engaging in conscious avoidance of understanding the magnitude.

17        MR. BROD:  It is not unlawful for Adam Skelos to have

18    a no-show job.  What is unlawful is for there to be an

19    agreement -- an agreement -- a corrupt agreement, and all of

20    what is in here essentially boils down to that.

21        So, as I was listening to Mr. Diskant talk about Dean

22    Skelos closing his eyes to the existence of a corrupt agreement

23    between him and these other parties, I was struck by -- and

24    maybe it was just -- I did not, for the life of me, understand

25    what he was talking about.  I do not think it is possible for

1    you to close your eyes to the existence of a corrupt agreement

2    between yourself and somebody else, or any agreement.

3            So, for all of the reasons that Ms. Shapiro said --

4            THE COURT:  I think the point -- I am sorry to

5    interrupt, but I think the point is that if Adam had put in a

6    full day's work for his pay that it would have been less

7    corrupt.

8            MS. SHAPIRO:  No, your Honor.  I'm sorry.

9            MR. BROD:  No, your Honor.

10           THE COURT:  Do I have the government's point wrong?

11           MR. DISKANT:  Somewhat slightly, and let me know at

12   the outset because this would shorten this a little.  We would

13   have no objection to the Court giving this instruction solely

14   with respect to Dean Skelos.  We agree that it probably is not

15   appropriate with respect to Adam Skelos.

16           With respect to Dean Skelos, the Court I think has it

17   exactly right, which is that there are certain facts about this

18   arrangement that the defendant is claiming to be intentionally

19   avoiding confirming.  We wouldn't argue it with respect to the

20   defendant's state of mind.  We agree conscious avoidance, we

21   would have to argue that based on the other evidence in the

22   case.  But, with respect to the bribe payor's state of mind

23   there has been an enormous amount of argument through

24   cross-examination and in opening about how the reason Anthony

25   Bonomo is giving Adam Skelos this job is because he feels bad

I755ske6                          charge conference

for Adam Skelos or because he is an old friend of Dean Skelos.

Similar arguments have been made about Charles Dorego, he is

just trying to curry with a powerful politician.  That is the

issue on which conscious avoidance would be most appropriate,

that is that the defendant deliberately closed his eyes to what

was actually happening, intent of the bribe payor, which

completes the quid pro quo.

          MR. THAYAMBALLI:  Your Honor, may I add something?

          I think it may help if we step back and consider when

conscious avoidance is appropriate in a conspiracy case and, as

the instruction explains, conscious avoidance is only

appropriate as to the defendant's knowledge of the objects of

the conspiracy and not to whether the defendant agreed with

someone else to become part of the conspiracy.  That's in this

conscious avoidance charge, it is also in, I believe, the

Farini case in the Second Circuit.  So, analogously, if you

can't consciously avoid knowing that you have entered into a

conspiracy, you can't consciously avoid knowing that you have

received a bribe or that you are entering into a quid pro quo.

Both of them involve agreements and it is an intent element not

merely a knowledge element.  And so, as a result, that is

precisely why it makes no sense to say that Dean Skelos

consciously avoided knowing whether he was receiving bribes,

the bribes require intent and not merely knowledge.

          MS. SHAPIRO:  Your Honor, just one other thing I was

1    going to add and I know Mr. Brod made this point, but the fact

2    of the no-show job in and of itself doesn't prove the crime so

3    there had to be an exchange and you can't consciously avoid

4    being involved in a quid pro quo.  They can argue that the fact

5    that it was supposedly a no-show job is evidence that helps

6    support their theory of a quid pro quo but it doesn't -- in and

7    of itself, the fact that Adam wasn't showing up to work isn't

8    what makes it a crime.  It has to be that the money was

9    accepted and he wasn't going to work and Dean Skelos knew that

10   and was allowing that to happen in exchange for his support for

11   legislation or whatever they're going to argue the official

12   action is.  But the fact of it being supposedly a no-show job

13   or not and whether Mr. Skelos knew about that doesn't, itself,

14   prove a crime, even if true.  That's the point, your Honor.

15   It's just not relevant to the elements of these crimes.  That's

16   why they're not able to cite a corruption case for this.  And I

17   also want to point out that in the last trial, the government's

18   argument was that it was Adam Skelos who was consciously

19   avoiding, not Dean.

20           In any event, we think this is incredibly confusing,

21   it is inappropriate, and it would be legally erroneous for the

22   Court to give the instruction on the facts of this case with

23   these charges and the evidence as it has come in.

24           MR. DISKANT:  Just very briefly.

25           That's not accurate.  Ms. Shapiro is not correct.  We

1    argued it with respect to Dean Skelos at the last trial.  I can

2    give this Court a citation, United States v. Skelos.  These

3    very arguments were presented to the Second Circuit on appeal.

4    The Second Circuit said absolutely nothing about them while

5    clearly coming out on other issues and providing guidance for

6    the tremendous trial.  If the Second Circuit thought this

7    instruction was improperly given, assuredly they would have

8    said something in response to Ms. Shapiro raising this claim on

9    appeal.  They didn't because it was appropriately given the

10   first time and we believe it should appropriately be given the

11   second time.

12           THE COURT:  What are other examples of Dean Skelos'

13   conscious avoidance?

14           MR. DISKANT:  I think it has to do with his, with

15   respect to each scheme, his understanding of the intent of the

16   bribe payor or the extortion victim.  They're flip-sides of the

17   same point.

18           So, with respect to each of them, we presume the

19   defendant -- well, we know the defendants have and we presume

20   they will continue to offer some sort of innocent explanation

21   for what Dean thought might be in the mind of Anthony Bonomo.

22   Right?  Anthony Bonomo just feels sorry for Adam and he is

23   doing this because he is an old-time friend; Charles Dorego is

24   a powerful real estate executive who wants to curry favor with

25   him; AbTech is a legitimate business that really thinks that

1    Adam is an up-and-comer.  It is the bribe payor's state of

2    mind, the bribe payor's intent or the extortion victim's state

3    of mind that really comes into play that we believe Dean Skelos

4    has been denying knowledge of what Anthony Bonomo's intent was

5    in making these payments, denying knowledge of what AbTech was

6    doing in making these payments, denying knowledge of what

7    Charles Dorego and Glenwood were doing in directing the title

8    work.

9            We believe that's the appropriate basis for the

10   instruction.

11           MS. SHAPIRO:  Your Honor, just to be clear also on

12   that point, it has to be a reasonable expectation on the

13   victim's part but I don't think that adds anything.  They also

14   haven't pointed to anything that actually shows any deliberate

15   actions on the part of Dean Skelos to avoid learning the facts.

16   And it's quite clear from all the case law including the

17   Supreme Court decision in Global Tech and the Second Circuit

18   cases that even if in a situation in which conscious avoidance

19   might otherwise be appropriate, that it would not be

20   appropriate -- that it requires a showing not only that the

21   defendant was aware of a high probability of the supposed fact

22   but also that the defendant deliberately avoids learning those

23   facts and there is no evidence that Dean Skelos ever said, you

24   know, I'm shutting my eyes to this, I'm going to avoid asking

25   these questions.

1          THE COURT:  He said "work it out" instead of having a

2     serious discussion of Adam's work on the site.

3          MS. SHAPIRO:  Well, Mr. Bonomo testified that he told

4     Dean Skelos what was going on and what Curcio had told him so

5     Dean Skelos knew those facts.  He knew those facts.  Bonomo

6     described them to him.  What was he deliberately avoiding

7     learning, your Honor?  It just doesn't make any sense and,

8     frankly, I'm really -- I don't understand why they're pushing

9     so hard for this in the context of this particular trial when

10    they have so many other things they can argue based on the real

11    instructions and the real elements here.  I just don't

12    understand and that is on them but I really don't -- I think

13    they're leading the Court into error on this if the instruction

14    is given and it would be extremely prejudicial to Dean's

15    defense and Adam's defense.

16          Lastly, with regard to the argument that was made in

17    the appeal, it was actually made by Adam Skelos and the reason

18    it was in Adam Skelos' brief and not in our brief was because

19    the argument in the trial Court was based on Adam.  But I don't

20    think that's important.  I think what's important -- and the

21    Circuit did not pass on it one way or the other in any direct

22    way and I think what's important is the context of this trial

23    and it's completely inappropriate here.

24          THE COURT:  Could you tell me, I understand you think

25    there is no factual basis for it.  What is prejudicial if there

I755ske6                          charge conference

1    is no factual basis?

2             MS. SHAPIRO:  You know, what's prejudicial is that it

3    adds a confusing instruction that doesn't fit the facts of the

4    case and the jury is going to be misled, potentially.  So, and

5    that's why the Second Circuit has held repeatedly that the

6    instruction is not supposed to be given unless there is a

7    factual basis.

8             Now, you know, the Court may think, well -- and

9    respectfully -- well, maybe it will be harmless error if the

10   defendants are convicted but I don't think that's the

11   appropriate way to look at this.  I mean --

12            THE COURT:  I'm not suggesting that.

13            MS. SHAPIRO:  No, I understand, your Honor, and I

14   apologize, I am just being a little rhetorical here.  But, the

15   point is that it's, in any case, whether it is appropriate or

16   not, it can be a very important instruction for the government.

17   It essentially lowers the burden of proof for the government on

18   the intent element which is so critical in this particular case

19   and I think it adds a level of confusion especially because the

20   intent element here isn't so much about knowledge of the facts

21   like the supposed no-show job, it is really about whether the

22   defendant understood that he was engaging in a quid pro quo,

23   that he was intending to be influenced by these jobs or what

24   the government calls payments to his son and whether he was --

25   he was asking for them with a specific purpose of engaging in

I755ske6                     charge conference

that kind of a quid pro quo and essentially trading his vote

for the benefits.  That's what the case is about, it is not

about really about knowledge in a more classic case like the

stolen property case or a securities fraud case or something

like that.  It is just out of context and I think we feel very

strongly that it is going to confuse the jury and distract them

from the real issue of criminal intent or not that they need to

be thinking about.

          THE COURT:  With respect to this for that, if a

defendant deliberately avoids knowing the full extent of that,

I think that's relevant.

