**GAGE SPENCER & FLEMING LLP**

ATTORNEYS AT LAW

410 PARK AVENUE

NEW YORK, NEW YORK 10022

TELEPHONE: (212) 768-4900
FACSIMILE: (212) 768-3629
E-MAIL: info@gagespencer.com

**FILED UNDER SEAL**

March 27, 2020

<u>Via Email</u>

The Honorable Kimba M. Wood
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 1910
New York, New York 10007-1312

      **Re:**   <u>*United States v. Dean Skelos*,
                   S1 15 Cr. 317 (KMW)</u>

Dear Judge Wood:

        As Your Honor knows, we represent Dean Skelos. We write to respectfully move this Court pursuant to the recently amended 18 U.S.C. § 3582(c)(1)(A)(i) for an order modifying his sentence to home confinement for the balance of his term of incarceration based upon his age and prediabetic condition, the combination of which make him uniquely susceptible to the COVID-19 virus pandemic. As set forth in more detail below and in the accompanying opinion of Dr. Richard Goldberg, Mr. Skelos's condition renders him particularly susceptible to infection and death from COVID-19 if he remains in a facility operated by the Bureau of Prisons ("BOP"). *See* Medical Report from Dr. Richard Goldberg re: Dean Skelos (The "Goldberg Report" is annexed hereto as Exhibit 1). Our ultimate concern is that risking Mr. Skelos' exposure to such a

disease amounts to excessive and undue punishment far beyond what we believe Your Honor intended in sentencing Mr. Skelos.

On March 25, 2020, Senators Cory Booker and Kamala Harris introduced S.3579 "The Emergency Community Supervision Act of 2020" before the Senate Judiciary Committee which, if passed, will require the release of individuals such as Mr. Skelos from federal facilities. In introducing the bill, Senator Booker explained the threat facing incarcerated individuals:

> "For thousands of people behind bars, contracting COVID-19 is tantamount to a death sentence. Those in prison and jail tend to have much higher rates of underlying health issues than the general public, and the conditions of confinement make social distancing virtually impossible. We have an obligation to do everything we can to prevent the spread of this deadly disease, and that means moving certain incarcerated people to community supervision when they don't pose a violent threat to our communities and are facing high risk of serious illness or death from COVID-19."[1]

Senators Booker and Harris recognize that individuals such as Mr. Skelos, who is 72 years old and has a compromised immune system, should not face the risk of death because of a global pandemic. We hope this Court will recognize the same.

On October 24, 2018, this Court sentenced Mr. Skelos to a term of 51 months imprisonment, followed by one year of supervised release. He self-surrendered on January 8, 2019. Mr. Skelos is presently housed at the satellite camp at FCI Otisville and his scheduled date of release is August 20, 2022.

**The National Emergency**

The United States is in the midst of a pandemic due to COVID-19, the scope of which is well-known to the Court. On March 13, 2020, the President declared a national

---

[1] https://www.booker.senate.gov/?p=press_release&id=1098

emergency and has since described the pandemic as putting the United States on a "War Time" basis. On March 20, 2020, New York Governor Andrew Cuomo issued the "New York State on PAUSE" executive order that includes a directive that all non-essential businesses statewide must close in-office personnel functions, and temporarily bans all non-essential gatherings of individuals of any size for any reason. Unlike any other modern pandemic, there is no medication for treatment of the coronavirus. All the protocols of the CDC, NIH, and the BOP for dealing with pandemics in the past are non-availing. Both federal and state officials have recommended that the only way to flatten the curve and reduce the extent of the COVID-19 pandemic, is to create social distancing, and to otherwise avoid contact with groups. The necessity of these precautions is heightened for the elderly and those with compromised immune systems.

## The Coronavirus and Federal Prisons

The risk of the coronavirus is extremely high in prisons because so many prisoners are housed in close quarters without access to basic palliative measures like hand sanitizer. As Your Honor is aware, there is no cure or vaccine for COVID-19 and, for those most vulnerable to the disease, the only true defense is to avoid all potential carriers. Mr. Skelos is currently in an environment where there can be no social distancing. There can be no quarantine. The BOP acknowledged this circumstance in its March 13 COVID-19 Action Plan[2] noting "that the population density of prisons creates a risk of infection and transmission for inmates and staff." [3]

---

[2] http://www.bop.gov/resources/news/20200313_covid-19.jsp

[3] "The Bureau of Prisons has established protocols for infectious diseases and, in fact, have a several part Pandemic Influenza Plan to assist with Surveillance and Infection Control. There are no apparent references to unusual pathogens such as COVID-19. Universal Precautions (standard precautions), Work Practice Controls, Personal Protective Equipment will only do so much to protect the inmate population." The Goldberg Report, at 1.