          MS. SHAPIRO:  Your Honor, but the issue isn't -- the

size of that isn't actually relevant.  So you could have a

bribery scheme where it is a minimal payment.

          THE COURT:  I don't think I am being clear enough.

          The full extent of Adam's refusal to put in a full

day's work is relevant, I think, to Dean's state of mind as he

works out the quid pro quo.

          MR. BROD:  Your Honor, if I might, Judge?

          I think the flip side of this is illustrated by the

so-called AbTech scheme in which there is no plausible

allegations other than a no-show job -- I'm waiting for the

government to disagree with me on this point -- but, clearly,

Adam was working but the yet the government is able to put in a

case that the payments given to Adam were not just for the work

1    he was doing on it but to secure Dean Skelos' support.  The

2    fact that a job may be a no or low-show job may be evidence

3    that might speak to intent but it's not the crime.  The crime

4    is always the corrupt exchange.  And, as I said before, I do

5    not think it is possible for a human being to be willfully

6    blind to the existence of an agreement to which they are a part

7    and don't think that makes any sense.

8           MR. DISKANT:  Your Honor seems to understand our

9    position.

10          Just very briefly, I think Mr. Brod's argument boils

11   down to this is why it is a jury instruction that can be argued

12   to the jury.  It is some evidence that is relevant.  To his

13   bigger point about how he doesn't know how someone can

14   unknowingly enter into a conspiracy, that's why I used the

15   example of the car parts.  Right?  There is clearly an

16   agreement going on to accomplish a common goal.  The defense in

17   that case was that the defendant was claiming to be unaware of

18   a fact that was essential to turn this from an innocent

19   agreement into a criminal one.

20          THE COURT:  And what is it here?

21          MR. DISKANT:  Here it is aspects of the bribe payor,

22   the extortion victim's mental state and what is going on with

23   respect to the, as your Honor put it, the "that" in the "this

24   for that."  So, in PRI it has to do with the circumstances

25   surrounding why it is that Adam Skelos is getting paid and what

1    is actually happening with respect to that employment.  The

2    term could potentially turn what the defendants have argued is

3    an innocent relationship into a criminal one.  The defendant

4    has denied knowledge of that.  We have elicited testimony that

5    the defendant was plainly on notice that there was something

6    improper there and to the extent he decided not to find out

7    more, that's classic conscious avoidance.

8            Your Honor heard a little bit of that today on the

9    AbTech scheme where Nick Barrella, the lobbyist, calls the

10   defendant to say your son just tried to retain me.  And there

11   is a pause on the call and Dean Skelos' answer is not to ask

12   more questions about what Adam is doing, not to try and find

13   out more about the situation, but simply to say something that

14   he knows won't actually be true, which is Adam Skelos is not to

15   lobby, he is not could come to Albany.  That is another fact

16   from which a juror could say that the defendant is deliberately

17   closing his eyes to information before him from which he should

18   have understood the full scope of the situation.

19           THE COURT:  All right.  To bring this to a close --

20   yes?

21           MR. THAYAMBALLI:  Sorry.  I would like to add one

22   thing.

23           The government is focusing on the intent of the payor

24   and how Dean Skelos consciously avoided knowing what the

25   payor's intent was, but for both extortion and honest services

I755ske6                          charge conference

fraud there is a corresponding component which is the intent of

Dean Skelos.  For extortion, Dean Skelos has to have intended

for the payor to believe that he would take official action in

exchange for the payment.  For honest services fraud, he has to

have intended to make good on the bargain and exchange official

action for the payment.  It doesn't make any sense for Dean

Skelos to have that corresponding intent if he is deliberately

avoiding knowing what the payor intends to do.  He has to know

that there is an exchange going on in order for his intent to

satisfy the elements of either extortion or honest services

fraud.  And so, as a result, there is no conceivable situation

in which he can consciously avoid knowing the intent of the

payor and that would satisfy the elements of the offenses.

          MR. BROD:  Just on prejudice, a big part of the

prejudice here is that the jury may leap to the same inference

that the government is making here, which would be incorrect,

and that would be willful blindness to the commissions of

Adam's employment at PRI matters.  And it doesn't.  So that

would be a large part.

          In other words, Judge, we are saying the government is

completely wrong but the jury might buy it.

          THE COURT:  I understand.

          I don't think I fully understand the government's

point.

          MR. McKAY:  Your Honor, I think one thing I can say is

I755ske6                          charge conference

1   to the extent that we are going to start closings tomorrow, I

2   don't think there is any chance we are going to get all the way

3   through them, I'm happy to not include anything about this in

4   my closing tomorrow if the Court wants to reserve on this and

5   think more about it because I do think there is a lot of other

6   issues we have to get to today, we ought to do that.

7           THE COURT:  Yes.  All right.  Let's move on.

8           MS. SHAPIRO:  So, the next thing we had was on page

9   54.

10          MR. McKAY:  We have something earlier than that, your

11  Honor, if we could.

12          THE COURT:  Okay.

13          MR. McKAY:  We are on page 53.

14          THE COURT:  Yes.

15          MR. McKAY:  This is the elements of bribery.

16          MR. KENNEY:  Before Mr. McKay starts, I want to note

17  that I have returned.

18          THE COURT:  Thank you.

19          MR. McKAY:  First, the third element that Dean Skelos

20  solicited, demanded, etc. something of value from another

21  person.  We would add "something of value for himself or

22  another person" since it does not have to be directly to Dean

23  Skelos and in fact the allegation here is that it is not

24  directly to Dean Skelos.  Say, for himself or a third-party.

25          THE COURT:  You want to strike "from another person."

I755ske6                          charge conference

1           MR. McKAY:  No.  "From another person" can remain but

2      we would like to clarify that Dean Skelos is accepting

3      something of value but that it doesn't necessarily have to go

4      to him, that it's something of value for himself or another

5      person.

6           THE COURT:  I see.  Okay.

7           MS. SHAPIRO:  I think that's fine.  It is obviously

8      correct.  You might want to say "or a third-party" because

9      otherwise it is a little awkward, otherwise you are saying

10     "another person" twice.

11          THE COURT:  It is awkward.  For himself.  It is hard

12     to de-awkwardize it.

13          MR. McKAY:  I think a third-party is fine.

14          THE COURT:  Third, that he solicited, etc., to accept

15     something of value for himself or a third-party.  From another

16     person?

17          MR. McKAY:  You might actually add it after "from

18     another person."  Something of value from another person,

19     comma, for himself or a third-party.

20          THE COURT:

21          (Continued on next page)

22

23

24

25

I75TSKE7                    Charge Conference

1           THE COURT:  Okay.  Or a third party.

2           MR. McKAY:  Then the sixth element says, "Sixth, that

3    the official act involved something of value of at least

4    5,000."  So here is where there's some awkwardness because the

5    statute says "transaction."  The Second Circuit has held that

6    McDonnell doesn't apply to 666.  We agreed for the purpose of

7    these instructions to use the official act language in the 666

8    instruction, so I'm not going back on that, but what I would

9    say is that when -- later, when we actually flesh out this

10   element, the Court has said something a little different.

11          So if you look to page 60 --

12          THE COURT:  Right.

13          MR. McKAY:  -- you describe the sixth element as that

14   the payment was related to official action on a government

15   matter or was at least 5,000.  I think that's a better

16   formulation and should be included when you introduce the

17   elements.  I think the idea --

18          THE COURT:  I think that's right.  So we'll strike all

19   of the last line on page 53 other than the word "sixth," and

20   we're going to add that the payment was related to official

21   action on the government matter worth at least $5,000.

22          MR. McKAY:  Thank you, your Honor.

23          Then the last thing on this page, and this carries

24   over to the few following pages, but in the defendant's

25   proposal, which the Court has adopted in your draft, the fourth

1    and fifth elements are broken up into two elements.  The way

2    the Court had previously instructed the jury on this and the

3    way we understood it was that those were the same elements,

4    that the corrupt intent was the intent to take an official act

5    in exchange for the thing of value.

6              So what we would propose is exactly what the Court did

7    the first time.  Well, not perhaps exactly, but close.  Last

8    time your Honor said "Dean Skelos acted corruptly with the

9    intent to be influenced or rewarded with respect to a

10   transaction of the State of New York."

11             I would take out "rewarded," to the extent we're

12   breaking out gratuities, which is fine, but we would combine

13   the fourth and fifth elements the way you did the first time,

14   so it would say, "Dean Skelos acted corruptly with the intent

15   to be influenced with respect to a transaction of the State of

16   New York."  And the reason for that is you're parroting the

17   statutory language, which is appropriate for this section, and

18   you can later elaborate on what the transaction is, that it's

19   an official act.

20             MS. SHAPIRO:  Your Honor, we object to that and we

21   appreciated the Court had actually taken this suggestion, which

22   I think is entirely correct as a matter of law, it's consistent

23   with several other instructions in 666 cases, including the *Ng*

24   *Lap Seng* case last year with Judge Broderick, and we think it's

25   important to separate out the element and explain separately

1    what corrupt means.  So we would ask the Court to keep this the

2    way it was.

3              THE COURT:  Why aren't they one and the same?

4              MS. SHAPIRO:  Well, because there's law as to what

5    corrupt means.  There's two separate things; one is the quid

6    pro quo, and the intent that goes with that, but there's also

7    case law that a corrupt intent involves some consciousness of

8    unlawfulness or wrongdoing, and that is encompassed in the

9    instruction the Court has in the draft, and we cited

10   authorities.

11             THE COURT:  I understand.

12             MS. SHAPIRO:  I can repeat them all.

13             THE COURT:  I think I'll leave it as is.

14             MS. SHAPIRO:  Your Honor, the next thing, we had an

15   objection on page 54, actually the last part of this

16   instruction, which is on the elements of agent of organization

17   or government.

18             Two points, your Honor.  First, we object to

19   instruction that all elected officials, including legislators,

20   are by definition agents of the state government.  And we cited

21   several authorities in the most recent objections, docket 385

22   at pages 77 to 78, note 84, our initial objections, docket

23   number 349-2 at 82 to 83, note 60, and in our July 1st letter,

24   docket number 378 at pages 8 to 9, which demonstrate that is

25   not accurate.