Our concern is exacerbated because the coronavirus has already begun to infiltrate prison facilities. There are confirmed cases of coronavirus at FCI Berlin in New Hampshire, FCI Yazoo City in Mississippi, FCC Oakdale in Louisiana, and BOP Designation & Sentence Computation Center in Texas. Inmates have tested positive for COVID-19 at the Metropolitan Detention Center in Brooklyn, New York, and the Metropolitan Correctional Center in New York, New York.[4]

The risk that the disease spreads to FCI Otisville, and that Otisville is unable to adequately contain the virus, is real and substantial. Hand-sanitizers, gloves and masks are scarce for hospitals, and are non-existent in the BOP. The likelihood of inmates being infected will also increase because staff come and go each day and risk exposure to the virus outside of the facility. In addition to staff, vendors, contractors, mail carriers, and, in limited circumstances, attorneys are still permitted at Otisville.[5] Any could be carriers of the disease. Further, a significant percentage of carriers of the disease are either asymptomatic or do not manifest symptoms for a number of days. Accordingly, there is significant risk that individuals may unknowingly expose the Otisville population. There is further a heightened risk of the virus spreading due to the close proximity of people and frequent foot traffic within BOP facilities. The inmates in the Otisville camp have an open communal living area in cubicles and dormitories with bunk beds. The rating (distance between inmates' beds) is approximately 1½ feet. The bathrooms are communal, and there is no place to isolate oneself from other inmates. The very designs that make prisons manageable also

---

[4] https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons

[5] Many of those outsiders may be coming from New York City, the virus' domestic epicenter, which raises an additional risk of exposure.

make them uniquely susceptible to a disease as invidious as coronavirus. Under these conditions, particularly should the inmates be held in "lockdown," there can be no social distancing and there can be no quarantine.[6]

It seems clear that there will be insufficient staff and health services that can be provided to address any outbreak of the virus among the inmates at FCI Otisville. The Health Services at Otisville has no rooms in which inmates can be quarantined. At Otisville, "quarantined" individuals are to be placed in the Segregated Housing Unit ("SHU"), however, they are not truly segregated as they are in the same area as others already in the SHU for disciplinary matters. The sad reality is that Otisville FCI is ill-equipped for the pandemic and little can be done to contain the spread of the virus when it enters the community. As the former executive director of the Colorado Department of Corrections describes: "These prisons are bacteria factories. I don't think people understand the gravity of what's going to happen if this runs in a prison, and I believe it's inevitable. You're going to see devastation that's unbelievable."[7]

---

[6] As reported in the Washington Post on March 17, Josiah D. Rich, a physician and professor of medicine and epidemiology at Brown University in discussing the problems associated with the spread of the virus in prison noted: "[Y]ou have an artificial environment which is at a high risk for transmission…the same you have in military barracks and dormitories." The Post also reported that Joe Rojas, southeast regional vice president for the Council of Prison Locals advised that officers are not being provided with basic protective gear and supplies. Most are bringing in their own alcohol wipes and hand sanitizer-if they are able to buy the products. Masks, he said, are also in short supply. https://www.washingtonpost.com/national/jails-and-prisons-suspend-visitation-to-keep-coronavirus-from-spreading/2020/03/16/0cae4adc-6789-11ea-abef-020f086a3fab_story.html CBS has also reported on the federal prison system: "At the Tallahassee Federal Correctional Institution, prison employees told CBS News that officers charged with moving prisoners do not have access to protective gear. Employees said the facility has 60 masks to be shared among 200 employees, no soap in multiple staff restrooms, a lack of hand sanitizer and a supply of gloves that may only last through next week." https://www.cbsnews/coronavirus-prison-federal-employees-say-conflicting-orders-putting lives-at-risk-2020-03-19.