1        But also, at a minimum, it is improper to withdraw

2   this question from the jury and direct the jury to make a

3   finding that Dean Skelos was an agent.  He's got a Sixth

4   Amendment right, at a minimum, for the jury to make that

5   factual finding.  And the text of 666 treats government

6   agencies, including subdivisions of the legislative branch, as

7   separate, as we pointed out in our most recent objections,

8   docket 83, 85 at 77, note 83, as well as the initial

9   objections, docket 349 at 82, note 59.

10        THE COURT:  I considered that and will keep the

11   language I have.

12        MS. SHAPIRO:  Thank you, your Honor.

13        MR. McKAY:  We had something on the next page, page

14   55, your Honor.

15        THE COURT:  Yes.

16        MR. McKAY:  At several points in the 666 instructions

17   the defense has included and the Court has adopted the language

18   from 666(c) about bone fide salary, wages, fees.  I note for

19   that parenthetical there is considerable dispute in the

20   circuits about which of the subsections of 666 the bone fide

21   salary applies to.

22        Because there's so much dispute, we're happy to leave

23   it the way the defense has proposed it, but with one request,

24   which is that the Court define bone fide at some point, because

25   it's is not a plain language term the jury is likely to

1    understand.  And so we don't want the jury to be misled into

2    thinking that, for example, a bribe payment is okay under 666

3    just because it comes in the form of a salary.  That is very

4    clearly not the law.

5            And so we have a suggestion as to how it would be

6    defined, which comes from the Eastern District case of *United*

7    *States v. Walsh*, and it would say that bone fide means made in

8    good faith without fraud or deceit.

9            MS. SHAPIRO:  I think that's fine, your Honor.

10           THE COURT:  That would come at the end of the second

11   paragraph on page 55.

12           MR. McKAY:  Yes, I think you would just say, "For

13   these purposes, I instruct you that bone fide means," and then

14   "bona fide" would be repeated several other times, you can

15   perhaps refer the jury back to your earlier definition.

16           THE COURT:  Okay.

17           MS. SHAPIRO:  Your Honor, could we have a moment to

18   confer?

19           THE COURT:  Yes.

20           (Pause)

21           MR. BROD:  Judge, the defense changed its position on

22   this slightly.

23           THE COURT:  On what?

24           MR. BROD:  On this language that this does not include

25   legitimate bone fide salary wages, fees, et cetera, and we

1    don't think it's necessary.  We don't think there's any dispute

2    on this point.  There's a stipulation for the federal funds.

3    There's no other evidence in the case.  It's not going to be an

4    issue --

5             MS. SHAPIRO:  Sorry, go ahead.

6             MR. BROD:  There's not going to be a dispute about

7    this point, so we ask this does not include legitimate and so

8    on language be struck.

9             THE COURT:  That entire sentence be struck?

10            MR. BROD:  Yes, your Honor.  And, of course, the

11   additional language which the government proposed moments ago.

12            MR. McKAY:  Is that on page 55 that you're striking

13   it?

14            THE COURT:  Yes, second paragraph, last sentence.

15            MR. McKAY:  So then I guess I would ask, the language

16   pops up again on 56, are they asking to strike it there as

17   well?

18            THE COURT:  The last sentence on 56.  I take it you

19   would strike it there as well.

20            MR. BROD:  Could we have just a moment, Judge?

21            THE COURT:  Sure.

22            (Pause)

23            MR. BROD:  We think the language could be kept here as

24   it is.

25            THE COURT:  Keep it both places?

1              MR. BROD:  Just on page 56, Judge.

2              THE COURT:  In other words, strike it from 55, keep it

3     on 56, and then we would add the government's language, "For

4     these purposes, bone fide means made in good faith without

5     fraud or deceit."

6              MR. BROD:  I think we can live with that, Judge.

7              THE COURT:  Okay.

8              MR. McKAY:  One other thing, on page 56, in the above

9     paragraph it says if payment was made to a third party for the

10    purpose of bribing Dean Skelos --

11             THE COURT:  I'm not with you.  Where are you on page

12    56?

13             MR. McKAY:  56, third paragraph, which begins it is

14    not necessary.

15             THE COURT:  Yes, I see it.

16             MR. McKAY:  Right before "Dean Skelos" we would delete

17    the word "bribing" and replace it with "influencing."

18    Influencing is the relevant concern here.  Bribing is a little

19    question begging.

20             THE COURT:  Yes.

21             MS. SHAPIRO:  Sorry, your Honor, to go back to this

22    but, I don't know if I heard Mr. McKay indicate where he got

23    that fraud or deceit language.  Because I just looked it up and

24    the definition is a bit different, so I don't know if he has a

25    source for that.

1          MR. McKAY:  It is 156 F.Supp.3d 374, 384.

2          MS. SHAPIRO:  What is it, though, a Southern District

3   case?

4          MR. McKAY:  Eastern District case quoting Webster's.

5          MS. SHAPIRO:  Okay.

6          THE COURT:  What is the difference in concept that you

7   found online?

8          MS. SHAPIRO:  I found a definition that talks about

9   real, authentic, genuine, true, actual.  I'm not going to

10  reargue the point, I wanted to know where he was getting it,

11  because I was seeing something different.

12         THE COURT:  Okay.  So Ms. Shapiro?

13         MR. McKAY:  Can I confirm on 56 are we replacing

14  "bribing" with "influencing?"

15         THE COURT:  Yes.

16         MR. McKAY:  Okay.

17         MS. SHAPIRO:  Your Honor, this is similar to a point I

18  made earlier, it's on the bottom of page -- sorry, I need to

19  look at the right version.

20         The bottom of page 58, the last sentence on that page,

21  "On the other hand, if you find that the government has proven

22  that Dean Skelos accepted payments or things of value intending

23  at least in part to take official action in return for those

24  payments as the opportunity arose, then this element will have

25  been proven."  Apart from the "as the opportunity arose," which

1    obviously we object to, this has the same problems as we

2    identified earlier in a similar sentence where it said "at

3    least in part," and I think --

4              THE COURT:  Claiming dual purpose.

5              MS. SHAPIRO:  No, I understand, but I think the

6    issue -- I think the Court made a change earlier, so we would

7    just want the same change.  And we can flip back and try to

8    find the page, but the concern here is just that, as phrased,

9    it seems to suggest that the public official doesn't need to

10   carry out his end of the supposed corrupt bargain, whereas the

11   law requires that he at least intend to carry it out, even if

12   it never comes to fruition.  And the Court made a change

13   earlier --

14             MR. McKAY:  We agree.

15             THE COURT:  What change?

16             MR. McKAY:  I think the change we made was to move "at

17   least in part" to after -- "in return."

18             MR. THAYAMBALLI:  That's right.

19             THE COURT:  All right.  So we're moving "at least in

20   part" to four places later.  It will now read "to take official

21   action, at least in part, in return for --"

22             MR. THAYAMBALLI:  Your Honor, I believe the last time

23   the phrase "at least in part" was put after the word "return,"

24   but I think that they are essentially the same.

25             THE COURT:  Maybe we should be consistent.

1              MR. THAYAMBALLI:  I agree.

2              THE COURT:  I will add it after the words "in return."

3     Thank you.

4              MS. SHAPIRO:  Your Honor, not to beat a dead horse,

5     but at the end of page 59 we would object to the last sentence

6     as, again, it's unnecessary to keep repeating ad nauseam so

7     many times that circumstantial evidence is sufficient.

8              THE COURT:  I understand.  I will leave the language

9     as is.

10             MR. McKAY:  Your Honor, I hate to backtrack but

11    there's one that we skipped for us, which was on page 57.  The

12    penultimate sentence on that page, "If Dean Skelos did not

13    believe his conduct was wrongful or unlawful, he did not act

14    corruptly," I'm not sure that's a precise statement of the law.

15             I think the way the Court phrased it at the last time

16    and we proposed is a little better, which is, "To act corruptly

17    means to act voluntarily and intentionally with improper motive

18    or purpose to be influenced in connection with," and then we go

19    on to cite the business or transaction language, which I

20    understand you may wish to change the official act at this

21    point.

22             And the next sentence -- sorry, I should be clear.

23             MR. GAGE:  What page, I'm sorry?

24             THE COURT:  57.

25             MR. McKAY:  What we object to is the last two

1    sentences there, "if Dean Skelos did not believe," and that

2    additionally, "corrupt intent involves a violation of some duty

3    owed to the public or the government in general."  And what I

4    would say is undoubtedly here the corrupt intent that is at

5    issue is the quid pro quo.

6         And so rather than defining it as some unspecified

7    duty, we should be specific, which is to say what the Court

8    said last time, essentially, it means to act with an improper

9    motive to be influenced in connection with a business or

10   transaction of the State of New York, or, if you will, in

11   connection with official action.  But the point is that's what

12   the corrupt intent is, it's not some nebulous violation of

13   duty.

14        MR. THAYAMBALLI:  Your Honor, while it's true that the

15   violation of duty here would be the quid pro quo, that is not

16   what the corruptly element is limited to.  And as I think we

17   explained in our objections, the definition that the government

18   just cited, "voluntarily and intentionally acting with an

19   intent to be influenced," is not sufficient.  There is already

20   an intent to be influenced element in Section 666.  Corruptly

21   is separate.  And what corruptly does is an important an idea

22   of consciousness of wrongdoing.  I think that if the Court were

23   to redefine "corruptly" in the manner the government explained

24   it would be confusing and would conflate those two elements and

25   understate the consciousness of wrongdoing.

1           THE COURT:  What if I were to take out the last two

2    sentences on page 57?

3           MR. THAYAMBALLI:  Your Honor, unless the government

4    wants to go first, the last sentence is an accurate statement

5    of the law from *United States v. Rooney*, which is a Second

6    Circuit case.  The sentence before that is also accurate.  If

7    Dean Skelos didn't believe his conduct was wrongful or

8    unlawful, then he didn't have consciousness of wrongdoing, and

9    therefore, did not act corruptly.

10          MR. McKAY:  Your Honor, our concern with that sentence

11   is not only that we think it's misleading, and I can explain

12   why, but it is also redundant of what your Honor has in the

13   first sentence, which is to act corruptly he must have been

14   conscious of his own wrongdoing.  That's exactly the concern

15   that my colleague was just describing, so I think cutting it

16   off after two sentences, as you proposed, and deleting the last

17   two would be clear.