[7] https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/03/25/prisons-are-bacteria-factories-elderly-most-at-risk

**Dean Skelos' Age and Health Condition Heighten the Need for a Modified Sentence**

Mr. Skelos is at a heightened risk for infection given his age and the fact that he has prediabetes, among other health issues. Continuing to require Skelos to be in a prison facility will result in an unnecessary risk of his exposure to COVID-19 and an unfair risk to his life, in addition to the added mental toll of incarceration during a pandemic given his susceptibility to the virus. As Your Honor described at Mr. Skelos' sentencing, "imprisonment takes a toll on everyone, but it is physically harsher for the elderly, and it is emotionally harsher for them in that there is less time in their lives to look forward to when one is released." Doc. No. 477, at 30. We do not seek to eliminate Mr. Skelos' punishment, rather we endeavor to make sure that he is able to live beyond the time of his incarceration.

On March 20, 2020, Governor Cuomo announced "Matilda's Law" to protect New York's most vulnerable populations – including individuals age 70 and older, those with compromised immune systems, and those with underlying illnesses – further emphasizing that age is a critical factor in assessing susceptibility to the coronavirus. Further, for reasons not yet fully understood by scientists, men appear to be approximately 50% more likely to die than women after contracting coronavirus.[8] Mr. Skelos is a 72 year old male and thus at high risk to COVID-19 even before considering his additional medical complications.

Dr. Susan Bleasdale, a spokesperson for the Infectious Diseases Society of America, said that all types of diabetes can increase the risk of complications from a COVID-19 infection. "Diabetes affects the immune system. Variability in blood glucose [sugar] affects the cells that help fight off infections," she explained. The main types of diabetes include:

---

[8] https://www.cnn.com/2020/03/24/health/coronavirus-gender-mortality-intl/index.html

- Type 1 diabetes.

- Type 2 diabetes.

- Prediabetes[9]

A consulting physician, Dr. Richard Goldberg, confirmed that Skelos suffers from Prediabetes and, observed:

> According to the PSR, Mr. Skelos is a 72 year old male who suffers from Hypercholesterolemia, Prediabetes mellitus, low testosterone levels, depression, anxiety and insomnia. Medications include Escitalopram, alprazolam, Ambien, and Vytorin. ..
>
> During a prediabetic state [such as Mr. Skelos' condition], the cells responsible for metabolism do not respond normally due to numerous causes now called "insulin resistance." The pancreatic response to the higher serum level of glucose in the blood is to produce more insulin to try to overcome this poor response. Eventually the pancreas cannot keep up adequate production, and a true diabetic state becomes reality.
>
> When this occurs in an adult, it is called Type 2 diabetes mellitus and is associated with an array of dysfunctions characterized by hyperglycemia and again, resulting from the combination of resistance to insulin action, inadequate insulin secretion, and excessive or inappropriate glucagon secretion….
>
> Those at increased risk are exemplified by Mr. Skelos, who is elderly and living with an immune disorder, as well as our elderly and other immuno-compromised segments of society. As we now know, those individuals like Mr. Skelos are at extreme risk should they be infected by the virus. Pneumonia caused by the virus, and the destruction of the pulmonary tree it causes, are the usual cause of death.
>
> In its response to the COVID-19 pandemic, the Centers for Disease Control and Prevention (CDC) has identified diabetics as "high risk" individuals

---

[9] https://www.usnews.com/news/health-news/articles/2020-03-18/whos-most-at-risk-from-coronavirus

>who are more likely to endure life-threatening health complications if infected with the virus. https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html Further, the American Diabetes Association states that "people with diabetes are more likely to experience severe symptoms and complications when infected with (the) virus, as COVID-19 may thrive in an environment of elevated blood glucose." The problem is not that people with diabetes are more likely to get COVID-19 than the general population, "the problem is that (they) face worse outcomes…In China, where most cases have occurred so far, people with diabetes had much higher rates of serious complications and death than people without diabetes—and generally we believe that the more health conditions someone has (for example, diabetes and heart disease), the higher their chance of getting serious complications from COVID-19." https://www.diabetes.org/coronavirus-covid-19 . In an article in Lancet, Respiratory Medicine, the authors stated, "Recent studies conducted on COVID-19 confirm that diabetes is of one of the most distinctive comorbidities of non-survivors who contracted the virus". https://doi.org/10.1016/S2213-2600(20)30116-8

The Goldberg Report, at 1-3.