18          MR. THAYAMBALLI:  Your Honor, I believe in other parts

19   of the charge the Court has expanded a bit on elements in order

20   to avoid confusion for the jury.  I think consciousness of

21   wrongdoing is something that is important, it is a separate

22   element, it requires more than one sentence to explain.

23          THE COURT:  Often brevity leads to one paying more

24   attention to the main point.  I think here the main point is

25   the consciousness of your own wrongdoing, and I think the

1   statement is stronger when we leave out the elaboration on it.

2   So my proposal is to delete the last two sentences on page 57.

3   I think the government says it can live with that.

4            MR. McKAY:  We can, your Honor, thank you.

5            THE COURT:  I note the defense objection.

6            MS. SHAPIRO:  Thank you.

7            MR. McKAY:  We have one more thing on 58, which was

8   just "as opportunities arise" is missing in one place, it's the

9   third paragraph, "In other words, the government must prove --"

10           THE COURT:  Right.

11           MR. McKAY:  "As opportunities arise" should be

12   included after "in exchange for payment" before the comma.

13           MS. SHAPIRO:  We object, your Honor.

14           THE COURT:  I understand.  I'm going to add it.

15           MR. THAYAMBALLI:  Your Honor, I apologize, if we could

16   go back to something the government raised.  I think we didn't

17   have a chance to respond or didn't think to respond at the

18   time.

19           On page 56, in the third paragraph, the government

20   wanted to change the word "bribing" to "influencing," so if the

21   payment was made for the purpose of influencing Dean Skelos.

22   And we object to that and we deliberately changed the language,

23   because although the statute uses the term "influence," clearly

24   more is required for a violation of 666.  There has to be a

25   quid pro quo.  We think that bribing is the better way to

1    describe it, and the Court does define it later, and as a

2    result the jury won't be confused.

3              If, on the other hand, the Court says "a payment is

4    made with the purpose of influencing Dean Skelos," there are

5    many things that are intended to influence that are not -- that

6    would not satisfy the statute; campaign contributions, for

7    example.  So as a result, we think that language is

8    prejudicial.

9              MR. McKAY:  We're just quoting the statute, your

10   Honor.  The problem with "bribing" is that it relates to the

11   entire crime as opposed to this element, which is just talking

12   about the influence on Dean Skelos.

13             THE COURT:  All right.  I'll keep "influencing" rather

14   than "bribing," given it's the language of the statute.  I

15   think we're to page 58, maybe 59, maybe even 60?

16             MR. McKAY:  On 60, your Honor, the bone fide language

17   appears again.  I don't know if the defense still wants it

18   there or not, but if they want to leave it, we just ask that

19   you cross-reference your earlier definition.

20             MS. SHAPIRO:  I think we could strike it here, your

21   Honor.

22             THE COURT:  Strike the last --

23             MS. SHAPIRO:  The last paragraph.

24             THE COURT:  -- paragraph.

25             Does the government disagree?

1          MR. McKAY:  No, that's fine, your Honor.

2          THE COURT:  We'll strike the last paragraph on page

3     60.

4          MR. McKAY:  We have two things on 61, if there's

5     nothing more on 60.  And these are just to make the same

6     changes that were made earlier when we defined these elements

7     with respect to bribery.  So in the third element we had added

8     "for himself or a third party" at the end of that element.

9          THE COURT:  Yes, I will add that.

10          MR. McKAY:  And for the sixth element, we had struck

11     that "the official act involved," and we replaced it with that

12     language which I believe was "the value of the government

13     matter to which the payment related was at least 5,000."

14          THE COURT:  So the government's proposal is to strike

15     from the last line the words "official act" and replace them

16     with "value of the government matter to which the payment

17     related was."

18          MR. McKAY:  Yes, your Honor.

19          MS. SHAPIRO:  That's fine with us, your Honor.

20          THE COURT:  Okay.

21          MR. THAYAMBALLI:  Your Honor, our next point is on

22     page 63.

23          MR. McKAY:  If we could go to 62 first.

24          THE COURT:  Yes.

25          MR. McKAY:  The last sentence there, again payments

1  made in the usual course of business, I think it's an

2  abbreviated version of the bone fide language that we had seen

3  earlier.  I guess I would inquire if the defense still wants it

4  there.  If they do, we ask that you use the same language you

5  used earlier that includes the phrase bone fide and the

6  definition rather than this shorthand.

7           MS. SHAPIRO:  We could just delete that sentence, your

8  Honor.

9           THE COURT:  Okay.  I'm deleting the last sentence on

10  page 62.

11           MR. THAYAMBALLI:  On page 63, in the fourth paragraph,

12  the Court is contrasting bribes and gratuities, and the second

13  sentence says, "To convict on a bribery theory you must find

14  that Dean Skelos had the intent to be influenced in connection

15  with some business or transaction of the State of New York."

16           We would again object to that sentence.  I think the

17  second and third paragraphs very clearly explain the difference

18  between a bribe and a gratuity.  And the fact that a gratuity

19  does not require quid pro quo, this comparison in the fourth

20  paragraph is therefore unnecessary, and we would submit

21  prejudicial again because simply referring to influence as the

22  standard for bribery is incomplete and therefore waters down

23  the quid pro quo standard.

24           MR. McKAY:  Your Honor, we do think it's useful to

25  explain the distinction between influence and reward.  It's not

1  necessarily that intuitive of a concept.

2            THE COURT:  I agree.  I will keep it.

3            I see a typo on 64, line 2.  I think we should strike

4  the word "that."

5            MR. McKAY:  Your Honor, I was going to propose

6  striking the whole paragraph.

7            THE COURT:  Even better.

8            MR. McKAY:  This is the same issue we dealt with as to

9  the other counts as well.

10           THE COURT:  Yes.  I think we should take it out.

11           MS. SHAPIRO:  Which paragraph?

12           THE COURT:  All of page 64.

13           MS. SHAPIRO:  We object.

14           THE COURT:  I'll nonetheless delete it.

15           MR. BROD:  Your Honor, on page 67 at the bottom, this

16  is on the aiding and abetting --

17           THE COURT:  Yes.

18           MR. BROD:  -- the way in which -- I just think the

19  last sentence is surplus.  It repeats the third sentence of

20  that paragraph, essentially, and thus is something of a non

21  sequitur.  The previous sentence talks about finding the

22  defendants not guilty.

23           THE COURT:  You're beginning to mumble.

24           MR. BROD:  Sorry, Judge, I think the last sentence of

25  the page could be struck without losing anything.

1      THE COURT:  Because it's redundant of what?

2      MR. BROD:  It's redundant of the third sentence of

3  that paragraph, which if you decide beyond a reasonable doubt

4  that . . . then the defendant Adam Skelos may be found guilty,

5  then the next sentence is if you do not find beyond a

6  reasonable doubt then he's not guilty, and then the final

7  sentence of the paragraph is thus, so it's redundant but also

8  it doesn't follow from the previous sentence, so it's confusing

9  and it's inconsistent with the way in which this if you do

10  find, if you don't find --

11      THE COURT:  I need to have a moment to read the page.

12      (Pause)

13      THE COURT:  Well, I think it certainly doesn't belong

14  where it is.  I'm going to -- I'm reviewing whether the concept

15  is --

16      MR. McKAY:  Your Honor, the reason we think it is

17  appropriate -- and I note this wasn't objected to in the

18  original proposal, but the reason this is appropriate is

19  because it is explaining what is not otherwise an intuitive

20  concept to the jury, which is that someone who is not a public

21  official can be found guilty if they caused a public official

22  to commit a corruption crime.  So it may be that there's a

23  better place for it than where it currently is, but we think it

24  does need to be included to crystallize that concept for the

25  jury.

1              MR. BROD:  Your Honor, I note that that point is made

2     I think throughout the section, but even right up front in the

3     first paragraph on page 65.  "Because Adam Skelos is not

4     himself a public official or an agent of New York State

5     government, you may find him guilty of Counts Three through

6     Eight only if the government proves beyond a reasonable doubt

7     that he aided and abetted or willfully caused the commission of

8     the crimes by Dean Skelos."

9              And it may be that that crops up later in the section,

10    I'm not sure, but I do think that point is made here.  So to

11    finish on it I do think is redundant and excessive because it

12    leaves the jury with an unbalanced picture, having been told if

13    you find beyond a reasonable doubt, if you don't, but then

14    again if you do.  It's just too much, Judge.

15             THE COURT:  Well, I think where it would fit, maybe a

16    more abbreviated form, would be on page 67 at the end of the

17    third paragraph, which now reads, "As I mentioned, Adam Skelos

18    can also be held liable for willfully causing another person to

19    commit a federal crime, that is, although Adam Skelos is not

20    himself a public official," et cetera, "he may be convicted if

21    he willfully caused."

22             MR. BROD:  It's okay with us, Judge.

23             MR. McKAY:  Us, too, your Honor.

24             THE COURT:  So I'm moving the last sentence on page 67

25    to becoming the last sentence of the third paragraph on page

1    67.

2              MR. McKAY:  Your Honor, going back a page to 66, the

3    fourth paragraph, the last sentence of that says -- ends with,

4    "were at the direction of Dean Skelos and were either bribes or

5    gratuities, as I have defined those terms," but that's actually

6    also referencing the extortion counts.  So we ask that either

7    be changed to reflect something like "were bribes, gratuities

8    or extortion payments, as I have defined those terms," or maybe

9    just "corrupt payments."

10             THE COURT:  Yes.  So the proposal is to add "or

11   corrupt payments" after the word "gratuities," "bribes,

12   gratuities or corrupt payments."

13             MR. McKAY:  That's fine, your Honor.

14             THE COURT:  Okay.

15             MS. SHAPIRO:  Your Honor, the next thing we had was on

16   page 68, the dual intent, no defense instruction.  Your Honor,

17   we think this is unbalanced and unnecessary and is confusing

18   because it conflates intent with motive, which of course the

19   latter is not an element.  And if the point is that you can't

20   accept bribes just to help out a family member, we proposed

21   what we believe is more neutral language that makes the same

22   point, and it would be for every count in the indictment if you

23   find that the government has proved the required elements

24   beyond a reasonable doubt, it does not matter what motivated

25   the defendant to engage in the charged conduct.