Dr. Goldberg concludes that Mr. Skelos' continued incarceration at FCI Otisville creates "potentially a very dangerous place to be being elderly and with a disease such as (pre)diabetes which impairs one's ability to fight a disease such as COVID-19." *Id*., at 3.

In an open letter to all prisons, the American Diabetes Association wrote about the risks of COVID-19 to diabetics in detention facilities. They explained that "[b]ecause people with diabetes face a significant and higher-than-average risk of getting *seriously ill* if infected with the COVID-19 virus, up to and including the risk of death, criminal and civil detention centers (prisons, jails, juvenile facilities, immigration detention centers, psychiatric centers, etc) should take aggressive steps to protect both the health of these individuals and larger public health interests in our communities." (emphasis in original). The organization concluded that "officials

should explore all possible strategies to release people with diabetes and other serious risk factors related to COVID-19, and to reduce the level of crowding at the facilities."[10]

It bears emphasis that, as of March 21, 2020, just 4,846 of the approximately 175,000 people incarcerated in federal facilities are over the age of 65, and thus most susceptible to the disease.[11] Fewer still have substantial, documented medical issues such as those presented by Mr. Skelos. Even fewer of those are first time, non-violent offenders whose "good works have greatly exceeded those of most others." Doc. No.477, at 29. Under these particularized circumstances, there is little risk that Mr. Skelos' situation would create a new precedent that would undermine the importance of the sentencing guidelines or lead to unwarranted sentencing disparities. Mr. Skelos' situation is unique and presents a chance to make sure that a decent man, who committed an egregious error, is spared the risk of death in prison.

### The Emergency Community Supervision Act of 2020

On March 25, 2020, Senators Cory Booker and Kamala Harris introduced a bill before the Senate that would call for the release of the federal prison population that particularly vulnerable to COVID-19. The bill calls for the immediate placement in community supervision of individuals who, among other things, are either over the age of 50 or diabetic. Senator Harris explained:

> "Research demonstrates how dangerous coronavirus is for the elderly and those with underlying conditions or compromised immune systems. Unfortunately, many incarcerated individuals fall within those high risk categories. In the midst of this pandemic, we must take reasonable steps to prevent potential exposure to coronavirus by reducing the incarcerated population wherever possible. This bill would improve our ability to

---

[10] https://drive.google.com/file/d/1HJw5_NqtD90PLy1s9g06B1ppYlf08P2N/view

[11] https://www.bop.gov/about/statistics/statistics_inmate_age.jsp

> provide immediate and humane treatment to some of our most vulnerable."[12]

Congressman Hakeem Jeffries will introduce companion legislation in the House. He further described the purpose of the bill:

> "In the midst of the COVID-19 pandemic, we must do everything in our power to ensure the safety, health and well-being of those incarcerated as well as those working in the prison system. Incarcerated individuals have higher rates of underlying health issues than the public, and the condition of their confinement makes impossible the social distancing needed to slow the spread of COVID-19. These are extraordinary times, and we must implement lifesaving measures like the immediate release of vulnerable, non-violent individuals into community supervision to prevent a catastrophe." [13]

Mr. Skelos will be eligible for release under two distinct provisions of this bill – one because of his age and one because of his health issues –if it is passed. Mr. Skelos is precisely the sort of at-risk inmate about whom Senator Booker, Senator Harris, and Congressman Jeffries are most concerned.

## Jurisdiction

On December 21, 2018, the President signed the First Step Act into law. Among the criminal justice reforms, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to provide the sentencing judge jurisdiction to consider a defendant's motion for modification of sentence. Pursuant to the First Step Act, the Court has jurisdiction to determine whether "extraordinary and compelling reasons" warrant a sentence modification after consideration of sentencing factors under 18 U.S.C. § 3553(a) and the Sentencing Commission's policy statement on reduction of

---

[12] https://www.booker.senate.gov/?p=press_release&id=1098

[13] *Id.*

sentence in U.S.S.G. § 1B1.13. *See*, *e.g.*, *United States v. Redd*, No. 1:97-cr-00006-AJT (E.D. Va. Mar. 16, 2020) (the First Step Act "eliminated the BOP Director's role as the *exclusive* channel through which a sentence reduction could be considered by courts. Indeed, the First Step Act authorized courts to act independently of the BOP Director, upon a defendant's motion, once administrative remedies are exhausted, reflecting the First Step Act's legislative purpose and intent to expand the opportunity for a defendant to seek review (and potentially a reduction) of his or her sentence.")