1          THE COURT:  I don't think that explains very well to

2     the jury what a dual intent is.

3          MS. SHAPIRO:  Well, I think the problem is that, as

4     phrased, this is confusing and conflates motive, which is

5     really not an issue, and intent.  So I don't know if there's

6     another way to do it, but we think that -- we think our

7     language does a better job of it.

8          THE COURT:  You're distinguishing between intent and

9     motive, is that right?

10          MS. SHAPIRO:  Correct, your Honor.  I just think this

11     is confusing, and I think if the point is simply that -- that's

12     right, we're making that distinction, so --

13          THE COURT:  If they act with a dual motive, in other

14     words, if the word intent is the problem, we can keep the

15     language by changing intent to roughly motive.  But that's not

16     what you want, I take it.

17          I understand why you're objecting, but I think that

18     it's helpful to the jury.

19          MS. SHAPIRO:  Could I have a moment, your Honor?

20          THE COURT:  Yes.

21          (Pause)

22          MS. SHAPIRO:  Your Honor, I think the sentence that we

23     have the most trouble with is the one that starts with

24     "However," which I think is sort of confusing.  What if we just

25     deleted that sentence?

1           THE COURT:  If we deleted and then begin the next

2    sentence with but something like that, "However, a defendant

3    may be found," how does the government feel about deleting?

4           MR. McKAY:  I would say, your Honor, maybe if the

5    concern is the terms "motive" and "intent," although I think in

6    this case they're co-extensive, we could change it to "However,

7    it is no defense that the defendant had --"

8           THE COURT:  Both proper --

9           MR. McKAY:  -- "both proper and improper intent."

10          MS. SHAPIRO:  I think there's some repetition there,

11   because the Court has eliminated the other redundancies that

12   were favorable to the defendant, that doesn't really add

13   anything because the very next sentence says that a defendant

14   may be found to have the requisite corrupt intent or intent to

15   defraud if he possesses a dual intent, and so it doesn't really

16   add anything that is not already captured by the second

17   sentence -- I mean the third sentence.

18          THE COURT:  I do think that it would be equally

19   helpful to the jury to strike, "It is no defense that the

20   defendant was motivated by both proper and improper motives."

21   That's basically what we're saying in the next sentence.

22          MR. McKAY:  Your Honor, that's fine.  We just keep the

23   "However," though?

24          THE COURT:  Yes.

25          MR. McKAY:  Okay.  Your Honor, on 69 there's a stray

1    reference to kickbacks.  I think we cut that elsewhere.

2          THE COURT:  Actually we left it in in an earlier page.

3    We should take it out.  44, middle of the page, first word,

4    "kickbacks."  So we would end the sentence with the word

5    "bribes" and strike "or kickbacks."

6          MS. SHAPIRO:  I have two other points on this page.

7          The first is in the nature of preservation, because I

8    know this was briefed, but we do preserve our objection and our

9    argument that a public official cannot be convicted of honest

10   services fraud or Section 666 bribery if he would have taken

11   the same official act regardless of the payment, as we argued

12   in our most recent objections, docket 385 at 100 to 101, note

13   12, our initial objections, 349-2 at 104 to 105, note 77, our

14   June 17 letter, docket number 364, and July 1st letter, docket

15   number 378 at 4 to 6.

16         I understand the Court has thought about that, but I

17   do have an issue with the language on a related point, which

18   is -- and I believe the government agrees with us or has

19   indicated in its past briefing that it did agree that if the

20   public official was already predisposed to taking the act

21   sought by the payor that that is relevant to his intent.

22         And so I make two suggestions in this regard.  Number

23   one, about five lines down there's a sentence here that says,

24   "But you may consider the lawfulness of the official act when

25   assessing the intent of the defendant."  And respectfully, the

1    request actually is that that sentence be taken out in lieu of

2    another sentence I'm going to propose.  And the point here is

3    that defense is not arguing that the lawfulness of the official

4    act, that is, that was lawful for him to cast these votes or

5    propose legislation or whatever is what reflects on his good

6    faith intent, but rather it's that this is legislation that he

7    supported for years, his vote was never in doubt.  That's the

8    relevant point.

9              So in lieu of that sentence, we propose --

10             THE COURT:  Sorry, in lieu of the one beginning "But?"

11             MS. SHAPIRO:  "But you may consider the lawfulness."

12             In lieu of that, we would propose the following,

13   "However, if the public official was already predisposed to

14   taking the official acts sought by the payor, that is a fact

15   you may consider in determining whether the payor had any

16   motive to influence the public official, and whether the public

17   official understood that the payor expected to receive official

18   actions in return."

19             This language, by the way, appears on page 101 of the

20   red line that we filed on July 3rd.

21             MR. McKAY:  Your Honor, I think we're okay with the

22   first part of that sentence, which is that if a public official

23   is predisposed to taking the official act sought, you may

24   consider that in determining -- as relevant when assessing the

25   intent of the defendant.  We think that gets the point across

1    and is sufficient.

2              I think the second part is a little bit more arguable.

3              THE COURT:  I think it makes the sentence very hard to

4    understand.

5              MS. SHAPIRO:  Sorry, I'm not entirely clear on exactly

6    what they're proposing.

7              THE COURT:  I can read what is on the screen, if you

8    want, if the public official was predisposed to take the acts

9    sought -- the official acts sought, you may consider that in

10   determining -- when assessing the intent of the defendant.

11             Do I have that right?

12             MR. McKAY:  Yes.  You might say when assessing the

13   intent of the public official.

14             THE COURT:  Yes.

15             MR. McKAY:  I think we would say instead of "if the

16   public official was predisposed," we would say "if you find

17   that the public official was predisposed."

18             THE COURT:  Yes, was predisposed.

19             MS. SHAPIRO:  Your Honor, I do think it's also

20   relevant to the state of mind of the alleged victim in the

21   sense that part of that inquiry is whether the alleged victim

22   had a reasonable fear.  And obviously we're going to argue that

23   these various alleged victims didn't have any such reasonable

24   fear because they knew that Dean Skelos had for years supported

25   the legislation they were seeking.  And I think it's relevant

1    to both.

2            MR. McKAY:  Our concern on that was twofold.  First of

3    all, I'm not sure that's exactly what they proposed.  What they

4    proposed is still focused on --

5            MS. SHAPIRO:  Focused on both.

6            MR. McKAY:  Let me say this instruction is about the

7    public official's intent and with respect to lawfulness or

8    whether or not he would have taken the same official action.

9    So now to focus this on the payor's intent we think is not

10   properly placed here.  We agree that the defense can make that

11   argument in their closing, but when we're talking about the

12   public official's intent, I'm not sure that makes sense.

13           MR. THAYAMBALLI:  Your Honor, if I may address that,

14   this instruction, as the government has proposed it, is not

15   about -- is not just about the intent of the defendant.  I mean

16   the point seems to be that you can't argue that you would have

17   done the same thing anyway, and that's not a defense with

18   respect to intent.  We are trying to explain that it is

19   relevant for a few purposes, the intent of the payor and the

20   intent of the public official, and I think stripping away of

21   the intent of payor is misleading, and it's important to

22   instruct the jury that that is a relevant consideration for

23   that element.

24           MS. SHAPIRO:  Your Honor, I noticed this, I'm not

25   quite sure how to fix it, but the title of this instruction is

1    also I think not quite right because it says unlawfulness of

2    official acts, no defense, which is not really what is relevant

3    in terms of the arguments made in this case.

4            THE COURT:  Right.  Predisposition to take, something

5    along those lines.

6            MR. McKAY:  Your Honor, we propose it to be

7    desirability of official acts, because that's the thrust of

8    this instruction.

9            THE COURT:  I think part of what is confusing here is

10   that the desirability of unlawful act in the first sentence and

11   then the last has to do with something different, which is

12   striking "and should have."  "And should have" is consistent,

13   but the fact that he would have taken the same action is

14   separate from desirable.

15           Perhaps they should be separate instructions.

16           MS. SHAPIRO:  I think, just so it's clear, our

17   argument is sort of the desirability or beneficial aspect of

18   this legislation is only -- the reason that's relevant to our

19   defense is that we're arguing that it's because of that that he

20   supported it for decades, and the fact that he supported it for

21   decades is what, in our view, is a reason the jury should

22   conclude that he wasn't selling his vote and that these

23   victims -- alleged victims couldn't have reasonably believed

24   that, for example, he would withhold support for the extender

25   legislation if Mr. Bonomo didn't do anything to help Adam.

1          So they're sort of related, but I think the ultimate

2     point is that the longstanding support and the fact that there

3     would have been such a huge problem if the legislation hadn't

4     been enacted all go to what was in both Dean Skelos' mind and

5     what would have been reasonable for the alleged victims to

6     think.  So they're sort of related.  I think they both need to

7     be in here.

8          THE COURT:  How would you phrase this?  In other

9     words, I don't recall exactly what your language would be.

10         MS. SHAPIRO:  Could we have a moment?

11         THE COURT:  Certainly.

12         (Pause)

13         MR. McKAY:  Your Honor, perhaps I can propose a

14    compromise, which the sentence the defendant wanted to strike,

15    the "but you may consider," we can say "but if you find the

16    public official was predisposed to taking the official action

17    sought, you may consider that in determining whether there was

18    a quid pro quo," and that reflects both sides.

19         THE COURT:  I think that's right.

20         MS. SHAPIRO:  Your Honor, I think we want to get

21    across in here and use the word "intent."  I don't think that's

22    sufficiently specific.  It makes the instruction more

23    unbalanced, especially because the title says -- I'm not sure

24    how the title --

25         THE COURT:  We'll have to rephrase the title.

1           MS. SHAPIRO:  But it says it's no defense, and the

2     point is, if argued a certain way, according to this

3     instruction, it's no defense, but it is relevant to the defense

4     as to lack of a corrupt intent, lack of a quid pro quo.  So I

5     don't think that works.

6           THE COURT:  Okay.  How about something like, "However,

7     that can be taken into account," et cetera.

8           MS. SHAPIRO:  When assessing the intent of the

9     defendant?