We recognize that, in the ordinary course, Mr. Skelos must exhaust all administrative remedies in the BOP before applying for judicial intervention. On March 26, 2020, Mr. Skelos submitted a letter to Warden Petrucci at FCI Otisville making a request similar to the one we make here. Under BOP regulations, Warden Petrucci has 30 days to respond to such a request. The Court may waive the 30-day waiting period, or even the requirement of petitioning the BOP at all. Under the Prison Litigation Reform Act, which preceded the First Step Act and has similar administrative requirements, the Second Circuit has held that in deciding whether to waive a failure to exhaust all administrative remedies "the Court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) (holding the Court could waive a failure to exhaust). COVID-19 presents the sort of special circumstance that should merit a waiver. The exigent circumstances and risk of COVID-19 make it impossible for Mr. Skelos to potentially wait upwards of four weeks for a response. In the day since Mr. Skelos filed his request, New York State has seen a 35% rise in total deaths and a 45%

increase in cases requiring intensive care.[14] New York State reported over 6,500 new cases raising the total to over 37,000.[15] Today will be worse, and tomorrow worse still.

### Sentence Modification Authority Under 18 U.S.C. § 3582(c)(1)(A)(i)

This Court has discretion to modify the terms of imprisonment imposed in this case based on § 3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce a term of imprisonment, after consideration of the factors set forth in section 3553(a) to the extent they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction[.]" Pursuant to the requirement of 28 U.S.C. § 944(t), as authorized by 28 U.S.C. § 944(a)(2)(C), the Sentencing Commission promulgated a policy statement that sets out the criteria and examples of "extraordinary and compelling reasons" in U.S.S.G. § 1B1.13 that would encompass Skelos's medical condition and age when considered in light of the pandemic. The legal and humane remedy is for Skelos to be allowed to complete his sentence in home confinement instead of exposing him to an increased likelihood of exposure to the Coronavirus and death.

The pandemic substantially diminishes Mr. Skelos' ability "to provide self-care within the environment of a correctional facility." U.S.S.G. § 1B1.13, Application Note.1(A)(ii). Because Skelos's circumstances fall within the Sentencing Commission's standards for reduction of sentence based on his vulnerable medical condition as defined in Application Note 1 of U.S.S.G. § 1B1.13, we submit that this is another reason for the Court to grant the requested sentence and order that he be released to serve the remainder of his sentence in home confinement.

---

[14] https://www.bloomberg.com/news/articles/2020-03-26/n-y-death-toll-up-to-385-ventilators-used-as-long-as-30-days

[15] *Id.*

Allowing Mr. Skelos to serve his sentence under the continued supervision of the Bureau of Prisons at home is a reasonable request, legally supported, and has significant long term personal and public health positive implications. The Court may also consider 18 U.S.C. § 3553(a)(2)(D), which provides that the Court shall consider the need for the sentence to "provide the defendant with needed educational or vocational training, *medical care*, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553 (emphasis added). Obviously, the national emergency due to the COVID-19 pandemic was not known at the time of sentencing. Nonetheless, in light of the viru, and Mr. Skelos's current and known risk, he urges the Court to grant the relief sought.

Finally, we would note that Mr. Skelos complied with every requirement of his release on bail over the course of multiple years and properly self-surrendered. Mr. Skelos does not pose a danger or risk to the community. As Your Honor noted regarding individual deterrence at Mr. Skelos' sentencing, "there is no need for that in this case." Doc. No. 477, at 29. The Court can be confident that Mr. Skelos will comply with all the terms of any home confinement allowed by the Court.

## Conclusion

For the foregoing reasons, Mr. Skelos respectfully requests that the Court allow a modification of his sentence and allow him to serve the balance of his prison sentence in Home Confinement under the supervision of the BOP.

    Respectfully submitted,

    /s/ *G. Robert Gage Jr.*

    G. Robert Gage, Jr.

                                     <u>/s/ *Alexandra Shapiro*_____</u>

                                     Alexandra Shapiro

                                     Shapiro Arato Bach LLP

cc: All Counsel of Record (via email)