10          THE COURT:  Yes.

11          MS. SHAPIRO:  And the payor as well.  I think if you

12    added "and the payor," that would probably be sufficient, as

13    long as we changed the title.

14          THE COURT:  So would it read, "However, that may be

15    taken into account when assessing the intent of the defendant

16    and the payors," defendants plural and payors plural.

17          MS. SHAPIRO:  I think that's a good start.  We would

18    suggest adding at the end of that, in entering into the quid

19    pro quo -- into a quid pro quo.

20          THE COURT:  Does the government have a problem with

21    that?

22          MR. McKAY:  No, that's fine.

23          THE COURT:  I think it's fine.

24          MR. THAYAMBALLI:  Your Honor, the way that I'm reading

25    it on the screen, I think it says you can consider this in

I75TSKE7                          Charge Conference

1   assessing the intent of the defendant and the payors in

2   entering the quid pro quo, I think it should be conditional,

3   whether the intent of -- in assessing whether the defendant and

4   the payor intended to enter a quid pro quo.

5          THE COURT:  All right.  However, that may be taken

6   into account when assessing whether a defendant or a payor

7   intended to enter into a quid pro quo.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I755ske8                    charge conference

1           MS. SHAPIRO:  That's fine with us, your Honor.

2           MR. McKAY:  Us too, your Honor.

3           THE COURT:  Okay, good.

4           MS. SHAPIRO:  I guess we still have to fix the title.

5    I'm not sure.

6           THE COURT:  Yes.  Something along the lines of History

7    of Official Acts.

8           MS. SHAPIRO:  Yes.  Maybe it should say Relevance of

9    History of Official Acts instead of saying No Defense.

10          THE COURT:  Yes.

11          MR. McKAY:  Your Honor, perhaps just you can strike

12   "No Defense" but just say Desirability of Official Acts.

13          MR. BROD:  Your Honor, I think the issue is that it

14   goes beyond desirability.

15          MS. SHAPIRO:  I think that's right, your Honor.  As I

16   indicated earlier, it is much more than that.  In fact, in a

17   way it is more about the history.

18          THE COURT:  Yes.  We can say Relevance of History and

19   Desirability of Official Acts.

20          MR. McKAY:  Well, look.  I mean, I think we are

21   agreeing over minutia now but the point is it is no defense, it

22   is no legal defense.  It is also relevant.  So, we would object

23   if we struck no defense but then added in relevance.

24          MS. SHAPIRO:  But, your Honor, no defense is in the --

25   the point that they're making about no defense is in the very

I755ske8                        charge conference

1    first sentence.  It says it is not a defense to extortion.  We

2    don't need it in the title as well because then the title

3    doesn't capture the relevance point.

4              MR. BROD:  It may be in the title that "or," rather

5    than "and," is more appropriate.  Relevance of History or

6    Desirability.

7              THE COURT:  I think we are trying to pack too much

8    into it.

9              MS. SHAPIRO:  Your Honor, this is a very important

10   point for us.

11             THE COURT:  I agree.

12             MS. SHAPIRO:  Yes.

13             THE COURT:  I want to get it right but it is getting

14   too long to be useful.

15             MR. McKAY:  I would just say it is a title, you might

16   as well keep it neutral, just say Desirability of Official Acts

17   and then they can read the --

18             THE COURT:  That leaves out the history.

19             MS. SHAPIRO:  Your Honor, if given a choice, we would

20   rather have "history" in the title than "desirability" but they

21   should both --

22             THE COURT:  History or desirability of official acts,

23   no defense.

24             MR. THAYAMBALLI:  Your Honor, we would not like to

25   keep a no defense language, it is relevant to factual events.

I755ske8                    charge conference

1              THE COURT:  Why don't we leave it Relevance of History

2    or Desirability of Official Acts.

3              MR. McKAY:  Again, we have now -- that's the part we

4    objected to.  I realize this is getting --

5              MR. BROD:  We think that would be a great title,

6    Judge, plus it is completely neutral.

7              MR. McKAY:  Well, no, it is not neutral because it

8    suggests their relevance but leaves out the fact that it is not

9    a legal defense.

10             MR. BROD:  The first sentence is, It is no defense so.

11             MS. SHAPIRO:  I mean, the concern is that obviously

12   the Court is going to read the whole instruction but the jury,

13   I assume, is going to get a copy of these instructions so if

14   they go back to it and see that the title says "no defense," it

15   is a little bit misleading because it doesn't -- the title

16   doesn't incorporate the other piece of it.  That's the concern.

17             THE COURT:  That's right.

18             All right, can we leave the title at relevance of

19   history.

20             MR. McKAY:  How about History of Official Acts?

21             THE COURT:  I think the defense said they liked that.

22             MS. SHAPIRO:  If that's all it is, that's fine.

23             THE COURT:  Okay.  History of Official Acts will be

24   the title.

25             MR. McKAY:  Your Honor, the next point, the defense

I755ske8                        charge conference

had asked that we take out the venue instruction.  Obviously

venue is stipulated to.  We are fine with taking out the

instruction since it has the different standard of proof but I

think in light of the fact that it is stipulated to, it would

be appropriate to just have a one-sentence instruction that

says venue is appropriate in the Southern District of New York.

          THE COURT:  Just for my education, why would that be

needed?

          MR. McKAY:  Well, you never know.

          THE COURT:  Because they have to find it.

          MR. McKAY:  They have to find it.  You never know who

on the jury has heard about venue before and they say --

          THE COURT:  Yes.

          MR. McKAY:  -- was there venue?  There is no dispute

about it so it is just one sentence, just to check the box.

          THE COURT:  Okay.

          MS. SHAPIRO:  I was going to say but not only is there

no dispute, I think we have effectively waived any venue

defense if there was one so I don't think it is anything the

jury needs to find, but.

          MR. McKAY:  I think the jury does have to find venue

and if have you a juror who is thinking about venue and thinks,

gosh, this happened out on Long Island...

          THE COURT:  Think it is harmless to keep it.

          MS. SHAPIRO:  That's fine.

 1              THE COURT:  Ms. Shapiro, what is your next one?

 2              MR. McKAY:  I guess on the informal immunity

 3    instruction we had proposed a different version of it that was

 4    adapted from Sand.  It is clear the Court rejected that in

 5    favor of one more similar to or perhaps identical to the one in

 6    the original trial but, so we are not going to belabor that

 7    point but I do think that this instruction is more unbalanced

 8    than the Sand.  For example, the Sand instruction specifically

 9    suggests saying such testimony should be received by you with

10    suspicion and you may give it such weight, if any, you believe

11    it deserves.  That concept, I think, is not adequately covered

12    here, so we would just request that that language be added.

13              THE COURT:  I have never given a charge with the word

14    "suspicion."  I haven't even considered it because no one has

15    proposed it.  So, what is here is "with great care and viewed

16    with particular caution."

17              Would the government like to respond?

18              MR. McKAY:  No, your Honor.  We think that sentence

19    you just quoted adequately covers the concept without having

20    the loaded term of "suspicion."

21              THE COURT:  I think "suspicion" is too loaded so I

22    note your objection.

23              MS. SHAPIRO:  Thank you, your Honor.

24              So, next thing we have is on page 75.  So, I guess the

25    main point here, which we briefed in both our original requests

I755ske8                        charge conference

1    to charge and objections and the more recent ones filed on

2    Tuesday, is that we think this is unnecessary and that this

3    type of instruction is generally given in 371 conspiracy cases

4    where there is an overt act requirement.  And it is important

5    that the jurors understand that with respect to the overt act,

6    the particular defendant doesn't have to have committed any

7    overt act but we think it is irrelevant here and it is

8    unnecessary and confusing and we don't think the Court should

9    give a Pinkerton instruction which is basically what this

10   amounts to.

11            So, we object to it.

12            THE COURT:  Would the government object to omitting

13   it?

14            MR. McKAY:  We would, your Honor.

15            This is a fairly standard instruction in conspiracy

16   cases which this is one.  It is certainly not limited to

17   proving an overt act which is the 371 conspiracy but we do have

18   two conspiracy counts, the defendants are alleged to be

19   co-conspirators and all sorts of defendants' statements came in

20   at this trial.  They, of course, were admissible both against

21   the person speaking them but also against their co-defendant as

22   co-conspirator statements and so we think this is actually

23   extremely important and helpful and inaccurate.

24            MS. SHAPIRO:  Your Honor, obviously the admissibility

25   of the co-conspirators' statements is, you know, no longer in

1    dispute, the jury has heard them, they can consider them, we

2    are not disputing that.  The problem with this instruction is

3    that when you have conspiracies like the two that are charged

4    in this case, neither of which requires an overt act, the only

5    elements are the agreement and the defendant's intent and it is

6    hard to see how the statements of another co-conspirator that

7    the defendant doesn't even know about could shed any light on

8    the defendant's intent to join the unlawful agreement and the

9    reason, as I mentioned earlier, the reason this language is

10   standard in most conspiracy cases is because the vast majority

11   of conspiracy cases tried in this district involve a 371 count

12   which does have an overt act element and that's what this is

13   relevant to.  It can't possibly be relevant to the defendant's

14   own state of mind if it is some statement that a co-conspirator

15   supposedly made that he wasn't even aware of.  It doesn't make

16   sense and it is confusing, it is unnecessary in this context.

17              MR. McKAY:  Your Honor, that's actually not the law.

18              In a conspiracy, the reasonably foreseeable acts and

19   statements of any member of the conspiracy committed in

20   furtherance are attributable.  That's important in this case

21   because there are all sorts of statements made by one

22   co-conspirator that the defendant are claiming another

23   co-conspirator didn't make or wasn't responsible for.  But, if

24   those are the reasonably foreseeable statements of a

25   co-conspirator, they do come in against him so the hostage

I755ske8                         charge conference

1   e-mail is one of but very many examples.  And so, this is

2   necessary to explain that concept to the jury.

3            THE COURT:  I will leave it in.

4            MS. SHAPIRO:  Well, we object, your Honor.

5            THE COURT:  Over objection.

6            MS. SHAPIRO:  Thank you.

7            MR. McKAY:  Your Honor, the prior page 74 you noted

8   that preparation of witnesses is if applicable.

9            THE COURT:  Yes.

10           MR. McKAY:  We think that should be included.

11           THE COURT:  Yes.

12           MR. McKAY:  I don't think there was objection.

13           THE COURT:  Right.  I will include page 74,

14   preparation of witnesses.

15           MR. THAYAMBALLI:  Your Honor, if I could amplify the

16   record on that, acts of statements of co-conspirators' point?

17   I know have you ruled on that.

18           The government has said that there are certain pieces

19   of evidence in this case that show that statements were made

20   that were reasonably foreseeable to one of the other

21   defendants.  I don't see how that has anything to do with the

22   element of the conspiracy which is that the defendant entered

23   into an agreement or -- whether there was an agreement, whether

24   the defendant entered into an agreement, the foreseeability

25   point presupposes the existence of a conspiracy.  So, I don't

1   see how you can prove that a defendant intentionally entered

2   into a knowing agreement to violate the law by looking at some

3   foreseeable statements that someone else made.

4               THE COURT:  Thank you.

5               MR. McKAY:  Judge, the next two, 77 and 78.

6               THE COURT:  Yes.

7               MR. McKAY:  False exculpatory and similar acts, we

8   will defer to the defense on this.  We are happy to leave these

9   in or to take them out.  We will defer to defense.

10              MS. SHAPIRO:  Your Honor, I think they should be taken

11  out.

12              THE COURT:  Okay.  I am striking page 77, false

13  exculpatory statements and page 78, similar acts.

14              MR. McKAY:  Your Honor, the next thing is we had asked

15  for an instruction on particular investigative techniques.

16  That did not appear in the Court's draft, we would ask that the

17  Court include it in the draft.

18              THE COURT:  It was taken out because I couldn't

19  remember how that had come up.

20              MR. McKAY:  It came up in a lot of different areas.

21              So, the most memorable example I have is when there

22  was a lot of cross-examination about how the FBI chose to have

23  Bjornulf White meet Adam Skelos at a bar rather than a coffee

24  shop.

25              THE COURT:  Yes.

I755ske8                    charge conference

1              MR. McKAY:  The very clear import of that was improper

2    conduct by the FBI.

3              THE COURT:  Yes.

4              MR. McKAY:  So, that was but one example and so we do

5    think that it is appropriate to have this instruction.

6              THE COURT:  I think you are right.

7              Any objection?

8              MR. BROD:  Judge, because it is not in the hard copy

9    document I don't have it in front of me.  I would like another

10   opportunity to go back and take a look at it.  So, if we could

11   circle back to this?

12             THE COURT:  Yes.

13             MS. SHAPIRO:  Your Honor, we just have one other

14   thing, item on page 85 and the persons not on trial.  We had

15   proposed some additional language that was taken from Sand and

16   we think it is particularly appropriate in this case because

17   there were so many witnesses with non-prosses.  It is from the

18   Sand instruction 3-4.

19             The sentence that begins:  In addition, you may not

20   speculate as to the reasons why other persons are not

21   defendants in this trial.  We would propose adding the

22   following:  Comma, except that as explained above, you may

23   consider whether a witness' testimony should be believed

24   because he has been granted a non-prosecution agreement.

25             MR. McKAY:  Your Honor, we think that's a bit of a

1   nonsequitur.  This is talking about persons not on trial, not

2   about witness credibility.  Your Honor has already given a

3   lengthy instruction on informal immunity and the way that they

4   should assess those witnesses' credibilities, so we think this

5   is already covered and a nonsequitur here.

6           THE COURT:  I agree.

7           MS. SHAPIRO:  Thank you, your Honor.

8           THE COURT:  Was that your last point?

9           MS. SHAPIRO:  It was, yes.  Believe it or not.

10          MR. McKAY:  I was hoping the defense could tell us

11   whether we needed page 88 or 89.

12          MS. SHAPIRO:  I will let Mr. -- do you want me to?

13          MR GAGE:  Go ahead.

14          MS. SHAPIRO:  So, and we are not being cute, we are

15   being instructed by our client.  Dean Skelos still hasn't

16   decided and he won't make a final decision until he hears the

17   other defense witnesses but he may testify, just to be clear,

18   so.

19          THE COURT:  Thank you, and Adam.

20          MR. BROD:  Judge, we intend to have one more

21   conversation with our client at the conclusion of this

22   conference but, you know, I am not going to put anything on the

23   record at this point.

24          MR. McKAY:  Your Honor, so I guess the only thing we

25   would say in response to that -- we understand the defense's

1    position -- is that with respect to both defendants,

2    particularly Adam Skelos, there are unbriefed issues as to the

3    scope of cross-examination if he testifies.  As to Dean Skelos,

4    there are some briefed issues that we would need to resolve.

5    Obviously we would need time to prepare.  So, we just ask two

6    things.  One, if the defendants aren't prepared to give us a

7    decision until the close of the other witnesses, just that we

8    have assurance that we will have the time we need to, A,

9    prepare for those cross-examinations; and B, file any motions

10   that may arise related to their testimony.

11             THE COURT:  I will do that.

12             MS. SHAPIRO:  Your Honor, I think it is unlikely that

13   we would, if anyone testifies, any of the defendants, that we

14   would get to the cross on Friday anyway, right?

15             THE COURT:  It is a non-point.

16             MS. SHAPIRO:  I thought there was only one issue as to

17   Dean Skelos which was fully briefed already which has to do

18   with the law firm.

19             THE COURT:  Well, I'll go with what the government

20   wants, in other words if they make a showing that they need

21   time I will give them time.

22             MR. BROD:  I mean, there is one motion which

23   Mr. Zolkind and McKay have told us they may intend to file with

24   respect to Adam Skelos.  I told Mr. Zolkind kind earlier that

25   we are going to tell him at some point after this conference

1   this evening, after we have had the discussion with our client,

2   whether he intends to testify or not and that should resolve

3   that issue.

4           MR. McKAY:  That's fine, your Honor.

5           And just with respect to the scheduling of this, if

6   the defense witnesses finish Friday morning and Dean Skelos is

7   prepared to testify Friday afternoon, we would just have two

8   issues.  One is, first of all, I think they're right, we

9   probably wouldn't get to cross-examination until Monday so that

10  may moot one of the issues, but the other is that we still have

11  no defense exhibits for any witness, let alone Dean Skelos.  If

12  there are a substantial number of exhibits that may be coming

13  in through him, we will need to get notice of those so we can

14  object, if necessary.

15          THE COURT:  I will give you the time you need to do

16  that.

17          MR. McKAY:  Thank you, your Honor.

18          THE COURT:  Shall we go back to conscious avoidance?

19          MR. McKAY:  I had one last thing.

20          THE COURT:  Yes.

21          MR. McKAY:  Which is page 86, there was an instruction

22  on outside income.

23          THE COURT:  Right.

24          MR. McKAY:  With respect to a very, very brief snippet

25  in that one recording I don't think there was any mention of

I755ske8                      charge conference

1    Dean Skelos' outside income.  Obviously, if he testifies that

2    may change but, as of now, I'm not sure if this is necessary or

3    not so I would ask the defense's position.

4              THE COURT:  Right.

5              MS. SHAPIRO:  I think that's fine.  I think it is

6    unnecessary now.  Obviously if he testifies and the Court rules

7    that he can be crossed on that, then it is a different story.

8              THE COURT:  Okay.  So, at this point I'm striking

9    outside income, striking outside income on page 86.

10             Do you have a preference as to where I insert venue?

11   Toward the end, I take it

12             MR. McKAY:  Anywhere in the end there is fine.

13             THE COURT:  So, on conscious avoidance I have some

14   questions.

15             MR. McKAY:  Your Honor?

16             THE COURT:  Yes.

17             MR. McKAY:  Your Honor, if I may, in what is the

18   seemingly unlikely event that we begin our closing tomorrow, I

19   should probably go start working on it.  Mr. Diskant is going

20   to handle conscious avoidance.  If it is all right, I am going

21   to take my leave.

22             THE COURT:  I wouldn't force anyone to close tomorrow

23   after the day we have had today so if you don't want -- if you

24   want to have a shorter day and not close tomorrow, that's all

25   right.

I755ske8                      charge conference

1        MR. McKAY:  I appreciate that, your Honor.  I think

2    perhaps we will see what the timing is like.  If the defense

3    rests at 11:00, I wouldn't want the jury to only have been here

4    for an hour and a half.  I could get a chunk of the closing

5    done.  But, let's see how far I get tonight.

6        THE COURT:  Okay.

7        MR. McKAY:  Thank you.

8        THE COURT:  Good.  We will take up conscious

9    avoidance.

10       MR GAGE:  Your Honor, if I may?  I would also like to

11   be excused.

12       THE COURT:  Yes.

13       MR GAGE:  Thank you.

14       THE COURT:  Would those of you who are here be ready

15   to deal with conscious avoidance or should we wait until we

16   have the men who are leaving?  I think I will begin with the

17   government.

18       MR. DISKANT:  We certainly are ready to proceed.  It

19   may be helpful to hear the Court's questions and we will do

20   what we can.

21       THE COURT:  Okay.

22       Does the government have an idea of where a jury could

23   acquit Dean Skelos if the conscious avoidance charge were not

24   given but would convict him if this they understood the concept

25   of conscious avoidance?

1          MR. DISKANT:  Yes.  I think that -- so, I think with
2     respect to the PRI scheme, which is what we have talked about a
3     lot, the defense argument has been all along that Anthony
4     Bonomo was giving this job to Adam Skelos and was allowing Adam
5     Skelos to continue to have the job out of some combination of
6     his friendship with Dean and his personal fondness or sympathy
7     for Adam Skelos.  The government's response to that has been
8     multi-faceted but, particularly, with respect to Anthony
9     Bonomo's corrupt intent, that is, the bribe payor's, the
10     extortion victim's intention, our opinion all along has been
11     the strongest corroborative evidence of Anthony Bonomo's
12     testimony has to do with the facts and the circumstances
13     surrounding Adam Skelos employment -- the fact that he lashes
14     out at his supervisor, the fact that he is not showing up, the
15     fact that he never gets a license and doesn't seem to be taking
16     the test all that seriously.  Absent a conscious avoidance
17     instruction, a juror could think, well, you know, Dean Skelos
18     didn't ask a lot of questions and so therefore when he said
19     work it out, he didn't have a whole lot of information,
20     particularly given Ms. Shapiro's cross-examination of Al
21     D'Amato which I think was intended to draw into question just
22     how much information, how many details about the circumstances
23     surrounding that employment were actually provided to Dean
24     Skelos.
25          I think the same could be said of the other two

1    schemes which is that there have been defense arguments about

2    the circumstances as they come from the bribe payor's

3    perspective or the extortion victim's perspective that Dean

4    Skelos may not have been aware of.  The response to that is the

5    conscious avoidance instruction, is that if there is sufficient

6    facts from which Dean Skelos was on notice that there is

7    something wrong here and he failed to ask additional questions,

8    the law doesn't allow him to insert that as a defense.

9              Now, let me be clear, I said it before and I want to

10   reiterate it:  The government has no intention of using

11   conscious avoidance with respect to the defendant's intention.

12   We agree that would be inappropriate.  We have to prove, based

13   on other evidence, that the defendant intended to be

14   influenced, that the defendant intended to take official action

15   in return for what PRI was doing.  So, this is only from the

16   bribe payer's perspective to complete the story.

17             THE COURT:  I don't understand your last sentence.

18             MR. DISKANT:  So, there obviously are two components

19   to the quid pro quo.  Right?  And we have to show on the one

20   hand what Dean Skelos' intent was.  Extortion is, in some

21   respects, a slightly easier example which is does Dean Skelos

22   intend to be extracting a payment in return for some sort of a

23   threat of official action.  On that we carry the burden of

24   proving direct, actual knowledge.  We can't use --

25   circumstantial evidence is obviously appropriate but we can't

I755ske8                          charge conference

1   use the buried-his-head-in-the-sand conscious avoidance side of

2   it.

3              With respect to the bribe payor's perspective and some

4   of the arguments the defendants have been making about what

5   Dean Skelos thought of the bribe payor's perspective, this is

6   just an old friend, this is someone who has sympathy on my son.

7   In connection with those arguments, in connection with that

8   component of the scheme we are entitled, we believe, to a

9   conscious avoidance instruction, that is, it is not a defense

10  that Dean Skelos didn't ask more questions about why his son

11  was continuing to have a no show job at PRI.  He didn't find

12  out more information about what it is his son was actually

13  doing for the payments or the circumstances surrounding them.

14             MS. SHAPIRO:  Your Honor, can I respond to that?

15             THE COURT:  Yes.

16             MS. SHAPIRO:  The problem with that is intent and

17  knowledge are two different things and it is one of the

18  problems.  But, I would just also add that there has been

19  evidence from both Anthony Bonomo and Senator D'Amato but

20  particularly Anthony Bonomo that he actually told Dean Skelos

21  that Adam Skelos was not showing up for work.  And, Mr. D'Amato

22  also testified that he said that to Dean Skelos, that he said

23  he was being disruptive.  I tried to call some of his

24  credibility on those points into question but the point is

25  there is evidence that he was actually told about this.  We may

1    dispute the credibility of that evidence but there is no

2    evidence that, you know, he was sort of on notice of the high

3    probability that Adam wasn't showing up but deliberately didn't

4    ask further questions.  But, I think more importantly, the

5    point is did he know that the bribe payor, the alleged bribe

6    payer here was only giving Adam, continuing to employ Adam

7    because he thought he needed to do that in order to influence

8    Dean Skelos.

9         So, I just think it's completely inapposite in this

10   context and, again, the government has not cited a single

11   public corruption case where this kind of an instruction was

12   approved so it is just not appropriate here, it is going to be

13   confusing, and I think Court's own confusion with some of the

14   government's arguments here illustrates the point because if

15   the Court and frankly at least myself on the defense table

16   cannot fully understand what the government is saying, I

17   respectfully submit it is inconceivable that the jury is going

18   to understand how this applies in this case.  It just muddies

19   the water and they have got a very straightforward case here,

20   your Honor.  You know we are going to dispute it, obviously,

21   but this is not -- this is just simply not appropriate here and

22   it is going to be incredibly prejudicial and confusing.

23        MR. DISKANT:  Can I propose something, your Honor?

24        The government doesn't intend, as Mr. McKay indicated,

25   the government does not intend to get into this issue in its

closing which Mr. McKay will be delivering.  I am prepared to

represent that I also will not get into this issue in my

rebuttal so that the Court can effectively reserve on this

issue and I think we should watch how the defendants argue to

the jury.  Because if they are making certain arguments about a

lack of knowledge I think they do in fact invite this

instruction because I think there is a factual predicate for

it.  I don't think it is as confusing as Ms. Shapiro is making

it out to be.  And if, by contrast, they choose not to make

those arguments then we can withdraw our request for the

instruction and that will be that.

          THE COURT:  That makes sense to me.

          MR. KENNEY:  I just want to add, your Honor, I was in

a case where this was an issue and argued in the Second Circuit

not too many years ago.  I cannot fathom what knowledge the

government is saying that would warrant argument about

knowledge or that such an argument would be made.  But, I am

perfectly happy to accept the proposal of considering the at a

later point.

          THE COURT:  I would like to -- yes.

          MR. THAYAMBALLI:  I would like to add one thing which

is that the knowledge that the government is referring to is

somewhat of a red herring because the instruction -- this is an

instruction for conscious avoidance in a conspiracy context.

It says that the defendants have to be consciously avoiding

knowing what the objectives of the conspiracy are.  I'm not
sure how the facts of this case were frankly or conceptually
defendants can consciously avoid knowing that they're part of a
bribery scheme if they're public officials or if one of them is
a public official.  He would know whether he is accepting a
bribe or not, or whether he has agreed to accept a bribe or
not.  That's the distinction.

          MR. BROD:  The point, since everybody is making their
points, is just that.  We cannot consciously avoid the fact
that you are a party to an agreement, which is the essence of
every single charge in this case.  It is not possible.

          THE COURT:  I understand that point.  I want to try to
see if I can capture anything different here.  Give me a
moment.  (pause)

          Well, I think we can leave it at the compromise
position.

          MS. SHAPIRO:  The compromise meaning the Court will
reserve?

          THE COURT:  Yes.

          MS. SHAPIRO:  That's fine, your Honor.  Obviously we
don't object to that.

          THE COURT:  Okay.  Anything else?

          MR. BROD:  I was just going to see, Judge, if I could
take a look at this instruction on investigative techniques.

          THE COURT:  Sure.  I think my law clerk might be able

1    to help.

2            I think it is straight out of Sand.  My law clerk has

3    it, if you would like.

4            MR. BROD:  Thank you very much.

5            (pause)

6            MR. BROD:  Judge, we have no problem with an

7    instruction being given on this point but we would object to

8    the last two sentences of the instruction which, I believe, do

9    not appear in Sand.  These are the sentences about no

10   particular techniques needing to be used.  I think that just

11   invites speculation and then the sentence about the government

12   not being on trial.  There has been no suggestion that the

13   government is on trial and just emphasizes the position that

14   the defendants are in.  I don't think it is necessary, it

15   doesn't add anything, and frankly, the entire instruction is

16   simpler with just the first couple of sentences.

17           THE COURT:  Well, a compromise might be to strike "the

18   government is not on trial," and keep "law enforcement

19   techniques are not your concern."

20           MR. DISKANT:  Your Honor, I will note that Mr. Brod

21   himself did a great deal to put the FBI on trial at this case

22   to the point where the Court had to give an instruction at one

23   point so I think, as drafted, it is not inappropriate.

24           THE COURT:  Well, I --

25           MS. SHAPIRO:  Your Honor, we are fine with the Court's

I755ske8                        charge conference

1    suggestion.

2              THE COURT:  I am going to go back and see why I do

3    this all the time.  I thought it was straight from Sand.  I

4    will reserve on that as well.

5              Have a good evening and thank you for being so

6    prepared.

7              MS. SHAPIRO:  Thank you, your Honor.

8              MR. DISKANT:  Thank you, your Honor.

9              MR. BROD:  Thank you, your Honor.

10             (Adjourned to Friday, July 8, 2018 at 9:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                            Page

3    NICHOLAS BARRELLA

4    Direct By Mr. Diskant  . . . . . . . . . . .1975

5    Cross By Mr Gage . . . . . . . . . . . . . .2028

6    Cross By Mr. Brod  . . . . . . . . . . . . .2046

7    TRACEE MERGEN

8    Direct By Mr. McKay  . . . . . . . . . . . .2079

9    Cross By Ms. Angel . . . . . . . . . . . . .2088

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       GOVERNMENT EXHIBITS

 2    Exhibit No.                                     Received

 3    1434     . . . . . . . . . . . . . . . .1975

 4    704, 712, 713 and 716 through 719   . . . .1978

 5    806   . . . . . . . . . . . . . . . . .1986

 6    809   . . . . . . . . . . . . . . . . .1988

 7    810   . . . . . . . . . . . . . . . . .1989

 8    936   . . . . . . . . . . . . . . . . .1994

 9    825   . . . . . . . . . . . . . . . . .1996

10    828   . . . . . . . . . . . . . . . . .1998

11    833   . . . . . . . . . . . . . . . . .1999

12    838 and 841   . . . . . . . . . . . . .2000

13    842   . . . . . . . . . . . . . . . . .2003

14    927   . . . . . . . . . . . . . . . . .2008

15    2621   . . . . . . . . . . . . . . . . .2019

16    302   . . . . . . . . . . . . . . . . .2023

17    2308   . . . . . . . . . . . . . . . . .2025

18    1   . . . . . . . . . . . . . . . . . .2077

19    103, 104, 105, 107, 109-A, 110, 111,  . . . .2078

20            113, 114, 115-B through 115-D,

21            117, 119

22

23

24

25
```

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 2010-A, 2010-B, 2011-A through 2011-D,  . . .2078

           2011-F through 2011-I,

           2011-I-1, 2011-J, 2011-K,

           2012-A, 2012-C, 2012-E,

           2012-F, 2012-F-1, 2012-G,

           2012-H, 2012-I and 2012-J,

           2013-A, 2013-C through 2013-F,

           2014-B, 2014-C, 2015-A through

           2015-E

 3303-B    . . . . . . . . . . . . . . . . .2081